No. _____

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

IN RE: PHILIP MARTIN, et al.,

*Petitioners*.

On Petition for Writ of Mandamus to the
United States District Court for the Southern District of Florida
Case Nos. 1:25-cv-22100-RAR, 1:25-cv-22202-RAR

# PETITION FOR WRIT OF MANDAMUS

ROBBINS GELLER RUDMAN
& DOWD LLP
JOSEPH D. DALEY
ERIC I. NIEHAUS
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
jdaley@rgrdlaw.com
ericn@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN
JONATHAN A. OHLMANN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
ekaufman@rgrdlaw.com
johlmann@rgrdlaw.com

*Attorneys for Petitioners*

[Caption continued on following page.]

SILVER MILLER
DAVID C. SILVER
JASON S. MILLER
Florida Bar No.: 572764
4450 NW 126th Avenue, Suite 101
Coral Springs, FL 33065
Telephone: 954/516-6000
dsilver@silvermillerlaw.com
jmiller@silvermillerlaw.com

KELLER ROHRBACK, L.L.P.
DEREK W. LOESER
CHRIS N. RYDER
1201 Third Avenue, Suite 3400
Seattle, Washington 98101-3268
Telephone: 206/623-1900
dloeser@kellerrohrback.com
cryder@kellerrohrback.com

HERMAN JONES LLP
JOHN C. HERMAN
3424 Peachtree Road NE, Suite 1650
Atlanta, GA 30326
Telephone: 404/504-6500
404/504-6501 (fax)
jherman@hermanjones.com

*In Re: Philip Martin, et al.*
Eleventh Circuit No.

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Eleventh Circuit Rule 26.1-1, Petitioners hereby file their Certificate of Interested Persons and Corporate Disclosure Statement:

1. Ahuruonye, Hyacinth, Plaintiff/Petitioner;
2. BAM Trading Services Inc. d/b/a Binance.US, a Delaware Corporation, Defendant/Respondent;
3. Baratta, Charles, Plaintiff/Petitioner;
4. Binance Holdings, Ltd d/b/a Binance, Defendant/Respondent;
5. Carlton Fields, P.A., law firm for Defendant/Respondent;
6. Charmani, Thania, counsel for Defendant/Respondent;
7. Daley, Joseph D., counsel for Plaintiffs/Petitioners;
8. Dickinson Wright PLLC, law firm for Defendant/Respondent;
9. Douty, Donald, Plaintiff/Petitioner;
10. Goss, Tyler, counsel for Defendant/Respondent;
11. Herman, John C., counsel for Plaintiffs/Petitioners;
12. Herman Jones, LLP, law firm for Plaintiffs/Petitioners;
13. Kaufman, Evan J., counsel for Plaintiffs/Petitioners;

14. Keller Rohrback L.L.P., law firm for Plaintiffs/Petitioners;
15. Khanna, Yatin, Plaintiff/Petitioner;
16. LaVigne, Christopher N., counsel for Defendant/Respondent;
17. Loeser, Derek W., counsel for Plaintiffs/Petitioners;
18. Martin, Philip, Plaintiff/Petitioner;
19. Mesropyan, Vahe, counsel for Defendant/Respondent;
20. Miller, Jason S., counsel for Plaintiffs/Petitioners;
21. Niehaus, Eric I., counsel for Plaintiffs/Petitioners;
22. Ohlmann, Jonathan A., counsel for Plaintiffs/Petitioners;
23. Pallen, Kimberly, counsel for Defendant/Respondent;
24. Plasencia, Gabriela, counsel for Defendant/Respondent;
25. Rappaport, Jason, Plaintiff/Petitioner;
26. Robbins Geller Rudman & Dowd LLP, law firm for Plaintiffs/Petitioners;
27. Rothstein, Barbara A., The Honorable Judge of the United States District Court, Western District of Washington.
28. Rudman, Samuel H., counsel for Plaintiffs/Petitioners;
29. Ruiz II, Rodolfo A., The Honorable Judge of the United States District Court, Southern District of Florida;
30. Ryder, Chris N., counsel for Plaintiffs/Petitioners;

31. Sarko, Lynn Lincoln, counsel for Plaintiffs/Petitioners;
32. Silver, David C., counsel for Plaintiffs/Petitioners;
33. Silver Miller, law firm for Plaintiffs/Petitioners;
34. Stabile, Daniel, counsel for Defendant/Respondent;
35. Tang, T.F. (Natalie), Plaintiff/Petitioner;
36. Viola, Thomas, Plaintiff/Petitioner;
37. Vogel, Jr., Harold S., counsel for Defendant/Respondent;
38. Weiss, Aaron S., counsel for Defendant/Respondent;
39. Winston & Strawn LLP, law firm for Defendant/Respondent;
40. Withers Bergman LLP, law firm for Defendant/Respondent;
41. Zhao, Changpeng, Defendant/Respondent.

DATED: May 14, 2026

ROBBINS GELLER RUDMAN
& DOWD LLP
JOSEPH D. DALEY
ERIC I. NIEHAUS

*s/Joseph D. Daley*

JOSEPH D. DALEY

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
jdaley@rgrdlaw.com
ericn@rgrdlaw.com

*In Re: Philip Martin, et al.*
Eleventh Circuit No.

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN
JONATHAN A. OHLMANN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
ekaufman@rgrdlaw.com
johlmann@rgrdlaw.com

SILVER MILLER
DAVID C. SILVER
JASON S. MILLER
Florida Bar No.: 572764
4450 NW 126th Avenue, Suite 101
Coral Springs, FL 33065
Telephone: 954/516-6000
dsilver@silvermillerlaw.com
jmiller@silvermillerlaw.com

HERMAN JONES LLP
JOHN C. HERMAN
3424 Peachtree Road NE, Suite 1650
Atlanta, GA 30326
Telephone: 404/504-6500
404/504-6501 (fax)
jherman@hermanjones.com

*In Re: Philip Martin, et al.*
Eleventh Circuit No.

KELLER ROHRBACK, L.L.P.
DEREK W. LOESER
CHRIS N. RYDER
1201 Third Avenue, Suite 3400
Seattle, Washington 98101-3268
Telephone: 206/623-1900
dloeser@kellerrohrback.com
cryder@kellerrohrback.com

*Attorneys for Petitioners*

# TABLE OF CONTENTS

**Page**


I. The Relief Sought ....................1

II. The Issue Presented ....................1

III. Facts and Procedural History Necessary to Understand the Issue Presented ....................2

A. A brief overview of the sprawling scheme undertaken by Defendants Binance, Changpeng Zhao, and BAM Trading that led to criminal charges and multi-billion-dollar penalties at the hands of U.S. authorities. ....................2

B. Petitioners, who never entered into arbitration agreements with Defendants, had their cryptocurrency stolen by bad actors who then laundered that crypto through Binance. ....................5

C. Before the Petitioners brought their *Martin* and *Baratta* lawsuits, the district court in a separate class action compelled that plaintiff to arbitrate his claims against Binance and BAM Trading under an equitable estoppel theory. ....................8

D. Following *Osterer*'s denied amendment, Petitioners filed the *Martin* and *Baratta* actions against Defendants....................12

E. The district court compelled Petitioners to undergo arbitration despite stark differences from the *Osterer* matter....................13

IV. The Reasons Why the Writ Should Issue ....................15

A. Legal standards governing the writ's issuance....................15

B. Given the district court's error of law concerning mandatory arbitration vis-à-vis equitable estoppel, on the record here Petitioners have a clear and indisputable right to the writ's issuance....................16




4926-4466-6539.v1

**Page**


1. No valid arbitration agreement exists between Petitioners and Defendants. ....16

2. Because Petitioners' claims arise out of Defendants' statutory obligations, and not the Terms of Use that Petitioners never agreed to (or even saw), equitable estoppel cannot apply. ....18

C. Petitioners have no other adequate means to remedy the injuries they've suffered due to Defendants' misconduct. ....24

1. There is no appeal as of right from the Order compelling arbitration, and it's clear the district court would never agree to certify that Order for interlocutory review under §1292(b). ....24

2. Given the immutable, negative factors associated with compelled arbitration in Hong Kong, it's also clear that Petitioners (and potentially thousands of Class members) will be unable to proceed against Defendants in that forum. ....26

D. The writ's issuance is appropriate. ....31

V. CONCLUSION ....33

# TABLE OF CITATIONS

**Page**

## CASES

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,
483 U.S. 143 (1987)....................29

*Allen v. Champion Enters. Inc.*,
250 F. App'x 266 (11th Cir. 2007)....................18

*Am. Express Fin. Advisors Inc. v. Makarewicz*,
122 F.3d 936 (11th Cir. 1997)....................26

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................20

*Bahamas Sales Assoc., LLC v. Byers*,
701 F.3d 1335 (11th Cir. 2012)....................19

*Baker Botts L.L.P. v. ASARCO LLC*,
576 U.S. 121 (2015)....................30

*Bazemore v. Jefferson Cap. Sys., LLC*,
827 F.3d 1325 (11th Cir. 2016)....................16, 17

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................20

*Cheney v. United States Dist. Court for D.C.*,
542 U.S. 367 (2004)....................15, 16

*Davis v. Prudential Sec. Inc.*,
59 F.3d 1186 (11th Cir. 1995)....................31

*Doe v. Princess Cruise Lines, Ltd.*,
657 F.3d 1204 (11th Cir. 2011)....................22

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995)....................16, 17

**Page**

*Imperial Indus. Supply Co. v. Thomas*,
825 F. App'x 204 (5th Cir. 2020) .......... 18

*In re BayCare Med. Grp., Inc.*,
101 F.4th 1287 (11th Cir. 2024) .......... 15

*In re Evans*,
2026 LX 67465 (11th Cir. Jan. 14, 2026) .......... 26

*Jules v. Andre Balazs Props.*,
S. Ct. No. 25-83, slip op. (May 14, 2026) .......... 31

*Klay v. All Defendants*,
389 F.3d 1191 (11th Cir. 2004) .......... 6, 16

*Leidel v. Coinbase, Inc.*,
729 F. App'x 883 (11th Cir. 2018) .......... *passim*

*Lubin v. Starbucks Corp.*,
122 F.4th 1314 (11th Cir. 2024) .......... 19, 32

*Osterer v. BAM Trading Servs. Inc.*,
753 F. Supp. 3d 1289 (S.D. Fla. 2024) .......... 8, 10, 11, 12

*Rajagopalan v. NoteWorld, LLC*,
718 F.3d 844 (9th Cir. 2013) .......... 19

*ReliaStar Life Ins. Co. v. EMC Nat'l Life Co.*,
564 F.3d 81 (2d Cir. 2009) .......... 30

*Smith v. Spizzirri*,
601 U.S. 472 (2024) .......... 25

*U.S. Nutraceuticals, LLC v. Cyanotech Corp.*,
769 F.3d 1308 (11th Cir. 2014) .......... 14, 22, 23

**Page**

*United States v. Shalhoub*,
855 F.3d 1255 (11th Cir. 2017) ....................16

**STATUTES, RULES, AND REGULATIONS**

9 U.S.C.
§16....................24
§16(a)(1)(A)....................24
§16(a)(1)(B)....................24
§16(a)(1)(C)....................24
§16(b)....................25, 26
§16(b)(3)....................24, 25

18 U.S.C.
§1962(c)....................8
§1962(d)....................8
§1964(c)....................29

28 U.S.C.
§1292(b)....................24, 25, 26

California Business & Professional Code
§17200....................8

Massachusetts General Laws
ch. 93A, §2....................8

## I. The Relief Sought

The Court should grant this Petition and issue a writ of mandamus directing the district court to vacate its Order Granting Defendants' Motion to Compel Arbitration (ECF144) (the "Order"), thus allowing the plaintiffs below ("Petitioners" here) to resume their class-action lawsuits against the three Respondents (hereinafter "Defendants") whose violations of federal and state statutes injured Petitioners and the putative Class.[1]

## II. The Issue Presented

Whether Defendants may use a contract containing an arbitration clause that was agreed to by one of them and certain bad actors to compel Petitioners—*none of whom were signatories to that contract*—to undergo arbitration in Hong Kong with the Defendants under an "equitable estoppel" theory, where the bad actors stole Petitioners' cryptocurrency assets and laundered them through Defendants' cryptocurrency exchange, and where the non-signatory Petitioners: (i) never performed under the contract; (ii) never received any direct benefits from the contract; and (iii) whose claims are not based upon or arise from that contract.

---

[1] Throughout this Petition internal citations and footnotes are omitted and emphasis added, and all ECF citations are to the consolidated docket *Martin v. Binance Holdings Ltd.*, No. 1:25-cv-22100 (S.D. Fla.), unless noted otherwise.

## III. Facts and Procedural History Necessary to Understand the Issue Presented

### A. A brief overview of the sprawling scheme undertaken by Defendants Binance, Changpeng Zhao, and BAM Trading that led to criminal charges and multi-billion-dollar penalties at the hands of U.S. authorities.

Changpeng Zhao ("Zhao") founded Binance Holdings Ltd. ("Binance") in or about June 2017. M:¶¶1, 25; B:¶¶1, 56.[2] It's a Cayman Islands limited liability company. M:¶23; B:¶54.

In July 2017 Binance formed, and has since operated, "Binance.com"—a major cryptocurrency exchange where customers deposit, trade, and withdraw hundreds of types of digital assets; those assets include cryptocurrencies and tokens (collectively, "crypto") such as Bitcoin and Ethereum. M:¶1; B:¶1. In order to draw scrutiny by U.S. regulators away from Binance.com, which was flouting numerous consumer, financial, and national-security controls required by U.S. law (M:¶¶1-2; B:¶¶1-2), Binance also formed a *de facto* United States subsidiary named "BAM Trading" (aka "Binance.US").[3] M:¶154; B:¶203. BAM Trading made a showing of compliance

---

[2] Throughout this Petition, "M:¶__" refers to the operative class-action complaint in *Martin*, (No. 1:25-cv-22100), while citations to "B:¶__" refer to the class-action complaint in *Baratta v. Binance Holdings LTD*, (No. 1:25-cv-22202-RAR (S.D. Fla.). The plaintiffs in both cases—Petitioners here—are the subjects of the district court's Order compelling them to arbitrate their claims against Defendants.

[3] Petitioners allege that because Binance.com's substantial U.S. user base required it to register with authorities and comply with United States banking laws,

with those U.S. laws' required controls—albeit while moving millions of dollars back to Binance and secretly remaining under Zhao's total control. M:¶¶154-169; B:¶¶203-218.

By early 2018, Binance.com was the world's largest cryptocurrency exchange, and it had earned billions of dollars in fees on trillions of dollars of crypto transactions. M:¶1; B:¶1. That explosive growth came at the expense of legal compliance.

For years, Binance was both a magnet and a hub for laundering *stolen* crypto. M:¶6; B:¶6. Binance.com became a depository for millions of dollars of cryptocurrency illegally removed from the digital wallets, accounts, or protocols of victimized individuals and entities located in the United States as a result of hacks, malware, theft, or ransomware. M:¶6; B:¶6. (As explained *infra* §III.B., those victims included Petitioners here and members of the putative Class they represent—United States residents all.[4])

---

U.S.-based BAM Trading was established to fulfill those prerequisites and "[d]istract" U.S. regulators from Binance.com's noncompliance with those same laws. M:¶¶128-129; B:¶¶176-177.

[4] The two complaints explain that Plaintiffs bring claims on behalf of themselves and all persons or entities in the United States whose cryptocurrency was removed from a non-Binance/BAM digital wallet, account, or protocol as a result of a hack, ransomware, or theft and, between August 16, 2020 and the date of Judgment (the Class Period), transferred to a Binance.com account, and who have not recovered all

Defendants' illegal conduct, while extensive and complicated, can be boiled down to the following facts: although Defendants knew that bad actors were laundering stolen crypto at Binance, they refused to comply with the Bank Secrecy Act and other U.S. laws, or to implement basic, requisite Know-Your-Customer ("KYC") and anti-money-laundering ("AML") policies designed to prevent crypto-laundering. M:¶¶87-113; B:¶¶99-106.[5] Defendants' deliberate actions allowed bad actors the world over—including crypto-thieves, terrorist organizations, and users in U.S.-sanctioned jurisdictions like Iran, Cuba, and Syria—to launder digital assets that couldn't be tracked by authorities. M:¶¶43, 105, 126; B:¶¶74, 153, 174.

Following extensive investigations by U.S. authorities, Defendants' scheme resulted in enforcement actions. On November 21, 2023, Binance and Zhao pleaded guilty to myriad criminal charges and regulatory violations brought by the U.S. Department of Justice ("DOJ"). M:¶¶67-70; B:¶¶107-110. A DOJ press release noted

---

of their cryptocurrency that was transferred to Binance.com (the "Class"). M:¶9; B:¶10.

[5] As the American Bankers Association has explained, the federal Bank Secrecy Act "refers to a series of laws intended to detect and prevent money laundering, and [] the financing of terrorism." American Bankers Association, *Bank Secrecy Act*, https://www.aba.com/banking-topics/compliance/acts/bank-secrecy-act (last visited May 14, 2026). The Act's goal "is to protect the U.S. financial system from criminal abuse, and safeguard U.S. national security by preventing money-laundering and terrorism financing, and facilitating the tracking of illicit funds through reasonably designed, risk-based programs." *Id.*

"'Binance's and Zhao's willful violations of anti-money laundering and sanctions laws threatened the U.S. financial system and our national security.'" M:¶71; B:¶111. A consent order on the same date, entered into between Binance and the U.S. Department of Treasury's Financial Crimes Enforcement Network, recounted that Binance had willfully failed to report hundreds of thousands of suspicious transactions, including transactions involving terrorist organizations like Al Qaeda, Palestinian Islamic Jihad, and ISIS. M:¶¶73-75; B:¶¶113-115.

Binance ended up paying more than $4.3 billion in financial penalties for its perfidy. M:¶68; B:¶108. Zhao individually paid a $50 million fine and stepped down as Binance's CEO. M:¶¶69, 72; B:¶¶109, 112.

### B. Petitioners, who never entered into arbitration agreements with Defendants, had their cryptocurrency stolen by bad actors who then laundered that crypto through Binance.

Each of the eight Petitioners had cryptocurrency stolen by (anonymous) bad actors who'd established Binance accounts in which they laundered the stolen proceeds. The *Martin* complaint details the losses suffered by the three named plaintiffs there:

- Philip Martin is a California citizen residing in Los Angeles. M:¶19. In December 2021, a third party stole at least tens of thousands of dollars-worth of cryptocurrency from Martin's Coinbase account. *Id.* An extensive investigation revealed that the stolen crypto was sent to at least one account at Binance.com. *Id.* Martin never held an account with

Binance or BAM Trading, nor agreed to any terms of use that Binance or Bam Trading impose upon their accountholders. *Id*.

- T.F. (Natalie) Tang is a California citizen residing in Los Angeles. M:¶20. In July 2022, a third party stole tens of thousands of dollars-worth of cryptocurrency from her Coinbase account. *Id*. Tang's stolen crypto was sent to at least one Binance.com account. *Id*. Tang never held an account with Binance or BAM Trading, nor agreed to any terms of use that Binance or BAM Trading impose upon their accountholders. *Id*.

- Yatin Khanna is a New York state citizen who resides in New York City, New York. M:¶21. In August 2022, a third party stole more than $1.5 million worth of cryptocurrency from him. *Id*. An investigation revealed that the stolen crypto was sent to at least one Binance.com account. *Id*. Like Martin and Tang, Khanna never held an account with Binance or BAM Trading, nor agreed to any terms of use that Binance or BAM Trading impose upon their accountholders. *Id*.

The *Baratta* complaint alleges a similar tale of stolen crypto ending up in Binance.com accounts, victimizing the five Petitioners:

- Charles Baratta is a New York citizen residing in Syosset, New York. B:¶20. In late 2024, Baratta joined a Discord group, an online messaging platform dedicated to financial investing that included cryptocurrency. B:¶21. Another member of the Discord group contacted Baratta and offered to let him mirror the anonymous member's online trading in exchange for 10 percent of any earnings (B:¶22); Baratta accepted the offer and registered an account on ProTraderCopy.com that the unidentified Discord member would manage. B:¶23. After initially sending $100,000 in Bitcoin to the account, over several weeks Baratta deposited another $820,000 in the account for a total of $920,000. B:¶¶24-25. When Baratta asked when he'd start to see earnings and could divest his funds, the anonymous Discord member stopped responding. B:¶26. Baratta then discovered that *all* of the funds in his ProTraderCopy.com account were gone, and that his stolen crypto was sent to at least one Binance account. B:¶¶27-28. Baratta never held an

account with Binance or BAM Trading, nor agreed to any terms of use that Binance or BAM Trading impose upon their accountholders. B:¶29.

- Jason Rappaport, an Ohio citizen residing in Cleveland, in late 2024 was victimized in an almost-identical series of events as Baratta. B:¶¶30-36. Participating in the same Discord messaging group, Rappaport received the same mirrored-trading offer—and so deposited a total of $249,000 in Bitcoin into a ProTraderCopy.com account. B:¶33. Within days, Rappaport's Bitcoin was gone—and had been sent to at least one account at Binance.com. B:¶¶34-35. Rappaport never held an account with Binance or BAM Trading, nor agreed to any terms of use that Binance or BAM Trading impose upon their accountholders. B:¶36.

- Donald Douty, a Massachusetts citizen residing in Lincoln, Massachusetts, fell prey in June-July 2024 to a third party who used the alias "Ashley Snowden." B:¶38. Snowden convinced Douty to transfer $140,000 of Ethereum from his Crypto.com wallet to a wallet held through Sogoclubin.com. *Id.* Snowden then stole the $140,000 by "freezing" Douty's account and requesting a further $93,000 deposit to release the funds. B:¶39. The stolen crypto was sent to at least one account at Binance.com. B:¶40. Douty has never held an account with Binance or BAM Trading, nor agreed to any terms of use that Binance or BAM Trading impose upon their accountholders. B:¶41.

- Thomas Viola, a California citizen residing in Los Angeles, deposited $9,717 in Bitcoin into his Exodus wallet on October 15, 2024. B:¶¶42-43. The following day, Viola discovered the Bitcoin was gone; Exodus support told him that his funds had been traced to a Binance account. B:¶¶43-44. Viola has never held an account with Binance or BAM Trading, nor agreed to any terms of use that Binance or BAM Trading impose upon their accountholders. B:¶46.

- Hyacinth Ahuruonye, a California citizen and resident of San Francisco, fell victim to a digital investment scheme in early 2023 when he was fraudulently induced to send approximately $850,000 in Bitcoin to scammers from his Coinbase account. B:¶47-48. An extensive investigation revealed that the stolen funds were deposited into both Binance.com and Binance.US (*i.e.*, BAM Trading) accounts between February and May 2023. B:¶49. Ahuruonye has never held an account

> with Binance or BAM Trading, nor agreed to any terms of use that Binance or BAM Trading impose upon their accountholders. B:¶50.

In both cases, the plaintiffs alleged claims for violations of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §§1962(c)-(d) (against all Defendants), conversion (against Binance and Zhao), and aiding and abetting conversion (against all Defendants). M:¶¶211-259; B:¶¶266-316. The *Baratta* plaintiffs also alleged claims for violations of the California Unfair Competition Law,[6] and the Massachusetts Consumer Protection Act.[7] B:¶¶317-333.

### C. Before the Petitioners brought their *Martin* and *Baratta* lawsuits, the district court in a separate class action compelled that plaintiff to arbitrate his claims against Binance and BAM Trading under an equitable estoppel theory.

Before Petitioners here filed their actions in the Western District of Washington, a separate class action against Binance and BAM Trading was pending in the Southern District of Florida. *See Osterer v. BAM Trading Servs. Inc.*, No. 1:23-CV-22083-RAR (S.D. Fla.). That action asserted claims against the two defendants for conversion, aiding and abetting conversion, and unjust enrichment. Order at 2.[8]

---

6 Cal. Bus. & Prof. Code §17200.

7 Mass. Gen. Laws ch. 93A, §2.

8 This Petition uses the Order's recitation of *Osterer*'s procedural history, as well as the published *Osterer* compelled-arbitration decision. *See Osterer v. BAM Trading Servs. Inc.*, 753 F. Supp. 3d 1289 (S.D. Fla. 2024).

The *Osterer* complaint didn't name Zhao as a defendant, or bring any RICO claims against the defendants.

The named plaintiff, Michael Osterer, had maintained an account with cryptocurrency exchange Coinbase, but didn't have an account with either Binance or BAM Trading. *Id.* Osterer alleged that after an unauthorized hacker had infiltrated his Coinbase account and stolen approximately eight Bitcoin and 449 Ethereum from him, the hacker then routed that crypto into several Binance accounts, withdrew the stolen funds, and absconded with the monies. *Id.*

Osterer sued Binance and BAM Trading on behalf of a class of similarly situated victims, alleging that the successful laundering of the stolen digital assets had resulted from those two defendants' failure to comply with KYC and AML protocols. *Id.* In particular, Osterer alleged that Binance and BAM Trading had "'unjustly enriched themselves by collecting significant fees on transactions'" involving his stolen crypto. *Id.*

Binance and BAM Trading moved to compel arbitration on a theory of equitable estoppel that utilized the Arbitration Provision in Binance's Terms of Use (also referred to herein as the "Terms"). Order at 3.[9] A key phrase in that provision

---

[9] In order to compel arbitration under a theory of equitable estoppel under Florida law, the party seeking to compel arbitration "must show both that the plaintiff is relying on a contract to assert its claims and that the scope of the arbitration clause in



4926-4466-6539.v1

required arbitration of any claims "'arising in connection with or relating in any way to these Terms or to your relationship with Binance.'" *Id.*[10]

In response, Osterer argued that the Terms of Use—and thus the Arbitration Provision within—didn't apply to *him*, "as he was not a party to the underlying agreement." *Id.* Having never had a Binance account and having never agreed to that entity's Terms of Use, Osterer maintained he couldn't be bound by its terms. *Id.* Osterer further argued that his claim was rooted in the regulatory requisites that those defendants flouted—*e.g.*, failing to maintain sufficient KYC and AML protocols—and didn't arise from Binance's Terms of Use. *Id.*

The district court disagreed. Even though "the parties agree that it was the unknown hacker, not Plaintiff, who agreed to the Terms containing the Arbitration Provision" (*Osterer*, 753 F. Supp. 3d at 1295), nonetheless the court sided with the

---

that contract covers the dispute." *Leidel v. Coinbase, Inc.*, 729 F. App'x 883, 886-87 (11th Cir. 2018).

[10] The Arbitration Provision stated: "'You and Binance Operators agree that, subject to paragraph 1 above, any dispute, claim, or controversy between you and Binance (and/or Binance Operators) arising in connection with or relating in any way to these Terms or to your relationship with Binance (and/or Binance Operators) as a user of Binance Services (whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory, and whether the claims arise during or after the termination of these Terms) will be determined by mandatory final and binding individual (not class) arbitration, except as set forth below under Exceptions to Agreement to Arbitrate.'" Order at 3 n.1.

defendants regarding compelled arbitration. It acknowledged Osterer's insistence that his claims derived from the defendants' *statutory* obligations—presumably removing them from the Terms of Use's ambit under this Court's equitable-estoppel analysis in *Leidel*, 729 F. App'x 883—but rejected that argument:

> [Osterer's] claims "derive" from the underlying Terms. Plaintiff specifically alleges in his Complaint that Binance failed to "halt the further movement of [Plaintiff's] stolen property." Compl. ¶108. Additionally, in his prayer for relief, Plaintiff seeks a declaration that "Defendants were unjustly enriched by their collection of transaction fees" as well as "restitution and disgorgement of Defendants' ill-gotten gains." Compl. at 32. In other words, *Plaintiff is suing Defendants for failing to exercise a right created by the Terms*—and for collecting funds *pursuant to the Terms*.

*Osterer*, 753 F. Supp. 3d at 1296 (original alteration). Thus, concluded the court, Osterer "may not 'rely upon the [Terms] to establish [his] claims while avoiding [his] obligations under the [Terms] to arbitrate such claims.'" *Id.*

While the *Osterer* defendants' motion to compel was pending, Osterer moved for leave to amend. Order at 4. The proposed amendment would have named Binance founder Zhao as a third defendant, introduced a RICO claim, and added three additional plaintiffs—Martin, Tang, and Khanna—the three *Martin* Petitioners here. *Id.* When the district court compelled arbitration on July 31, 2024, however, it denied that amendment request as moot. *Osterer*, 753 F. Supp. 3d at 1298; *see also* Order at 4.

### D. Following *Osterer*'s denied amendment, Petitioners filed the *Martin* and *Baratta* actions against Defendants.

About two weeks after the denied amendment in *Osterer*, the *Martin* plaintiffs filed a class action against Defendants in the Western District of Washington. Order at 5. In addition to naming Zhao as a third defendant, the plaintiffs included a RICO claim against all three. *Id.* While the *Martin* plaintiffs kept *Osterer*'s conversion and aiding-and-abetting conversion claims, they did not allege that matter's claim for unjust enrichment. Order at 5, 10. (Recall, the *Osterer* court's reasoning, which compelled arbitration based on the doctrine of equitable estoppel, focused on Osterer's unjust enrichment claim that sought restitution of fees Binance had earned pursuant to its Terms of Use. *Osterer*, 753 F. Supp. 3d at 1296-97.) Notably, the *Martin* plaintiffs alleged that "'Binance.com failed to apply KYC and AML procedures as required by statutory law.'" Order at 5.

The following year the *Baratta* plaintiffs followed suit in a second Western District of Washington filing—similarly alleging that their crypto was stolen and sent to Binance accounts, and claiming that Binance had violated KYC and AML protocols (among other statutory obligations). *Id.* The *Baratta* plaintiffs asserted the same three counts as *Martin* had against the three Defendants and added violations of California's UCL and Massachusetts's MCPA. *Id.*

Following a motion to transfer filed by the Defendants in *Martin*, the Honorable Judge Barbara A. Rothstein transferred *Martin* and *Baratta* from the Western District of Washington to the district court below. Order at 6. The court then consolidated the cases for purposes of the Defendants' July 25, 2025 Motion to Compel Arbitration. *Id*. The subsequent Order resolving that motion in Defendants' favor—and prompting this Petition—is discussed next.

### E. The district court compelled Petitioners to undergo arbitration despite stark differences from the *Osterer* matter.

Defendants below argued that because (in their view) *Martin* and *Baratta* were predicated on the same facts as and concerned the same issues as *Osterer*, Petitioners should be likewise compelled to arbitrate their claims. Order at 6. Petitioners opposed, arguing (among other points) that: (i) no valid arbitration agreement existed between Petitioners and Defendants; and (ii) that equitable estoppel couldn't apply because their claims derived from Defendants' statutory obligations. *Id*.

In the district court's eyes, the decision whether to compel arbitration below "ultimately turns on whether the inclusion of new plaintiffs, a new defendant, and additional claims … necessitate a different result than the one reached in *Osterer*." Order at 7. The court held it did not (*id*.), with its reasoning set forth over the Order's subsequent pages.

The district court first rejected Petitioners' attempts to separate themselves from the *Osterer* equitable-estoppel analysis by pleading new statutory claims. "Despite Plaintiffs' addition of claims under RICO, the UCL, and the MCPA, *Martin* and *Baratta* are ultimately predicated on the same factual allegations as *Osterer*." Order at 9; *see also id*. ("Plaintiffs' claims are subject to arbitration if the factual allegations underlying them arise in connection with or relate to the Terms, regardless of how their legal theory is framed."). Here, reasoned the court, Petitioners' claims clearly arose in connection with, or relate to, Defendants' Terms of Use—"in the same way as Osterer's claims." Order at 9 (discussing *Martin*); Order at 10-11 (discussing *Baratta*).

The district court also brushed aside Petitioners' good-faith attempts to distinguish their pleadings from *Osterer*.

As for the *Martin* matter, the court wasn't swayed by plaintiffs' removal of the unjust enrichment claim that had helped sink Osterer. Order at 10. Nor had the *Martin* plaintiffs changed the calculus by expressly alleging "that 'Plaintiffs are not relying on any contracts or agreements entered into between Binance or BAM Trading (including Binance.US) and any'" Binance users. *Id*. Those modifications, reasoned the court, didn't change the "'true thrust' of the *Martin* Complaint"—which it deemed the same as the *Osterer* complaint. *Id*. (quoting *U.S. Nutraceuticals, LLC v.*

*Cyanotech Corp.*, 769 F.3d 1308, 1312 (11th Cir. 2014)).[11] Thus, the court compelled arbitration in *Martin* "for the same reasons as in *Osterer*." *Id.*

"*Baratta* is no different," the district court held, for "it includes similarly situated Plaintiffs suing the same Defendants for the same conduct." *Id.* Despite the *Baratta* complaint's emphasis on KYC and AML procedures, along with its three counts for statutory causes of action, "the true thrust of the *Baratta* Complaint is nevertheless the same as *Osterer* and *Martin*." Order at 11.

Arbitration was compelled. *Id.*[12]

## IV. The Reasons Why the Writ Should Issue

### A. Legal standards governing the writ's issuance.

There are three prerequisites to a writ's issuance.

First, "'the party seeking issuance of the writ [must] have no other adequate means to attain the relief he desires.'" *Cheney v. United States Dist. Court for D.C.*, 542 U.S. 367, 380-81 (2004) (original alteration); *see also In re BayCare Med. Grp.,*

---

[11] The court also found that Osterer's attempted amendment that sought to add new plaintiffs, a new defendant, and a RICO claim to his complaint "illustrates the lack of daylight between the two cases." Order at 10.

[12] Although the district court also rejected three additional "contract-based" arguments against compelled arbitration that Petitioners made (Order at 11-16), this Petition focuses on the court's equitable-estoppel reasoning and ultimate holding. Petitioners reserve the right to make those contract-based arguments should this Court order additional mandamus-related briefing.

*Inc.*, 101 F.4th 1287, 1290 (11th Cir. 2024). Second, the petitioner must satisfy "the burden of showing that his right to issuance of the writ is clear and indisputable." *Cheney*, 542 U.S. at 381 (cleaned up). Third, even if the first two prerequisites are met, this Court "in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Id.*; *see also United States v. Shalhoub*, 855 F.3d 1255, 1262-63 (11th Cir. 2017).

All three criteria are satisfied here.

### B. Given the district court's error of law concerning mandatory arbitration vis-à-vis equitable estoppel, on the record here Petitioners have a clear and indisputable right to the writ's issuance.

#### 1. No valid arbitration agreement exists between Petitioners and Defendants.

Before addressing the district court's errors here concerning "equitable estoppel" (*infra* §IV.B.2.), it's helpful to acknowledge a bedrock principle of arbitrability—namely, that absent a valid arbitration agreement between parties, "'a court cannot compel [them] to settle their dispute in an arbitral forum.'" *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016); *accord Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004). Indeed, "[t]he threshold question of whether an arbitration agreement exists at all is 'simply a matter of contract.'" *Bazemore*, 827 F.3d at 1329 (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)). Arbitration simply "is a way to resolve those disputes—but

only those disputes—that the parties have agreed to submit to arbitration." *First Options*, 514 U.S. at 943.

Defendants did not—and could not—show that any contracts or arbitration agreements exist between them and Petitioners. The underlying complaints expressly allege that *none* of the eight Petitioners created or owned Binance accounts and never agreed to the Defendants' Terms of Use. *See, e.g.*, M:¶19 (At no time has Petitioner ever held an account with Binance or BAM Trading, nor has Petitioner ever agreed to any terms of use that Binance or BAM Trading impose upon their accountholders.); *see* M:¶¶20-21 (same); *see also* B:¶¶29, 36, 41, 46, 50 (same). Indeed, Defendant themselves admitted as much (ECF138:14), and haven't produced any evidence otherwise. And Defendants conceded that neither BAM Trading nor Zhao was a party to any purported arbitration agreement. ECF137:22-23.

Given the utter lack of evidence that any Petitioner ever had a contractual agreement with any Defendant,[13] the Hong Kong arbitration should never have been compelled. *See, e.g.*, *Bazemore*, 827 F.3d at 1334 (where defendant "offered no competent evidence to demonstrate the existence of a genuine issue of material fact concerning the existence of an arbitration agreement, its motion to compel arbitration

---

[13] Even the purported agreements produced by Defendants are incomplete, as they omit a section titled "Exceptions to Agreement to Arbitrate." ECF138:14 n.5.

must be denied as a matter of law”); *Allen v. Champion Enters. Inc.*, 250 F. App’x 266, 268 (11th Cir. 2007) (affirming arbitration denial while noting “the evidence lacks a written arbitration agreement”); *Imperial Indus. Supply Co. v. Thomas*, 825 F. App’x 204, 204 (5th Cir. 2020) (given “the utter lack of any evidence of any arbitration agreement in the first place,” district court properly vacated arbitral award).[14]

**2. Because Petitioners’ claims arise out of Defendants’ statutory obligations, and not the Terms of Use that Petitioners never agreed to (or even saw), equitable estoppel cannot apply.**

The linchpin of the court’s Order compelling arbitration is the legal construct of equitable estoppel—that parties (like Defendants) may compel arbitration against non-signatories to a contract (like Petitioners) if the non-signatories are *relying upon* that contract to assert their claims against the former parties. Order at 8. As with any linchpin, however, once it’s removed the assembled mechanism collapses—and so it is here with the district court’s reasoning.

First, a bit of black letter law: Under the doctrine of equitable estoppel, a party is precluded “from claiming the benefits of some of the provisions of a contract while

---

[14] Ironically, the counterparties to Binance’s Terms of Use who *are* bound by its Arbitration Provision are the same criminals who stole Petitioners’ crypto and laundered it through Binance. They aren’t parties to the underlying litigation, however.

simultaneously attempting to avoid the burdens that some other provisions of the contract impose." *Bahamas Sales Assoc., LLC v. Byers*, 701 F.3d 1335, 1342 (11th Cir. 2012). As a result, *"[i]n some cases*, a non-signatory plaintiff *can be bound* to an arbitration agreement based on equitable estoppel." *Lubin v. Starbucks Corp.*, 122 F.4th 1314, 1321 (11th Cir. 2024).

This case isn't one of them.

Petitioners aren't relying upon any part of Defendants' contractual Terms of Use; rather, Petitioners' claims are based upon on Defendants' RICO violations, conversion of their stolen assets, and failures to implement the KYC and AML procedures mandated by the Bank Secrecy Act. *E.g.*, B:¶82 (Defendants' refusal and failure to follow the law and implement AML and KYC policies and protocols at Binance.com enabled bad actors to launder crypto at Binance.com.).

Petitioners are not "claiming the benefits of the agreement" between Defendants and other, actual signatories "while simultaneously attempting to avoid its burdens." *Lubin*, 122 F.4th at 1321; *see also Leidel*, 729 Fed. App'x at 888 (Finding no equitable estoppel in cryptocurrency matter: "Because Leidel's claims rely on obligations allegedly imposed by [the Bank Secrecy Act] and in recognition of public policy to persons who are strangers to the User Agreements, his claims neither rely on nor bear a significant relationship to those agreements."); *accord Rajagopalan v.*

*NoteWorld, LLC*, 718 F.3d 844, 848 (9th Cir. 2013) (refusing to allow equitable estoppel where party's "statutory claims 'd[o] not arise out of or relate to the contract that contained the arbitration agreement'" (original alteration)).

The district court held otherwise, but in doing so committed several errors.

The district court rejected Petitioners' allegations that their claims derived from Defendants' *statutory obligations*, rather than Binance's Terms of Use. Order at 8-9. The court noted it had "rebuffed" that "same argument" in *Osterer*, where it concluded that Defendants' "failure to freeze" the purloined funds had "no connection" with statutory obligations, but rather required referencing Binance's Terms. *Id*. With this line of reasoning, the court committed two errors.

First, the district court refused to credit Petitioners' well-pleaded allegations that it should have accepted as true at the pleading stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 696 (2009) ("a court must take the allegations as true, no matter how skeptical the court may be"); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

Second, the district court misread Petitioners' complaints—which breathe not one word of Defendants' failure to "freeze" stolen monies. Instead, Petitioners specifically alleged that their claims arose out of Defendants having flouted statutory requirements. *See, e.g.*, B:¶52 (Binance failed to apply KYC and AML procedures *to detect the lawful ownership* of the cryptocurrency properly belonging to Petitioners or

members of the Class); B:¶82 (had Defendants complied with the law and ensured Binance.com implemented AML and KYC policies, Binance.com *would have identified* potential crypto laundering transactions and *reported them to the authorities*); B:¶102 (under the Bank Secrecy Act, Binance was required to file a suspicious activity report within 30 to 60 calendar days *of detecting each of the suspicious transactions* involving Petitioners' stolen assets).

Those allegations are on all fours with similar ones this Court found dispositive in *Leidel* while rejecting compelled arbitration via equitable estoppel:

> Here, Leidel's claims are based on Defendant's alleged failure to (1) adequately monitor or investigate Cryptsy's and Vernon's use of Defendant's website; (2) *detect Vernon's theft* of Cryptsy's customers' Bitcoin; and (3) *report suspicious activity* by Vernon or Cryptsy to the appropriate authorities. According to the complaint, these duties were imposed on Defendant by the Bank Secrecy Act and its implementing regulations not for the protection of Defendant's customers, but to detect money laundering and other suspicious or illegal activities by Defendant's customers.

*Leidel*, 729 Fed. App'x at 888. Not surprisingly, then, this Court held: "Because Leidel's claims rely on obligations allegedly imposed by law and in recognition of public policy to persons who are strangers to the User Agreements, his claims neither rely on nor bear a significant relationship to those agreements." *Id.* The same result should occur here.

The district court also erred in holding that however Petitioners framed their legal theories, the "'true thrust'" of their complaints nonetheless brought them within the ambit of the Terms of Use whose "broad Arbitration Provision" covered any disputes or claims "'relating *in any way* to these terms.'" Order at 9 (citing *Nutraceuticals*, 769 F.3d at 1311). Again, the court was doubly wrong in its reasoning.

First, the district court flipped the script. Instead of crediting Petitioners' careful allegations that focused on statutory obligations, it allowed the ridiculously broad language of the Terms of Use to control— even though Petitioners (and two of the three Defendants) weren't party to the agreements containing that language, and their statutory claims were not directly related to the Terms of Use. *See, e.g.*, *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1218 (11th Cir. 2011) (Refusing to credit the far reach of similar broad arbitral language: "'[R]elated to' *marks a boundary by indicating some direct relationship*; otherwise, the term would stretch to the horizon and beyond.").

Second, divining a complaint's "'true thrust'" (Order at 9) made perfect sense in *Nutraceuticals*, where a corporate plaintiff (Valensa) attempting to avoid arbitration had carefully referenced only one of two contracts it had entered into with the defendant. *Nutraceuticals*, 769 F.3d at 1310. Valensa's choice was deliberate: while

an earlier, 2007 contract "mandated the arbitration of *any dispute* that arose under that contract," a 2010 contract's arbitration provision "contained a carve-out" allowing litigation in certain circumstances. *Id*. at 1309-10.

This Court wasn't fooled by the gambit:

> Valensa's complaint alleges causes of action based on the 2010 contract, but its reliance on only the 2010 contract is a legal label. The allegations of fact are the same whether Valensa labels the causes of action as violations of the 2007 contract or the 2010 contract. Although the complaint does not mention the 2007 contract, the facts alleged in the complaint—its "true thrust"—implicate both the 2007 and 2010 contracts. For that reason, the 2007 contract is "susceptible of an interpretation that covers" the dispute.

*Nutraceuticals*, 769 F.3d at 1312. That situation is light years away from what occurred here, where Petitioners weren't even parties to the contractual language Defendants rely upon.

Finally, the district court chided Petitioners for pleading many of the same factual bases for their claims as appeared in the *Osterer* matter. Order at 9-10. It's a puzzling observation: Defendants' actions affecting Petitioners and absent Class members were of a certain, repetitive kind, and injured numerous hapless crypto investors—so of course the underlying wrongful conduct would be similar in most instances. If anything, the similar underlying conduct involving statutory violations lends itself to more-economical resolution through class-action litigation, versus thousands of individual arbitrations.

### C. Petitioners have no other adequate means to remedy the injuries they've suffered due to Defendants' misconduct.

Petitioners have no immediate appeal as of right from the Order compelling arbitration. *Infra* §IV.C.1. Nor will they have an opportunity to appeal from a final judgment following arbitration—for, as the record shows, a perfect storm of circumstances likely guarantees that Petitioners will have to forego arbitration and abandon their claims against Defendants. *Infra* §IV.C.2.

#### 1. There is no appeal as of right from the Order compelling arbitration, and it's clear the district court would never agree to certify that Order for interlocutory review under §1292(b).

When a district court's order denies arbitration, §16 of the Federal Arbitration Act authorizes an immediate appeal as of right. *See* 9 U.S.C. §16(a)(1)(C). The authorization disappears, however, when a district-court order *grants* a party's motion to compel arbitration; in that case, an immediate appeal is forbidden. *See* 9 U.S.C. §16(b)(3). That's the situation here given the Order compelling the Hong Kong arbitration: Petitioners' ability to appeal as of right to this Court is nil.[15]

[15] Recent proceedings involving Binance and Zhao make the asymmetry concrete. In *Sizemore v. Zhao*, No. 1:23-cv-21261 (S.D. Fla.), Judge Altman denied Binance's and Zhao's motion to compel arbitration because neither Binance nor Zhao was a signatory to the arbitration agreement they sought to enforce. Order Denying Motion to Compel Arbitration, *Sizemore*, ECF270 (S.D. Fla. Apr. 9, 2026). Binance and Zhao have now noticed an appeal from that denial, invoking immediate appellate review under 9 U.S.C. §§16(a)(1)(A) and (B). *Sizemore*, ECF281 (S.D. Fla. May 8, 2026).

The one statutory exception to that roadblock wouldn't apply here, either. Section 16(b) does allow an immediate appeal from an order compelling arbitration via the certification of a controlling question of law under 28 U.S.C. §1292(b). *See* 9 U.S.C. §16(b); *see also Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) ("When a court compels arbitration, by contrast, Congress made clear that, *absent certification of a controlling question of law by the district court under 28 U.S.C. §1292(b)*, the order compelling arbitration is not immediately appealable.").

But that avenue of appellate review requires completing a two-step application process: before requesting discretionary review by the circuit court, the party must first receive the district court's blessing. *See* 28 U.S.C. §1292(b) ("*When a district judge*, in making in a civil action an order not otherwise appealable under this section, *shall be of the opinion that such order involves a controlling question of law* as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, *he shall so state in writing in such order*.").

That's not going to happen here. In both its *Osterer* opinion and the Order, the district court repeatedly confirmed its conclusion that equitable estoppel mandated the

---

Petitioners face the mirror-image arbitration posture here, but §16(b)(3) denies them the same direct appellate path.

Hong Kong arbitration process for all injured plaintiffs making claims against Binance, BAM Trading, and Zhao. Thus the necessary first step of a §1292(b) certification process—the district court's acknowledging that its legal conclusions warrant immediate appellate review—wouldn't occur, preventing this Court from considering Petitioners' interlocutory appeal. *See, e.g.*, *Am. Express Fin. Advisors Inc. v. Makarewicz*, 122 F.3d 936, 939 (11th Cir. 1997) (absent the district court's §1292(b) certification, "we have no jurisdiction over the district court's decision to stay the present action pending arbitration").

Summing up: all avenues of pursuing an adequate remedy under §16(b) are blocked off.

**2. Given the immutable, negative factors associated with compelled arbitration in Hong Kong, it's also clear that Petitioners (and potentially thousands of Class members) will be unable to proceed against Defendants in that forum.**

No doubt Defendants will argue, if ordered to respond to this Petition, that there's no exigency warranting a writ's issuance … that Petitioners *eventually* will be able to challenge the district court's Order via an appeal following a post-arbitration final judgment. *Cf. In re Evans*, 2026 LX 67465, at *3 (11th Cir. Jan. 14, 2026) (denying mandamus petition for party complaining about, *inter alia*, order compelling

arbitration: "he has the adequate alternative remedy of raising those issues on appeal at the appropriate time").

But the Defendants' threshold premise for that argument would be illusory. The record shows that *any* arbitration in Hong Kong will be prohibitively expensive and illogical—and even *more-expensive* than some Petitioners' alleged losses—taking that process off the table. With no arbitration undertaken, a final judgment in the district court from which an appeal might be taken appears unattainable.

That's no idle assertion; consider the factors making a Hong Kong arbitration unfair, unattractive, and in at least three Petitioners' cases, impossible to undertake:

*The numerous fees and expenses associated with the Hong Kong arbitration make that process illogical and prohibitively expensive*. A declaration submitted by Terence Wong, a Hong Kong attorney whose practice focuses on international commercial arbitration and other dispute-resolution mechanisms (ECF139:¶3), makes clear that Petitioners and Class members will likely incur significant out-of-pocket fees and expenses were they to proceed with arbitration against Defendants before the Hong Kong International Arbitration Centre ("HKIAC"). ECF139:¶¶10-13. Mr. Wong identifies *nine* different categories of likely fees and expenses facing Petitioners and Class members, along with explanations of how they are calculated. ECF139:¶13.

While those categories' descriptions and calculations are too lengthy to repeat within this Petition's confines, several of Mr. Wong's observations bear highlighting:

- Petitioners and Class members will be at a disadvantage if they don't retain Hong Kong counsel, "including solicitors and barristers (in addition to [Petitioners'] existing US counsel)" (ECF139:¶12(c));
- Given the amount of fees depending upon the sums in dispute, administrative fees could range from $2,538 to $51,282 per arbitration (ECF139:6-7);
- Arbitrators' fees could range from 11% of the amount in dispute to a maximum of $1.6 million (ECF139:8); if the parties agree to use *three* arbitrators—as BAM Trading already proposed in the *Osterer* arbitration—those fees will be tripled (ECF139:¶14 n.18);
- The smaller the sum in dispute, the "more disproportionate the fees and expenses to be incurred" (ECF139:¶17);
- Petitioner Viola could conceivably incur fees and expenses "*more than 3.6 times*" the $9,717 sum he's disputing (ECF139:¶16);[16]
- A claim for under $37,000 would likely cost more than the value of the claim to arbitrate, while a claim for $5,000 would cost approximately $35,000, or *six times* an injured plaintiff's losses, to arbitrate (ECF139:¶¶13-17); and
- Under HKIAC rules, the "general rule is for the losing party *to pay the winning party's legal costs*" (ECF139:¶23), and the "mean" average cost over a recent nine-year period was $137,332 (ECF139:¶24).

---

16 Petitioners Tang and Martin are similarly situated, with claims totaling tens of thousands of dollars-worth of cryptocurrency. M:¶¶19-20. While those amounts make their pursuit via class-action litigation sensible, in the arbitration context described here they'd likely be dwarfed by fees and expenses.

Plainly, it doesn't make sense for Petitioners like Viola, Tang, or Martin to spend *more* on arbitration-related fees and costs than the amounts they hope to recover from Defendants—even if they successfully recouped every dollar sought. Moreover, there are undoubtedly numerous Class members who are similarly situated, with losses in the four- or five-figure range that would render the Hong Kong arbitration process so financially illogical as to nullify any participation.[17]

*Diminished legal claims*. Recall, in addition to their conversion claims, Petitioners bring federal and state claims under RICO, as well as Massachusetts and California consumer-protection statutes. The RICO claims, in particular, are particularly attractive to injured Petitioners as the statute provides for *treble* damages. *See* 18 U.S.C. §1964(c). And it has a four-year statute of limitations for civil actions. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987).

And yet the compelled arbitration severely limits these legal remedies. The Terms of Use establish a unilateral *one-year* limit—not four years—to bring *any claim* against Binance. ECF138:21. Moreover, because the Terms apply Hong Kong law, they would foreclose Petitioners from pursuing the RICO, as well as state statutory, claims (ECF138:23) that would be available in the district court here.

---

[17] Those same Petitioners and Class members undoubtedly would need to spend additional thousands of dollars for international flights and Hong Kong accommodations. ECF139:12.

*Legal-fee shifting*. Finally, under Hong Kong arbitration rules, Petitioners (and Class members) could potentially be on the hook for all costs *including Defendants' legal fees*. ECF139:¶¶21-26. Those fees, based upon average and mean calculations (and taking into account recent average inflation), could see Petitioners' and Class members' potential liability for Defendants' legal costs range from $22,502 to $107,808 per arbitration. ECF139:¶26. And Defendants haven't been stingy in retaining local legal talent—in the *Osterer* arbitration, Binance has already engaged three Hong Kong lawyers, while BAM Trading has retained international law firm O'Melveny and one of its top partners. ECF139:¶¶31-37.

That specter of innocent crypto-laundering victims having to (potentially) pay Defendants' legal fees is doubly troubling.

For one thing, it contradicts the "American Rule" that would apply to Petitioners' lawsuit in federal court, whereby the parties ordinarily are responsible for their own legal fees—win or lose. *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126 (2015) (under the "'bedrock principle known as the American Rule,'" each party "'pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise'"). It also would contradict the similar default rule in U.S. arbitrations where, without a specific, agreed-to arbitral passage addressing fee-shifting, the losing party isn't responsible for the winner's legal fees. *See ReliaStar Life Ins. Co. v. EMC*

*Nat'l Life Co*., 564 F.3d 81, 87 (2d Cir. 2009) ("'As a general rule, each party to an arbitration must bear its own attorney fees associated with an arbitration action or the enforcement of an arbitration award.'").

For another, it's doubtful that the imposition of those Hong Kong fees could even be challenged on a post-judgment appeal to this Court. *See, e.g.*, *Davis v. Prudential Sec. Inc.*, 59 F.3d 1186, 1190 (11th Cir. 1995) ("It is well settled that judicial review of an arbitration award is narrowly limited."). Absent some exceptional misconduct in the overall arbitration process or by the Hong Kong arbitrators themselves—*e.g.*, fraud, corruption, evident partiality, etc.—the fees foisted upon unsuccessful Petitioners would likely be unreviewable.[18]

At bottom, the foregoing factors make the compelled Hong Kong arbitration no viable remedy at all. Yet by (understandably) abandoning that illogical remedy, Petitioners also won't be able to file an appeal as of right from a final judgment—and thus won't have an adequate remedy in *this* Court, as well.

### D. The writ's issuance is appropriate.

The writ's issuance is particularly appropriate given Petitioners' satisfaction of the two criteria *supra*. To recap: not only is the district court's Order compelling

[18] That any arbitral award's review by this Court would be very narrow was noted earlier today by the Supreme Court. *See Jules v. Andre Balazs Props.*, S. Ct. No. 25-83, slip op. at 2 (May 14, 2026) ("The grounds for vacatur and modification are limited.").

arbitration wrongly decided and contrary to this Circuit's precedents like *Leidel* and *Lubin*, but the ruling virtually guarantees that Petitioners (and their fellow Class members) will have no viable remedy for their injuries caused by Defendants.

Those two conclusions lead to a third, equally disturbing one: the compelled arbitration piles another, likely insurmountable, injury upon those that Petitioners and the Class already suffered at the hands of (i) the criminals who stole their crypto and (ii) Defendants who facilitated that stolen crypto's laundering. The resulting irony is stark: although Defendants flouted statutory obligations designed to thwart bad actors from using the U.S. financial system for money laundering and other illicit activities, the district court's Order now *insulates* them from the consequences of their actions.

One final point for the Court's consideration: U.S. authorities concluded that Defendants' criminal conduct warranted over $4.3 billion in penalties. This Court shouldn't let Defendants avoid similar (albeit civil) responsibility for their deliberate actions that injured Petitioners.

## V. CONCLUSION

For all of the foregoing reasons, the Court should issue a writ of mandamus directing the district court to vacate its arbitration Order and allow Petitioners' lawsuits to proceed.

DATED: May 14, 2026

Respectfully submitted,

ROBBINS GELLER RUDMAN
& DOWD LLP
JOSEPH D. DALEY
ERIC I. NIEHAUS

*s/Joseph D. Daley*
JOSEPH D. DALEY

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
jdaley@rgrdlaw.com
ericn@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN
JONATHAN A. OHLMANN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
ekaufman@rgrdlaw.com
johlmann@rgrdlaw.com

SILVER MILLER
DAVID C. SILVER
JASON S. MILLER
Florida Bar No.: 572764
4450 NW 126th Avenue, Suite 101
Coral Springs, FL 33065
Telephone: 954/516-6000
dsilver@silvermillerlaw.com
jmiller@silvermillerlaw.com

HERMAN JONES LLP
JOHN C. HERMAN
3424 Peachtree Road NE, Suite 1650
Atlanta, GA 30326
Telephone: 404/504-6500
404/504-6501 (fax)
jherman@hermanjones.com

KELLER ROHRBACK, L.L.P.
DEREK W. LOESER
CHRIS N. RYDER
1201 Third Avenue, Suite 3400
Seattle, Washington 98101-3268
Telephone: 206/623-1900
dloeser@kellerrohrback.com
cryder@kellerrohrback.com

*Attorneys for Petitioners*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

This document complies with the word limit of FRAP 21(d)(1) because, excluding the parts of the document exempted by FRAP 32(f), this document contains 7,547 words.

This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) by using the Microsoft Word 2016 word-processing system and font size 14 Times New Roman.

*s/Joseph D. Daley*
JOSEPH D. DALEY

DECLARATION OF SERVICE

I, the undersigned, declare:

1. That declarant is and was, at all times herein mentioned, a citizen of the United States and employed in the City and County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2. I hereby certify that on May 14, 2026, I electronically filed the foregoing document: PETITION FOR WRIT OF MANDAMUS with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system.

3. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within three calendar days, to the district court and all parties listed on the attached Service List.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 14, 2026, at San Diego, California.

*s/Joseph D. Daley*
JOSEPH D. DALEY

Silver Miller
David C. Silver
Jason S. Miller
4450 NW 126th Avenue, Suite 101
Coral Springs, FL 33065

Herman Jones LLP
John C. Herman
3424 Peachtree Road NE, Suite 1650
Atlanta, GA 30326

Keller Rohrback, L.L.P.
Derek W. Loeser
Chris N. Ryder
1201 Third Avenue, Suite 3400
Seattle, Washington 98101-3268

Winston & Strawn LLP
Thania Charmani
200 Park Avenue
New York, NY 10166

Winston & Strawn LLP
Daniel Stabile
Gabriela Plasencia
Southeast Financial Center
200 South Biscayne Blvd., 24th Floor
Miami, Florida 33131

Withers Bergman LLP
Tyler Goss
Christopher N. LaVigne
430 Park Avenue, 10th Floor
New York, NY 10022

Withers Bergman LLP
Vahe Mesropyan
10250 Constellation Blvd., Suite 1400
Los Angeles, CA 90067

Withers Bergman LLP
Kimberly Pallen
909 Montgomery St., Suite 300
San Francisco, CA 94133

Dickinson Wright PLLC
Harold S. Vogel Jr.
350 East Las Olas Blvd., Suite 1750
Ft. Lauderdale, FL 33301

Carlton Fields, P.A.
Aaron S. Weiss
700 N.W. 1st Ave., Suite 1200
Miami, FL 33136

United States District Court, Western District of Washington
The Honorable Barbara J. Rothstein
700 Stewart Street, Suite 8230
Seattle, WA 98101-9906

United States District Court, Southern District of Florida
The Honorable Rodolfo A. Ruiz II
Wilkie D. Ferguson Jr. United States Courthouse
400 N. Miami Avenue
Courtroom 11-2
Miami FL 33128

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-CV-22100-RAR**
**CASE NO. 25-CV-22202-RAR**

**PHILLIP MARTIN**, *et al.*,
*individually and on behalf of*
*all others similarly situated*,

Plaintiffs,

v.

**BINANCE HOLDINGS LTD.**
*d/b/a* **BINANCE**, *et al.*,

Defendants.
_______________________________________/

**CHARLES BARATTA**, *et al.*,
*individually and on behalf of*
*all others similarly situated*,

Plaintiffs,

v.

**BINANCE HOLDINGS LTD.**,
*d/b/a* **BINANCE**, *et al.*,

Defendants.
_______________________________________/

**ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION**

**THIS CAUSE** comes before the Court upon Defendants Binance Holdings, Ltd. ("Binance"), BAM Trading Services Inc. ("BAM"), and Changpeng Zhao's Motion to Compel Arbitration ("Motion"), [ECF No. 137]. On July 31, 2024, the Court entered an Order Granting Defendants' Motion to Compel Arbitration in *Osterer v. BAM Trading Services Inc., et al.* Now before the Court is another Motion to Compel Arbitration in two consolidated cases arising from similar factual allegations. Plaintiffs argue that the inclusion of more Plaintiffs, a new Defendant,

and additional statutory causes of action commands the Court to reach a different result than in *Osterer*—but that is not so.

Having carefully considered the Motion, Plaintiffs' Response in Opposition, [ECF No. 138], Defendants' Corrected Reply in Support, [ECF No. 143], the record, and being otherwise fully advised, it is hereby

**ORDERED AND ADJUDGED** that Defendants' Motion, [ECF No. 137], is **GRANTED** for the reasons set forth herein.

## BACKGROUND

### I. *Osterer*

On July 31, 2024, the Court entered an Order Granting Defendants' Motion to Compel Arbitration ("*Osterer* Order") in a related case—*Osterer v. BAM Trading Services Inc., et al.*, No. 23-22083, ECF No. 71. *Osterer* involved a Class Action Complaint against Binance and BAM that asserted claims for conversion, aiding and abetting conversion, and unjust enrichment. *See Osterer*, ECF No. 1. The plaintiff, Michael Osterer, alleged that his and other class members' digital assets were stolen and laundered through Binance accounts due to Defendants' failure to comply with Know Your Customer ("KYC") and Anti-Money Laundering ("AML") protocols. *Id.* at ¶ 1. He further alleged that Defendants "unjustly enriched themselves by collecting significant fees on transactions involving Plaintiff's stolen cryptocurrency." *Id.*

Osterer had maintained an account with U.S.-based cryptocurrency exchange Coinbase, but he did not have an account with Binance or BAM—which are different exchanges. *Osterer*, ECF No. 1 at ¶ 76. He alleged that an unauthorized hacker infiltrated his Coinbase account and stole approximately 8 BTC and 449 ETH from him, which the hacker subsequently routed into several Binance accounts. *Id.* at ¶¶ 77–82. Then, the hacker allegedly withdrew the stolen funds from the Binance accounts and absconded with the money. *Id.*

Defendants Binance and BAM moved to compel arbitration on a theory of equitable estoppel, pointing to the Arbitration Provision[1] in Binance's Terms of Use. *See* Terms, *Osterer*, ECF No. 49-1 at § X.2. The Arbitration Provision required arbitration of any claims "arising in connection with or relating in any way to these Terms or to your relationship with Binance." *Id.* The Terms of Use also included a Delegation Provision,[2] providing that threshold questions as to the jurisdiction, applicability, or scope of the Arbitration Provision are also subject to mandatory arbitration. *Id.*

Osterer countered by arguing that the Terms of Service, and thus the Arbitration and Delegation Provisions included therein, did not apply to him as he was not a party to the underlying agreement. *Osterer*, ECF No. 52. Because a user agrees to the Binance Terms of Use by checking a box while creating their account, Osterer—who never had a Binance account and thus never agreed to the Terms of Use—maintained that he could not be bound by them. *Id.* Osterer further argued that his claims were rooted in the regulatory scheme under which Defendants operated (such as failing to maintain adequate KYC and AML protocols) and thus did not arise from or relate to the Terms of Use. *Id.* at 12–13.

The Court ultimately sided with Defendants and compelled arbitration. *See Osterer*, ECF No. 71. After finding that it had jurisdiction to determine the threshold issues regarding the validity

---

[1] The Arbitration Provision states: "You and Binance Operators agree that, subject to paragraph 1 above, any dispute, claim, or controversy between you and Binance (and/or Binance Operators) arising in connection with or relating in any way to these Terms or to your relationship with Binance (and/or Binance Operators) as a user of Binance Services (whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory, and whether the claims arise during or after the termination of these Terms) will be determined by mandatory final and binding individual (not class) arbitration, except as set forth below under Exceptions to Agreement to Arbitrate."

[2] The Delegation Provision states: "You and Binance Operators further agree that the arbitrator shall have the exclusive power to rule on his or her own jurisdiction, including without limitation any objections with respect to the existence, scope or validity of the Agreement to Arbitrate, or to the arbitrability of any claim or counterclaim . . . ."

of the Arbitration and Delegation Provisions, the Court held that there was a valid agreement to arbitrate under the doctrine of equitable estoppel. *Id.* The Court pointed out that "a party may compel arbitration against a non-signatory to a contract if the 'plaintiff is relying on a contract to assert its claims and [ ] the scope of the arbitration clause in that contract covers the dispute.'" *Id.* at 6 (quoting *Leidel v. Coinbase, Inc.*, 729 F. App'x 883, 887 (11th Cir. 2018)).

Notably, the Court was unpersuaded by Osterer's attempt to ground his claims in Defendants' failure to comply with KYC and AML rules. *Id.* at 8. Rather, the Court found that Osterer's claims derived from the Terms of Service, which broadly required arbitration of any claims "arising in connection with or relating in any way to these Terms." *Osterer*, ECF No. 71 at 10. Osterer's allegations involved Binance's failure to freeze the deposited funds, which would have "halted the further movement of his stolen property." *Id.* (cleaned up). Thus, his claims had a significant relationship to the Terms of Use because "determining whether Defendants had the ability and obligation to freeze funds will require referencing § II(D)(1) of the Terms." *Id.* The Court also pointed out that Osterer's claims were *not* rooted in Defendants' failure to properly identify customers or trace the origin of deposited funds, as required by KYC and AML protocols. *Id.*

On May 24, 2024, Osterer moved for leave to amend his Complaint. *Osterer*, ECF No. 62. He sought to add Binance founder and CEO Changpeng Zhao as a Defendant. *Id.* at 1. He also sought to add three plaintiffs—Phillip Martin, T.F. (Natalie) Tang, and Yatin Khanna—"who all have been injured by the same wrongful practices of Defendants as Plaintiff Osterer was." *Id.* Finally, he sought to add a claim for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1962(c)-(d). *Id.* But the Court compelled arbitration on July 31, 2024, and in doing so, denied Osterer's request for leave to amend his Complaint as moot. *Osterer*, ECF No. 71.

## II. *Martin* and *Baratta*

Shortly after the Court entered its Order compelling arbitration in *Osterer*, two cases were filed in the Western District of Washington. The first was filed on August 16, 2024—about two weeks after entry of the *Osterer* Order—and included the new defendant, new plaintiffs, and RICO claim that Osterer had unsuccessfully sought leave to add. Indeed, Plaintiffs Philip Martin, T.F. (Natalie) Tang, and Yatin Khanna ("*Martin* Plaintiffs") filed a Class Action Complaint against Binance, BAM, and Zhao. *Martin*, [ECF No. 1].

Like in *Osterer*, the *Martin* Plaintiffs alleged that their cryptocurrency was stolen from other exchanges and sent to Binance accounts. *Id.* at ¶¶ 19–21. As such, they allege that "Binance.com failed to apply KYC and AML procedures as required by statutory law to detect the lawful ownership of the cryptocurrency properly belonging to Plaintiffs or members of the Class." *Id.* at ¶ 22. The *Martin* Complaint asserts three counts against Defendants: conversion and aiding and abetting conversion (which were also brought in *Osterer*), as well as a RICO claim. *See generally Martin*, [ECF No. 1].

Then, on April 9, 2025, Plaintiffs Charles Baratta, Jason Rappaport, Donald Douty, Thomas Viola, and Hyacinth Ahuruonye ("*Baratta* Plaintiffs") filed a Class Action Complaint against the same three Defendants—Binance, BAM, and Zhao. *Baratta*, [ECF No. 1]. The *Baratta* Plaintiffs similarly allege that their cryptocurrency was stolen and sent to Binance accounts, and they also point to Binance's violations of KYC and AML protocols among other statutory obligations. *See generally id.* The *Baratta* Complaint asserts the same three counts as *Martin*—conversion, aiding and abetting conversion, and RICO—as well as two additional counts for violations of the California Unfair Competition Law ("UCL") and the Massachusetts Consumer Protection Act ("MCPA"). *Id.*

Due to their similarities to *Osterer*, both *Martin* and *Baratta* were transferred to this District from the Western District of Washington. *See Martin*, [ECF Nos. 75, 79]; *Baratta*, [ECF Nos. 14, 18]. In her Order Granting Defendants' Motion to Transfer or Compel Arbitration in *Martin*, Judge Barbara Rothstein held that the parties and issues in *Martin* were "substantially similar" to those in the first-filed *Osterer*. *Martin*, [ECF No. 75] at 4–7. Then, in *Baratta*, the parties filed a Stipulated Motion to Transfer, which Judge Rothstein also granted. *Baratta*, [ECF Nos. 12, 14]. While the cases were originally assigned to other judges in this District, both were promptly transferred to this Court. *Martin*, [ECF No. 79]; *Baratta*, [ECF No. 18]. The Court consolidated the cases on May 22, 2025 for purposes of Defendants' forthcoming Motion to Compel Arbitration. *Martin*, [ECF No. 108]; *Baratta*, [ECF No. 20].

**III. Defendants' Motion to Compel Arbitration**

Defendants filed their Motion to Compel Arbitration on July 25, 2025. *Martin*, [ECF No. 137]. Defendants argue that because *Martin* and *Baratta* are predicated on the same facts and concern the same issues as *Osterer*, Plaintiffs should likewise be compelled to arbitrate their claims. *Id*. at 14. Defendants further argue that Plaintiffs should be judicially estopped from asserting that their claims are different from those in *Osterer*, and that collateral estoppel principles preclude Plaintiffs from relitigating the issue of arbitrability because it was already decided in *Osterer*. *Id*. at 17, 19.

Plaintiffs raise several arguments in their Response. *Martin*, [ECF No. 138]. First, Plaintiffs assert that no valid arbitration agreement exists between Plaintiffs and Defendants—an argument that the Court rejected in *Osterer*. *Id*. at 13–15. Next, in an attempt to distinguish their cases from *Osterer*, Plaintiffs argue that equitable estoppel does not apply because Plaintiffs' claims derive from Defendants' statutory obligations. *Id*. at 15. Finally, Plaintiffs attack the arbitration agreement as unconscionable, illegal, and unenforceable. *See id*. at 17–26.

Defendants' Motion ultimately turns on whether the inclusion of new plaintiffs, a new defendant, and additional claims in *Martin* and *Baratta* necessitate a different result than the one reached in *Osterer* on the question of arbitrability. But it does not, and the *Martin* and *Baratta* Plaintiffs must likewise arbitrate their claims.

## LEGAL STANDARD

The Arbitration Provision is governed by the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. ("FAA"). Under the FAA, a district court must grant a motion to compel arbitration if it is satisfied that there is an "issue referable to arbitration under an agreement in writing for such arbitration[.]" *See* 9 U.S.C. § 3; *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) ("[T]he [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration . . . ."). "[A]ny doubts" concerning the arbitrability of a dispute "should be resolved in favor of arbitration[.]" *Moses H Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *see also Attix v. Carrington Mortg. Servs., LLC*, 35 F.4th 1284, 1294 (11th Cir. 2022). Under the FAA, a district court must compel arbitration if (1) a valid written agreement to arbitrate exists, (2) an arbitrable issue exists, and (3) the right to arbitrate has not been waived. *Integrated Sec. Servs. v. Skidata, Inc.*, 609 F. Supp. 2d 1323, 1324 (S.D. Fla. 2009).

## ANALYSIS

### I. As in *Osterer*, Plaintiffs are compelled to arbitrate their claims against Defendants pursuant to Binance's Terms.

Defendants, pointing to this Court's analysis in *Osterer*, assert that a valid arbitration agreement exists and that Defendants did not waive their right to arbitrate, satisfying the first and third elements requiring arbitration. Mot. at 15 (citing *Osterer* Order at 6–7). Defendants also argue that the second element—whether an arbitrable issue exists—is also met because Plaintiffs'

claims, which derive from Binance's Terms, are subject to the Terms' Arbitration Provision under principles of equitable estoppel. Despite Plaintiffs' arguments to the contrary, Defendants are correct.

First, Plaintiffs argue that no valid arbitration agreement exists between Plaintiffs and Defendants because "Plaintiffs never created or owned Binance accounts, and therefore never agreed to the Terms."[3] Resp. at 13–14. However, the Court squarely rejected this argument in *Osterer*. *See Osterer* Order at 7–8. Indeed, under the doctrine of equitable estoppel, a party may compel arbitration against a non-signatory to a contract if the "plaintiff is relying on a contract to assert its claims and [ ] the scope of the arbitration clause in that contract covers the dispute." *Leidel*, 729 F. App'x at 887. Here, as in *Osterer*, Plaintiffs did not have Binance accounts and thus never agreed to the Terms. *See Martin*, [ECF No. 1] at ¶¶ 19–21; *Baratta*, [ECF No. 1] at ¶¶ 20–53. But Defendants can nevertheless compel arbitration against the non-signatory Plaintiffs if their claims rely on Binance's Terms and the Terms' arbitration clause covers the dispute. *Leidel*, 729 F. App'x at 887.

Plaintiffs argue that their claims derive from Defendants' statutory obligations, rather than Binance's Terms. Resp. at 15. This same argument, however, was rebuffed in *Osterer*, where the Court concluded that "Defendants' failure to freeze the deposited funds has no connection to

---

[3] Plaintiffs also maintain that Defendants have not shown a valid arbitration agreement exists between the parties on two evidentiary grounds. First, Plaintiffs assert that "Defendants have not even presented the full arbitration agreement for any date, as they failed to produce the 'Exceptions to Agreement to Arbitrate' section referenced in the arbitration clauses of the Terms." Resp. at 5 n.5. While the Terms make such a reference, it does not appear that the provision was omitted by Defendants. Moreover, the Court considered the Terms as produced in *Osterer* without any concern about their completeness.

Next, Plaintiffs claim that "even though Defendants have produced several agreements from April 20, 2020 to June 24, 2022, they have not established that any of those agreements were in effect with respect to any of the Plaintiffs . . . who had crypto laundered at Binance during 2023 or 2024." *Id.* at 6–7. But, as Defendants point out in their Reply, they produced a version of the Terms that were in effect in 2023 and 2024 in support of their Motion to Transfer, [ECF No. 68-10], which include the same Arbitration and Delegation Provisions. *See* Reply at 4.

Defendant's failure (or statutory obligation) to properly identify customers or trace the origin of deposited funds." *Osterer* Order at 10. Thus, "determining whether Defendants had the ability and obligation to freeze funds will require referencing § II(D)(1) of the Terms." *Id.*

Here, the Court's inquiry centers on whether the *Martin* and *Baratta* Plaintiffs' inclusion of additional statutory claims alters this analysis. It does not. Despite Plaintiffs' addition of claims under RICO, the UCL, and the MCPA, *Martin* and *Baratta* are ultimately predicated on the same factual allegations as *Osterer*. Thus, Plaintiffs' claims likewise arise in connection with or relate to Binance's Terms.

In evaluating whether a plaintiff's claims fall within the scope of an arbitration clause, courts look to the facts alleged in the complaint. *U.S. Nutraceuticals, LLC v. Cyanotech Corp.*, 769 F.3d 1308, 1311 (11th Cir. 2014) (citing *Doe v. Princess Cruise Lines, Ltd.,* 657 F.3d 1204, 1208 (11th Cir. 2011)). This analysis involves evaluating the "true thrust" of the complaint, regardless of how the plaintiff "couches its allegations in various terms and theories of action." *Id*. at 1312 (cleaned up). Here, Binance's Terms include a broad Arbitration Provision that covers "any dispute, claim, or controversy between you and Binance (and/or Binance Operators) arising in connection with or relating in any way to these Terms . . . whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory." *See* Terms at § X.2.[4] Thus, Plaintiffs' claims are subject to arbitration if the factual allegations underlying them arise in connection with or relate to the Terms, regardless of how their legal theory is framed.

The *Martin* Plaintiffs' claims clearly arise in connection with or relate to the Terms in the same way as Osterer's claims. Indeed, the *Martin* Complaint is nearly identical to the Complaint

[4] Defendants attach various iterations of Binance's Terms to their Motion to Compel Arbitration. *See* [ECF No. 137-1] at 194, 219, 242, 265, 288, 312, 335, 368, 394. Defendants also produced a more recent version of the Terms with their Motion to Transfer. *See* [ECF No. 68-10].

in *Osterer*, as illustrated by the redline Defendants attach to their Motion. *See* [ECF No. 137-1] at 5. To be clear, the *Martin* Plaintiffs attempt to distinguish their case from *Osterer* by removing the unjust enrichment claim and adding allegations that "Plaintiffs are not relying on any contracts or agreements entered into between Binance or BAM Trading (including Binance.US) and any users of Binance" because "Plaintiffs' claims are based on Binance and CZ, aided and abetted by BAM Trading, violating federal statutory obligations and engaging in the conversion of, and aiding and abetting the conversion of, cryptocurrency properly belonging to Plaintiffs and the members of the Class." *Martin*, [ECF No. 1] ¶ 11.

But these modifications do not change the "true thrust" of the *Martin* Complaint—which remains the same as the *Osterer* Complaint. *U.S. Nutraceuticals, LLC*, 769 F.3d at 1312. Like Osterer, the *Martin* Plaintiffs allege that they were not Binance users who had their cryptocurrency stolen and laundered through Binance—which allowed Defendants to collect fees from transactions involving their stolen cryptocurrency. *Martin*, [ECF No. 1] ¶¶ 19–22, 41. And although the *Martin* Plaintiffs allege a RICO violation in place of unjust enrichment, the present inquiry turns on the underlying factual allegations—*not* the theories of action under which Plaintiffs couch their allegations. *U.S. Nutraceuticals, LLC*, 769 F.3d at 1312. The fact that Osterer sought leave to amend to add the new Plaintiffs, Defendants, and RICO claim to his own Complaint illustrates the lack of daylight between the two cases. *See Osterer*, ECF No. 62. Thus, the Court must likewise compel arbitration in *Martin* for the same reasons as in *Osterer*.

*Baratta* is no different, as it includes similarly situated Plaintiffs suing the same Defendants for the same conduct. *See* [ECF No. 137-1] at 89 (providing a redline comparing the *Baratta* and *Osterer* Complaints). *Baratta* similarly focuses on Defendants' collection of fees from transactions involving non-Binance-user Plaintiffs' stolen cryptocurrency, alleging that "Binance has a strong monetary incentive to encourage, facilitate, and allow as many transactions on its

exchange as possible, even transactions involving stolen cryptocurrency." *Baratta*, [ECF No. 1] ¶ 67. Despite its emphasis on KYC and AML procedures, and its three counts for statutory causes of action, the true thrust of the *Baratta* Complaint is nevertheless the same as *Osterer* and *Martin*. As such, the Court must also compel arbitration in *Baratta*.

**II. Plaintiff's additional challenges are without merit because the Terms' Delegation Provision vests the arbitrator with the power to decide threshold issues of arbitrability.**

Plaintiffs also raise three contract-based arguments challenging the arbitration agreement itself. *First*, Plaintiffs argue that the arbitration agreement is both procedurally and substantively unconscionable. Resp. at 17–22. *Second*, Plaintiffs argue that Defendants are seeking to enforce an illegal contract, citing Binance's Plea Agreement with the Department of Justice over separate conduct. *Id.* at 22. *Third*, Plaintiffs argue that the doctrine of effective vindication applies, as the arbitration agreement prohibits Plaintiffs from pursuing their statutory claims under RICO, the UCL, and the MCPA. *Id.* at 22–26. But these arguments are for the arbitrator to resolve, as Binance's Terms—which Plaintiffs are subject to—include a Delegation Provision that vests the arbitrator with the power to decide these threshold issues of arbitrability.

"When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019). "In those circumstances, a court possesses no power to decide the arbitrability issue." *Id.* at 68. Under Eleventh Circuit precedent, courts employ a two-step approach to determine whether an arbitrator should decide threshold issues of arbitrability. First, courts must "consider whether the parties clearly and unmistakably agreed to delegate questions of arbitrability to an arbitrator." *Attix*, 35 F.4th at 1296. Then, courts look at whether the party opposing arbitration specifically challenged the enforceability of the parties' delegation agreement. *Id.* If the parties agreed to delegate questions of arbitrability to an arbitrator *and* the

party opposing arbitration has not specifically challenged the enforceability of the delegation agreement, the court must "enforce the parties' delegation agreement as written and compel arbitration." *Id.*

Here, the Terms' Delegation Provision serves as a clear and unmistakable agreement to delegate questions of arbitrability to an arbitrator. The Court has already held that Plaintiffs are subject to Binance's Terms. *See supra* at 8. And the Terms include a Delegation Provision that provides "the arbitrator shall have the exclusive power to rule on his or her own jurisdiction, including without limitation any objections with respect to the existence, scope or validity of the Agreement to Arbitrate, or to the arbitrability of any claim or counterclaim." Terms at § X.2. Indeed, the Delegation Provision here is even more specific than the one in *Attix*, which the Eleventh Circuit deemed to be sufficiently clear and unmistakable. *Attix*, 35 F.4th at 1296–97 ("The arbitrator shall also decide what is subject to arbitration unless prohibited by law. The arbitration will be administered by American Arbitration Association ("AAA") under its Consumer Arbitration Rules,[5] which are available at https://www.adr.org/active-rules.").

Moreover, Plaintiffs' arguments do not specifically challenge the enforceability of the Delegation Provision. Rather, they attack the Arbitration Provision or Binance's Terms at large. A party may resist an arbitration agreement by asserting one of two types of challenges under § 2 of the FAA. The first type "challenges specifically the validity of the agreement to arbitrate," while the second "challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.*, the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." *Rent-A-Ctr, W., Inc. v.*

[5] The *Attix* court noted that the AAA's Consumer Arbitration Rules state that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." *Attix*, 35 F.4th at 1297–98.

*Jackson*, 561 U.S. 63, 70 (2010) (citing *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006)). Only the first type of challenge may defeat a delegation provision. *Id.* Thus, "a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate." *Id.* That said, when the challenge to one part of the contract "applies 'equally' to the whole contract and to an arbitration or delegation provision, a court must address that challenge." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 151 (2024).

In *Osterer*, the Court held that it had jurisdiction to determine the validity of the Arbitration and Delegation Provisions. *Osterer* Order at 4. Specifically, the Court noted that by "disputing the very existence" of a valid agreement to arbitrate, plaintiff's challenge applied equally to the Arbitration and Delegation Provisions. *Id.* at 6 (citing *Coinbase, Inc.*, 602 U.S. at 151). A similar challenge to the validity or enforceability of a delegation provision occurred in *Parm v. Nat'l Bank of California, N.A.*, 835 F.3d 1331 (11th Cir. 2016). There, the plaintiff contested the arbitration clause's provision that "any Dispute . . . will be resolved by Arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules." *Id.* at 1333. The plaintiff argued that "the delegation clause is unenforceable because the arbitration agreement provides no available forum for an arbitrator to decide threshold issues of arbitrability," noting that the Cheyenne River Sioux Tribal Nation does not arbitrate disputes or have arbitration procedures. *Id.* at 1135. Because the plaintiff argued that the designated forum was illusory, she specifically contested the primary agreement to arbitrate *and* the delegation provision. *Id.* at 1337. In other words, plaintiff's challenges in both *Osterer* and *Parm* went directly to whether an arbitration could occur at all, thereby calling into question the entirety of the parties' agreement to arbitrate—and by extension, the parties' delegation agreement as well.

Conversely, general challenges to arbitration provisions that do not specifically implicate delegation provisions are for the arbitrator to resolve. This was the case in *Rent-a-Center*, where the plaintiff contested an arbitration agreement as unconscionable. *Rent-A-Ctr*, 561 U.S. at 73. Particularly, the plaintiff argued that the arbitration provision was one-sided in that it only covered claims that an employee would likely bring against Rent-a-Center, and that it required unconscionable fee-splitting arrangements and limitations on discovery. *Id.* The Supreme Court held that the plaintiff did not specifically contest the delegation provision, which he did not even mention, but instead assailed other provisions of the contract for imposing unconscionable arbitration procedures. *Id.* at 73–74. The Eleventh Circuit reached a similar conclusion *Attix*, where plaintiff's challenge involved whether the arbitration clause covered claims brought pursuant to the Dodd-Frank Act. 35 F.4th at 1307. The Eleventh Circuit held that "[b]y arguing that § 1639c(e)(3) [of the Dodd-Frank Act] gives him the right to prosecute his claims against Carrington in federal court, Attix is disputing the enforceability of the parties' *primary arbitration* agreement." *Id.* (emphasis added). The plaintiff's Dodd-Frank challenge did not concern the *delegation* agreement, which provided that an arbitrator shall determine his or her own jurisdiction to decide what is subject to arbitration. *Id.*

Thus, cases like *Rent-a-Center* and *Attix* concern challenges to the procedures and scope of the arbitration—threshold determinations that were reserved for an arbitrator pursuant to a delegation clause. Neither case addressed the validity or enforceability of the delegation clause at issue. And failure to do so requires a court to treat such a delegation agreement as valid under § 2 of the FAA and enforce it pursuant to §§ 3 and 4. *Attix*, 35 F.4th at 1304.

Here, Plaintiff's unconscionability, illegality, and effective vindication arguments address the parameters of the arbitration—rather than the foundational question of whether the arbitration can actually take place. For instance, Plaintiffs allege that the arbitration agreement is

substantively unconscionable because it exists solely to insulate Defendants from liability, and that it includes other substantively unconscionable mechanisms like the cost-splitting model. Resp. at 19–22. These challenges are analogous to the *Rent-a-Center* plaintiff's unconscionability arguments—which were not specific to the delegation provision and thus for the arbitrator to resolve. *See Rent-A-Ctr*, 561 U.S. at 73–74. And Plaintiffs' effective vindication arguments assert that the arbitration provision prevents Plaintiffs from pursuing statutory remedies under RICO, the UCL, and the MCPA. Resp. at 22–26. But, as with the Dodd-Frank challenge in *Attix*, this is a clear threshold dispute about what claims can be subject to arbitration. *See Attix*, 35 F.4th 1307. Pursuant to the Terms' Delegation Clause, these are all objections for Plaintiffs to raise before an arbitrator.

Plaintiffs also challenge Binance's Terms on procedural unconscionability and illegality grounds. On procedural unconscionability, Plaintiffs essentially repackage their arguments that they cannot be bound by the Terms because they never agreed to them and lacked notice of the Arbitration Clause included therein. Resp. at 17–19. And on illegality, Plaintiffs argue that Binance's Terms are an unenforceable, illegal contract because of Binance's Plea Agreement with the Department of Justice for "conspiring to conduct, and conducting, an unlicensed [money transmitting business] in violation of federal law." *Id.* at 22.

In general, "[a]rbitration provisions will be upheld as valid unless defeated by fraud, duress, unconscionability, or another 'generally applicable contract defense.'" *Parnell v. CashCall, Inc.*, 804 F.3d 1142, 1146 (11th Cir. 2015) (quoting *Rent-A-Ctr*, 561 U.S. at 67–68). But "[w]hen an arbitration agreement contains a delegation provision and the plaintiff raises a challenge to the contract *as a whole*," review is committed to the arbitrator—unless the plaintiff has "'challenge[d] the delegation provision *specifically*.'" *Id.* (quoting *Rent-A-Ctr*, 561 U.S. at 72). Here, Plaintiffs raise generally applicable contract defenses against the Terms as a whole,

which do not specifically challenge the Delegation Provision. And the challenges Plaintiffs assert here do not "apply equally" to the arbitration agreement *and* the Delegation Provision. *Coinbase, Inc.*, 602 U.S. at 151.

By contrast, the challenge to the Terms in *Osterer* "applied equally" to the Arbitration and Delegation Provisions. *Osterer* Order at 5. There, Osterer maintained that he was not a party to the Terms *at all*, which directly implicated whether he fell under the ambit of the Arbitration *and* Delegation Provisions. *See id.* at 6. Accordingly, Osterer's attack on the Terms as a whole constituted a specific attack on the delegation provision in substance. *See Mod. Perfection, LLC v. Bank of Am., N.A.*, 126 F.4th 235, 243 (4th Cir. 2025) (explaining that while *Coinbase* "does not require that a party challenge *only* the . . . delegation provision," a party's challenge to the contract as a whole must still *specifically* implicate said provision (quoting *Coinbase, Inc.*, 602 U.S. at 151)).

Here, the Court lacks jurisdiction to hear Plaintiffs' procedural unconscionability and illegality arguments because, while they challenge the Terms as a whole, they do not mention or implicate the Delegation Provision at all. *See Lackie Drug Store, Inc. v. OptumRx, Inc.*, 143 F.4th 985, 998 (8th Cir. 2025) ("[U]nlike the plaintiff in *Coinbase*, Lackie has never challenged the delegation clause."); *Brown v. Santander Consumer USA Inc.*, No. 3:24-CV-00665-NJR, 2025 WL 2280559, at *9 (S.D. Ill. Aug. 8, 2025) (enforcing the delegation clause where plaintiff did not challenge the substance of the arbitration or delegation clauses but rather argued that the underlying contract was void in its entirety). Unlike in *Osterer* and *Parm*, these challenges only address the enforceability of the Terms in a general fashion; they do not challenge the delegation provision directly. Thus, it is within the province of an arbitrator to consider the Terms' overall enforceability—a quintessential threshold inquiry.

## CONCLUSION

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1. The Motion, [ECF No. 137], is **GRANTED**.

2. The *Martin* and *Baratta* Plaintiffs are **COMPELLED** to arbitrate their claims against Defendants pursuant to the Terms.

3. This case is **STAYED** pending the conclusion of arbitration proceedings.

4. The parties shall provide the Court with joint status reports every **sixty (60) days** regarding the status of arbitration proceedings.

5. The Clerk shall **CLOSE** this case for administrative purposes only.

**DONE AND ORDERED** in Miami, Florida, this 16th day of March, 2026.

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**