**No. 26-11695**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

---

IN RE PHILIP MARTIN, ET AL.

---

On Petition for Writ of Mandamus to the
United States District Court for the Southern District of Florida
Case Nos. 1:25-cv-22100-RAR, 1:25-cv-22202-RAR

---

# RESPONDENTS BINANCE HOLDINGS, LTD., BAM TRADING SERVICES, INC. AND CHANGPENG ZHAO'S RESPONSE TO PETITION FOR WRIT OF MANDAMUS

---

Christopher N. LaVigne
Withers Bergman LLP
430 Park Avenue, 10th Floor
New York, New York 10022

*Attorneys for Defendant Binance Holdings, Ltd. d/b/a Binance*

Daniel Stabile (FBN 95750)
Winston Taylor LLP
200 S. Biscayne Blvd., Suite 2400
Miami, Florida 33131

*Attorneys for Defendant BAM Trading Services Inc.*

Harold S. Vogel, Jr. (FBN 432784)
Jacob S. Frenkel
Dickinson Wright PLLC

*Attorneys for Defendant Changpeng Zhao*

# TABLE OF CONTENTS

**Page**


I. PRELIMINARY STATEMENT ... 1

II. STATEMENT OF THE CASE ... 6

A. Plaintiffs' Counsel Files the First-Filed *Osterer* in the District Court on Behalf of the Same Putative Class as that in *Martin* and *Baratta* ... 6

B. While the Arbitration Motion Was Pending, Plaintiffs' Counsel Sought Leave to Add the *Martin* Plaintiffs and a RICO Claim ... 8

C. The District Court Found Plaintiffs' Claims Rely on BHL's Terms, Compelled Arbitration, and Denied Leave to Amend as Moot ... 9

D. Plaintiffs Filed Two Copycat Complaints in the Western District of Washington and Judge Rothstein Found that *Martin* and *Baratta* Are Substantially Similar to *Osterer* ... 10

E. Judge Ruiz Compels the Substantially Similar *Martin* and *Baratta* Cases to the Ongoing HKIAC Arbitration Based on the Terms ... 13

III. LEGAL STANDARD ... 15

IV. ARGUMENT ... 16

A. Plaintiffs' Petition is an Improper Attempt to End-Run Congress's Bar on Immediate Appeals of Orders Compelling Arbitration ... 16

1. Congress Explicitly Barred the Relief Plaintiffs Seek ... 16

2. Plaintiffs Can Still Appeal Through Normal Processes at the Conclusion of the Case ... 17

3. In Addition to Their Right to Appeal at the Conclusion of the Case, Plaintiffs Have Other Adequate Means to Seek the Relief They Desire ... 19

B. Plaintiffs Fail to Show a Clear and Indisputable Right to Relief ... 22

C. Plaintiffs' Argument is Otherwise Meritless ... 26

V. CONCLUSION ... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Chem. Corp. v. Daiflon, Inc.*,
449 U.S. 33 (1980) ........ 18, 19, 21

*Am. Exp. Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) ........ 21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 24

*Baratta et al. v. Binance Holdings, Limited et al.*,
Case No. 25-22202 (S.D. Fla.) ........ *passim*

*Baratta v. Binance Holdings, Ltd.*,
2025 WL 1383369 (W.D. Wash. May 13, 2025) ........ 13

*In re BellSouth Corp.*,
334 F.3d 941 (11th Cir. 2003) ........ 5, 15, 18, 20

*Cheney v. U.S. Dist. Ct. for D.C.*,
542 U.S. 367 (2004) ........ 18

*In re Evans*,
2026 U.S. App. LEXIS 1055 (11th Cir. Jan. 14, 2026) ........ *passim*

*Ex parte Fahey*,
332 U.S. 258 (1947) ........ 1, 16

*FI-Tampa, LLC v. Kelly-Hall*,
135 So.3d 563 (Fla. 2d DCA 2014) ........ 21

*In re Gillespie*,
2025 WL 3772082 (4th Cir. Dec. 31, 2025) ........ 17

*In re Huertas*,
779 F. App'x 77 (3d Cir. 2019) ........ 18

*Jackson v. Motel 6 Multipurpose, Inc.*,
130 F.3d 999 (11th Cir. 1997) ........ 1, 16

*Leidel v. Coinbase, Inc.*,
729 F. App'x 883 (11th Cir. 2018) ....................23

*Lindo v. NCL (Bahamas), Ltd.*,
652 F.3d 1257 (11th Cir. 2011) ....................18

*Lipcon v. Underwriters at Lloyd's, London*,
148 F.3d 1285 (11th Cir. 1998) ....................21

*Martin et al. v. Binance Holdings, Limited et al.*,
Case No. 25-22100 (S.D. Fla.) ....................*passim*

*Martin v. Binance Holdings, Ltd.*,
2025 WL 1159213 (W.D. Wash. Apr. 21, 2025) ....................*passim*

*Martin v. Binance Holdings Ltd.*,
2026 WL 739476 (S.D. Fla. Mar. 16, 2026) ....................*passim*

*McDermott Int'l, Inc. v. Underwriters At Lloyds Subscribing To Memorandum of Ins. No. 104207*,
981 F.2d 744 (5th Cir. 1993) ....................17, 22

*Osterer v. Binance Holdings, Ltd., et al.*
No. 23-22083 (S.D. Fla.) ....................6

*Osterer v. BAM Trading Servs. Inc.*,
753 F. Supp. 3d 1289 (S.D. Fla. 2024) ....................*passim*

*Osterer v. Binance Limited Holdings, et al.*,
Case No. 23-cv-22083 (S.D. Fla.) ....................*passim*

*Rain Forest Adventures (Holdings) Ltd. v. AIG Ins. Hong Kong Ltd.*,
2020 WL 1288573 (S.D. Fla. Mar. 18, 2020) ....................21

*Reca v. Flashdot Ltd.*,
2026 WL 82702 (S.D.N.Y. Jan. 12, 2026) ....................26

*Shafer v. Morgan Stanley*,
2025 WL 1890535 (2d Cir. July 9, 2025) ....................20

*Smith v. Spizzirri*,
601 U.S. 472 (2024) ....................5, 17, 27

*United States v. Shalhoub*,
855 F.3d 1255 (11th Cir. 2017) ....................16

*Watt v. OkCoin USA Inc.*,
2026 WL 880154 (N.D. Cal. Mar. 31, 2026) ....................26

*Ya Mon Expeditions, LLC v. Int'l Yacht Brokers Ass'n, Inc.*,
2026 WL 1678244 (11th Cir. June 10, 2026)....................5, 25

**Statutes**

9 U.S.C. § 16(a)(1)(C) ....................17

9 U.S.C. § 16(b) ....................4, 19

9 U.S.C. § 16(b)(2)....................17, 21

28 U.S.C. § 1292(b) ....................5, 17, 19, 21

# I. <u>PRELIMINARY STATEMENT</u>

Mandamus is a "drastic and extraordinary" remedy "reserved for really extraordinary causes." *Ex parte Fahey*, 332 U.S. 258, 259-260 (1947). It is available only "when no other adequate means are available to remedy a clear usurpation of power or abuse of discretion." *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1004 (11th Cir. 1997) (quoting *In re Temple*, 851 F.2d 1269, 1271 (11th. Cir. 1988)). This is no such case.

Plaintiffs[1] seek an extraordinary writ to accomplish what Congress expressly prohibited: immediate appellate review of the district court's order compelling arbitration. Their Petition for Writ of Mandamus ("Petition") is an interlocutory appeal in disguise.

These cases arise from the theft of cryptocurrency by anonymous hackers and Plaintiffs' effort to hold an unrelated cryptocurrency exchange responsible for their losses. Plaintiffs are individuals whose digital assets were stolen from their accounts on exchanges wholly unrelated to Binance, and later moved through Binance.com, a large cryptocurrency exchange. Plaintiffs allege that Respondent Binance

---

[1] "Plaintiffs" refers to the Plaintiffs in the two consolidated actions in the underlying proceedings: *Martin et al. v. Binance Holdings, Limited et al.*, Case No. 25-22100 (S.D. Fla.) ("*Martin*") and *Baratta et al. v. Binance Holdings, Limited et al.*, Case No. 25-22202 (S.D. Fla.) ("*Baratta*").

Holdings, Ltd. ("BHL"), together with BAM Trading Services, Inc. ("BAM"), which operates the independent U.S.-facing Binance.US platform, and Changpeng Zhao, BHL's former CEO (collectively "Respondents" or "Defendants"), could have frozen accounts that allegedly received the stolen funds but chose not to, so that it could keep collecting transaction fees. Seeking to represent a nationwide class of similarly situated purported theft victims, Plaintiffs assert claims for conversion, unjust enrichment, and, in later versions of their pleadings, civil RICO and related statutory violations.

The claims have been litigated across three related, near-identical cases filed by the same counsel: *Osterer v. Binance Limited Holdings, et al.*, Case No. 23-cv-22083 (S.D. Fla.) ("*Osterer*"), the first-filed action, and the two cases now before this Court—*Martin* and *Baratta*. The Southern District of Florida (the "District Court") has reached the same conclusion in each of these cases: they belong in arbitration. That is because Plaintiffs, though not signatories to BHL's Terms of Use ("Terms"), base their theory on rights that exist only under the Terms—including BHL's right to freeze customer accounts, halt customer transactions, and collect transaction fees from its customers—and under the doctrine of equitable estoppel, a party who sues on rights created by a contract is also bound by that contract's arbitration clause.

This dispute has already traveled a long and well-worn path. Plaintiffs' counsel first advanced the same core theory before the District Court in *Osterer*, on behalf of the same putative class, based on the same alleged conduct, against defendants BHL and BAM. Defendants there moved to compel arbitration on the grounds that the class claims depended on rights created by BHL's Terms. While the motion to compel arbitration was pending, Plaintiffs' counsel sought to add the *Martin* Plaintiffs, Changpeng Zhao, and a RICO claim to the *Osterer* action, while assuring the District Court that the amendments would not alter the arbitration analysis. The District Court agreed that the class claims depend on BHL's Terms, compelled arbitration to the Hong Kong International Arbitration Centre ("HKIAC"), and denied the motion for leave to amend the complaint as moot. Osterer then commenced arbitration as ordered.

The *Martin* Plaintiffs, however, abandoned their representations to the District Court and filed *Martin* in the Western District of Washington along with *Baratta*, a second copycat complaint alleging the same conduct and harm.

Multiple courts rejected that maneuver. The Honorable Barbara Rothstein of the Western District of Washington found that *Martin* and *Baratta* were substantially similar to *Osterer*, arose from the same factual predicate, and raised the same central issue. She transferred both cases to the District Court. The cases were then transferred internally to the Honorable Rodolfo A. Ruiz II, who presided over

*Osterer*. Respondents[2] moved to compel arbitration of *Martin*'s and *Baratta*'s claims. Judge Ruiz reached the same conclusion he had reached in *Osterer*: despite the addition of RICO and other statutory claims, the complaints remained predicated on the same allegations and belonged in arbitration. Plaintiffs were compelled to arbitrate, and the litigation was stayed.

Plaintiffs' own conduct confirms they have always understood these cases to be one and the same. In the *Osterer* HKIAC arbitration, Plaintiffs' counsel agreed to stay the proceeding pending resolutions of the motions to compel in *Martin* and *Baratta*, so that, if those cases were also compelled, the three arbitrations could be consolidated. Rather than commence the arbitration that they repeatedly represented they would pursue, Plaintiffs filed this Petition to evade Congress's unequivocal judgment that orders compelling arbitration are not immediately appealable. The Petition should be denied for this reason alone.

Congress made a deliberate choice about the timing of arbitration appeals. Under Section 16 of the Federal Arbitration Act, a party denied arbitration may appeal immediately, but a party *ordered into* arbitration may not. Congress expressly barred interlocutory appeals from orders "directing arbitration to proceed." 9 U.S.C. § 16(b). That one-way rule reflects a policy judgment that arbitration should go

[2] The defined terms "Respondents" or "Defendants" refer to BHL, BAM, and Changpeng Zhao.

forward "as quickly and easily as possible," *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024), without the delay of piecemeal appellate review. Plaintiffs cannot use mandamus as a "subterfuge to obtain appellate review that is otherwise foreclosed by law." *In re BellSouth Corp.*, 334 F.3d 941, 951 (11th Cir. 2003).

Additionally, a writ is not available when, as in this case, Plaintiffs have alternative avenues of relief, such as the arbitration they represented they would pursue, a request for certification under 28 U.S.C. § 1292(b), and appellate review after a final judgment. Writs are reserved for clear usurpations of power and indisputable rights to relief. Plaintiffs fail to meet this high threshold.

Plaintiffs cite no authority—in this Court or any circuit—granting mandamus to vacate an order compelling arbitration. And their reliance on *Ya Mon Expeditions, LLC v. Int'l Yacht Brokers Ass'n, Inc.*, 2026 WL 1678244 (11th Cir. June 10, 2026), which was before this Court following the denial of a motion to compel arbitration, is misplaced. In fact, *Ya Mon* undercuts Plaintiffs' arguments because it recognized that *Osterer* correctly compelled arbitration on equitable estoppel grounds where the nonsignatory plaintiff sued Respondents based on rights created by, or requiring reference to, BHL's Terms. By contrast, the *Ya Mon* plaintiffs, as nonsignatories, were not required to arbitrate their antitrust claims that were unrelated to the agreement containing the arbitration clause.

Put simply, Plaintiffs cannot avoid arbitration by repackaging the same allegations under statutory labels. Their claims still depend on rights created by BHL's Terms of Use, including the alleged ability to freeze accounts, stop transactions, and collect fees. Plaintiffs therefore cannot show a clear and indisputable right to mandamus relief, much less overcome Congress's bar on immediate appeals from orders compelling arbitration.

## II. STATEMENT OF THE CASE

### A. Plaintiffs' Counsel Files the First-Filed *Osterer* in the District Court on Behalf of the Same Putative Class as that in *Martin* and *Baratta*

In June 2023, Plaintiffs' counsel filed the first of the three cases, *Osterer*, attempting to manufacture a nationwide class action against BHL and BAM. Plaintiff Osterer, represented by the same counsel as the Plaintiffs here, alleged claims against BHL and BAM for conversion, aiding and abetting conversion, and unjust enrichment. [*Osterer*, ECF No. 1 ("*Osterer* Complaint").][3] He alleged that unidentified third-party hackers infiltrated his Coinbase account, stole his cryptocurrency, deposited the cryptocurrency in BHL accounts, and then withdrew the funds. [*Id.* ¶¶ 76-81.] Osterer brought the claims on behalf of himself and a putative class consisting of:

---

[3] All "ECF" cites refer to the District Court proceedings in *Osterer*, *Martin*, or *Baratta*, as indicated, whereas "Dkt. No" cites refer to the present proceedings.

> All persons or entities in the United States within the applicable statute of limitations period through class certification who had their stolen cryptocurrency deposited in a Binance account.

[*Id.* ¶ 85.]

Osterer alleged that the harm he and the class suffered was the "direct and proximate result of [BHL]'s policies and failures" [*id.* ¶ 84], and that BHL and BAM were liable because BHL "had the ability to freeze those accounts and stop transactions," but did not do so "for the purpose of earning [BHL] transaction fees" [*id.* ¶¶ 73-75].

BHL and BAM moved to compel arbitration of these claims on equitable estoppel grounds, arguing that Osterer's individual and class claims are based on rights created by BHL's Terms—the right to freeze accounts and charge transaction fees—and, therefore, he was also bound by the Terms' arbitration and class waiver provisions. [*Osterer*, ECF No. 49 ("*Osterer* Arbitration Motion") (attached hereto as Exhibit 1).]

Osterer's principal opposition argument was that his claims were not premised on BHL's ability to freeze accounts and collect fees, and thus not based on the Terms. [*Osterer*, ECF No. 52 (attached hereto as Exhibit 2).] Instead, he argued the claims were based on BHL's "practices that led to Plaintiff and Class Members' losses," including Defendants' "inadequate KYC and AML protocols," policy allowing deposits and withdrawals of up to 2 Bitcoin per day without verification,

and "lack of internal controls" and tracing policies. [*Id.* at 8.] He further argued that the claims were not based on the Terms, but were "rooted 'in the regulatory scheme under which [Defendants] operate.'" [*Id.* at 9.] Specifically, Osterer argued the complaint relied on the same conduct underlying BHL's guilty plea with the Department of Justice, namely that BHL conspired to and did conduct an "unlicensed money transmitting business ('MTB') in violation of Title 18, United States Code – Sections 1960(a) and 1960(b)(1)(B)" and "fail[ed] to maintain an effective Anti-Money Laundering ('AML') program in violation of Title 31, United States Code, Section 5318(h), 5322, as charged in Count 1, in violation of Title 18, United States Code, Section 371." [*Id.* (footnote omitted).]

### B. **While the Arbitration Motion Was Pending, Plaintiffs' Counsel Sought Leave to Add the *Martin* Plaintiffs and a RICO Claim**

In May 2024, while the *Osterer* Arbitration Motion was pending, Osterer moved for leave to amend [*Osterer*, ECF No. 62 ("*Osterer* Motion for Leave") (attached hereto as Exhibit 4)] and attached a proposed amended complaint [*Osterer*, ECF No. 62-1 ("*Osterer* Amended Complaint") (attached hereto as Exhibit 5)]. The proposed amendment sought to add (1) the *Martin* Plaintiffs as named plaintiffs, (2) BHL's former CEO, Changpeng Zhao, as a defendant, (3) a RICO claim, and (4) additional factual detail regarding the government proceedings Osterer had relied on in opposing arbitration. Plaintiffs assured the District Court that "the proposed amendments in no way would alter the Court's analysis of the pending motion to

compel arbitration." [*Osterer* Motion for Leave at 5.] They also represented that the *Martin* Plaintiffs and "all other members for the proposed Class . . . all have been injured by the same wrongful practices of Defendants as Plaintiff Osterer was." [*Id.* at 1-2.] Similarly, the *Martin* Plaintiffs represented that "the new facts alleged in the proposed Amended Complaint . . . strengthen [the] existing claims while not altering the balance of the arguments for or against arbitration." [*Id.* at 6; *see also Osterer*, ECF No. 64 ("*Osterer* Motion for Leave Reply") at 4 (attached hereto as Exhibit 7).] They also admitted that the proposed RICO claim was based on "the same wrongful conduct alleged in the initial Complaint." [*Osterer* Motion for Leave at 6-7.] Finally, they argued amendment would promote efficiency because they "will be in a better position to move expeditiously" to arbitrate if arbitration were compelled. [*Osterer* Motion for Leave Reply at 5.]

### C. **<u>The District Court Found Plaintiffs' Claims Rely on BHL's Terms, Compelled Arbitration, and Denied Leave to Amend as Moot</u>**

On July 31, 2024, the District Court granted the Defendant's motion to compel arbitration (the "*Osterer* Arbitration Order"). *Osterer v. BAM Trading Servs. Inc.*, 753 F. Supp. 3d 1289 (S.D. Fla. 2024) (attached hereto as Exhibit 8). The District Court found that because Osterer alleged Binance failed to "halt the further movement of [Plaintiff's] stolen property, … Plaintiff is suing Defendants for failing to exercise a right created by the Terms—and for collecting funds pursuant to the Terms." *Id.* at 1295. The District Court therefore held that Osterer was equitably

estopped from "rely[ing] upon the [Terms] to establish [his] claim while avoiding [his] obligations under the [Terms] to arbitrate such claims." *Id.* at 1296.

The District Court rejected Osterer's argument that his claims and the claims of the putative class are rooted in a statutory scheme. *Id.* It explained that "Defendants' failure to freeze the deposited funds has no connection to Defendant's failure (or statutory obligation) to properly identify customers or trace the origin of deposited funds. . . . And determining whether Defendants had the ability and obligation to freeze funds will require referencing . . . of the Terms." *Id.* at 1297. The District Court ordered, *inter alia*, that: (1) "Plaintiffs are **COMPELLED** to arbitrate their claims against Defendants pursuant to the Terms"; and (2) "Plaintiff's Motion for Leave . . . is hereby **DENIED AS MOOT.**" *Id.*

### D. Plaintiffs Filed Two Copycat Complaints in the Western District of Washington and Judge Rothstein Found that *Martin* and *Baratta* Are Substantially Similar to *Osterer*

Just two weeks after the *Osterer* Arbitration Order, Plaintiffs did the opposite of what they had promised. Despite telling the District Court they would "move expeditiously" to arbitrate if compelled, they filed two copycat complaints—*Martin* and *Baratta*—in the Western District of Washington, seeking to evade the outcome of the *Osterer* Arbitration Order.

The putative classes in *Martin* and *Baratta* are materially identical to the putative class in *Osterer*; each seeks to represent a class of all persons or entities

"whose cryptocurrency was removed from a non-Binance/BAM digital wallet" and "transferred to a Binance.com account[.]" [*Martin*, ECF No. 1 ¶ 202; *Baratta*, ECF No. 1 ¶ 253.]

Moreover, the Defendants in *Martin* and *Baratta* are identical to the defendants in the *Osterer* Amended Complaint [*compare*, *Martin* Compl. ¶ 175 and *Baratta* Compl. ¶ 224, *with Osterer* Am. Compl. ¶ 178], and the alleged facts and issues are nearly identical [*compare*, *Martin* Compl. ¶¶ 211-59 and *Baratta* Compl. ¶¶ 266-333, *with Osterer* Am. Compl. ¶¶ 214-64]. [*See Martin*, ECF No. 137-1, Ex. 1 (Redline comparison of *Martin* Compl. and *Osterer* Am. Compl.; *id.*, Ex. 2 (Redline comparison of *Baratta* Compl. and *Osterer* Am. Compl.)].

The *Martin* and *Baratta* Complaints are near carbon copies of the *Osterer* Amended Complaint, and for all three pleadings, Plaintiffs tried to plead around arbitration.[4] Judge Rothstein saw the *Martin* and *Baratta* Complaints for what they were: an attempt to avoid the *Osterer* Arbitration Order.

---

[4] By way of example, they rephrased their allegations regarding BHL's ability to freeze accounts and collect fees, instead alleging that Defendants "made no effort to utilize reasonable measures" to stop transactions. [*See Martin* Compl. ¶¶ 242, 255; *Baratta* Compl. ¶¶ 299, 312; *Osterer* Am. Compl. ¶ 243, 254.] The *Martin* and *Baratta* Complaints removed explicit references to BHL's ability to collect transaction fees (e.g., "ill-goten gains" and "disgorgement"), but *Martin* still seeks restitution [*Martin* Compl. ¶ 12], and both complaints still allege that Defendants' motive was to collect "massive" transaction fees [*see, e.g.*, *Martin* Compl. ¶¶ 36, 171, 182; *Baratta* Compl. ¶ 232]. Finally, the *Martin* and *Baratta* Complaints added the conclusory allegation that Plaintiffs "are not relying on any contracts or

Plaintiffs' efforts do not change what the *Osterer* court already held: no matter how artfully Plaintiffs reframe their claims, they still derive from the Terms. *Osterer*, 753 F.Supp.3d at 1296-98. Judge Rothstein agreed. She transferred *Martin* to the Southern District of Florida, finding that the parties and issues in *Martin* were substantially similar to those in *Osterer*, the first-filed case. She held that "[a]lthough the two Complaints describe the proposed classes in slightly different terms, both encompass the same proposed class of individuals whose cryptocurrency was stolen and transferred to a Binance.com account during the relevant period" and therefore "are sufficiently similar[.]" *Martin v. Binance Holdings, Ltd.*, 2025 WL 1159213, at *2-*3 (W.D. Wash. Apr. 21, 2025) ("*Martin I*") (attached hereto as Exhibit 9). She also held that adding Mr. Zhao as a defendant did not defeat substantial similarity. *Id.*

Judge Rothstein explicitly rejected Plaintiffs' argument that "the issues in [*Martin*] are dissimilar from those in *Osterer*, because unlike in *Osterer*, the Complaint here (1) does not allege unjust enrichment, and (2) adds a RICO claim." *Id.* at *3. Judge Rothstein was "unpersuaded" by "Plaintiffs attempts to distinguish this case from *Osterer*," and held "that the two cases arise from the same factual

---

agreements entered into between Binance or BAM" to establish their claims. [*E.g.*, *Martin* Compl. ¶ 10; *Baratta* Compl. ¶ 11.]

predicate and concern the same central issue." *Id.* As Judge Rothstein correctly concluded, "comparing the factual allegations in the two Complaints," the "central issue" in both *Osterer* and *Martin* is "whether the relevant defendants may be held responsible for acting in a manner that enabled hackers to launder cryptocurrency through Binance.com." *Id.*

Similarly, and shortly after the above order, Judge Rothstein entered an order transferring *Baratta* to the District Court, finding that her "reasoning in *Martin* that transfer of that action was necessary to promote efficiency and avoid duplicative litigation is equally applicable [to *Baratta*]." *Baratta v. Binance Holdings, Ltd.*, 2025 WL 1383369, at *2 (W.D. Wash. May 13, 2025) (attached hereto as Exhibit 14).

### E. Judge Ruiz Compels the Substantially Similar *Martin* and *Baratta* Cases to the Ongoing HKIAC Arbitration Based on the Terms

In May 2025, following transfer of *Martin* and *Baratta* to the Southern District of Florida and then to Judge Ruiz, the District Court held an initial status conference. Because the cases were substantially similar to *Osterer*, Defendants advised that they intended to move to compel arbitration. The District Court then consolidated *Martin* and *Baratta* "for purposes of addressing a single Motion to Compel Arbitration by Defendants." [*Martin*, ECF No. 108 at 2.] Plaintiffs did "not object." [*Id.*]

On July 25, 2025, Defendants moved to compel arbitration and briefing was completed on October 6, 2025. [*Martin*, ECF Nos. 137-143[5]]. On March 16, 2026, the District Court granted the motion (the "*Martin* Arbitration Order"). *Martin v. Binance Holdings Ltd.*, 2026 WL 739476 (S.D. Fla. Mar. 16, 2026) ("*Martin II*") (attached hereto as Exhibit 13). The *Martin* Arbitration Order rejected Plaintiffs' principal argument—that "their claims derive from Defendants' statutory obligations, rather than Binance's Terms"—and found that the claims again relied on the Terms. Judge Ruiz recognized that Plaintiffs' arguments were the "same argument" he "rebuffed in *Osterer*," because "determining whether Defendants had the ability and obligation to freeze funds will require referencing" the Terms. *Id.* at *4. Judge Ruiz added that "the *Martin* and *Baratta* Plaintiffs' inclusion of additional statutory claims" does not alter the arbitrability analysis because the additional claims are "ultimately predicated on the same factual allegations as *Osterer*" and "arise in connection with or relate to Binance's Terms." *Id.*

The District Court then looked to the facts "alleged in the complaint" and the "'true thrust' of the complaint, regardless of how the plaintiff 'couche[d] its allegations in various terms and theories of action,'" to determine whether the claims

[5] The parties' briefing, without supporting declarations, is attached hereto as Exhibit 10 (*Martin*, ECF No. 137, Defendant's Motion to Compel), Exhibit 11, (*Martin*, ECF No. 138, Plaintiff's Opposition to Motion to Compel), and Exhibit 12 (*Martin*, ECF No. 141, Defendants' Reply to Motion to Compel).

fell within the arbitration clause. *Id.* at *5 (quoting *U.S. Nutraceuticals, LLC v. Cyanotech Corp.*, 769 F.3d 1308, 1311-12 (11th Cir. 2014)).] The District Court concluded that both complaints still centered on "Defendants['] [ability] to collect fees from transactions involving their stolen cryptocurrency," and that "although [they] allege[d] a RICO violation in place of unjust enrichment, the present inquiry turns on the underlying factual allegations—*not* the theories of action under which Plaintiffs couch their allegations." *Martin II*, 2026 WL 739476, at *5 (emphasis in original). The District Court also noted that the fact "Osterer sought leave to amend to add the new Plaintiffs, Defendants, and RICO claim to his own Complaint illustrates the lack of daylight between [*Osterer* and *Martin* and *Baratta.*]" *Id.*

The District Court compelled Plaintiffs to arbitrate, stayed the case pending the conclusion of the arbitration proceedings, and required joint status reports every sixty days. *Id.* at *8. Plaintiffs did not comply with the *Martin* Arbitration Order. Rather, about two months later, Plaintiffs petitioned this Court for the issuance of a writ of mandamus. [Dkt. No. 1.] As of the most recent status update, dated July 14, 2026, Plaintiffs have not commenced arbitration. [*Martin*, ECF No. 151 at 2.]

## III. LEGAL STANDARD

"Mandamus is not to be used as a subterfuge to obtain appellate review that is otherwise foreclosed by law." *In re BellSouth Corp.*, 334 F.3d at 951 (citation omitted). Mandamus is available "'only in drastic situations, when no other adequate

means are available to remedy a clear usurpation of power or abuse of discretion.'" *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1004 (11th Cir. 1997) (quoting *In re Temple*, 851 F.2d 1269, 1271 (11th Cir. 1988)); *Ex parte Fahey*, 332 U.S. at 259-60 (mandamus is a "drastic and extraordinary" remedy "reserved for really extraordinary causes"); *United States v. Shalhoub*, 855 F.3d 1255, 1259 (11th Cir. 2017). Mandamus may not be "used as a substitute for appeal, or to control decisions of the [district] court in discretionary matters." *Jackson*, 130 F.3d at 1004 (citing *In re Estelle*, 516 F.2d 480, 483 (5th Cir. 1975)). "When an alternative remedy exists, even if it is unlikely to provide relief, mandamus relief is not proper." *In re Evans*, 2026 U.S. App. LEXIS 1055, at *2 (11th Cir. Jan. 14, 2026) (citing *Lifestar Ambulance Serv., Inc. v. United States*, 365 F.3d 1293, 1298 (11th Cir. 2004)). Plaintiffs therefore bear the heavy burden to show both that they have "no other avenue of relief" and that their "right to relief is clear and indisputable." *Id.* (citing *Mallard v. United States Dist. Ct.*, 490 U.S. 296, 309 (1989)).

## IV. ARGUMENT

### A. Plaintiffs' Petition is an Improper Attempt to End-Run Congress's Bar on Immediate Appeals of Orders Compelling Arbitration

#### 1. Congress Explicitly Barred the Relief Plaintiffs Seek

At the threshold, this Court should deny the Petition because it is an improper attempt to evade Congress's prohibition on interlocutory appeals of orders compelling arbitration. Section 16 of the Federal Arbitration Act permits immediate

appeals from orders ***denying*** arbitration. *See* 9 U.S.C. § 16(a)(1)(C). But "[w]hen a court compels arbitration, by contrast, Congress made clear that . . . the order compelling arbitration is ***not*** immediately appealable." *Smith*, 601 U.S. at 478 (emphasis added) (citing 9 U.S.C. § 16(b)); *see* 9 U.S.C. § 16(b)(2) ("[A]n appeal ***may not*** be taken from an interlocutory order . . . directing arbitration to proceed[.]") (emphasis added); *McDermott Int'l, Inc. v. Underwriters At Lloyds Subscribing To Memorandum of Ins. No. 104207*, 981 F.2d 744, 748 (5th Cir. 1993) ("Congress has expressly limited interlocutory review of a district court decision on arbitration.").[6] Because Congress barred appeals from orders "directing arbitration to proceed," the Petition should be denied. The relief Plaintiffs seek "is not available by way of mandamus." *In re Gillespie*, 2025 WL 3772082, at *1 (4th Cir. Dec. 31, 2025) (denying petition for writ of mandamus seeking to vacate order granting motion to compel arbitration).

### 2. Plaintiffs Can Still Appeal Through Normal Processes at the Conclusion of the Case

Even if Congress did not specifically prohibit interlocutory appeals of orders compelling arbitration, Plaintiffs would still not be entitled to mandamus because

---

[6] As discussed *infra*, under 9 U.S.C. § 16, an interlocutory appeal of an order directing arbitration may only be taken where the District Court certifies such an appeal based on a controlling question of law under 28 U.S.C. § 1292(b). Plaintiffs concede they did not seek certification. (Petition at 25.)

they cannot satisfy their burden of establishing that they "ha[ve] no other adequate means to seek the relief [t]he[y] desire[]." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980) (quoting *Kerr v. U. S. Dist. Ct. for N. Dist. of California*, 426 U.S. 394, 403 (1976)). They still have the opportunity to appeal the arbitration decision after final judgment. As such, "[they] [are] not entitled to mandamus relief." *In re Evans*, 2026 U.S. App. LEXIS 1055, at *3 (denying petition for writ of mandamus seeking to vacate order granting motion to compel because plaintiff "has the adequate alternative remedy of raising those issues on appeal at the appropriate time").

A writ cannot be "used as a substitute for the regular appeals process[.]" *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380-81 (2004). Plaintiffs' Petition does exactly that: it seeks immediate review of an order compelling arbitration despite Congress's contrary command. But Plaintiffs can obtain appellate review "at the conclusion of [the] case in the District Court." *In re Huertas*, 779 F. App'x 77, 79 (3d Cir. 2019); *In re BellSouth Corp.*, 334 F.3d at 954 (denying mandamus because petitioners have not shown that it will suffer irreparable harm or demonstrable injustice if resolution is delayed until the end of the case); *Lindo v. NCL (Bahamas), Ltd.*, 652 F.3d 1257, 1269 (11th Cir. 2011).

Because Plaintiffs can still appeal at the conclusion of the case, they have "adequate means" to seek the relief they desire, and "[they] [are] not entitled to

mandamus relief." *In re Evans*, 2026 U.S. App. LEXIS 1055, at *3 (internal quotation marks and citation omitted).

### 3. In Addition to Their Right to Appeal at the Conclusion of the Case, Plaintiffs Have Other Adequate Means to Seek the Relief They Desire

Plaintiffs also have "'other adequate means to seek the relief [t]he[y] desire[.]'" *Allied Chem. Corp.*, 449 U.S. at 36 (quoting *Kerr*, 426 U.S. at 403).

***First***, Plaintiffs had the opportunity to ask the District Court to certify an interlocutory appeal based on a controlling question of law under 28 U.S.C. § 1292(b). *See* 9 U.S.C. § 16(b). In their Petition, Plaintiffs concede they are intentionally choosing ***not*** to do this. [Petition at 25 (citing *Smith*, 601 U.S. at 478).] That matters. Congress created a narrow certification path for exceptional interlocutory review of orders compelling arbitration, and Plaintiffs chose not to invoke it. Having bypassed that available statutory route, they cannot satisfy the demanding requirement that no "other adequate means" exist to seek the relief they desire. *Allied Chem. Corp.*, 449 U.S. at 36.

***Second***, Plaintiffs fail to show that they cannot seek the relief they desire in the HKIAC, where the District Court compelled arbitration. In fact, the HKIAC forum has *proven* to be an appropriate forum for this exact dispute. "On or about March 7, 2025, Plaintiff [Osterer] commenced arbitration against [BHL] and [BAM] before the [HKIAC]." [*Osterer*, ECF No. 106 at 1.] Because the *Osterer* Complaint

is "nearly identical" (*Martin II*, 2026 WL 739476, at *5) and "concern[s] the same central issue" (*Martin I*, 2025 WL 1159213, at *3) as the *Martin* and *Baratta* Complaints, the fact Osterer commenced and is currently arbitrating against Defendants in the HKIAC refutes Plaintiffs' assertion that the arbitral forum is unavailable [Petition at 26-31] and demonstrates that Plaintiffs can pursue relief there. *See, e.g.*, *In re Evans*, 2026 U.S. App. LEXIS 1055, at *2 (denying mandamus petition following the lower court's order granting a motion to compel arbitration); *Shafer v. Morgan Stanley*, 2025 WL 1890535, at *2 (2d Cir. July 9, 2025) (compelling arbitration and explaining that "this is not a situation where 'no adequate alternative remedies are available' to Morgan Stanley," because, to the extent Morgan Stanely disagreed on the manner the court compelled arbitration, "Morgan Stanley is free to argue to those arbitrators that the district court's conclusion that the plans were governed by ERISA was dictum and was legally incorrect") (internal citations omitted).

Plaintiffs respond by repeating their procedural and substantive unconscionability arguments, principally that HKIAC arbitration is too expensive. [Petition at 24-31.] But even if an order imposes additional cost, that does not "satisfy the high standard required for mandamus." *In re BellSouth Corp.*, 334 F.3d at 954. Nor does expense alone eliminate a remedy. As the Supreme Court held in an analogous context, "the fact that it is not worth the expense involved in *proving*

a statutory remedy does not constitute the elimination of the *right to pursue* that remedy." *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 236 (2013) (emphasis in original); *see also FI-Tampa, LLC v. Kelly-Hall*, 135 So.3d 563, 568 (Fla. 2d DCA 2014). Plaintiffs therefore cannot show that HKIAC arbitration is unavailable, much less that they have "no other adequate means" to seek relief. *Allied Chem. Corp.*, 449 U.S. at 36.

Plaintiffs' argument that they cannot pursue their substantive claims in arbitration fares no better. The District Court found HKIAC to be a proper forum for those issues. *Martin II*, 2026 WL 739476, at *5-*8. Courts routinely compel arbitration under international rules or law even where plaintiffs assert statutory claims. *See, e.g.*, *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1299 (11th Cir. 1998); *Rain Forest Adventures (Holdings) Ltd. v. AIG Ins. Hong Kong Ltd.*, 2020 WL 1288573, at *4 (S.D. Fla. Mar. 18, 2020).

* * * * *

In sum, the Petition is procedurally barred by Congress's express mandate that "an appeal ***may not*** be taken from an interlocutory order . . . directing arbitration to proceed[.]" 9 U.S.C. § 16(b)-(b)(2) (emphasis added). Instead, Plaintiffs have other means—including their right to appeal at the conclusion of the case, their right to seek certification for an interlocutory appeal under 28 U.S.C. § 1292(b), and the

HKIAC itself, where Plaintiff Osterer is currently arbitrating—that are adequate to seek and obtain the relief Plaintiffs desire.

### B. Plaintiffs Fail to Show a Clear and Indisputable Right to Relief

Even if the Petition was not procedurally barred, Plaintiffs fail to meet their heavy burden to show their "right to relief is clear and indisputable." *In re Evans*, 2026 U.S. App. LEXIS 1055, at *2. That burden is "particularly heavy" here because "Congress has expressly limited interlocutory review of a district court decision on arbitration." *McDermott Int'l, Inc.*, 981 F.2d at 748. Contrary to Plaintiffs' arguments—each of which has already been addressed through years of briefing on this same issue—the District Court correctly compelled Plaintiffs to arbitration through the doctrine of equitable estoppel.

As the District Court explained, a party may be compelled to arbitrate if that party is "'relying on a contract to assert its claims and [] the scope of the arbitration clause in that contract covers the dispute.'" *Osterer*, 753 F. Supp. 3d at 1295 (S.D. Fla. 2024) (quoting *Leidel v. Coinbase, Inc.*, 729 F. App'x 883, 887 (11th Cir. 2018) (footnote omitted)). The District Court found that the "true thrust" of the *Osterer* Complaint was that "(1) Binance could have, but did not, freeze Plaintiff's allegedly stolen cryptocurrency assets; and (2) Binance failed to do so in order to earn transaction fees." *Osterer*, 753 F. Supp. 3d at 1295 (cleaned up). That theory necessarily invoked BHL's rights "to suspend, freeze or lock [ ] assets and accounts,

and to collect fees based on [ ] transactions on the exchange," which are "created only by the Terms." *Id.* Because Osterer relied on rights created by the Terms, the District Court held that he was equitably estopped from "rely[ing] upon the [Terms] to establish [his] claim while avoiding [his] obligations under the [Terms] to arbitrate such claims." *Id.* at 1296 (cleaned up). The District Court rejected Osterer's assertion that his, and the class's, claims were purportedly rooted in "statutory rights" instead of the Terms. The District Court found that "Plaintiff's claims 'derive' from the underlying Terms [and that] Plaintiff is suing Defendants for failing to exercise a right by the Terms—and for collecting funds pursuant to the Terms." *Id.*

The District Court also distinguished *Osterer* from *Leidel v. Coinbase*, 729 F. App'x 883 (11th Cir. 2018), and held that Plaintiff's "allegation regarding Defendants' failure to freeze the deposited funds has no connection to Defendants' failure" to comply with any statutory KYC or AML protocols. *Osterer*, 753 F. Supp. 3d at 1297. The *Martin* and *Baratta* Complaints are "nearly identical" to *Osterer*. *Martin II*, 2026 WL 739476, at *5. Judge Rothstein found that Plaintiffs' "attempts to distinguish this case from *Osterer* do not change the fact that the two cases arise from the same factual predicate and concern the same central issue," and that the Complaints contain "numerous identical or nearly identical allegations." *Martin I,* 2025 WL 1159213, at *3. "It is apparent from comparing the factual allegations in the two Complaints that the central issue in both cases is whether the relevant

defendants may be held responsible for acting in a manner that enabled hackers to launder cryptocurrency through Binance.com." *Id.* The District Court likewise held that "[d]espite Plaintiffs' addition of claims under RICO, the UCL, and the MCPA, *Martin* and *Baratta* are ultimately predicated on the same factual allegations as *Osterer*. Thus, Plaintiffs' claims likewise arise in connection with or relate to Binance's Terms." *Martin II*, 2026 WL 739476, at *5.

Plaintiffs' principal argument is that, under *Iqbal*, the District Court was required to credit their allegation that their claims arose from Defendants' statutory obligations. [Petition at 20.] That misstates the law. The Supreme Court held the opposite: "the tenet that a court must accept as true all of the allegations contained in a complaint *is inapplicable to legal conclusions*." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added). Nor does adding a RICO label change the analysis. "[A] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

As the District Court and Judge Rothstein correctly found, the "true thrust" of the *Martin* and *Baratta* Complaints remains the same as in *Osterer*. Equitable estoppel was therefore proper, and the claims in *Martin* and *Baratta* are arbitrable. Osterer's own attempt to add the *Martin* Plaintiffs, Mr. Zhao, and a RICO claim to his complaint further "illustrates the lack of daylight" between *Osterer* and *Martin*

and *Baratta*. *Martin II*, 2026 WL 739476, at *5. Indeed, when it suited Plaintiffs, they told the District Court that their proposed amendments would "in no way . . . alter the Court's analysis of the pending motion to compel arbitration," and that they would "move expeditiously" to arbitrate if compelled. [*Osterer* Motion for Leave at 5; *Osterer* Motion for Leave Reply at 5.] Having conceded arbitrability when it served their interests, Plaintiffs cannot now manufacture a "clear and indisputable" right to avoid it. *In re Evans*, 2026 U.S. App. LEXIS 1055, at *2.

Plaintiffs' supplemental reliance on *Ya Mon* does not change the result. In *Ya Mon*, this Court rejected the district court's application of equitable estoppel to compel arbitration because the nonsignatory plaintiffs' antitrust claims did not require reference to, or construction of, the agreement containing the arbitration clause, which did not concern the alleged commission-fixing conspiracy or the practices challenged in that case. *See Ya Mon*, 2026 WL 1678244, at *8-*9. This case is different. Plaintiffs' theory repeatedly turns on whether BHL had and failed to exercise rights to freeze or restrict accounts, stop transactions, and collect fees on the exchange—rights created, if at all, by the Terms. *Martin II*, 2026 WL 739476, at *4-*5. Indeed, *Ya Mon* recognized this distinction, explaining that *Osterer* correctly compelled arbitration because the nonsignatory plaintiff sued based on rights created by the relevant contract. *See Ya Mon*, 2026 WL 1678244, at *9 n.8. *Ya Mon* therefore confirms *Martin* and *Baratta* were also correctly decided because statutory labels

cannot defeat estoppel where, as here, the pleaded theory depends on rights and conduct governed by contract.

### C. <u>Plaintiffs' Argument is Otherwise Meritless</u>

Finally, Plaintiffs argue that a writ is appropriate because, in October 2023, "U.S. authorities concluded that Defendants' criminal conduct warranted over $4.3 billion in penalties." [Petition at 32.] That is a non sequitur. The mandamus question is not whether Plaintiffs can invoke inflammatory background allegations; it is whether they have shown extraordinary circumstances, no adequate alternative remedy, and a clear and indisputable right to relief from the *Martin* Arbitration Order. They have not. Plaintiffs also concede that the alleged thefts were committed by unknown third parties, not Defendants. [*Id.*] And the *Martin* and *Baratta* Plaintiffs allege their crypto was stolen from accounts not located on Binance.com or Binance.US and was later "laundered" through Binance.com after the referenced criminal proceedings concluded.

Plaintiffs' counsel have advanced similar theories against other crypto companies without success. *See, e.g., Watt v. OkCoin USA Inc.*, 2026 WL 880154, (N.D. Cal. Mar. 31, 2026); *Reca v. Flashdot Ltd.*, 2026 WL 82702 (S.D.N.Y. Jan. 12, 2026). But this Court need not resolve the ultimate merits of Plaintiffs' claims to deny mandamus. It is enough that Plaintiffs have not satisfied any of the extraordinary requirements for the writ. The Petition should therefore be denied, and

the arbitration should proceed "'as quickly and easily as possible.'" *Smith*, 601 U.S. at 478 (internal citation omitted).

## V. **CONCLUSION**

For the foregoing reasons, this Court should deny the Petition.

Dated: August 4, 2026

By: */s/ Christopher N. LaVigne*

Christopher N. LaVigne (*pro hac vice*)
christopher.lavigne@withersworldwide.com
Withers Bergman LLP
430 Park Avenue, 10th Floor
New York, New York 10022
Telephone: (212) 848-9800

*Attorneys for Defendant Binance Holdings, Ltd. d/b/a Binance*

By: */s/ Daniel Stabile*

Daniel Stabile (FBN 95750)
dstabile@winston.com
Winston Taylor LLP
200 S. Biscayne Blvd., Suite 2400
Miami, Florida 33131
Telephone: (305) 910-0500

*Attorneys for Defendant BAM Trading Services Inc.*

By: */s/ Harold S. Vogel, Jr.*
Harold S. Vogel, Jr. (FBN 432784)
hvogel@dickinsonwright.com
Jacob S. Frenkel
jfrenkel@dickinsonwright.com
Dickinson Wright PLLC
350 E. Las Olas Blvd., Ste 1750
Fort Lauderdale, Florida 33301
Telephone: (954) 991-5420

*Attorneys for Defendant Changpeng Zhao*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 4, 2026, the foregoing document was electronically filed with the Clerk of this Court by using the appellate CM/ECF system. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

Dated: August 4, 2026

*/s/ Christopher N. LaVigne*
Christopher N. LaVigne

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 1:23-cv-22083-RUIZ/Sanchez**

MICHAEL OSTERER,

*Plaintiff*,

v.

BAM TRADING SERVICES, INC. *et al.*,

*Defendants*.

_________________________________________/

**DEFENDANTS' MOTION TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, TO DISMISS PLAINTIFF'S COMPLAINT AND STRIKE CLASS ACTION ALLEGATIONS**

Dated: December 8, 2023

By: s/*Aaron S. Weiss*
Aaron S. Weiss (FBN 48813)
aweiss@carltonfields.com
Carlton Fields, P.A.
700 N.W. 1st Ave., Ste. 1200
Miami, Florida 33136
Telephone: 305-530-0050

Christopher N. LaVigne (pro hac vice)
christopher.lavigne@withersworldwide.com
Withers Bergman LLP
430 Park Avenue, 10th Fl.
New York, New York 10022
Telephone: 212-848-9800

*Counsel for Defendant Binance Holdings, LTD. d/b/a Binance*

By: *Adam F. Foslid*
Adam M. Foslid (FBN 682284)
Email: afoslid@winston.com
Winston & Strawn LLP
200 S. Biscayne Blvd., Ste. 2400
Miami, Florida 33131
Telephone: 305-910-0646

*Counsel for Defendant BAM Trading Services Inc. d/b/a Binance.US*

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .......... 1

II. BACKGROUND .......... 4

A. Plaintiff Alleges an Unidentified Hacker Stole Digital Assets From Plaintiff's Coinbase Account and Traded Them on Binance's Exchange .......... 4

B. Plaintiff Alleges Binance – Not BAM – Should Have Stopped the Hacker From Withdrawing the Alleged Stolen Funds and Should Not Have Collected Fees Based on the Hacker's Transactions .......... 5

C. Defendants Are Separate Legal Entities That Provide Cryptocurrency Exchange Services to Different Markets .......... 6

D. Before Users Are Able to Use Binance's Services, They Agree to Be Bound by Binance's Terms .......... 7

1. Binance's Terms Authorize Binance to Freeze Customer Assets and Collect Transaction Fees .......... 7

2. The Terms Include Binding Arbitration and Class Action Waiver Provisions .......... 8

III. ARGUMENT .......... 9

A. The Complaint Should Not Proceed in This Court Because the Claims Are Subject to Mandatory Binding Arbitration .......... 9

1. Governing Law Compels Arbitration Here .......... 10

a. The Terms Constitute a Valid Clickwrap Agreement .......... 11

b. Plaintiff Is Bound by the Terms' Arbitration Provision Under the Doctrine of Equitable Estoppel .......... 11

c. An Arbitral Issue Exists Because Plaintiff's Claims Fall Within the All-Encompassing Arbitration Provision .......... 15

d. BAM May Invoke the Arbitration Provision to Compel Plaintiff to Arbitrate .......... 17

B. Plaintiff Has Not Satisfied His Burden of Establishing Personal Jurisdiction Over Binance .......... 18

1. There is No General Jurisdiction Over Binance Because It Is Not at Home in Florida .......... 19

2. There Is No Specific Jurisdiction Because the Controversy Does Not Arise Out of Binance's Contacts in Florida .......... 20

3. Plaintiff Has Not Carried the "Very Heavy Burden" of Establishing That Binance and BAM Are Alter Egos .......... 24

C. Plaintiff's Complaint Should Be Dismissed Because It Fails to State a Claim ....26

1. Under Florida's Choice of Law Rules, Plaintiff's Claims Are Subject to New York Substantive Law ....26

2. Plaintiff Fails to State a Claim for Conversion ....27

3. Plaintiff Fails to State a Claim for Aiding and Abetting Conversion ....30

4. Plaintiff Fails to State a Claim for Unjust Enrichment ....32

5. Plaintiff Fails to State a Claim Against BAM Because There Are No Independent Allegations of Wrongdoing by BAM ....34

D. The Class Allegations Should Be Dismissed Because the Complaint Does Not Plausibly Allege the Required Elements to Proceed As a Class Action ....35

IV. CONCLUSION ....37

V. REQUEST FOR HEARING ....38

VI. S.D. FLA. L.R. 7.1(A)(3) CERTIFICATION ....38

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adkins v. Morgan Stanley*,
307 F.R.D. 119 (S.D.N.Y. 2015) ....................35

*AIM Recycling Fla., LLC v. Metals USA, Inc.*,
2019 WL 1991946 (S.D. Fla. Mar. 4, 2019)....................33

*Anwar v. Fairfield Greenwich Ltd.*,
728 F. Supp. 2d 372 (S.D.N.Y. 2010)....................30

*Aramony v. United Way of Am.*,
949 F. Supp. 1080 (S.D.N.Y. 1996)....................29

*Argos Global Partner Services, LLC v. Ciuchini*,
446 F. Supp. 3d 1073 (S.D. Fla. 2020) ....................21

*Arthur Andersen LLP v. Carlisle*,
556 U.S. 624 (2009)....................11

*AT & T Techs., Inc. v. Commc'ns Workers of Am.*,
475 U.S. 643 (1986)....................15

*Attix v. Carrington Mortg. Servs., LLC*,
35 F.4th 1284 (11th Cir. 2022) ....................10, 15, 16

*Ayala-Rodriguez v. Falic Fashion Grp. LLC*,
2019 WL 13216292 (S.D. Fla. Mar. 6, 2019)....................16

*Babcock v. Neutron Holdings, Inc.*,
454 F. Supp. 3d 1222, 1228 (S.D. Fla. 2020) ....................9

*Bailey v. ERG Enterprises, LP*,
705 F.3d 1311 (11th Cir. 2013) ....................3, 14

*Bandyopadhyay v. Defendant 1*,
2023 WL 2263552 (S.D. Fla. Feb. 28, 2023) ....................26, 27, 29

*Bentley v. Control Grp. Media Co., Inc.*,
2020 WL 3639660 (S.D. Cal. July 6, 2020) ....................14

*Berdeaux v. OneCoin Ltd.*,
561 F. Supp. 3d 379 (S.D.N.Y. 2021)....................30, 32

*Bernsley v. Advance Group*,
2022 WL 2915741 (S.D. Fla. July 24, 2022)....19, 23

*Blinco v. Green Tree Servicing LLC*,
400 F.3d 1308 (11th Cir. 2005) ....2, 13, 14

*Brown v. Electrolux Home Prods.*,
817 F.3d 1225 (11th Cir. 2016) ....35

*Brown v. Evans*,
2016 WL 69629 (N.D. Ill. Jan. 6, 2016)....21

*Brown v. ITT Consumer Fin. Corp.*,
211 F.3d 1217 (11th Cir. 2000) ....16, 17

*Cabrera-Morales v. UBS Tr. Co. of Puerto Rico*,
769 F. Supp. 2d 67 (D.P.R. 2011)....12

*Caporicci U.S.A. Corp. v. Prada S.p.A.*,
2018 WL 2264194 (S.D. Fla. May 7, 2018)....18

*Chemtex, LLC v. St. Anthony Enters., Inc.*,
490 F. Supp. 2d 536 (S.D.N.Y. 2007)....32

*Commodity Futures Trading Commission v. Binance Holdings Limited, et al.*,
1:23-cv-01887 (N.D. Ill)....31

*Coughlan v. Jachney*,
473 F. Supp. 3d 166 (E.D.N.Y. 2020) ....29, 36

*Cox v. Am. Cast Iron Pipe Co.*,
784 F.2d 1546 (11th Cir. 1986) ....35

*Daimler AG v. Bauman*,
571 U.S. 117 (2014)....19

*Day v. Taylor*,
400 F.3d 1272 (11th Cir. 2005) ....9

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985)....10

*Del Puerto Water Dist. v. U.S. Bureau of Reclamation*,
271 F. Supp. 2d 1224 (E.D. Cal. 2003)....21

*Env't Prot. Comm'n of Hillsborough Cnty., Fla. v. Mercedes-Benz USA, LLC*,
2022 WL 4355666 (M.D. Fla. Sept. 20, 2022)....21, 25

*Flextronics Int'l USA, Inc. v. Murata Mfg. Co., Ltd.*,
2020 WL 5106851 (N.D. Cal. Aug. 31, 2020) ....................16

*Fraser v. Smith*,
594 F.3d 842 (11th Cir. 2010) ....................19

*Frida Kahlo Corp. v. Pinedo*,
2021 WL 4147876 (S.D. Fla. Sept. 13, 2021) ....................23

*Frybarger v. Salemme*,
2022 WL 18530012 (S.D. Fla. Dec. 28, 2022) ....................24

*Gadasalli v. Bulasa*,
2023 WL 3586424 (E.D. Tex. May 22, 2023) ....................3, 26, 35

*Gibson v. BTS North, Inc.*,
2018 WL 888872 (S.D. Fla. Feb. 14, 2018) ....................28

*Green Tree Fin. Corp. Alabama v. Randolph*,
531 U.S. 79 (2000) ....................10

*Guarini v. Doe*,
2022 WL 20180341 (S.D. Fla. Apr. 5, 2022) .................... *passim*

*Gulf Coast Produce, Inc. v. Am. Growers, Inc.*,
2008 WL 660100 (S.D. Fla. Mar. 7, 2008) ....................28, 36

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
139 S. Ct. 524 (2019) ....................15

*Herrera v. West Flagler Assocs., Ltd.*,
2017 WL 9324515 (S.D. Fla. Apr. 5, 2017) ....................18

*Hinkle v. Cirrus Design Corp.*,
775 F. App'x 545 (11th Cir. 2019) ....................23

*Home Design Servs., Inc. v. David Weekley Homes, LLC*,
2007 WL 1080001 (M.D. Fla. Apr. 9, 2007) ....................21

*HostLogic Zrt. v. GH Int'l, Inc.*,
2014 WL 2968279 (M.D. Fla. June 30, 2014) ....................27

*Huang v. Hong Kong & Shanghai Banking Corp. LTD*,
2022 WL 4123879 (S.D.N.Y. Sept. 9, 2022) ....................32

*Iglesias v. Pernod Ricard*,
2020 WL 13367465 (S.D. Fla. Aug. 17, 2020) ....................19, 20, 23, 24

*Inetianbor v. CashCall, Inc.*,
923 F. Supp. 2d 1358 (S.D. Fla. 2013) ....................11

*Integrated Sec. Servs. v. Skidata, Inc.*,
609 F. Supp. 2d 1323 (S.D. Fla. 2009) ....................11

*In re January 2021 Short Squeeze Trading Litig.*,
584 F. Supp. 3d 1161 (S.D. Fla. 2022) ....................12

*Jim Moore Ins. Agency, Inc. v. State Farm Mut. Auto. Ins. Co.*,
2003 WL 21146714 (S.D. Fla. May 6, 2003) ....................36

*Johnson v. Chase Bankcard Servs., Inc.*,
582 F. Supp. 3d 1230 (M.D. Fla. 2022) ....................33

*JPay, Inc. v. Kobel*,
904 F.3d 923 (11th Cir. 2018) ....................10

*Judge v. Unigroup, Inc.*,
2017 WL 3971457 (M.D. Fla. Sept. 8, 2017) ....................15

*K3 Enterprises, Inc. v. Sasowski*,
2021 WL 8363506 (S.D. Fla. Nov. 22, 2021) ....................24, 25, 34

*King v. UA Local 91*,
2020 WL 4003019 (N.D. Ala. July 15, 2020) ....................35

*Kirschner v. Bennett*,
648 F. Supp. 2d 525 (S.D.N.Y. 2009) ....................30, 36, 37

*Louis Vuitton Malletier, S.A. v. Mosseri*,
736 F.3d 1339 (11th Cir. 2013) ....................18

*In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*,
603 F. Supp. 3d 1183 (S.D. Fla. 2022) ....................26

*Melton v. Century Arms, Inc.*,
243 F. Supp. 3d 1290 (S.D. Fla. 2017) ....................26

*Miro v. Doe*,
2023 WL 2734374 (S.D. Fla. Mar. 31, 2023) ....................3, 26

*Molinos Valle Del Cibao, C. por A. v. Lama*,
633 F.3d 1330 (11th Cir. 2011) ....................34

*Moses H Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) ....................10, 17

*Multi-Financial Sec. Corp. v. King*,
386 F.3d 1364 (11th Cir. 2004) ....................15

*New Prime Inc. v. Oliveira*,
202 L. Ed. 2d 536 (2019) ....................15

*Nix v. ESPN, Inc.*,
2018 WL 8802885 (S.D. Fla. Aug. 30, 2018) ....................12

*Pearson v. Deutsche Bank AG*,
2022 WL 951316 (S.D. Fla. Mar. 30, 2022) ....................30, 36, 37

*Perlman v. Wells Fargo Bank, N.A.*,
559 F. App'x 988 (11th Cir. 2014) ....................30

*Perry v. Ryan*,
2023 WL 2403889 (M.D. Fla. Mar. 8, 2023) ....................23

*Physician Consortium Services, LLC v. Molina Healthcare, Inc.*,
414 F. App'x 240 (11th Cir. 2011) ....................11, 17, 18

*Ray v. NPRTO Fla., LLC*,
322 F. Supp. 3d 1261 (M.D. Fla. 2017) ....................11

*In re Refco, Inc. Sec. Litig.*,
2008 WL 2185676 (S.D.N.Y. May 21, 2008) ....................17

*Rent-A-Center, West, Inc. v. Jackson*,
561 U.S. 63 (2010) ....................15

*Reynolds v. Binance Holdings Ltd.*,
481 F. Supp. 3d 997 (N.D. Cal. 2020) ....................4, 25, 26, 35

*Sanho Corp. v. KaiJet Tech. Int'l Ltd., Inc.*,
2021 WL 2355096 (N.D. Ga. June 9, 2021) ....................21

*Scherer v. Hyundai Cap. Am., Inc.*,
2022 WL 17488420 (S.D. Fla. Nov. 22, 2022) ....................16

*Schrier v. Qatar Islamic Bank*,
632 F.Supp.3d 1335 (S.D. Fla. Sept. 30, 2022) ....................23

*Securities and Exchange Commission v. Binance Holdings Limited et al.*,
Case 1:23-cv-01599 (D.D.C.) ....................31

*Segal v. Amazon.com, Inc.*
763 F. Supp. 2d 1367 (S.D. Fla. 2011) ....................11

*Shamsi v. Levin*,
2017 WL 7803807 (S.D. Fla. Oct. 27, 2017)....12

*Steinberg v. Sherman*,
2008 WL 1968297 (S.D.N.Y. May 2, 2008)....33

*ThunderWave, Inc. v. Carnival Corp.*,
954 F. Supp. 1562 (S.D. Fla. 1997)....27

*Tiffany Tate & Quantum Luxury Props., LLC v. Ibis Prop. Owners Ass'n*,
2018 WL 11585481, at *6 (S.D. Fla. Feb. 20, 2018)....12

*Toll v. North*,
2022 WL 17412937 (S.D. Fla. Dec. 5, 2022)....21

*Trumpet Vine Invs., N.V. v. Union Capital Partners I, Inc.*,
92 F.3d 1110 (11th Cir. 1996)....27

*Vasquez v. Hong Kong & Shanghai Banking Corp. Ltd.*,
2019 WL 2327810 (S.D.N.Y. May 30, 2019)....32

*Vega v. T-Mobile USA, Inc.*,
564 F.3d 1256 (11th Cir. 2009)....37

*Vitzethum v. Dominick & Dominick Inc.*,
1996 WL 19062 (S.D.N.Y. Jan. 18, 1996)....18

*Waite v. All Acquisition Corp.*,
901 F.3d 1307 (11th Cir. 2018)....20, 22, 23, 24

*Wallace v. VF Jeanswear Ltd. P'ship*,
2020 WL 999341 (N.D. Ala. Mar. 2, 2020)....36

**State Cases**

*ALP, Inc. v. Moskowitz*,
204 A.D.3d 454 (2022)....31

*Alrai Naked Opportunity LLC v. Naked Brand Group Ltd.*,
2019 WL 5595157 (N.Y. Sup. Ct. Oct. 30, 2019)....27, 29

*Arrowhead Golf Club, LLC v. Bryan Cave, LLP*,
59 A.D.3d 347 (2009)....12

*Clifford R. Gray, Inc. v. LeChase Const. Servs., LLC*,
31 A.D.3d 983 (2006)....33

*Corsello v. Verizon N.Y., Inc.*,
944 N.Y.S.2d 732 (2012)....33

*Georgia Malone & Co. v. Rieder*,
19 N.Y.3d 511 (2012) ....................................................................................34

*IDT Corp. v. Morgan Stanley Dean Witter & Co.*,
12 N.Y.3d 132 (2009) ....................................................................................33

*Lenczycki v. Shearson Lehman Hutton, Inc.*,
238 A.D.2d 248 (1997) ....................................................................................31

*Mandarin Trading Ltd. v. Wildenstein*,
944 N.E.2d 1104 (2011)....................................................................................32, 33, 34

*McKinnon Doxsee Agency, Inc. v. Gallina*,
187 A.D.3d 733, 132 N.Y.S.3d 144 (2020) ....................................................................28

*Samiento v. World Yacht Inc.*,
10 N.Y.3d 70, 883 N.E.2d 990 (2008)....................................................................33

*SH575 Holdings LLC v. Reliable Abstract Co., LLC*,
195 A.D.3d 429, 149 N.Y.S.3d 62 (2021) ....................................................................27, 28, 31

**Federal Statutes**

9 U.S.C. § 1 ....................................................................................10

9 U.S.C. § 3 ....................................................................................10, 15

Fair Credit Reporting Act ....................................................................................14

Federal Arbitration Act ....................................................................................10

**State Statutes**

Fla. Stat. Ann.
§ 48.193(1) ....................................................................................23
§ 48.193(1)(a)(1) ....................................................................................24
§ 48.193(1)(a)(2) ....................................................................................24
§ 48.193(1)(a)(6)(a) ....................................................................................24

Real Estate Settlement Procedures Act ....................................................................13

**Rules**

Federal Rules of Civil Procedure
8(c)(1) ....................................................................................12
23(a) ....................................................................................35
23(b) ....................................................................................35

S.D. Fla. Local Rules
7.1(a)(3) ....................................................38
7.1(b)(2) ....................................................38

Defendant Binance Holdings, Ltd. and Defendant BAM Trading Services Inc. ("Defendants") respectfully move the Court to enter an order compelling arbitration, or, in the alternative, dismissing Plaintiff's Complaint (the "Complaint") (ECF No. 1). In support of this motion, Defendants state as follows:

## I. INTRODUCTION

This case has no legal or factual basis. Defendants are totally unaffiliated with the Plaintiff or the exchange where his cryptocurrency was purportedly stolen. For a host of reasons, this case should be dismissed.

Plaintiff Michael Osterer's cryptocurrency was purportedly stolen by an unknown hacker from his Coinbase account. Oddly, Plaintiff has not sued either party connected to this occurrence. Plaintiff did not sue the hacker for stealing his assets, or Coinbase for failing to adequately protect those assets. Instead, Plaintiff sued two cryptocurrency exchanges that are entirely uninvolved with the alleged theft or Plaintiff: Defendant Binance Holdings, Ltd ("Binance") and Defendant BAM Trading Services Inc. ("BAM").

The Complaint is mostly barren of facts specific to how Plaintiff was purportedly harmed by Binance. And it contains zero substantive allegations against BAM. Plaintiff's attempt to sue these entities, who are at least three degrees removed from the alleged theft, fails for several independent reasons: (1) Plaintiff is required to arbitrate his claims, (2) the Court lacks personal jurisdiction over Binance, and (3) the Complaint fails to allege plausible facts to state a claim. The Court should compel arbitration, or, in the alternative, dismiss the Complaint.

Plaintiff's theory is that Defendants are liable for the hacker's theft of the cryptocurrency from a completely separate exchange because the hacker allegedly eventually moved the stolen assets from Coinbase, where the alleged theft occurred, pursuant to numerous blockchain

transactions unassociated with Binance, to Binance's exchange. Plaintiff never alleges that the stolen funds touched BAM's exchange. Plaintiff alleges that Binance should have stopped the hacker from ultimately withdrawing their funds through its authority to freeze user accounts. Furthermore, Plaintiff's theory is that Binance knowingly allowed this conduct, and unjustly enriched itself, in order to collect fees on the hacker's transactions.

As an initial matter, the Court need not address the blatant deficiencies in Plaintiff's allegations because the claims are subject to mandatory arbitration. This is because the bases for Plaintiff's conversion and unjust enrichment claims and the attendant relief he seeks – Binance's right to freeze or suspend customer accounts and to collect transaction fees – derive directly from Binance's Terms of Use ("Terms"), which must be agreed to as a prerequisite to depositing or withdrawing any funds on Binance, and which also contain a binding arbitration provision. Among other things, the Terms confer the rights and obligations of Binance and its users, including among other things, creating the right for Binance to: (1) freeze users' accounts and transactions, and (2) collect fees from users' transactions.

Pursuant to widely recognized equity principles, Plaintiff, who does not allege he is a Binance customer or a signatory to the Terms, is nevertheless bound by the Terms' arbitration and class waiver provisions. Equitable estoppel "precludes a party from claiming the benefits of [some of the provisions] of a contract" in pleading their claims while attempting to avoid the arbitration and class waiver provisions in the same contract. *Blinco v. Green Tree Servicing LLC*, 400 F.3d 1308, 1312 (11th Cir. 2005). That is exactly what Plaintiff is attempting to do here. Without the benefits conferred by the Terms, i.e., Binance's ability to freeze user accounts and charge fees, Plaintiff's claims would be completely toothless. Courts in this Circuit consistently recognize that plaintiffs cannot have their cake and eat it too in this manner. They cannot rely on the "underlying

contract to make out his or her claim" and avoid the arbitration provision in that same contract. *Bailey v. ERG Enterprises, LP*, 705 F.3d 1311, 1321 (11th Cir. 2013). Accordingly, the Court should compel Plaintiff to abide by the arbitration and class waiver provisions in Binance's Terms.

Even if Plaintiff is not compelled to arbitrate his claims, the Complaint should be dismissed because it fails to sufficiently allege personal jurisdiction or a claim upon which relief can be granted. First, Plaintiff has not established that the Court has personal jurisdiction over Binance. Under Plaintiff's own version of events, the conduct of Binance, not BAM, caused him injury. But the Complaint is devoid of any facts that would establish personal jurisdiction over Binance. There is not a single allegation regarding Binance's conduct in Florida such that the Court can infer that Binance is "at home" in Florida, or that Binance has purposefully availed itself to Florida such that the Complaint "arises from or relates to" Binance's contacts with Florida.

Plaintiff alleges, in a misguided attempt to establish jurisdiction over Binance, that Binance and BAM are alter egos by copying allegations from two totally unrelated complaints, which were recently filed by government agencies and are pending in other, distant courts. But this falls short of satisfying his "very heavy burden" of establishing jurisdiction over Binance based on alter ego. This theory fails because there are no allegations that Binance controlled BAM or used BAM for a fraudulent or improper purpose in a manner that caused Plaintiff's injury, in Florida or elsewhere. In fact, Binance and BAM are entirely separate legal entities and BAM has no corporate affiliation to Binance whatsoever, and there are no facts Plaintiff has alleged – or could allege – to the contrary. Indeed, Courts in this District and elsewhere consistently rejected the argument that Binance, a foreign entity, is subject to personal jurisdiction within Florida and other states based on this alter ego theory. *See Miro v. Doe*, 2023 WL 2734374 (S.D. Fla. Mar. 31, 2023); *Guarini v. Doe*, 2022 WL 20180341 (S.D. Fla. Apr. 5, 2022); *Gadasalli v. Bulasa*, 2023 WL 3586424, (E.D.

Tex. May 22, 2023); *Reynolds v. Binance Holdings Ltd.*, 481 F. Supp. 3d 997 (N.D. Cal. 2020). Accordingly, the Court lacks jurisdiction over Binance.

Second, each of Plaintiff's causes of action are inadequately pled. This is unsurprising given the attenuated circumstances on which Plaintiff's theory relies. The Complaint does not state any of the elements of conversion, because there are no allegations: (1) that Defendants intended to deprive Plaintiff of his cryptocurrency; (2) that Defendants, as exchanges, asserted dominion over the cryptocurrency; or (3) that Defendants interfered with Plaintiff's right to possess the cryptocurrency. Likewise, Plaintiff's purported aiding and abetting claim fails as a matter of law, because the Complaint contains no allegations that Defendants had actual knowledge of the supposed theft of the cryptocurrency, had some freestanding duty to Plaintiff, or intended to or did help conceal or "affirmatively assist" the purported thief. Furthermore, while as a threshold matter it should be barred for being duplicative, Plaintiff's claim for unjust enrichment cannot survive because Plaintiff has not plausibly alleged, among other things, that he conferred a benefit upon Defendants. And, finally, the claims against BAM fail because there are no independent allegations of misconduct on the part of BAM, and Plaintiff has no viable basis to impute liability to BAM.

Simply put, there is no basis whatsoever for the Complaint to proceed in this Court. Defendants respectfully request that the Court enter an order compelling arbitration, or alternatively, dismissing the Complaint with prejudice.

## II. BACKGROUND

### A. Plaintiff Alleges an Unidentified Hacker Stole Digital Assets From Plaintiff's Coinbase Account and Traded Them on Binance's Exchange

Plaintiff's 32-page Complaint contains only 9 paragraphs alleging any facts pertaining to his specific claims or alleged injury. (Compl. ¶¶ 76-84 ("Plaintiff's Experience").) Those paragraphs allege that Plaintiff had an account with Coinbase (an unaffiliated U.S.-based

cryptocurrency exchange) in which he deposited his cryptocurrency. (*Id.* ¶ 76.) Plaintiff further alleges that "[o]n or about April 7, 2021, an unauthorized person(s) infiltrated Plaintiff's Coinbase account and stole approximately 8.06 BTC [Bitcoin] and 449 ETH [Ether] from Plaintiff." (*Id.* ¶ 77.) This hacker then allegedly transferred the Bitcoin into a purported "High Risk wallet" and the Ether into a separate digital wallet. (*Id.* ¶¶ 77-80.) Notably, these two wallets are not alleged to be associated with, or located on, Binance's platform. (*Id.*) The alleged stolen cryptocurrency was then allegedly transferred from these two non-Binance wallets through a series of separate transactions on the Bitcoin and Ethereum into various other cryptocurrency wallets. (*Id.* ¶¶ 79-80.) Eventually, the alleged hacker purportedly deposited the stolen cryptocurrency from these various wallets into Binance accounts, from which it later withdrew the stolen funds. (*Id.* ¶¶ 78-81.)

### B. Plaintiff Alleges Binance – Not BAM – Should Have Stopped the Hacker From Withdrawing the Alleged Stolen Funds and Should Not Have Collected Fees Based on the Hacker's Transactions

Plaintiff alleges that the financial harm he suffered by virtue of the unknown hacker stealing his cryptocurrency from his Coinbase account was "a direct and proximate result of Binance's policies and failures." (*Id.* ¶ 84.) In support of this misguided theory, Plaintiff alleges that Binance knowingly engaged in this allegedly culpable conduct "for the purpose of earning Binance transaction fees[.]" (*Id.* ¶ 75.) Plaintiff alleges nothing, along these lines, against BAM.

Plaintiff's cobbled-together theory is that Binance is liable because Binance "actually knew" that the stolen cryptocurrency was deposited into Binance accounts, "Binance had the ability to freeze those accounts and stop transactions" and "could have done so before some or all of the stolen cryptocurrency left the Binance exchange, but failed to do so." (*Id.* ¶¶ 72-73.) The Complaint contains no information supporting the conclusory allegation that Binance – one brief stop along the alleged series of transactions made by the hacker – had "actual knowledge" (*id.* ¶ 72) that Plaintiff's allegedly stolen cryptocurrency had been transferred to a Binance account.

Instead, Plaintiff relies on the general and conclusory allegation that Plaintiff's stolen Bitcoin was transferred to a "High Risk wallet" wholly unassociated with Binance's exchange, and which is supposedly "known in the cryptocurrency industry" as being maintained by suspected criminals. (*Id.* ¶ 78.) Plaintiff does not allege how Binance would know this, or how or why that wallet was purportedly "known in the industry," let alone known by Binance specifically, to be associated with suspected criminals. Plaintiff does not allege that his Ether was transferred to a high risk or suspected criminal's wallet. (*Id.* ¶ 80.)

Notably, Plaintiff does not allege that he or the hacker had any interaction with BAM, that BAM had any knowledge of the hacker's alleged conduct, or that BAM or its policies played any role in the theft of Plaintiff's cryptocurrency. The only allegations against BAM are simply copied and pasted from unrelated complaints filed by the SEC and the CFTC in completely different courts in a failed attempt to establish that Binance operates in the U.S. and that Binance and BAM are alter egos. (*Id.* ¶¶ 17-37.) The lack of a single original allegation against BAM makes it clear that BAM is only included in this action as a jurisdictional façade.

### C. Defendants Are Separate Legal Entities That Provide Cryptocurrency Exchange Services to Different Markets

Binance was founded in 2017 as a cryptocurrency exchange that allows its users to purchase and trade cryptocurrencies and digital assets such as Bitcoin and Ether. (*Id.* ¶¶ 7-8.) Binance is a foreign company incorporated outside the U.S. (*Id.* ¶ 6.) Binance does not operate in the U.S. On the other hand, BAM was founded in 2019 and is organized under the laws of Delaware. (*Id.* ¶ 5.) BAM is a completely different cryptocurrency exchange and operates in the U.S. (*Id.* ¶ 9.)

### D. Before Users Are Able to Use Binance's Services, They Agree to Be Bound by Binance's Terms

Before a user can deposit, withdraw, or trade assets on Binance's exchange, the user must first register and create an account with Binance. (*See* Declaration of Erin Fracolli, dated July 19, 2023 ("Decl.") at ¶ 3.) The Terms expressly provide that U.S. users are restricted from creating accounts with Binance. (Decl. ¶ 8.) To create an account, the user must read and agree to Binance's Terms. (Decl. ¶ 3.) Users must affirmatively check a box confirming that they "agree to Binance's Terms of Use." (*Id.*) The words "Terms of Use" in this sentence are hyperlinked (in bold and underlined typeface) to the Terms themselves. (Decl. ¶ 4.) The Terms plainly explain that the "Terms constitute a legal agreement and create a binding contract" between the user and Binance. (Decl. ¶ 6, Exh. 2 at § II.1.a.)

Thus, to allegedly move Plaintiff's cryptocurrency to Binance, the hacker must have first agreed to the Terms. (Decl. ¶¶ 3-4.) Additionally, whenever the Terms are modified, Binance alerts users of those changes and notifies users that they are assenting to those changes by continuing to use Binance. (Decl. ¶ 7.) Every version of the Terms from the date of Plaintiff's first alleged injury to the present have included substantially similar language regarding all the material provisions discussed in this Motion. (*See* Decl. Exh. 3.)

#### 1. Binance's Terms Authorize Binance to Freeze Customer Assets and Collect Transaction Fees

The Complaint alleges that Binance could have frozen the alleged hacker's accounts and stopped their transactions "before some or all of the stolen cryptocurrency left the Binance exchange." (Compl. ¶¶ 72-73.) Binance's ability to freeze users' accounts and stop transactions on its exchange derives directly from the Terms, which give Binance "the right to immediately suspend your Binance Account (and any accounts beneficially owned by related entities or affiliates), freeze or lock the Digital Assets or funds in all such accounts, and suspend your access

to Binance for any reason . . . ." (Decl. Exh. 2 § VI.1.) Users also agree to confer on Binance "the right . . . to permanently freeze (cancel) the authorizations of your Binance Account on Binance and withdraw the corresponding Binance Account" in case of certain events. (*Id.* § VI.2.)

Plaintiff also seeks disgorgement of fees allegedly collected by Binance on the hacker's alleged transactions. (Compl. ¶¶ 1, 3.) The basis for this claim also derives directly from the Terms, which provide Binance the right to collect fees from users for transactions. (Decl. ¶¶ 9-10, Exh. 2 § III.2.c ("You agree to pay Binance the fees specified in [the published online fee schedule]. . . . You authorize Binance to deduct from your account any applicable fees that you owe under these Terms.").)

**2. The Terms Include Binding Arbitration and Class Action Waiver Provisions**

The Terms bind both the user and Binance to mandatory binding arbitration, requiring Binance and users to arbitrate any dispute arising out of the Terms or related to Binance's "Services" (the "Arbitration Provision"). (Decl. ¶ 15, Exh. 2 § X.2.) The "Services" subject to the Arbitration Provision include the "Digital Asset Trading Platforms" that Plaintiff alleges the hacker used to move Plaintiff's cryptocurrency. (Decl. ¶ 15, Exh. 2 § I.3.)

The Arbitration Provision states in relevant part:

> **2. Agreement to Arbitrate and Governing Law.** You and Binance Operators agree that, subject to paragraph 1 above, *any dispute, claim, or controversy* between you and Binance (and/or Binance Operators) arising in connection with or relating in any way to these Terms or to your relationship with Binance (and/or Binance Operators) as a user of Binance Services (*whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory, and whether the claims arise during or after the termination of these Terms) will be determined by mandatory final and binding individual (not class) arbitration*, except as set forth below under Exceptions to Agreement to Arbitrate.

(Decl. ¶ 15, Exh. 2 § X.2 .) The Arbitration Provision also provides: "These Terms (including this arbitration agreement) shall be governed by, and construed in accordance with, the laws of Hong Kong" administered in English by the Hong Kong International Arbitration Centre (HKIAC). (*Id.*)

The Arbitration Provision is prominently highlighted throughout the Terms. In the preamble of the Terms found on the first page of the Terms, prospective users are instructed to "Please read the terms carefully as they govern your use of Binance Services. **THESE TERMS CONTAIN IMPORTANT PROVISIONS INCLUDING AN ARBITRATION PROVISION THAT REQUIRES ALL CLAIMS TO BE RESOLVED BY WAY OF LEGALLY BINDING ARBITRATION.** " (Decl. ¶ 13, Exh. 2 at p. 1 (bold and all caps in original).) And just above the Arbitration Provision, the Terms again emphasize – using bold and all caps – that the Terms include a waiver of legal rights, including proceeding "as a class action." (*Id.* § X.)

## III. ARGUMENT

Plaintiff's claims cannot proceed in this Court for three independent reasons: (1) the claims are subject to binding arbitration pursuant to the established doctrine of equitable estoppel; (2) the Court lacks personal jurisdiction over Binance – the only defendant that Plaintiff alleges engaged in culpable (or any) conduct; and (3) Plaintiff fails to allege plausible facts to state a viable claim against either Binance or BAM.

### A. The Complaint Should Not Proceed in This Court Because the Claims Are Subject to Mandatory Binding Arbitration

Plaintiff must arbitrate his claims because he is suing based on, and seeking benefits arising from, Binance's Terms, which include a mandatory arbitration clause.[1] A necessary component of all Plaintiff's claims is that Binance could have, but failed to, freeze Plaintiff's allegedly stolen cryptocurrency. (*See, e.g.*, Compl. ¶ 73 ("Binance had the ability to freeze those accounts and stop

[1] The Court can properly consider the extrinsic evidence, including Binance's Terms, submitted in support of this Motion because the Terms are incorporated by reference in the Complaint (*see* Compl. ¶ 24). *Day v. Taylor,* 400 F.3d 1272, 1276 (11th Cir. 2005) (citing *Harris v. Ivax Corp.,* 182 F.3d 799, 802 n. 2 (11th Cir. 1999)). Additionally, on a motion to compel arbitration, the Court can consider extrinsic evidence. *Babcock v. Neutron Holdings, Inc.*, 454 F. Supp. 3d 1222, 1228 (S.D. Fla. 2020).

transactions on its exchange involving the stolen cryptocurrency. Binance could have done so before some or all of the stolen cryptocurrency left the Binance exchange, but failed to do so."); *id.* ¶ 108 ("Notwithstanding the actual knowledge of the custody of stolen assets in a Binance address, Binance did not halt the further movement of that stolen property, . . .").) Plaintiff's unjust enrichment claim further relies on Plaintiff's allegation that Binance's collection of transaction fees from this alleged failure to freeze was unjust. (Compl. ¶¶ 1, 3, 55, 75, 116; *id.* at p. 32 (seeking declaratory judgment, restitution, and disgorgement because "Defendants were unjustly enriched by their collection of transaction fees on Plaintiff and Class members' stolen cryptocurrency.").) These allegations, which form the gravamen for both of Plaintiff's causes of action here, demonstrate that Plaintiff is suing Binance based on rights arising from the Terms.

**1. Governing Law Compels Arbitration Here**

The Arbitration Provision is governed by the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. (the "FAA"). Under the FAA, a district court must grant a motion to compel arbitration if it is satisfied that there is an "issue referable to arbitration under an agreement in writing for such arbitration[.]" *See* 9 U.S.C. § 3; *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) ("[T]he [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration . . . ."); *see also JPay, Inc. v. Kobel*, 904 F.3d 923, 929 (11th Cir. 2018).

Given the FAA's liberal policy favoring arbitration, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp. Alabama v. Randolph*, 531 U.S. 79, 91 (2000). "[A]ny doubts" concerning the arbitrability of a dispute "should be resolved in favor of arbitration[.]" *Moses H Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *see also Attix v. Carrington Mortg. Servs., LLC*, 35 F.4th 1284, 1294 (11th Cir. 2022).

Under the FAA, a district court must compel arbitration if (1) a valid written agreement to arbitrate exists, (2) an arbitrable issue exists, and (3) the right to arbitrate has not been waived. *Integrated Sec. Servs. v. Skidata, Inc.*, 609 F. Supp. 2d 1323, 1324 (S.D. Fla. 2009). A plaintiff challenging the enforcement of an arbitration agreement must establish, by substantial evidence, any defense to the enforcement of the agreement. *Inetianbor v. CashCall, Inc.*, 923 F. Supp. 2d 1358, 1362 (S.D. Fla. 2013). Here, all three of these factors compel arbitration.

**a. The Terms Constitute a Valid Clickwrap Agreement**

The Arbitration Provision in Binance's Terms constitutes a valid agreement in writing. (Decl. Exh. 2 § X.2). As set forth in the accompanying declaration from Binance, in order to trade on Binance's exchange platform, the hacker would have had to create an online account with Binance and would have had to affirmatively check a box agreeing to the Terms. (*See supra* § II(D); Decl. ¶¶ 3-4.) Courts routinely enforce online agreements of this nature, particularly where the user is required to take affirmative action to consent. *Segal v. Amazon.com, Inc.* 763 F. Supp. 2d 1367, 1369 (S.D. Fla. 2011) ("In Florida and the federal circuits . . . 'clickwrap agreements,' where a user accepts a website's terms and conditions . . . are valid and enforceable contracts.").

**b. Plaintiff Is Bound by the Terms' Arbitration Provision Under the Doctrine of Equitable Estoppel**

While Plaintiff is not a signatory to the Terms, he is nonetheless bound to the Arbitration Provision under well-settled principles of equitable estoppel. "[T]raditional principles of state contract law determine whether an arbitration agreement can be enforced by or against a non-party." *Ray v. NPRTO Fla., LLC*, 322 F. Supp. 3d 1261, 1262-63 (M.D. Fla. 2017), *aff'd*, 743 F. App'x 955 (11th Cir. 2018); *see also Physician Consortium Services, LLC v. Molina Healthcare, Inc.*, 414 F. App'x 240, 242 (11th Cir. 2011); *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631, (2009).

The Court need not engage in any choice-of-law analysis here because there is no conflict among the possible applicable laws with respect to the doctrine of equitable estoppel. *See In re January 2021 Short Squeeze Trading Litig.*, 584 F. Supp. 3d 1161, 1179 (S.D. Fla. 2022) (finding that "[u]nder Florida's choice-of-law rules, courts need not decide a choice-of-law dispute unless a true conflict of laws exists[.]"). Florida law (forum), New York law (applicable to Plaintiff's claims, to which estoppel is an affirmative defense),[2] federal common law (which some courts have relied on in cases like this one (*see, e.g.*, *Cabrera-Morales v. UBS Tr. Co. of Puerto Rico*, 769 F. Supp. 2d 67, 71 (D.P.R. 2011) ("[A]pplying federal common law to evaluate Defendant's argument that a nonsignatory 'can be bound by an arbitration provision in a contract executed solely by others.'") (cleaned up), and Hong Kong law (selected by Terms' choice-of-law provision) all apply the doctrine of equitable estoppel in the same way to bind a nonsignatory to a contract's arbitration provision when the nonsignatory relies on the contract to state his claims.[3]

Under any of these laws, which do not conflict, equitable estoppel binds Plaintiff to the Arbitration Provision because Plaintiff relies on the Terms to establish his causes of action.

---

[2] *See* Fed. R. Civ. P. 8(c)(1); *Nix v. ESPN, Inc.*, 2018 WL 8802885 (S.D. Fla. Aug. 30, 2018) (finding first that the tort claim at issue was governed by New York law, as opposed to Florida law, and then applying New York law to the affirmative defenses).

[3] *See Tiffany Tate & Quantum Luxury Props., LLC v. Ibis Prop. Owners Ass'n*, 2018 WL 11585481, at *6 (S.D. Fla. Feb. 20, 2018) (applying Florida law and binding non-signatory to contract containing arbitration provision under "direct benefits" theory of estoppel because the non-signatory's suit sought to benefit under contract); *Arrowhead Golf Club, LLC v. Bryan Cave, LLP*, 59 A.D.3d 347 (2009) (applying New York law and binding a non-signatory to an arbitration clause because non-signatory used contract as basis for its claims, which signaled intent to be bound by contract's arbitration clause); (Declaration of Sherlin Tung, dated July 21, 2023 ("Tung Decl.") ¶ 15 (recognizing "in the appropriate circumstances, [that] non-signatories may be bound to written arbitration agreements under the theory of estoppel.") (citing *Dickson Valora Group (Holdings) Co., Ltd. v. Fan Ji Qian*, [2019] HKCFI 482 (binding, under Hong Kong law, non-signatory to arbitration clause where non-signatory sought to enforce contractual rights under contract containing arbitration clause)); *Shamsi v. Levin*, 2017 WL 7803807, at *4 (S.D. Fla. Oct. 27, 2017) (applying federal law on equitable estoppel and compelling arbitration where the plaintiff's claims made reference to or presumed the existence of a contract that included an arbitration clause.)

Specifically, Plaintiff's theory of liability against Binance (and BAM) requires that (1) Binance could have, but did not, freeze Plaintiff's allegedly stolen cryptocurrency assets; and (2) Binance failed to do so in order to earn transaction fees. (*See supra* §§ II(B), II(D)(1).) The only reason Plaintiff is able to invoke these rights is because the alleged hacker – in order to make deposits and withdrawals on Binance – must have agreed to the Terms, which allowed Binance to suspend, freeze or lock their assets and accounts, and to collect fees based on their transactions on the exchange. (*See supra* § II(D)(1); Decl. ¶¶ 9-12.) Thus, Plaintiff is relying on the Terms to establish his claims.

*Blinco v. Green Tree Servicing LLC* is instructive. In *Blinco*, two plaintiffs, Mr. and Mrs. Blinco, asserted claims against a group of affiliated defendants pursuant to the Real Estate Settlement Procedures Act ("RESPA") for failing to provide notice that Mr. Blinco's loan had been transferred and was being serviced by a different entity. *Id.* at 1310. While Mr. Blinco had signed the underlying note, which contained an arbitration clause (the "Note"), Mrs. Blinco had not. The defendants moved to compel Mrs. Blinco to arbitrate her claims despite her status as a nonsignatory because her claims derived from the Note. *Id.* at 1311. Mrs. Blinco argued that her "claims arise solely from statutory rights," but the Circuit rejected that argument and explained that while RESPA claims are statutory, Mrs. Blinco's claims – that she was entitled to notice of the transfer of her husband's loan – derived from the Note and she was thus relying "upon the Note to establish her . . . claims while avoiding her obligation under the Note to arbitrate such claims." *Id*. at 1312. As such, Mrs. Blinco was bound "to the arbitration clause of the Note under the doctrine of equitable estoppel." *Id.*

Similarly, in *Bentley v. Control Grp. Media Co., Inc.*, the court bound a nonsignatory to an arbitration agreement where the facts were virtually identical to those here. In *Bentley*, plaintiffs filed a putative class action against a defendant who was the parent of two online public records

search companies. *Bentley v. Control Grp. Media Co., Inc.*, 2020 WL 3639660, at *1 (S.D. Cal. July 6, 2020). Plaintiffs hired a service to expunge certain criminal records online. *Id.* Plaintiffs alleged that the expungement company sent multiple notices to defendants, but defendants refused to remove the expunged criminal records, thereby violating the Fair Credit Reporting Act and state laws. *Id.* Defendants moved to enforce the arbitration agreement included on the website's terms of use on the grounds that the expungement company agreed to the terms of use. *Id.* at *2. Even though the plaintiffs did not have a direct relationship with the defendants and therefore never accepted the terms of use, including the arbitration provision, the Court nevertheless found that plaintiffs were bound by the arbitration agreement. The Court held:

> Equity similarly requires Plaintiffs be estopped from refusing to comply with the 'Terms of Use' provisions, including the arbitration agreement . . . [The expungement company hired by Plaintiffs] subscribed to Defendants' websites, agreed to the 'Terms of Use', paid Defendants' fee, accessed and reviewed Plaintiffs' criminal records through Defendants' websites, and reported the results to Plaintiffs. . . . Plaintiffs' claims "presume the existence of the underlying contract." Plaintiffs, therefore, cannot avoid the restrictive obligations of the contract. [I]n relying on [the] website subscriptions, Plaintiffs seek to benefit from the 'Terms of Use' without being bound by the contract's provisions. Equity precludes such selective enforcement of a contract.

*Id.* at *3.

Plaintiff must be bound by the Arbitration Provision here because just like in *Blinco* and *Bentley*, Plaintiff cannot sustain his claims without relying on Binance's Terms. Plaintiff attempts to selectively rely on these obligations while ignoring the rest of the Terms, but case law is abundantly clear that equity precludes him from doing so. *See Bailey*, 705 F.3d at 1320-21 ("Equitable estoppel [binds] a nonsignatory . . . when [it] relies on the terms of the contract to assert his or her claims [and] [a] party relies on the terms of a contract when the party needs the underlying contract to make out his or her claim[.]"); *Judge v. Unigroup, Inc.*, 2017 WL 3971457,

at *4 (M.D. Fla. Sept. 8, 2017) (when party "relies on the agreement to assert claims[,]" compelling arbitration is proper). Accordingly, Plaintiff must be bound by the Arbitration Provision.

**c. An Arbitral Issue Exists Because Plaintiff's Claims Fall Within the All-Encompassing Arbitration Provision**

An "issue referable to arbitration," 9 U.S.C. § 3, exists for two independent reasons.

First, the Arbitration Provision clearly and unmistakably delegates the question of arbitrability to the arbitrator. Where an arbitration agreement "clearly and unmistakably" states that an arbitrator will decide gateway issues such as the validity, enforceability or applicability of the arbitration agreement, it is for the arbitrator, and not the Court, to decide those issues. *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). Courts must enforce "agreement[s] to arbitrate threshold issues" regarding the arbitrability of their dispute. *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-70 (2010); *New Prime Inc. v. Oliveira*, 202 L. Ed. 2d 536 (2019).[4] This mandate is non-negotiable. Indeed, when a "contract delegates the arbitrability question to an arbitrator, a court may not override the contract" and "possesses no power to decide the arbitrability issue . . . even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019).

The Arbitration Provision provides "that the arbitrator shall have the exclusive power to rule on his or her own jurisdiction, including without limitation any objections with respect to the existence, scope or validity of the Agreement to Arbitrate, or to the arbitrability of any claim or counterclaim." (Decl. Exh. 2 § X.2.) Moreover, the Arbitration Provision expressly incorporates

---

[4] It is settled in the Eleventh Circuit that, absent statutory prohibition, questions of arbitrability are decided by arbitrators, not the federal courts. *See Multi-Financial Sec. Corp. v. King*, 386 F.3d 1364, 1367 (11th Cir. 2004); *Attix v. Carrington Mortg. Servs.*, LLC, 35 F.4th 1284, 1298, 1300-01 (11th Cir. 2022) (questions of arbitrability are delegated to an arbitrator unless law prohibits that delegation.).

the Hong Kong International Arbitration Centre ("HKIAC") rules (*id.*), which also mandate delegation of all questions of arbitrability to the arbitrator. (*See* Tung Decl. Exh. 3 Art. 19.) Accordingly, the threshold issue of arbitrability of Plaintiff's claims requires referral to arbitration. *See Scherer v. Hyundai Cap. Am., Inc.*, 2022 WL 17488420, at *7 (S.D. Fla. Nov. 22, 2022), *report and recommendation adopted*, 2022 WL 17486330 (S.D. Fla. Dec. 7, 2022) (enforcing delegation provision because the "provision permit[s] either party to elect to resolve 'any' claim or dispute . . . by arbitration," and "any disputes means all disputes, because any means all"); *Attix v. Carrington Mortg. Servs.*, LLC, 35 F.4th 1284, 1300-01 (11th Cir. 2022) ("[I]ncorporation of AAA rules giv[es] an arbitrator the power to rule on his or her own jurisdiction constitutes a clear and unmistakable delegation of questions of arbitrability."); *Ayala-Rodriguez v. Falic Fashion Grp. LLC*, 2019 WL 13216292, at *3 (S.D. Fla. Mar. 6, 2019) (same); *see also Flextronics Int'l USA, Inc. v. Murata Mfg. Co., Ltd.*, 2020 WL 5106851, at *8 (N.D. Cal. Aug. 31, 2020) (finding that HKIAC Rules "delegat[e] all questions of arbitrability to the arbitrator").

Second, if this Court determines it must answer the question of whether there is an arbitral claim, Plaintiff's claims fall squarely within the broad Arbitration Provision which mandates that "any" claim – "whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory, and whether the claims arise during or after the termination of these Terms" – "arising in connection with or relating in any way to" the Terms "will be determined by mandatory final and binding (not class) arbitration." (Decl. ¶ 15, Exh. 2 § X.2.) The Eleventh Circuit has interpreted arbitration provisions like this one to be "unequivocal and all-encompassing." *Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1221 (11th Cir. 2000) ("It states that 'any dispute between them or claim by either against the other' is subject to arbitration. By using this inclusive language, the parties agreed to arbitrate any and all claims against each other, with no exceptions. An

arbitration agreement is not vague solely because it includes the universe of the parties' potential claims against each other.").[5]

Here, the "all-encompassing" and classically "broad" Arbitration Provision at issue covers the alleged dispute between Plaintiff and Binance. *See Brown*, 211 F.3d at 1221. As set out above, the substance of Plaintiff's claims relies directly on the Terms, and therefore "arise under" and "relate to" the Terms. (*Supra* § III(A)(1)(a).) The Arbitration Provision also expressly covers the types of claims brought by Plaintiff, *i.e.*, a tort and quasi-contractual claim. (Decl. ¶ 15, Exh. 2 § X.2.) *See also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]").

In sum, because Plaintiff's claims arise under Terms containing an Arbitration Provision encompassing those claims, Plaintiff is equitably bound to arbitrate his claims against Binance.

**d. BAM May Invoke the Arbitration Provision to Compel Plaintiff to Arbitrate**

A similar equitable estoppel theory requires Plaintiff to arbitrate his claims against BAM. A plaintiff bound by an arbitration agreement must arbitrate claims against a nonsignatory defendant if those claims are "both based on the same facts" and "inherently inseparable from the alleged" misconduct by a signatory. *Physician Consortium Servs., LLC v. Molina Healthcare, Inc.*, 414 F. App'x 240, 243 (11th Cir. 2011); *Caporicci U.S.A. Corp. v. Prada S.p.A.*, 2018 WL 2264194 at * 3 (S.D. Fla. May 7, 2018); *accord Herrera v. West Flagler Assocs., Ltd.*, 2017 WL

[5] The interpretation of the Arbitration Provision is the same under Hong Kong law or New York law. *See In re Refco, Inc. Sec. Litig.*, 2008 WL 2185676, at *6 (S.D.N.Y. May 21, 2008) ("The arbitration clause. . . .providing for arbitration of 'any controversy or claim arising out of or relating to. . . . is 'precisely the kind of broad arbitration clause that justifies a presumption of arbitrability[.]'"); (*see also* Tung Decl. ¶ 10 ("[T]he courts of Hong Kong interpret arbitration clauses broadly and determine that disputes or claims 'arising out of' or 'related to' contracts containing arbitration agreements fall under the scope of arbitration."); *id.* Exhs. 6-8.)

9324515, at *5 (S.D. Fla. Apr. 5, 2017).[6] This rule exists for good reason: requiring arbitration of interrelated claims against non-signatories prevents plaintiffs from "attempting an 'end run'" around their obligation to arbitrate. *Physician Consortium Servs.*, 414 F. App'x at 243.

The Court should similarly require Plaintiff to arbitrate his claims against BAM because those claims against BAM are "based on the same facts" and "inherently inseparable from the alleged" misconduct asserted against Binance. To be sure, Plaintiff alleges nothing independently against BAM and wholly relies on its allegations against Binance to impute liability onto BAM. (*See, e.g.*, Compl. ¶ 17.) Nonetheless, Plaintiff asserts both his claims against both Defendants. (Compl. ¶¶ 93-119.) Plaintiff's hollow alter ego premise demonstrates BAM should be permitted to arbitrate because the "same facts" are alleged against both Defendants as the basis for liability. Stated simply, there is no basis for Plaintiff's claims against BAM to proceed in court.

### B. Plaintiff Has Not Satisfied His Burden of Establishing Personal Jurisdiction Over Binance

There is no basis for Plaintiff's claims against Binance to proceed in this Court for the additional reason that Plaintiff has not satisfied his "initial burden of alleging in the complaint sufficient facts to make out a *prima facie* case of [personal] jurisdiction" over Binance. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013). "[A] federal court sitting in diversity [as here] undertakes a two-step inquiry" to determine whether personal jurisdiction exists: "the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate [] Due Process[.]" *Bernsley v. Advance Group*, 2022 WL 2915741, at **1-2 (S.D. Fla.

[6] The laws of New York and Hong Kong are in accord. *See Vitzethum v. Dominick & Dominick Inc.*, 1996 WL 19062, at *7 (S.D.N.Y. Jan. 18, 1996) (binding a non-signatory to an arbitration agreement when the non-signatory relied on the agreement in asserting claims); (Tung Decl. ¶¶ 14-16 (citing *Dickson Valora Group (Holdings) Co., Ltd. v. Fan Ji Qian*, [2019] HKCFI 482 (binding, under Hong Kong law, a non-signatory to an arbitration clause where the non-signatory sought to enforce contractual rights under the agreement containing the arbitration clause)).

July 24, 2022) (Ruiz, J.) (citations and quotations omitted). Personal jurisdiction may be either general or specific. *Id.* Here, neither exists over Binance.

**1. There is No General Jurisdiction Over Binance Because It Is Not at Home in Florida**

Plaintiff does not allege Binance is subject to general jurisdiction under Florida's long-arm statute, nor can he. A corporation is subject to general jurisdiction, such that the court can hear any claim against it, where "the corporation is fairly regarded as at home[.]" *Iglesias v. Pernod Ricard*, 2020 WL 13367465, at *4 (S.D. Fla. Aug. 17, 2020). The Eleventh Circuit has noted the general jurisdiction provisions of Florida's long-arm statute are coextensive with "the limits on personal jurisdiction imposed by the Due Process Clause[.]" *Fraser v. Smith*, 594 F.3d 842, 846 (11th Cir. 2010). In this respect, general jurisdiction is normally established over a corporation if it is incorporated or has its principal place of business in Florida. *Daimler AG v. Bauman*, 571 U.S. 117, 118 (2014); *see also Iglesias*, 2020 WL 13367465, at *2 (citing cases).

Here, Plaintiff concedes that "Binance is a foreign corporation," and does not allege that it is incorporated in Florida, or that it has a principal place of business in Florida. (Compl. ¶ 6.) And as explained below (*infra* § III(B)), the Complaint is devoid of *any* facts regarding Binance's activities in Florida let alone facts sufficient to characterize Binance as at home in Florida. The only allegations in the Complaint pertain to the United States generally, not Florida, which the Court in *Guarini* already found is insufficient to establish personal jurisdiction over Binance. *Guarini v. Doe*, 2022 WL 20180341, at *3 (S.D. Fla. Apr. 5, 2022) (holding that allegations "about customers' use of [Binance's] services in the United States is woefully inadequate [grounds] to support the exercise of general jurisdiction over [Binance]").

Accordingly, Plaintiff attempts to impute BAM's contacts to Binance to establish general jurisdiction over Binance. But Plaintiff fails for the reasons below. *Iglesias*, 2020 WL 13367465,

at *7 ("[E]ven if Plaintiff had sufficiently alleged . . . alter ego . . . for purposes of satisfying Florida's long-arm requirement of 'substantial and not isolated activity' in the state, [the foreign defendant's] connections with Florida are not 'so continuous and systemic' as to render it essentially at home[.]").

**2. There Is No Specific Jurisdiction Because the Controversy Does Not Arise Out of Binance's Contacts in Florida**

To establish specific jurisdiction, Plaintiff's "*suit* must arise out of or relate to the defendant's contacts with the forum." *Iglesias*, 2020 WL 13367465, at *4 (quoting *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.* 137 S.Ct. 1773, 1779-80 (2017) (emphasis in original) (cleaned up). The Complaint is devoid of any facts to satisfy Plaintiff's burden to show that (1) Binance has "purposefully availed" itself to the Florida forum, (2) that Plaintiff's claims against Binance "arise out of or relate to" Binance's "contacts with" Florida; and (3) that the exercise of personal jurisdiction would comport with "traditional notions of fair play and substantial justice." *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1313 (11th Cir. 2018).

First, the Complaint is devoid of any *factual* allegations showing Binance "purposefully availed" itself of the Florida forum. Instead, the Complaint improperly alleges collectively that there is specific jurisdiction "over both Defendants because they (i) transact business in Florida; (ii) have substantial aggregate contacts with Florida; (iii) engaged in and are engaging in conduct that has and had a direct, substantial, and reasonably foreseeable, and intended effect of causing injury to persons in Florida; and (iv) purposely availed themselves to the laws of Florida." (Compl. ¶ 15.) The Complaint does not, however, make allegations specific to either Binance or BAM, which is a pleading deficiency that courts in this Circuit routinely find fails to meet Plaintiff's burden as to personal jurisdiction. *See Sanho Corp. v. KaiJet Tech. Int'l Ltd., Inc.*, 2021 WL 2355096, at *5 (N.D. Ga. June 9, 2021); *Home Design Servs., Inc. v. David Weekley Homes, LLC*,

2007 WL 1080001, at *3 (M.D. Fla. Apr. 9, 2007) (plaintiff's group allegations failed to establish what actions individual defendants took to establish personal jurisdiction).

Plaintiff's allegations regarding Defendants' solicitation of customers in the *United States* are likewise insufficient to show Binance availed itself to the forum of *Florida*. Namely, a sizeable portion of the Complaint copies swaths of allegations from complaints filed by the SEC and CFTC regarding how Binance purportedly knowingly operated in the United States via customers' use of VPNs.[7] Regardless, there is not a single allegation in the Complaint regarding how Binance purposefully availed itself *specifically in Florida*. (*See* Compl. ¶ 39 (referencing ". . . customers were located *in 'U.S.'*"); *id.* ¶ 40 (referencing customers "located *in the United States*."); *id.* ¶ 50 (referencing customer traffic from the U.S.).) Finding personal jurisdiction here based on such generic allegations would be improper. *See Toll v. North*, 2022 WL 17412937, at *3 (S.D. Fla. Dec. 5, 2022) (merely making a website available is not "target[ing] [it to] a Florida audience in any way"); *Argos Global Partner Services, LLC v. Ciuchini*, 446 F. Supp. 3d 1073, 1092 (S.D. Fla. 2020) ("[T]he mere posting of…a website 'without more' is insufficient to demonstrate that Defendants purposefully aimed their activity toward Florida.").

Indeed, the facts and arguments raised by Plaintiff are identical to the those in *Guarini*, and there, Judge Middlebrooks found that the Court lacked jurisdiction over Binance. In *Guarini*, a

[7] As a threshold issue, Plaintiff's reliance on allegations from a different complaint are improper and do not show plausible facts sufficient to satisfy the pleading standard. *Env't Prot. Comm'n of Hillsborough Cnty., Fla. v. Mercedes-Benz USA, LLC*, 2022 WL 4355666, at *4 (M.D. Fla. Sept. 20, 2022) (citing *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) ("[N]either a complaint nor references to a complaint . . . may properly be cited in the pleadings"); *Brown v. Evans*, 2016 WL 69629, at *5 (N.D. Ill. Jan. 6, 2016) ("The allegations of a different complaint involving different facts and actors are irrelevant to Brown's claims before this Court."); *Del Puerto Water Dist. v. U.S. Bureau of Reclamation*, 271 F. Supp. 2d 1224, 1234 (E.D. Cal. 2003) ("To the extent their contents are in dispute, such matters of controversy are not appropriate subjects for judicial notice.").

Florida resident, represented by the same counsel as counsel for Plaintiff in this action, brought an action against an unknown thief and Binance for conversion, imposition of constructive trust, and disgorgement of funds based on the allegations that the thief stole cryptocurrency and deposited it into a Binance account. The plaintiff argued that there was personal jurisdiction over Binance because it conducted business in the U.S. through Binance.US. The Court held that:

> [T]he fact that Plaintiff was the victim of a crime in Florida committed by an unknown John Doe Defendant does not bear on Defendant Binance's contacts with the forum state. In order to establish that a defendant is carrying on business for the purposes of the long-arm statute, the activities of the defendant must be considered collectively and show a general course of business activity in the state for pecuniary benefit. Factors relevant to this inquiry include: (1) the presence and operation of an office in Florida; (2) the possession and maintenance of a license to do business in Florida; (3) the number of Florida clients served; and (4) the percentage of overall revenue gleaned from Florida clients. Plaintiff's Amended Complaint contains no allegations that Defendant Binance satisfies any of these factors.

*Guarini v. Doe*, 2022 WL 20180341, at *4 (S.D. Fla. Apr. 5, 2022) (quotations omitted). The connection to Florida in this case is even less than in *Guarini* as Plaintiff is a New York resident (whereas Guarini was a Florida resident). Thus, just like in *Guarini*, the Complaint here is devoid of any allegations satisfying any of the factors to establish specific jurisdiction over Binance.

Second, the Complaint also contains no allegations indicating that Plaintiff's injury arose out of Defendants' contacts with Florida. *See Waite*, 901 F.3d at 1314 (holding "a tort 'arises out of or relates to' the defendant's activity in a state only if the activity is a 'but-for' cause of the [alleged] tort."). In all of Plaintiff's 32-page complaint, there are only 9 paragraphs dedicated to facts specific to Plaintiff and *none* contain allegations that any conduct occurred in Florida. (*See* Compl. ¶¶ 76-84.) Plaintiff is a New York resident (*id.* ¶ 4) and the Complaint contains absolutely no information about the identity of the hacker, including whether he resided or interacted with Binance in Florida (or even in the United States). Courts routinely dismiss claims for lack of personal jurisdiction with similarly vague allegations. *See Hinkle v. Cirrus Design Corp.*, 775 F.

App'x 545, 550 (11th Cir. 2019); *Schrier v. Qatar Islamic Bank*, 632 F.Supp.3d 1335, 1352-53 (S.D. Fla. Sept. 30, 2022) (Altman, J.); *Perry v. Ryan*, 2023 WL 2403889, at *3 (M.D. Fla. Mar. 8, 2023) ("[T]he complaint does not allege specific factual events or transactions involving Defendants that occurred in Florida."); *Bernsley*, 2022 WL 2915741, at *5 (Ruiz, J) (holding that plaintiff has not established specific personal jurisdiction where conduct giving rise to the complaint "occurred entirely in New York."); *see also Iglesias*, 2020 WL 13367465, at *7-8 (finding no specific jurisdiction where foreign defendant conducted business in Florida through a subsidiary, but did not have sufficient contacts itself, and the acts giving rise to the complaint all occurred outside of Florida).

Third, since the Complaint is devoid of facts supporting the first two prongs of this specific jurisdiction analysis, there is no need to ascertain whether exercising personal jurisdiction would comport with traditional notions of fair play and substantial justice. *See Waite*, 901 F.3d at 1313. However, it is clear that the exercise of such jurisdiction would offend due process given Binance's total lack of connections with, and presence in, Florida. *See Frida Kahlo Corp. v. Pinedo*, 2021 WL 4147876, at *6 (S.D. Fla. Sept. 13, 2021).

Lastly, Florida's long-arm statute does not support specific personal jurisdiction. "Under Florida's long-arm statute, specific jurisdiction can only be exercised over a defendant in causes of action that arise from a list of enumerated acts. And Florida's long-arm statute is strictly construed." *Guarini v. Doe*, 2022 WL 20180341, at *3 (S.D. Fla. Apr. 5, 2022) (cleaned up); *see* Fla. Stat. Ann. § 48.193(1). The Complaint fails to state which section of Florida's long-arm could be satisfied here, and it is completely devoid of non-conclusory facts that support Binance has "operat[ed] a business venture" in Florida, "committ[ed] a tortious act" in Florida, or "solicit[ed]" any business in Florida that is the "but-for" cause of Plaintiff's claims. Fla. Stat. Ann. §§

48.193(1)(a)(1), (1)(a)(2), (1)(a)(6)(a); *Waite*, 901 F.3d at 1314. As explained above, the Complaint does not allege that either the forum of Florida or any Florida resident has anything to do with this lawsuit.

### 3. Plaintiff Has Not Carried the "Very Heavy Burden" of Establishing That Binance and BAM Are Alter Egos

In an effort to distance itself from the well-reasoned holding in *Guarini*, Plaintiff alleges that Binance is subject to personal jurisdiction because it is the so-called "alter ego" of an entirely separate legal entity, BAM. (Compl. ¶ 14.) The alter ego theory of personal jurisdiction is "a limited exception to the general, two-step process of establishing long-arm [personal] jurisdiction." *Frybarger v. Salemme*, 2022 WL 18530012, at *6 (S.D. Fla. Dec. 28, 2022). Under the alter ego theory, the Court may pierce the corporate veil and find that a foreign entity is subject to personal jurisdiction in Florida *only if* the Plaintiff alleges sufficient facts to establish that the foreign entity exerts so much control over a resident entity that the two do not exist as separate entities but are one and the same for purposes of jurisdiction. *See K3 Enterprises, Inc. v. Sasowski*, 2021 WL 8363506, at *5 (S.D. Fla. Nov. 22, 2021). A plaintiff seeking to pierce the corporate veil in Florida carries a "very heavy burden." *Iglesias*, 2020 WL 13367465, at *5 (S.D. Fla. Aug. 17, 2020). "To establish that a non-resident defendant corporation is an alter ego of a resident defendant, a plaintiff must show that (1) the non-resident defendant dominated and controlled the resident corporation to such an extent that the corporation's independent existence was in fact non-existent, (2) the corporate form was used fraudulently or for an improper purpose, and (3) the fraudulent or improper use of the corporate form caused injury to the plaintiff." *Sasowski*, 2021 WL 8363506, at *3. Here, the allegations fall far short of satisfying Plaintiff's very heavy burden to justify piercing the corporate veil.

Plaintiff alleges virtually nothing based upon his own personal knowledge or information and belief to satisfy any of the elements needed to establish Binance and BAM are alter egos. First, the Complaint is devoid of any factual allegations regarding Binance's control over BAM. *Env't Prot. Comm'n of Hillsborough Cnty., Fla.*, 2022 WL 4355666, at *5 ("Simply noting that another entity has made allegations . . . does not provide sufficient detail to support the Commission's claims."). Plaintiff also makes no allegations that Binance used BAM for a fraudulent or improper purpose in this case. Likewise, there is no allegation that Binance's supposed control over BAM caused Plaintiff's injury. Indeed, there are no specific allegations that Plaintiff (or the hacker) interacted with BAM at all: Plaintiff alleges that an unknown hacker stole his cryptocurrency maintained in Coinbase, a different cryptocurrency exchange, and then deposited Plaintiff's stolen cryptocurrency into "three Binance recipient addresses"; and that his injury was caused because "*Binance* had actual knowledge" that the stolen cryptocurrency was deposited into its accounts, that "*Binance* had the ability to freeze" the transactions but "*Binance* . . . failed to do so." (Compl. ¶¶ 72-74, 76-81 (emphasis added).) There is not a single allegation regarding any conduct by BAM that resulted in Plaintiff's injury, or that Binance's control over BAM allowed the hacker to steal his cryptocurrency and allegedly deposit it into Binance accounts.

Given the dearth of substantive allegations against BAM, it is apparent that Plaintiff included BAM in in this case solely for purposes of attempting to artificially create personal jurisdiction over Binance. But courts in this District and others have already rejected this alter ego theory. *See Guarini*, 2022 WL 20180341 at **3-4 (dismissing action against Binance for lack of personal jurisdiction finding that BAM is not actually affiliated with Binance such that its contacts can be imputed to Binance); *Miro v. Doe*, 2023 WL 2734374, at *3 (S.D. Fla. Mar. 31, 2023) (dismissing action against Binance for lack of personal jurisdiction, rejecting alter-ego theory, and

explaining that "Binance.US is an entirely different entity from Defendant and should not be conflated with Defendant in this action."); *Reynolds v. Binance Holdings Ltd.*, 481 F. Supp. 3d 997, 1008 (N.D. Cal. 2020) ("Binance is not subject to personal jurisdiction as BAM's alter ego."); *Gadasalli v. Bulasa*, 2023 WL 3586424, at *4 (E.D. Tex. May 22, 2023) ("The Court will reject [Plaintiff's] theory that it may exercise personal jurisdiction [over Binance] based on a theory of alter ego."). The Court should find similarly and conclude that Plaintiff has not carried the heavy burden necessary to pierce the corporate veil.

**C. Plaintiff's Complaint Should Be Dismissed Because It Fails to State a Claim**

**1. Under Florida's Choice of Law Rules, Plaintiff's Claims Are Subject to New York Substantive Law**

Plaintiff's claims for conversion and aiding and abetting conversion (the "Conversion Claims") are governed by New York law. Florida's choice-of-law rules dictate that the "'most significant relationship test' outlined in the Restatement (Second) of Conflict of Laws[,]" be used to determine the applicable law for the Conversion Claims. *Melton v. Century Arms, Inc.*, 243 F. Supp. 3d 1290, 1299 (S.D. Fla. 2017). In cases involving alleged cyber-torts where the alleged situs of the injury is ostensibly unknown, courts have explained the "location of the breach itself is fortuitous[,]" (*In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*, 603 F. Supp. 3d 1183, 1199 (S.D. Fla. 2022)), and have instead looked toward where the plaintiff *felt* the injury. *See, e.g.*, *Bandyopadhyay v. Defendant 1*, 2023 WL 2263552, at *4 (S.D. Fla. Feb. 28, 2023) ("The State of Washington has the most significant relationship to the occurrence and the parties because Plaintiff suffered substantial damages and is a resident and citizen of the State of Washington[.]"). Here, we know Plaintiff is a citizen of New York, and that is the location where Plaintiff ostensibly felt the alleged injury, so under *Bandyopadhyay*, New York law applies to the Conversion Claims.

Plaintiff's claim for unjust enrichment is likewise governed by New York law. Florida applies "lex loci contractus" to determine the law applicable to this contract implied-in-law claim. *See Trumpet Vine Invs., N.V. v. Union Capital Partners I, Inc.*, 92 F.3d 1110, 1119-20 (11th Cir. 1996). "Under this rule, an implied-in-law contract is created where the last act necessary to complete the contract is made." *ThunderWave, Inc. v. Carnival Corp.*, 954 F. Supp. 1562, 1564 (S.D. Fla. 1997) (citation omitted); *see also HostLogic Zrt. v. GH Int'l, Inc.*, 2014 WL 2968279, at *8 (M.D. Fla. June 30, 2014) (applying Florida law because "the last necessary act for the unjust enrichment claim occurred in Florida[.]"). Here, the Complaint only alleges that the Plaintiff felt the alleged injury in New York, where he is located, which may be the ostensible location of where the "last necessary act" for the unjust enrichment claim occurred. In the event this Court were to find Florida law (*i.e.*, the forum's law) applies to Plaintiff's claims, Defendants also analyze Florida law for the sake of completeness.

**2. Plaintiff Fails to State a Claim for Conversion**

Plaintiff fails to state a claim for conversion. A "conversion takes place when someone," (1) "intentionally and without authority," (2) "assumes or exercises control over personal property belonging to someone else," and (3) interferes "with that person's right of possession[.]" *Alrai Naked Opportunity LLC v. Naked Brand Group Ltd.*, 2019 WL 5595157, at *4 (N.Y. Sup. Ct. Oct. 30, 2019) (citations omitted). The first element, *i.e.*, intent, may be properly stated if the plaintiff pleads that it made a prior demand for the return of the alleged converted property. *See SH575 Holdings LLC v. Reliable Abstract Co., LLC*, 195 A.D.3d 429, 430-31, 149 N.Y.S.3d 62, 64 (2021) (dismissing conversion claim and explaining "even if the funds were specifically identifiable,

plaintiff still failed to plead a claim. It is undisputed that plaintiff [did] not ma[k]e demands for return of the funds upon the moving defendants.") (citations omitted) (cleaned up).[8]

The Complaint fails to establish any of these three elements of conversion. First, the Complaint is devoid of any allegations of intent or any corresponding demand to return the assets. There are no non-conclusory statements alleging that Binance (or BAM) *intended* to deprive Plaintiff or the purported class of their cryptocurrency or crypto assets. Indeed, there is no allegation that Plaintiff alerted Binance that his stolen currency was deposited on Binance's exchange, demanded its return, and that Binance refused to return it. *See SH575 Holdings LLC*, 195 A.D.3d at 430-31 (dismissing conversion claim for failing to state prior demand).

Second, the Complaint does not state, let alone establish, that Binance (or BAM) asserted any dominion, let alone intentional wrongful dominion, over the cryptocurrency or crypto assets in question. The Complaint does not assert that either Binance or its affiliates hold title to any of the digital assets that users hold or transfer on Binance affiliated exchanges, nor does it allege that Binance asserted, let alone intended to assert, legal dominion and/or control over the assets. *See, e.g.*, *McKinnon Doxsee Agency, Inc. v. Gallina*, 187 A.D.3d 733, 738, 132 N.Y.S.3d 144, 149 (2020) (affirming dismissal of conversion claim because plaintiff failed to show "the defendant exercised an unauthorized dominion"). Moreover, the Complaint fails to sufficiently state that "the personal property" belonging to Plaintiff is unsegregated and specifically identifiable. *SH575*

---

[8] Under Florida law, the elements of a conversion claim are similar: (1) an act of dominion wrongfully asserted; (2) over another's property; and (3) inconsistent with his ownership therein. *See, e.g., Gulf Coast Produce, Inc. v. Am. Growers, Inc.*, 2008 WL 660100, at *4 (S.D. Fla. Mar. 7, 2008). Similar to New York law, "the essence of conversion is not the possession of property by the wrongdoer, but rather such possession in conjunction with a present intent on the part of the wrongdoer to deprive the person entitled to possession of the property, which intent may be, but is not always, shown by demand and refusal." *Gibson v. BTS North, Inc.*, 2018 WL 888872, at *9 (S.D. Fla. Feb. 14, 2018) (quoting *Senfeld v. Bank of Nova Scotia Tr. Co. (Cayman)*, 450 So. 2d 1157, 1161 (Fla. Dist. Ct. App. 1984).

*Holdings LLC v. Reliable Abstract Co., LLC*, 195 A.D.3d 429, 430, 149 N.Y.S.3d 62, 63 (2021) (affirming dismissal of conversion claim and explaining "[a]s the account is unsegregated, plaintiff's funds, upon their transfer therein, became commingled with monies that were already in it, rendering them no longer specifically identifiable.").

In fact, the Complaint suggests the opposite—that crypto assets are commingled and not specifically identifiable—vitiating its own claim for conversion. (*See* Compl. ¶ 63 ("Binance lacks internal controls to ensure that customer funds are identifiable and segregated from company revenues, and therefore regularly comingles customer assets with its own.").) Also, the Complaint fails to allege in a non-conclusory manner that the Plaintiff had anything more than a right to repayment for the dollar-value of the crypto assets. *See Alrai Naked Opportunity LLC v. Naked Brand Group Ltd.*, 2019 WL 5595157, at *5 (N.Y. Sup. Ct. Oct. 30, 2019) ("[M]ere right to payment . . . is not sufficient to establish a 'present possessory interest for purposes of a conversion claim'") (citations omitted).

Third, the Complaint fails to sufficiently allege that Binance (or BAM) "interfere[ed] with [Plaintiff's] right of possession," *Alrai Naked Opportunity LLC*, 2019 WL 5595157, at *4, because the Complaint fails to state that Binance was the cause of the alleged conversion. To establish this element, the plaintiff must show, among other things, that plaintiff possessed or controlled the property prior to its conversion. *Aramony v. United Way of Am.*, 949 F. Supp. 1080, 1086 (S.D.N.Y. 1996) (citing *Peters Griffin Woodward, Inc., v. WCSC, Inc.*, 88 A.D.2d 883, 452 N.Y.S.2d 599, 600 (1st Dep't 1982)). Here, Plaintiff's crypto assets were stolen by a third-party hacker, and the hacker, not Plaintiff, allegedly possessed and deposited those assets on Binance's exchange. *See also Coughlan v. Jachney*, 473 F. Supp. 3d 166, 199-200 (E.D.N.Y. 2020) (citing cases) (explaining the complaint must state that the *defendant* exercised the unauthorized

"dominion over the thing in question [at] the exclusion of plaintiff's rights."). For these reasons, Plaintiff's conversion claim should be dismissed.

**3. Plaintiff Fails to State a Claim for Aiding and Abetting Conversion**

Plaintiff also fails to state a claim for aiding and abetting conversion. Aiding and abetting conversion requires (1) "the existence of a primary violation," (2) "actual knowledge of the violation on the part of the aider and abettor," and (3) "substantial assistance." *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 533 (S.D.N.Y. 2009).[9]

The Complaint does not plead any basis for the required element that Binance (or BAM) had "actual knowledge" of the hacker's theft and laundering of Plaintiff's stolen digital assets. (Compl. ¶ 107.) "[P]leading knowledge for purposes of an aiding and abetting claim requires allegations of facts that give rise to a 'strong inference' of actual knowledge." *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 412 (S.D.N.Y. 2021) (quoting *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC,* 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007)). Allegations that the defendant "should have known of the conduct" are insufficient to raise an inference of actual knowledge. *See, e.g.*, *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 442 (S.D.N.Y. 2010); *Berdeaux*, 561 F. Supp. 3d at 412 ("[C]onstructive knowledge is not sufficient, nor is 'a lower standard such as recklessness or willful blindness.'") (quotations omitted). Other than trying to impute BAM's Know Your Customers ("KYC") and Anti-Money Laundering ("AML") obligations on Binance, the Complaint contains no allegations allowing even a reasonable inference that Binance actually

[9] Under Florida law, the elements of this claim are substantially similar. *Pearson v. Deutsche Bank AG*, 2022 WL 951316, at *7 (S.D. Fla. Mar. 30, 2022). Similar to New York law, Florida law requires a showing of "actual" knowledge. *See Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988, 993 (11th Cir. 2014) ("Merely alleging a series of red flags—that a bank should have known of a Ponzi scheme based solely on a series of purportedly atypical transactions—is not sufficient [enough] to [state a claim.]") (emphasis added).

knew that the alleged hacker was depositing stolen cryptocurrency.[10] Even assuming such obligations were applicable to Binance during the time period in question (which they were not), there are no allegations at all supporting the notion that Binance's adherence to those obligations would establish the requisite actual knowledge that the assets were stolen. Plaintiff alleges nothing regarding the hacker's identity that would allow Binance or the Court to determine whether Binance would have had information that would have raised even a suspicion, let alone actual knowledge, of impropriety. For example, the Complaint simply alleges that Plaintiff's stolen crypto assets were "transferred to a High Risk wallet (ICGMU9***) which is [supposedly] known … to been maintained by suspected criminals or dark web users[.]" (Compl. ¶ 78.) Aside from being a wholly conclusory statement based on conjecture, *SH575 Holdings LLC*, 195 A.D.3d 429, 431, 149 N.Y.S.3d 62, 64 (2021) (dismissing aiding and abetting conversion claim because the relevant allegations towards actual knowledge and substantial assistance "were largely made upon information and belief, and based on conjecture"), the allegation does permit a reasonable inference that Binance knew anything. *See ALP, Inc. v. Moskowitz*, 204 A.D.3d 454, 460 (2022) ("The complaint does not allege that Luntz had the requisite knowledge of Moskowitz's and the Bender Ciccotto defendants' conversions of funds or assets[.]"); *Lenczycki v. Shearson Lehman Hutton, Inc.*, 238 A.D.2d 248 (1997) ("[P]laintiff's claim…for aiding and abetting that conversion was properly dismissed in the absence of evidence that they knew of [the wrongdoer's] intention to convert the funds."). At most, under the most strained of interpretations, these allegations

[10] Again, there are no allegations that Plaintiff or the criminal hacker interacted with BAM. Instead, Plaintiff relies solely on the SEC's complaint against Binance and the SEC's alter ego theory to impute certain KYC and AML obligations on Binance. This has yet to be resolved, and such obligations have yet to be established on Binance. *See Securities and Exchange Commission v. Binance Holdings Limited et al.*, Case 1:23-cv-01599 (D.D.C.) and *Commodity Futures Trading Commission v. Binance Holdings Limited, et al.*, 1:23-cv-01887 (N.D. Ill).

amount to "red flags" concerning the subject account. But "red flags" or suspicions are uniformly insufficient to state an aiding and abetting claim. *See Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 412 (S.D.N.Y. 2021) (holding that the existence of several red flags indicating suspicious account activity alone is insufficient to establish actual knowledge); *Chemtex, LLC v. St. Anthony Enters., Inc.*, 490 F. Supp. 2d 536, 547 (S.D.N.Y. 2007) (holding allegations that the defendant ignored *obvious* warning signs of fraud are not sufficient to allege "actual knowledge").

Given the Complaint fails to plead actual knowledge, it logically follows that substantial assistance cannot be shown either. *Cf. Vasquez v. Hong Kong & Shanghai Banking Corp. Ltd.*, 2019 WL 2327810, at *18 (S.D.N.Y. May 30, 2019) (concluding there was no substantial assistance where there was no freestanding duty owed by bank to plaintiffs, notwithstanding court's finding that bank had actual knowledge of fraud). Since there are no allegations permitting an inference that Binance (or BAM) had knowledge that the subject cryptocurrency was stolen, Binance could not have "helped conceal" or "affirmatively assisted" a conversion that Binance knew nothing about. *See Huang v. Hong Kong & Shanghai Banking Corp. LTD*, 2022 WL 4123879, at *5 (S.D.N.Y. Sept. 9, 2022) ("[T]he law in New York is clear that a bank's performance of routine banking transactions does not constitute substantial assistance in another's tort.") (citing cases); *Berdeaux*, 561 F. Supp. 3d at 416 ("Inaction on the part of the alleged aider and abettor 'ordinarily should not be treated as substantial assistance[.]'"). Thus, this claim should also be dismissed.

**4. Plaintiff Fails to State a Claim for Unjust Enrichment**

Plaintiff also fails to state a claim for unjust enrichment. To state a claim for unjust enrichment a plaintiff must plausibly state "that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110

(2011). "The essence of such a cause of action is that one party is in possession of money or property that rightly belongs to another." *Clifford R. Gray, Inc. v. LeChase Const. Servs., LLC*, 31 A.D.3d 983, 988 (2006).[11]

As a threshold matter, Plaintiff's unjust enrichment claim is duplicative of the conversion and aiding and abetting claims, which provide an adequate remedy at law. *See Samiento v. World Yacht Inc.*, 10 N.Y.3d 70, 81, 883 N.E.2d 990 (2008). Indeed, a claim for unjust enrichment cannot survive a motion to dismiss where it "simply duplicates, or replaces, a conventional contract or tort claim," even if the contract or tort claims are not otherwise legally viable. *Corsello v. Verizon N.Y., Inc.*, 944 N.Y.S.2d 732, 740 (2012); *Steinberg v. Sherman*, 2008 WL 1968297, at *5 (S.D.N.Y. May 2, 2008) (dismissing unjust enrichment claim where it seeks same relief as conversion claim, which provides for an adequate remedy at law).

Even if this Court were to entertain this unjust enrichment claim, it should be dismissed because Binance was not enriched at Plaintiff's "expense[.]" *Mandarin Trading Ltd.*, 16 N.Y.3d at 182. In *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142 (2009), the plaintiff asserted an unjust enrichment claim against Morgan Stanley asserting that it must disgorge certain profits that were allegedly wrongfully made at the plaintiff's expense. The court dismissed the unjust enrichment claim and explained "[i]n seeking Morgan Stanley's profits . . . IDT does not, and cannot, allege that Morgan Stanley has been unjustly enriched at IDT's expense, because IDT did not pay the alleged fees." *Id.* Here, Plaintiff similarly prays for Defendants to "reimburse . . . the transactions fees, and disgorge their ill-gotten gains . . . ." (Compl. ¶ 119.) But

---

[11] A claim for unjust enrichment is substantially similar under Florida law. *See AIM Recycling Fla., LLC v. Metals USA, Inc.*, 2019 WL 1991946, at *1 (S.D. Fla. Mar. 4, 2019); *Johnson v. Chase Bankcard Servs., Inc.*, 582 F. Supp. 3d 1230, 1236 (M.D. Fla. 2022), *appeal dismissed*, 2022 WL 3716649 (11th Cir. June 24, 2022).

the Complaint fails to allege that Plaintiff paid these fees or that these transaction fees were taken from Plaintiff's cryptocurrency.

Furthermore, New York courts uniformly hold that "a plaintiff cannot succeed on an unjust enrichment claim unless it has a sufficiently close relationship with the other party." *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516-518 (2012) (dismissing unjust enrichment claim because plaintiff and defendant's relationship was "too attenuated" provided they "had no dealings with each other" nor "any contact regarding the purchase transaction" which formed basis for unjust enrichment claim) (citing cases); *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d at 1111 (dismissing unjust enrichment claim because complaint failed to state "a relationship between the parties that could have caused reliance or inducement[,]" or "at least an awareness by [defendant] of [plaintiff]'s existence."). Similar to *Georgia*, there are no allegations that Binance had "any dealings" or "any contact" with Plaintiff regarding the alleged wrongful transfer of crypto assets into and out of its exchange or that Binance was even aware of Plaintiff's existence. *See id.*

#### 5. Plaintiff Fails to State a Claim Against BAM Because There Are No Independent Allegations of Wrongdoing by BAM

As discussed above, Plaintiffs allege no independent wrongdoing on the part of BAM. Instead, Plaintiffs attempt to impute liability from Binance to BAM, alleging that the entities acted as alter egos of one another. But, as explained in section III(B)(3), *supra*, Plaintiff has not carried the very heavy burden of establishing that Binance and BAM are alter egos for jurisdictional purposes.[12] The Court should find similarly here, side with the other courts that have rejected this flawed theory, and conclude that Plaintiff has not met the heavy burden necessary to pierce the

[12] The three-factor analysis for piercing the corporate veil to impute jurisdiction and liability are the same. *Compare Sasowski*, 2021 WL 8363506, at *3 *with Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1349 (11th Cir. 2011).

corporate veil. *See Guarini*, 2022 WL 20180341 at *3; *Reynolds*, 481 F. Supp. 3d at 1008; *Gadasalli*, 2023 WL 3586424, at *4.

**D. The Class Allegations Should Be Dismissed Because the Complaint Does Not Plausibly Allege the Required Elements to Proceed As a Class Action**

Courts in this District and throughout the 11th Circuit routinely dismiss class allegations at the pleading stage where the complaint fails to plausibly allege the required elements of class claims. *King v. UA Local 91*, 2020 WL 4003019, at *7 (N.D. Ala. July 15, 2020). In the Eleventh Circuit there is a presumption against class proceedings "because class actions are an exception to our constitutional tradition of individual litigation." *Brown v. Electrolux Home Prods.*, 817 F.3d 1225, 1233 (11th Cir. 2016). As the party seeking to overcome this presumption, Plaintiff bears the burden of establishing that a class can be certified, which he must do by plausibly alleging the four Rule 23(a) requirements *and* at least one alternative requirement of Rule 23(b). *King*, 2020 WL 4003019, at *7.

Plaintiff's class allegations must be dismissed because the Complaint fails to plausibly allege numerosity, ascertainability, or predominance. As to numerosity and ascertainability, Plaintiff's Complaint pleads in a conclusory fashion that the number of people who have had their crypto assets stolen off of Coinbase and laundered through Binance is "so numerous that individual joinder of all class members is impracticable," (Compl. ¶ 87), but the Complaint does not plausibly allege, or identify, even one other person, let alone at least forty others, that have experienced a similar hack and theft. *See Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986), *cert. denied*, 479 U.S. 883 (1986); *see also Adkins v. Morgan Stanley*, 307 F.R.D. 119, 137 (S.D.N.Y. 2015), *aff'd*, 656 F. App'x 555 (2d Cir. 2016). In fact, Plaintiff's proposed class fails on its face as a matter of law for the even more obvious and fundamental reason that it is impossible to identify any of the other class members. Neither Plaintiff nor Defendants have any way of

ascertaining which wallets and accounts are holding stolen assets. Thus, there is no way to notify class members of the action, provide an opportunity to opt out, calculate damages, or distribute any settlement or judgment.

Even if it were possible to identify other members of the class, Plaintiff's class allegations should be dismissed because the Complaint does not adequately plead that issues subject to generalized proof do not predominate over issues subject to individualized proof. To the contrary, the conversion, aiding-and-abetting, and unjust enrichments claims will all require an individualized showing of theft by a hacker and intent or knowledge by the Defendants, which will require a mini-trial for each class member. *See Jim Moore Ins. Agency, Inc. v. State Farm Mut. Auto. Ins. Co.*, 2003 WL 21146714, at *8 (S.D. Fla. May 6, 2003); *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 533 (S.D.N.Y. 2009); *Pearson v. Deutsche Bank AG*, 2022 WL 951316, at *7 (S.D. Fla. Mar. 30, 2022).

First, with respect to Plaintiff's conversion claim, he and the rest of the class will be required to show that a specific and identifiable amount of crypto assets were taken. *See Coughlan v. Jachney*, 473 F. Supp. 3d 166, 199-200 (E.D.N.Y. 2020) (citing cases); *Gulf Coast Produce, Inc. v. Am. Growers, Inc*., 2008 WL 660100, at *4 (S.D. Fla. Mar. 7, 2008). The Complaint fails to state in a non-conclusory manner how it would be possible to ascertain each class members' type and amount of crypto assets that were taken, in the first instance, and whether those assets were in fact stolen, without requiring a mini-trial with respect to each class member. *See Jim Moore Ins. Agency, Inc.*, 2003 WL 21146714, at *8. And, it defies logic that Binance or anyone else could somehow identify any others who had allegedly had stolen funds placed into a wallet on a Binance exchange by an unidentified hacker. *See Wallace v. VF Jeanswear Ltd. P'ship*, 2020 WL 999341, at *6 (N.D. Ala. Mar. 2, 2020) (Kallon, J).

Second, with respect to Plaintiff's aiding and abetting conversion claim, he and the rest of the class will be required to show that Binance had "actual knowledge" of each underlying tort. *See Kirschner v. Bennett*, 648 F. Supp. 2d 525, 533 (S.D.N.Y. 2009); *Pearson v. Deutsche Bank AG*, 2022 WL 951316 at *7 (S.D. Fla. Mar. 30, 2022). The Complaint fails to state how Binance would possibly have actual knowledge with respect to each instance of theft and each hacker's alleged laundering of crypto assets through Binance, and this certainly would not be possible without requiring a mini-trial for each act of conversion.

Third, Plaintiff's unjust enrichment claims, which are rarely ever subject to class certification, *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274-75 (11th Cir. 2009), seek to disgorge the profits Binance made from allegedly receiving transaction fees for allegedly permitting the wrongdoer to transfer stolen assets on to and from its exchange. (Compl. ¶¶ 115-119.) If Binance's transaction fees vary based on the amount and type of crypto asset transferred, then this would require each class member to put forth individualized proof to show their damages. The complaint fails to state in a non-conclusory manner how it would be possible to ascertain these alleged damages, especially if such stolen funds are commingled with other stolen or non-stolen funds, without a showing of individualized proof with respect to each class member.

For these reasons, it is clear on the face of the Complaint that no class can be ascertained, let alone certified. Therefore, the class allegations should be struck now, rather than later

## IV. CONCLUSION

In conclusion, Defendants respectfully request that this Court compel Plaintiff to arbitrate his purported claims because he is suing based on, and seeking benefits arising from, Binance's Terms, which include a mandatory arbitration clause. Alternatively, this Court should dismiss this case with prejudice for lack of jurisdiction and failure to state a claim because, as many courts

inside and outside of this District have repeatedly held, there is no basis to establish jurisdiction over Binance and Plaintiff's pleading deficiencies are incurable by amendment.

## V. Request For Hearing

Pursuant to S.D. L.R. 7.1(b)(2), Defendants respectfully request oral argument on this motion. Given the different legal issues in the motion, Defendants believe that an opportunity to address any questions the Court may have concerning these issues may assist the Court. Defendants estimate that ninety minutes will be a sufficient amount of time.

## VI. S.D. Fla. L.R. 7.1(A)(3) Certification

Pursuant to S.D. L.R. 7.1(a)(3), counsel have met and conferred and were unable to come to an agreement on the requested relief herein.

Dated: December 8, 2023

By: *s/Aaron S. Weiss*
Aaron S. Weiss (FBN 48813)
aweiss@carltonfields.com
Carlton Fields, P.A.
700 N.W. 1st Ave., Ste. 1200
Miami, Florida 33136
Telephone: 305-530-0050

Christopher N. LaVigne (pro hac vice)
christopher.lavigne@withersworldwide.com
Withers Bergman LLP
430 Park Avenue, 10th Fl.
New York, New York 10022
Telephone: 212-848-9800

*Counsel for Defendant Binance Holdings, LTD. d/b/a Binance*

By: *Adam F. Foslid*
Adam M. Foslid (FBN 682284)
Email: afoslid@winston.com
Winston & Strawn LLP
200 S. Biscayne Blvd., Ste. 2400
Miami, Florida 33131
Telephone: 305-910-0646

*Counsel for Defendant BAM Trading Services Inc. d/b/a Binance.US*

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**Case No.: 1:23-cv-22083-RAR/Sanchez**

MICHAEL OSTERER, individually and on behalf and all others similarly situated,

Plaintiff,

v.

BAM TRADING SERVICES INC. d/b/a BINANCE.US, a Delaware corporation, and BINANCE HOLDINGS, LTD. d/b/a BINANCE, a foreign company,

Defendants.
_______________________________________/

# PLAINTIFF'S RESPONSE MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

Respectfully submitted,

**SILVER MILLER**
4450 NW 126th Avenue - Suite 101
Coral Springs, Florida 33065
Telephone: (954) 516-6000
DAVID C. SILVER
Florida Bar No. 572764
E-mail: DSilver@SilverMillerLaw.com
JASON S. MILLER
Florida Bar No. 072206
E-mail: JMiller@SilverMillerLaw.com

*Attorneys for Plaintiff and the Putative Class*

## TABLE OF CONTENTS

**Page**

**I. INTRODUCTION** ........ **1**

**II. FACTUAL AND PROCEDURAL BACKGROUND** ........ **3**

**III. APPLICABLE LAW** ........ **4**

**A. Defendants Carry the Burden of Proof** ........ **4**

**B. Florida's Principles of Equitable Estoppel Preclude Compelling Arbitration** ........ **5**

**IV. ARGUMENT** ........ **6**

**A. Binding Case Law Dictates that Equitable Estoppel Does Not Compel Plaintiff to Arbitrate His Claims** ........ **6**

***1. Leidel v. Coinbase*** ........ **6**

**2. Post-*Leidel v. Coinbase*** ........ **11**

**B. No Arbitrable Issue Exits Because Plaintiff's Claims Against, and Disputes with, Defendants Are Not Covered by the Arbitration Provision** ........ **12**

**1. Plaintiff's Claims Are Not Covered by the Scope of the Arbitration Provision** ........ **12**

**2. The Court Must Decide the Question of Arbitrability** ........ **13**

**V. CONCLUSION** ........ **14**



SILVER MILLER
4450 NW 126th Avenue - Suite 101 • Coral Springs, Florida 33065 • Telephone (954) 516-6000
www.SilverMillerLaw.com

## TABLE OF AUTHORITIES

**Cases** **Page**

*Bailey v. ERG Enterprises, LP*
705 F.3d 1311 (11th Cir. 2013)....6

*Beautyman v. Lilyandmajor, LLC*
No. 20-81290-CV, 2021 U.S. Dist. LEXIS 20696 (S.D. Fla. Jan. 29, 2021)....11

*Bentley v. Control Grp. Media Co., Inc.*
No. 19-CV-2437-DMS-RBB, 2020 U.S. Dist. LEXIS 118076 (S.D. Cal. July 6, 2020)....6

*Blinco v. Green Tree Servicing LLC*
400 F.3d 1308 (11th Cir. 2005)....6

*First Options of Chi., Inc. v. Kaplan*
514 U.S. 938 (1995)....5

FTC v. Changpeng Zhao, Binance Holdings Limited, *et al.*
U.S. District Court - Northern District of Illinois - Case No. 1:23-cv-01887....10

*Green Tree Fin. Corp. Alabama v. Randolph*
531 U.S. 79 (2000)....5

*Integrated Sec. Servs. v. Skidata, Inc.*
609 F. Supp. 2d 1323 (S.D. Fla. 2009)....4

*Jimenez v. Viacord, LLC*
No. 21-61805-CIV-SINGHAL, 2022 U.S. Dist. LEXIS 167009 (S.D. Fla. Sept. 14, 2022)....5

*Joseph v. Communicare Healthcare Servs.*
No. 21-CV-60164, 2021 U.S. Dist. LEXIS 52500 (S.D. Fla. Mar. 18, 2021)....5

*Judge v. Unigroup, Inc.*
No. 8:17-cv-201-T-23TGW, 2017 U.S. Dist. LEXIS 145576 (M.D. Fla. Sept. 8, 2017)....6

*Kroma Makeup EU, LLC v. Boldface Licensing & Branding, Inc.*
845 F.3d 1351 (11th Cir. 2017)....13

*Leidel v. Coinbase, Inc.*
729 Fed. Appx. 883 (11th Cir. 2018)....*passim*

*Rensel v. Centra Tech. Inc.*
No. 17-24500-KING/SIMONTON, 2018 US. Dist. LEXIS 100720 (S.D. Fla. June 14, 2018)....5

*Scherer v. Hyundai Capital Am., Inc.*
No. 22-CV-61014-DIMITROULEAS/STRAUSS, 2022 U.S. Dist. LEXIS 212562 (S.D. Fla. Nov. 22, 2022)....11

*The Taylor Group, Inc. et al. v. Industrial Distributors Int'l Co.*
859 Fed. Appx. 439 (11th Cir. 2021) .......... 13, 14

*United States v. Binance Holdings Limited d/b/a Binance.com*
U.S. District Court - Western District of Washington - Case No. 2:23-cr-00178-RAJ .......... 9

**Rules**

Fed.R.Civ.P. 7 .......... 3

S.D. Fla. Local Rule 7.1 .......... 3



SILVER MILLER
4450 NW 126th Avenue - Suite 101 • Coral Springs, Florida 33065 • Telephone (954) 516-6000
www.SilverMillerLaw.com

## I. INTRODUCTION

***"There are two ways to be fooled. One is to believe what isn't true; the other is to refuse to believe what is true."***

— Soren Kierkegaard

In response to the Class Action Complaint filed by Plaintiff MICHAEL OSTERER, individually and on behalf and all others similarly situated ("Plaintiff")[1], Defendants BAM TRADING SERVICES INC. d/b/a BINANCE.US, a Delaware corporation, and BINANCE HOLDINGS, LTD. d/b/a BINANCE, a foreign company (collectively "Defendants") have moved this Court to, *inter alia*, compel arbitration of this dispute under what Defendants describe as the "*well-settled principles of equitable estoppel*."[2] According to Defendants, the "*case law is abundantly clear*"[3]; and the "*governing law*"[4] of this jurisdiction requires Plaintiff's claims to be arbitrated. In proffering to the Court what Defendants contend is the governing case law, though, Defendants conspicuously omit the actual governing law on this subject. Regardless of whether Defendants' intent is to convince the Court of something that isn't true or whether Defendants simply refuse to believe what is true, the Court will not be fooled. Defendants' Motion rests on a false premise and is willfully blind to the controlling case law on this subject, which instructs that the theory of equitable estoppel is inapplicable in cases such as the instant matter and cannot be used as a tool to force Plaintiff's and the putative class' claims into arbitration.[5]

In his Class Action Complaint, Plaintiff brings solely tort claims against Defendants for losses he and putative class members suffered when an unknown hacker stole their cryptocurrency and then deposited, funneled, laundered, and dissipated those digital assets through Defendants' online

---

[1] Docket Entry No. ("DE") 1 (the "Class Action Complaint" or "Compl.").

[2] DE 49 (the "Motion").

[3] Motion at 14.

[4] *Id.* at 10.

[5] *See*, *Leidel v. Coinbase, Inc.*, 729 Fed. Appx. 883 (11th Cir. 2018) ("*Leidel v. Coinbase*"), discussed below.



SILVER MILLER
4450 NW 126th Avenue - Suite 101 • Coral Springs, Florida 33065 • Telephone (954) 516-6000
www.SilverMillerLaw.com

cryptocurrency exchange platform[6] -- a platform which failed to maintain even the most basic of safety measures required by federal law to detect and prevent fraudulent activities. This was not by accident, nor through oversight. Instead, as outlined in Plaintiff's Complaint, Defendants knowingly and intentionally allowed stolen funds to flow through their systems because this yielded Defendants profitable rewards in the form of large transaction fees.[7]

By their Motion, Defendants seek to compel all of Plaintiff's claims to arbitration, even though "*Defendants are totally unaffiliated with Plaintiff*"[8] and Plaintiff is not a signatory to any contract – or any arbitration agreement – with either Defendant. In support of their argument, Defendants point to an arbitration provision in their user agreements on which they mistakenly believe Plaintiff's claims rely, arguing that equitable estoppel binds Plaintiff to those terms -- terms to which Defendants claim, without even coming close to establishing, the unknown hacker agreed when registering its accounts with Defendants.[9] Defendants cite no less than eight cases in support of their equitable estoppel argument yet incredibly fail to mention *Leidel v. Coinbase* -- the binding precedent established by the Eleventh Circuit Court of Appeals in a case involving parties and facts nearly identical to those of this action. Applying the *Leidel v. Coinbase* holding to the facts of this case requires denial of Defendants' Motion, because Plaintiff's tort "claims neither rely on nor bear a significant relationship to th[e] agreements" containing arbitration provisions.[10]

While binding case law dictates dismissal of Defendants' Motion, so too do legal analysis and common sense. As described herein, Defendants fail to establish that they entered *any* agreement with *any* person relevant to this case. Defendants' attempt to compel non-signatory Plaintiff to arbitration

---

[6] Compl. at ¶¶ 58-66.
[7] *Id.* ¶¶ 75, 101, 112, 116.
[8] Motion at 1.
[9] *Id.* at 11-14.
[10] *Leidel v. Coinbase*, 729 Fed. Appx. at 888.

through the principle of equitable estoppel fails not just because Plaintiff's claims do not rely on, or bear a significant relationship to, the terms of Defendants' user agreements; but also because the terms themselves limit the arbitration provision to disputes between the signing party and Defendants. For these reasons and more, Defendants cannot hide their knowing facilitation of fraud and theft in a confidential arbitral forum. Instead, they must face scrutiny and judgment for their wrongdoings in this Court.

In light of the foregoing and as further demonstrated below, Plaintiff, pursuant to Rule 7 of the Federal Rules of Civil Procedure and S.D. Fla. Local Rule 7.1, hereby serves his memorandum of law in opposition to the Motion.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On or about April 7, 2021, an unknown hacker stole approximately One Million Dollars ($1,000,000.00) in cryptocurrency assets from an account Plaintiff had with Coinbase, one of Defendants' largest competitors.[11] Following the theft, the hacker deposited Plaintiff's cryptocurrency into online accounts it held with Defendants in exchange for which Defendants reaped large transaction fees while having little-to-no anti-money laundering or Know Your Customer safeguards in place to detect, prevent, and stop unlawful transfer and ownership of cryptocurrency.[12]

This nationwide class action is brought by Plaintiff, on behalf of himself and similarly situated individuals (the "Class"), each of whom had cryptocurrency stolen from them and deposited into Defendants' cryptocurrency exchange platforms by an unknown hacker. As a result of Defendants evading federal law and willingness to look the other way when presented with evidence of fraud, Plaintiff and Class Members suffered great financial losses. Each of those losses directly benefited Defendants through transaction fees earned as the funds flowed through their systems.

[11] Compl. at ¶¶ 2-4.
[12] *Id.*


SILVER MILLER
4450 NW 126th Avenue - Suite 101 • Coral Springs, Florida 33065 • Telephone (954) 516-6000
www.SilverMillerLaw.com

On June 5, 2023, Plaintiff filed his Class Action Complaint with this Court, asserting the following three tort claims against Defendants for their facilitation of, and profiting from, the thefts from Plaintiff and the Class: (i) Conversion; (ii) Aiding and Abetting Conversion; and (iii) Unjust Enrichment.[13] On June 21, 2023, Defendants moved to compel Plaintiff's claims to arbitration and to dismiss Plaintiff's lawsuit on other grounds as well.[14] Defendants filed a Motion to Stay Discovery the same day.[15] On October 13, 2023, the Court entered an Order permitting the parties to engage in arbitration-related discovery and establishing that the Court would rule upon the portion of Defendants' request to send the case to arbitration before setting a separate briefing schedule for the parties to address any of the other grounds upon which Defendants posited that Plaintiff's lawsuit should be dismissed.[16] Upon conclusion of that limited arbitration-related discovery, and at the direction of the Court, Defendants refiled their Motion on December 8, 2023[17], to which Plaintiff files this Response.

## III. <u>APPLICABLE LAW</u>

### A. <u>Defendants Carry the Burden of Proof.</u>

The parties agree that the requirements for enforcing an arbitration agreement, include: (1) proving the existence of a valid written agreement to arbitrate, (2) showing that an arbitrable issue exists, and (3) no finding of waiver of the right to arbitrate.[18]

---

[13] Compl.
[14] DE 34.
[15] DE 35.
[16] DE 44.
[17] DE 49.
[18] Motion at 11 (citing *Integrated Sec. Servs. v. Skidata, Inc.,* 609 F. Supp. 2d 1323, 1324 (S.D. Fla. 2009)).


SILVER MILLER
4450 NW 126th Avenue - Suite 101 • Coral Springs, Florida 33065 • Telephone (954) 516-6000
www.SilverMillerLaw.com

Citing "the FAA's liberal policy favoring arbitration," Defendants mistakenly place on Plaintiff the burden of proof on the arbitration issue.[19] "The presumption of arbitrability, however, 'does not apply to the determination of whether an arbitration agreement exists.'"[20] Here, Plaintiff denies the existence of a valid arbitration agreement between him and Defendants. Therefore, just as a "party asserting the existence of a contract has the burden of proving its existence and its terms . . . the party moving to compel arbitration bears the burden of proving the contract is a valid and enforceable agreement."[21]

**B. <u>Florida's Principles of Equitable Estoppel Preclude Compelling Arbitration.</u>**

"When deciding whether the parties agreed to arbitrate a certain matter (including [the issue of] arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."[22] In this case, the parties agree that Plaintiff did not sign any agreement with Defendants. As a result, Plaintiff denies *the existence* of an agreement to arbitrate between himself and Defendants; therefore, the burden is on Defendants to prove otherwise. To do so, Defendants turn to the principle of equitable estoppel; though they do so to no avail.

[19] *Id.* at 10 ("[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration"), citing *Green Tree Fin. Corp. Alabama v. Randolph*, 531 U.S. 79, 91 (2000).

[20] *Jimenez v. Viacord, LLC,* No. 21-61805-CIV-SINGHAL, 2022 U.S. Dist. LEXIS 167009, at *3-4 (S.D. Fla. Sept. 14, 2022) (quoting *Rensel v. Centra Tech. Inc.,* No. 17-24500-KING/SIMONTON, 2018 US. Dist. LEXIS 100720 at *10 (S.D. Fla. June 14, 2018) (citing *Dasher v. RBC Bank (USA),* 745 F.3d 1111, 1115-16 (11th Cir. 2014))).

[21] *Jimenez,* 2022 U.S. Dist. LEXIS 167009, at *4.

[22] *Joseph v. Communicare Healthcare Servs.*, No. 21-CV-60164, 2021 U.S. Dist. LEXIS 52500, at *4-6 (S.D. Fla. Mar. 18, 2021) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (citations omitted)). *See also Leidel v. Coinbase,* 729 Fed. Appx. at 886 ("State law controls on the issue of whether an arbitration clause in a contract can be enforced against a nonsignatory to that contract."), though Defendants state in their Motion that a ruling on the issue of arbitration here is the same whether applying New York law, Florida law, or Hong Kong law. Motion at 12.

# IV. ARGUMENT

## A. Binding Case Law Dictates that Equitable Estoppel Does Not Compel Plaintiff to Arbitrate His Claims.

### 1. *Leidel v. Coinbase*

Defendants argue that even though "*Plaintiff is not a signatory to the Terms, he is nonetheless bound to the Arbitration Provision under well-settled principles of equitable estoppel.*"[23] Defendants claim equitable estoppel applies "*because Plaintiff relies on the Terms to establish his causes of action.*"[24] Defendants' equitable estoppel analysis analogizes this case to the factually dissimilar cases of *Blinco v. Green Tree Servicing LLC,* 400 F.3d 1308 (11th Cir. 2005),[25] and *Bentley v. Control Grp. Media Co., Inc.,* No. 19-CV-2437-DMS-RBB, 2020 U.S. Dist. LEXIS 118076 (S.D. Cal. July 6, 2020).[26] Also cited in support of their equitable estoppel argument is *Bailey v. ERG Enterprises, LP,* 705 F.3d 1311 (11th Cir. 2013) and *Judge v. Unigroup, Inc.,* No. 8:17-cv-201-T-23TGW, 2017 U.S. Dist. LEXIS 145576 (M.D. Fla. Sept. 8, 2017).

Glaringly absent from Defendants' equitable estoppel argument is the leading and binding case arising from a set of facts nearly identical to the facts in this case: ***Leidel v. Coinbase.***[27] In *Leidel,* a cryptocurrency investor in Florida brought tort claims on behalf of himself and a similarly-situated class of cryptocurrency holders against one of Defendants' largest competitors, Coinbase.[28] The lead plaintiff in *Leidel* held cryptocurrency in a smaller crypto exchange named Cryptsy; and over a period

---

[23] Motion at 11.

[24] *Id.*

[25] In *Blinco,* a wife unsuccessfully sought to avoid arbitration while asserting claims to enforce terms of a promissory note containing an arbitration provision which only her husband had signed. Here, Plaintiff does not seek to enforce the terms of the agreement containing the arbitration provision nor does Plaintiff have any relation to the individual who allegedly entered into the agreement with Defendants.

[26] The *Bentley* plaintiff hired an online record expungement service to delete online personal records and then sued a website that failed to remove her records. The court held that she was bound by the arbitration provision in the website's terms of use because her claims presumed the existence of the underlying contract.

[27] 729 Fed. Appx. 883 (11th Cir. 2018).

[28] *Id.*


SILVER MILLER
4450 NW 126th Avenue - Suite 101 • Coral Springs, Florida 33065 • Telephone (954) 516-6000
www.SilverMillerLaw.com

of three years, Cryptsy's owner (Paul Vernon) stole Cryptsy customers' cryptocurrency and used Coinbase accounts to launder and convert those stolen digital assets into cash.[29] As in the instant case, Mr. Leidel alleged that the thieves were able to steal and launder/convert his cryptocurrency assets as a result of Coinbase's non-compliance with the Bank Secrecy Act, which was evidenced by Coinbase's failure to: (1) adequately monitor or investigate use of its websites, (2) detect theft; and (3) report suspicious activity to the appropriate authorities.[30] Coinbase moved to compel arbitration of Mr. Leidel's claims under the doctrine of equitable estoppel, arguing that Mr. Leidel was "bound by the arbitration clause in the User Agreements entered into by Cryptsy and [its owner]," because any duty Coinbase owed to Mr. Leidel arose from those User Agreements.[31] This Court denied Coinbase's motion to compel arbitration, finding that Mr. Leidel did not assert any right or benefit under Coinbase's User Agreements; that the terms of the User Agreements were not related to Coinbase's allegedly wrongful conduct; and that any indirect benefit to Mr. Leidel and the plaintiff class from the thieves' use of Coinbase "did not arise from the User Agreements, but instead **arose 'from the regulatory scheme under which [Coinbase] operated.'"**[32]

Affirming this Court's denial of Coinbase's motion to compel arbitration, the Eleventh Circuit Court of Appeals held that Mr. Leidel's claims did not belong in arbitration; because they "rely on obligations allegedly imposed by law and in recognition of public policy to persons who are strangers to the User Agreements" and therefore his claims "neither rely on nor bear a significant relationship to those agreements."[33] Astonishingly, Defendants omitted from their Motion any mention of that directly binding ruling.

---

[29] *Id.* at 884-885.

[30] *Id.* Mr. Leidel brought claims of aiding and abetting both the breach of fiduciary duty and the conversion, negligence, and unjust enrichment.

[31] *Id.*

[32] *Id.* (emphasis added).

[33] *Id.* at 888.



SILVER MILLER
4450 NW 126th Avenue - Suite 101 • Coral Springs, Florida 33065 • Telephone (954) 516-6000
www.SilverMillerLaw.com

Perhaps in an (unsuccessful) effort to distinguish this case from *Leidel v. Coinbase* and its progeny, Defendants argue the following:

> Plaintiffs' theory of liability . . . requires that (1) Binance could have, but did not, freeze Plaintiff's allegedly stolen cryptocurrency assets; and (2) Binance failed to do so in order to earn transaction fees. . . . The only reason Plaintiff is able to invoke these rights is because the alleged hacker – in order to make deposits and withdrawals on Binance – must have greed to the Terms, which allowed Binance to suspend, freeze or lock their assets and accounts, and to collect fees based on their transactions on the exchange . . . Thus, Plaintiff is relying on the Terms to establish his claims.[34]

By reviewing Plaintiff's Complaint, though, it is obvious to any reader that the above is in no way an accurate description of Plaintiff's theory of liability. Instead, it is a theory constructed by Defendants in an attempt to anchor Plaintiff's claims to a term in their User Agreements "*which allow[s] Binance to suspend, freeze or lock their assets and accounts, and to collect fees based on their transactions on the exchange*."[35] In fact, Plaintiff's Complaint mentions Defendants' ability to freeze accounts <u>just</u> <u>one</u> <u>time</u> in the Complaint (¶ 73); and Plaintiff's theory of liability encompasses many other practices that led to Plaintiff and Class Members' losses, including,

- Defendants' shockingly nonexistent or inadequate KYC and AML protocols (Comp. ¶ 58);
- Defendants' allowance of deposits and withdrawals of up to 2 Bitcoin per day through the Binance.com exchange *without any form of identification verification* (Comp. ¶ 59);
- Defendants' lack of internal controls to ensure that customer funds are identifiable and segregated from company revenues (Comp. ¶ 63);
- Defendants' knowledge of, and decision to ignore, the fact that policies and procedures on tracing analysis of where funds originated were nonexistent or inadequate (¶ 111);
- Defendants' conscious participation in the conver of stolen cryptocurrency to drive revenues and profits (¶ 113).

---

[34] Motion at 13.

[35] *Id.*


**SILVER MILLER**
4450 NW 126th Avenue - Suite 101 • Coral Springs, Florida 33065 • Telephone (954) 516-6000
www.SilverMillerLaw.com

Given the number of legal violations outlined in the Complaint, it is clear that Defendants' claims are in no way tied to whether Binance has the ability or authority to freeze its customers' accounts.

Contrary to Defendants' purposeful misinterpretation of the Class Action Complaint, Plaintiff's claims are rooted "in the regulatory scheme under which [Defendants] operate"[36] -- a regulatory scheme BINANCE recently admitted it has flagrantly violated in precisely the manner Plaintiff alleges caused him and the putative Class Members their harm. Since the date on which the Class Action Complaint was filed, BINANCE has pleaded guilty in the U.S. District Court - Western District of Washington to charges brought against it by the U.S. Department of Justice for, *inter alia*:

(a) conspiring to conduct an unlicensed money transmitting business ("MTB") in violation of Title 18, United States Code - Sections 1960(a) and 1960(b)(1)(B);

(b) conducting an unlicensed MTB in violation of Title 18, United States Code - Sections 1960(a) and 1960(b)(1)(B); and

(c) failing to maintain an effective Anti-Money Laundering ("AML") program, in violation of Title 31, United States Code, Sections 5318(h), 5322, as charged in Count 1, in violation of Title 18, United States Code, Section 371.[37]

In connection with BINANCE's guilty plea, BINANCE agreed to pay the U.S. government a sum total of Four Billion Three Hundred Million Dollars ($4,300,000,000.00) as a penalty for its crimes. Then, in December 2023, BINANCE entered into a Consent Order with the U.S. Commodity Futures Trading Commission (CFTC), imposing against BINANCE a permanent injunction, a One Billion Three Hundred Fifty Million Dollar ($1,350,000,000.00) civil monetary penalty, and other equitable relief; and agreed not to deny that BINANCE, *inter alia*:

(a) Actively solicited customers in the United States while failing to implement an effective AML program as required by U.S. law;

(b) Made money by charging its customers transaction fees for trades on its platform and knowingly did so while aware that a meaningful percentage of its

[36] *Leidel v. Coinbase*, 729 Fed. Appx. at 885.

[37] *See*, *United States v. Binance Holdings Limited d/b/a Binance.com*, U.S. District Court - Western District of Washington - Case No. 2:23-cr-00178-RAJ at Docket Entry No. 23 (November 2023).



SILVER MILLER
4450 NW 126th Avenue - Suite 101 • Coral Springs, Florida 33065 • Telephone (954) 516-6000
www.SilverMillerLaw.com

billions of dollars in revenue was derived from digital asset derivative transactions entered into by U.S. customers

(c) Assisted U.S. customers to create "new" accounts using "new KYC" documentation to circumvent BINANCE's compliance controls; and

(d) employed an inadequate supervisory system and failed to diligently perform their supervisory duties, including by:

(i) failing to implement an effective Customer Identification Program;

(ii) failing to implement effective KYC procedures;

(iii) failing to implement effective AML procedures;

(v) purposefully instructing customers to evade compliance controls; and,

(vi) intentionally destroying documents related to illegal conduct.[38]

BINANCE also settled with other U.S. civil enforcement agencies, including pursuant to a Consent Order with the Financial Crimes Enforcement Network ("FinCEN"), in December 2023 as well. While BINANCE's plea agreement and Consent Orders will take on greater relevance at a later stage of this lawsuit when the Court addresses Defendants' contention that Plaintiff's claims do not present plausible bases for relief, they are relevant to the instant Motion to demonstrate that Plaintiff's claims arise from legal duties owed by Defendants that are not simply limited to those expressed in User Agreements entered into by Defendants' accountholders.

At its core, "[t]he lynchpin for equitable estoppel is equity and the point of applying it to compel arbitration is to prevent a situation that would fly in the face of fairness."[39] In this case, as in *Leidel v. Coinbase,* there is no argument that fairness would be achieved by forcing Plaintiff into arbitration.

---

[38] *See*, *CFTC v. Changpeng Zhao, Binance Holdings Limited, et al.,* U.S. District Court - Northern District of Illinois - Case No. 1:23-cv-01887 at Docket Entry No. 80 (December 2023).

[39] *Guy Roofing v. Angel Enters., LLC*, No. 17-14081-CIV-ROSENBERGY/MANYARD, 2018 U.S. Dist. LEXIS 34807, at *10-11 (S.D. Fla. Feb. 28, 2018).



SILVER MILLER
4450 NW 126th Avenue - Suite 101 • Coral Springs, Florida 33065 • Telephone (954) 516-6000
www.SilverMillerLaw.com

### *2.* **Post-*Leidel v. Coinbase***

Since the *Leidel v. Coinbase* ruling, courts in this district and circuit have adhered to its analysis and provided additional guidance on the circumstances under which non-signatories can enforce agreements against signatories on the basis of equitable estoppel, as well as the circumstances under which signatories can enforce agreements against non-signatories on the basis of equitable estoppel.[40] As pointedly explained by Judge Bloom in *Garcia v. J&J, Inc.:*

> These concepts are not interchangeable. Given the nature of arbitration, the distinction between whether a non-signatory seeks to compel a signatory into arbitration, and whether a signatory seeks to compel a non-signatory into arbitration, is important . . . Because arbitration is a matter of contract, if the parties have not agreed to arbitrate, the courts have no authority to mandate that they do so.[41]

Applying the reasoning of *Leidel v. Coinbase*[42] and post-*Leidel v. Coinbase* cases to the case at hand demonstrates that Plaintiff clearly does not rely on the terms of Defendants' User Agreements, because nothing in the User Agreements is needed to resolve Plaintiff's claims. Instead, resolution of Plaintiff's claims will require consideration of industry and regulatory norms for detecting and preventing fraud in comparison to the actual policies and procedures employed by Defendants.

---

[40] *See Beautyman v. Lilyandmajor*, LLC, No. 20-81290-CV, 2021 U.S. Dist. LEXIS 20696, at *15 (S.D. Fla. Jan. 29, 2021) (applying *Leidel v. Coinbase* and holding that, "whether a claim falls within the scope of an arbitration agreement turns on the factual allegations in the complaint" rather than the legal causes of action asserted"); *Scherer v. Hyundai Capital Am., Inc.,* No. 22-CV-61014-DIMITROULEAS/STRAUSS, 2022 U.S. Dist. LEXIS 212562, at *17 (S.D. Fla. Nov. 22, 2022) (holding that reliance on a contract sufficient to equitably estop one from avoiding arbitration "must, at a minimum, raise some issue the resolution of which requires reference to or construction of some portion of the contract itself").

[41] *Garcia v. J&J, Inc.,* No. 19-cv-60728-BLOOM/Valle, 2019 U.S. Dist. LEXIS 194405, at * 11-12 (S.D. Fla. Nov. 2019) (internal citations omitted).

[42] Notably, the facts of this case weigh even more heavily in favor of avoiding arbitration than they did in *Leidel v. Coinbase*, because Mr. Leidel had a business relationship with Cryptsy (the company which stole his assets and allegedly consented to arbitration); whereas in this case, all parties agree that Plaintiff has no relationship whatsoever with the thief who stole/absconded with Plaintiff's cryptocurrency assets and purportedly agreed to Defendants' arbitration provisions.

Whether the User Agreements exist or not is of no moment to determining whether Defendants' actions, or inactions, facilitated the theft of Plaintiff's cryptocurrency.

**B. No Arbitrable Issue Exits Because Plaintiff's Claims Against, and Disputes with, Defendants Are Not Covered by the Arbitration Provision.**

Defendants cite the following in their Motion as the applicable arbitration provision[43]:

> **2. Agreement to Arbitrate and Governing Law.** You and Binance Operators agree that, subject to paragraph 1 above, *any dispute, claim, or controversy* between you and Binance (and/or Binance Operators) arising in connection with or relating in any way to these Terms or to your relationship with Binance (and/or Binance Operators) as a user of Binance Services (*whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory, and whether the claims arise during or after the termination of these Terms) will be determined by mandatory final and binding individual (not class) arbitration*, except as set forth below under Exceptions to Agreement to Arbitrate.

As described in Sections IV(b)(1) and IV(b)(2) below, this language takes Plaintiff's disputes with Defendants outside the scope of the arbitration provision and shows that all questions, including the question of arbitrability, must be decided by this Court.

**1. Plaintiff's Claims Are Not Covered by the Scope of the Arbitration Provision.**

The plain language of the arbitration provision provides that the agreement to arbitrate is between "You and Binance Operators" and that the disputes covered are those "between you and Binance . . . ." Notably, the word "You" is not a defined term in Defendants' User Agreements.[44] In 2017, the Eleventh Circuit Court of Appeals considered the following similar language, "the Parties agree that the disputes arising between them concerning the validity, interpretation, termination or

[43] Motion at 8 (quoting Decl. ¶ 15, Ex. 2 § X.2 to Def. Mot.)).

[44] *Id.,* Ex. 3. Defendants' failure to define "You" is unsurprising considering that Defendants allowed deposits and withdrawals on their platform of up to 2 bitcoin per day (currently worth more than $85,000) *without any form of identification*. Compl. at ¶ 59. Defendants typically do not know who "You" is; but in this instance, even Defendants concede that "You" is not Plaintiff.

performance" will be arbitrated[45]; and in that case, the court held that, even if equitable estoppel is invoked, under Florida law a party's dispute can only be compelled to arbitration if that dispute "falls within the scope of the arbitration clause."[46] Given the language limiting the agreement to "the Parties," the *Kroma* court held that disputes involving anyone not a "party" to the agreement fell outside the scope of the agreement and could not be compelled to arbitration.[47]

**2. <u>The Court Must Decide the Question of Arbitrability.</u>**

Defendants also incorrectly argue in their Motion that the allegedly applicable arbitration provision requires the arbitrator to decide all questions of arbitrability -- including questions about jurisdiction or the existence, scope, or validity of the arbitration agreement.[48] Defendants' argument must be rejected because "[a]bsent 'clear and unmistakable evidence' to the contrary, 'the question whether the parties have a valid arbitration agreement at all is for the court, not the arbitrator, to decide.'"[49] In *Taylor,* an agreement containing an arbitration which was signed by Taylor International and Industrial Distributors Int'l Co. stated that it applied to any "dispute between the Company and the Agent."[50] The party moving to compel arbitration (Industrial Distributors) argued that Taylor Group was also bound by the agreement because: (1) The Taylor Group was an affiliate of the signatory, Taylor International; (2) Industrial Distributors' defenses to Taylor Group's claims were based on the agreement containing the arbitration provision; and (3) The Taylor Group accepted benefits from the agreement containing the arbitration provision. The *Taylor* court rejected these

---

[45] *Kroma Makeup EU, LLC v. Boldface Licensing & Branding, Inc.*, 845 F.3d 1351, 1355 (11th Cir. 2017) (case in which non-signatory to an agreement invoked equitable estoppel to compel dispute with signatory to arbitration).

[46] *Id.*

[47] *Id.*

[48] Motion at 16-17.

[49] *The Taylor Group, Inc. et al. v. Industrial Distributors Int'l Co.,* 859 Fed. Appx. 439, 444 (11th Cir. 2021) ("*Taylor*").

[50] *Id.* at 443.



SILVER MILLER
4450 NW 126th Avenue - Suite 101 • Coral Springs, Florida 33065 • Telephone (954) 516-6000
www.SilverMillerLaw.com

arguments, noting that, "[t]here is no mention of [defendant] or any non-party . . . [t]herefore, we cannot say that [defendant] 'clearly and unmistakably' agreed to arbitrate this threshold question."[51]

Similarly, the arbitration provision cited by Defendants in this case uses the following language: "any dispute, claim, or controversy *between you and Binance* (and/or Binance Operators) arising in connection with or relating in any way to these Terms or your relationship with Binance."[52] There exists no evidence, let alone clear and unmistakable evidence, that Plaintiff did, or even could, agree to arbitrate with Defendants; given that Plaintiff had no idea his cryptocurrency would be stolen and deposited into Binance accounts. Moreover, as demonstrated above, Plaintiff's claims (unlike the claims in *Taylor*) were not based on the agreement containing the arbitration provision, nor has Plaintiff accepted any benefits from the agreement containing the arbitration provision -- thus making even more tenuous and ineffectual Defendants' assertion that the arbitration provisions in their User Agreements somehow bind Plaintiff and the putative Class Members to forced mandatory arbitration.

## V. **CONCLUSION**

For all of the reasons stated herein, Plaintiff MICHAEL OSTERER, individually and on behalf and all others similarly situated, respectfully requests that the Court deny Defendants' Motion to Compel Arbitration and enter all other relief the Court deems just and proper.

---

[51] *Id.*

[52] Emphasis added.

Respectfully submitted,

**SILVER MILLER**
4450 NW 126th Avenue - Suite 101
Coral Springs, Florida 33065
Telephone: (954) 516-6000

By: _/s/ David C. Silver_
DAVID C. SILVER
Florida Bar No. 572764
E-mail: DSilver@SilverMillerLaw.com
JASON S. MILLER
Florida Bar No. 072206
E-mail: JMiller@SilverMillerLaw.com

*Attorneys for Plaintiff and the Putative Class*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing was electronically filed with the Clerk of Court on this 2nd day of February 2024 by using the CM/ECF system which will send a notice of electronic filing to the following CM/ECF participant(s): **AARON S. WEISS, ESQ.**, CARLTON FIELDS, P.A., *Counsel for Defendant Binance Holdings, Ltd. d/b/a Binance*, 700 NW 1st Ave. - Suite 1200, Miami, Florida 33137, E-mail: aweiss@carltonfields.com; **CHRISTOPHER LAVIGNE, ESQ.**, WITHERS LLP, *Counsel for Defendant Binance Holdings, Ltd. d/b/a Binance*, 430 Park Avenue - 10th Floor, New York, NY 10022, E-mail: christopher.lavigne@withersworldwide.com; **ADAM FOSLID, ESQ., DANIEL T. STABILE, ESQ., and GABRIELA A. PLASENCIA, ESQ.**, WINSTON & STRAWN LLP, *Counsel for Defendant BAM Trading Services, Inc. d/b/a Binance.US*, Southeast Financial Center, 200 S. Biscayne Blvd. - 24th Floor, Miami, Florida 33131, E-mail: AFoslid@winston.com, DStabile@winston.com, GPlasencia@winston.com.

_/s/ David C. Silver_
DAVID C. SILVER

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 1:23-cv-22083-RUIZ/Sanchez**

MICHAEL OSTERER,

*Plaintiff*,

v.

BAM TRADING SERVICES, INC. *et al*.,

*Defendants*.

_______________________________________/

**REPLY MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION TO COMPEL ARBITRATION**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........ 1

II. ARGUMENT ........ 2

A. Pursuant to the Broad Delegation Provision, the Question of Whether Plaintiff Is Bound by the Arbitration Agreement Is Subject to Mandatory Arbitration ........ 2

1. Plaintiff Does Not Specifically Challenge the Delegation Provision and Thus the Court Must Treat It As Valid Under Supreme Court Precedent ........ 2

2. Whether a Nonsignatory is Bound is a Threshold Arbitrability Issue ........ 3

B. Plaintiff Relies on Binance.com's Terms, Not a Regulatory Scheme, to Assert His Claims, and Thus He Is Estopped From Avoiding the Terms' Arbitration Provision ........ 5

1. The Complaint Relies on the Provisions of the Terms That Authorize BHL to (1) Freeze Customer Assets and (2) Collect Transaction Fees ........ 5

2. Unlike the Defendant in *Leidel v. Coinbase*, the Complaint Does Not Allege BHL Is a Registered Money Services Business ........ 6

C. Plaintiff's Claims Fall Within the Scope of the Arbitration Provision ........ 8

1. *Kroma* Is Inapplicable Here ........ 8

2. If *Kroma* Extends to This Case, There Is a Conflict and Hong Kong Law Applies ........ 10

III. CONCLUSION ........ 10

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Apollo Comput., Inc. v. Berg*,
886 F.2d 469 (1st Cir. 1989) ........ 4

*Attix v. Carrington Mortg. Servs., LLC*,
35 F.4th 1284 (11th Cir. 2022) ........ 2

*Bailey v. ERG Enterprises, LP*,
705 F.3d 1311 (11th Cir. 2013) ........ 8

*Blinco v. Green Tree Servicing LLC*,
400 F.3d 1308 (11th Cir. 2005) ........ 6

*Brittania–U Nigeria, Ltd. v. Chevron USA, Inc.*,
866 F.3d 709 (5th Cir. 2017) ........ 4

*Cooley v. KDVH Enterprises, LLC*,
2022 WL 980843 (N.D. Ala. Mar. 30, 2022) ........ 4, 5

*Dresdner Bank AG v. M/V OLYMPIA VOYAGER*,
446 F.3d 1377 (11th Cir. 2006) ........ 10

*Eco Brands, LLC by & through Midas Fin. Grp., LLC v. Eco Brands, LLC*,
2021 WL 724924 (S.D. Fla. Feb. 5, 2021) ........ 3, 5

*Gilmour v. Gates, McDonald & Co.*,
382 F.3d 1312 (11th Cir. 2004) ........ 7

*Haasbroek v. Princess Cruise Lines, Ltd.*,
286 F. Supp. 3d 1352 (S.D. Fla. 2017) ........ 10

*Kroma Makeup EU, LLC v. Boldface Licensing & Branding, Inc.*,
845 F.3d 1351 (11th Cir. 2017) ........ 8, 9, 10

*Leidel v. Coinbase*
729 Fed. App'x 883, 884 (11th Cir. 2018) ........ *passim*

*Lipsky v. Commonwealth United Corp.*,
551 F.2d 887 (2d Cir. 1976) ........ 7

*In re Lloyd's Reg. N. Am., Inc.*,
780 F.3d 283 (5th Cir. 2015) ........ 10

*Luria v. T-Moblie USA, Inc.*,
2022 WL 4363582 (S.D. Fla. Sept. 21, 2022) ....................7

*MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*,
268 F.3d 58 (2d Cir. 2001)....................10

*Nipro Corp. v. Verner*,
2021 WL 8894430 (S.D. Fla. June 24, 2021) ....................3, 10

*In re Platinum & Palladium Commodities Litig.*,
828 F. Supp. 2d 588 (S.D.N.Y. 2011)....................7

*Rent-A-Ctr., W., Inc. v. Jackson*,
561 U.S. 63 (2010)....................2, 3

*SBMH Grp. DMCC v. Noadiam USA, LLC*,
297 F. Supp. 3d 1321 (S.D. Fla. 2017) ....................10

*Sisca v. Hal Mar., Ltd.*,
2020 WL 6581608 (S.D. Fla. Nov. 10, 2020)....................10

*Swiger v. Rosette*,
989 F.3d 501 (6th Cir. 2021) ....................3

*In re Takata Airbag Prod. Liab. Litig.*,
396 F. Supp. 3d 1101 (S.D. Fla. 2019) ....................7

*Taylor Grp., Inc. v. Indus. Distributors Int'l Co.*
859 F. App'x 439 (11th Cir. 2021) ....................4

**State Cases**

*Revis v. Schwartz*,
140 N.Y.S.3d 68 (2020), *aff'd*, 38 N.Y.3d 939 (2022)....................10

**Other Authorities**

Charles Alan Wright & Arthur R. Miller, *Federal Practice And Procedure* § 3569
n.53 (3d ed. Apr. 2023)....................4

## I. INTRODUCTION

Plaintiff asserts conversion and unjust enrichment claims against Binance Holdings, Ltd. ("BHL") and BAM Trading Services Inc. ("BAM") because criminals purportedly stole his digital assets and ultimately sent them to accounts on the Binance cryptocurrency exchange, Binance.com. Plaintiff asserts no substantive allegations against BAM and fails to explain how BAM has anything to do with this case. The bases for his claims are that BHL should have stopped the criminals from moving the stolen funds and that BHL knowingly failed to do so because it sought to collect fees on the criminals' transactions. BHL is allowed to freeze customer funds and collect fees pursuant to the account suspension and customer fee provisions set out in the Binance.com Terms of Use ("Terms"). Plaintiff's claims are thus based on rights and benefits conferred by the Terms. According to established precedent, Plaintiff is therefore bound to arbitrate his dispute pursuant to the Terms' Arbitration Provision.

Plaintiff now tries to run away from the complaint's allegations. He argues, under *Leidel v. Coinbase*, BHL's recent plea agreement means BHL's failure to adhere to AML obligations and register with FinCEN are the real bases for his claims, not the Terms. But Plaintiff cannot alter his pleading through his motion, and he cannot escape that, for example, the only way his claims survive is because the Terms, and not a regulatory scheme, allow BHL to charge users—including the criminals who purportedly transacted on the Binance.com exchange—transaction fees. More fundamentally, though, while Plaintiff challenges the applicability of the Terms' Arbitration Provision generally (including because some versions of the Terms require arbitration of disputes "between you and Binance" specifically), Plaintiff has not challenged the Arbitration Provision's standalone delegation clause. Therefore, Supreme Court precedent mandates that the Court must treat the delegation clause as valid and enforceable. Further, the Terms' delegation clause is broad

and all-encompassing, is not limited to issues arising "between you and Binance," and expressly delegates any disputes regarding the scope or applicability of the Arbitration Provision to the arbitrator. Courts in this and other Circuits hold that under such delegation clauses, the arbitrator, not this Court, must decide whether Plaintiff is bound by the Arbitration Provision. Accordingly, just as Plaintiff's underlying claims must be arbitrated, his threshold challenge to the existence, scope, and validity of the Arbitration Provision must also be arbitrated.

## II. ARGUMENT

### A. Pursuant to the Broad Delegation Provision, the Question of Whether Plaintiff Is Bound by the Arbitration Agreement Is Subject to Mandatory Arbitration

#### 1. Plaintiff Does Not Specifically Challenge the Delegation Provision and Thus the Court Must Treat It As Valid Under Supreme Court Precedent

It is well-settled that an arbitration agreement's provision delegating the threshold issue of arbitrability to the arbitrator is severable and distinct from other provisions. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71 (2010). Courts must enforce "agreement[s] to arbitrate threshold issues" regarding the arbitrability of their dispute. *See id.* at 68-70; *Attix v. Carrington Mortg. Servs., LLC,* 35 F.4th 1284, 1298, 1300-01 (11th Cir. 2022) (holding that questions of arbitrability are delegated to an arbitrator unless prohibited by law). "[U]nless [Plaintiff] challenged the delegation provision specifically, [courts] must treat it as valid under [FAA] § 2, and must enforce it under §§ 3 and 4." *Rent-A-Ctr., W., Inc.*, 561 U.S. at 72 (emphasis added).

As explained in Defendant's Motion to Compel Arbitration (ECF No. 49 ("Br.")), the Arbitration Provision[1] contains two provisions that clearly delegate the threshold determination of arbitrability to the arbitral forum. First, the Arbitration Provision expressly incorporates the Hong

---

[1] Unless otherwise defined herein, all defined terms have the same meaning ascribed to them in the opening brief.

Kong International Arbitration Centre ("HKIAC") rules, which mandate delegation of all questions of arbitrability to the arbitrator ("Incorporation Provision"). (Br. at 16.) *See Attix*, 35 F.4th at 1300-01 ("[I]ncorporation of AAA rules . . . constitutes a clear and unmistakable delegation of questions of arbitrability."). Second, the Arbitration Provision includes a separate provision providing that any threshold questions as to, among others, the jurisdiction, applicability, or scope of the Arbitration Provision are subject to mandatory arbitration ("Delegation Provision"). (Br. at 15-16.) Specifically, the Delegation Provision states:

> You and Binance Operators further agree that the arbitrator shall have the exclusive power to rule on his or her own jurisdiction, including without limitation any objections with respect to the existence, scope or validity of the Agreement to Arbitrate, or to the arbitrability of any claim or counterclaim . . . . (*See* ECF No. 49-1 (the "Fracolli Decl."), Exh. 2 § X.2.)

Plaintiff does not dispute that either the Incorporation or Delegation Provision is valid and enforceable. (*See* ECF No. 52 ("Opp.").) Plaintiff only posits that because the ***arbitration provision*** "uses the following language: 'any dispute, claim, or controversy between you and Binance (and/or Binance Operators) arising in connection with or relating in any way to these Terms or your relationship with Binance,'" the ***delegation provision*** is unenforceable. (Opp. at 14.) Because Plaintiff has not specifically challenged the enforceability of the Delegation Provision, the Court must treat the Provision as valid. *Rent-A-Ctr.*, 561 U.S. at 70-72.

2. Whether a Nonsignatory is Bound is a Threshold Arbitrability Issue

Although the Eleventh Circuit has not decided the issue, District Courts in the Circuit have held that whether a nonsignatory is bound by the arbitration agreement is a threshold arbitrability question that must be decided by an arbitrator if a delegation provision exists. *See, e.g.*, *Eco Brands, LLC by & through Midas Fin. Grp., LLC v. Eco Brands, LLC* ("*Eco Brands*"), 2021 WL 724924, at *7 (S.D. Fla. Feb. 5, 2021) (enforcing delegation provision and ordering arbitrator to decide whether nonsignatory is bound to arbitration agreement); *see also Nipro Corp. v. Verner*, 2021 WL 8894430, at *12-14 (S.D. Fla. June 24, 2021). These courts have followed other Circuits'

holdings. *See Swiger v. Rosette*, 989 F.3d 501, 507 (6th Cir. 2021) ("[W]hether [a nonsignatory] can enforce the arbitration agreement against [a signatory] presents a question of arbitrability."); *Apollo Comput., Inc. v. Berg*, 886 F.2d 469, 473-74 (1st Cir. 1989); *Brittania–U Nigeria, Ltd. v. Chevron USA, Inc*., 866 F.3d 709, 715 (5th Cir. 2017); *see also* Charles Alan Wright & Arthur R. Miller, *Federal Practice And Procedure* § 3569 n.53 (3d ed. Apr. 2023) (explaining that "whether an arbitration clause binds persons who did not sign it" is a gateway arbitrability issue).

Plaintiff disregards these cases and instead relies on *Taylor Grp., Inc. v. Indus. Distributors Int'l Co*., which is clearly inapposite. (Opp. at 13-14.) Unlike the broad and all-encompassing Delegation Provision in the Terms, the clause in *Taylor* was limited in scope, and stated, in full: "'In the event of a dispute between the Company and the Agent, the International Chamber of Commerce shall be the arbitrating body.' *That is all*." 859 F. App'x 439, 443 (11th Cir. 2021) (emphasis added). On the other hand, the Delegation Provision here is broad and extends to "any" dispute regarding the "scope" of the Arbitration Provision. To be clear, unlike *Taylor*, the Delegation Provision here is not limited to arbitrability disputes "between" BHL and a user; it is all-encompassing and it clearly and unmistakably delegates to the arbitrator "exclusive power to rule on his or her own jurisdiction, <u>including without limitation any objections</u> with respect to the existence, scope or validity of the Agreement to Arbitrate, or to the arbitrability of any claim or counterclaim." (Fracolli Decl. Exh. 2 §X.2.)

*Cooley v. KDVH Enterprises, LLC* is instructive. The *Cooley* court held that the arbitrator, not the Court, must decide whether a dispute involving a nonsignatory falls within the scope of the arbitration agreement because the agreement delegated to the arbitrator any disputes involving the terms of the agreement "and all clauses [t]herein contained, their breadth and scope, and any term of any agreement contemporaneously entered into by the parties." *Cooley v. KDVH Enterprises, LLC*, 2022 WL 980843, at *8 (N.D. Ala. Mar. 30, 2022). The *Cooley* court further explained the

delegation provision was enforceable because the plaintiff failed to "challenge the delegation provision directly." *Id.* Like *Cooley*, Plaintiff has not directly challenged the Delegation Provision, which is broad and specifically delegates the determination of the scope of the arbitration. Therefore, the Court must treat the Terms' Delegation Provision as valid, *Eco Brands,* 2021 WL 724924, at *7, and must compel Plaintiff to arbitrate the applicability of the Arbitration Provision.

**B. Plaintiff Relies on Binance.com's Terms, Not a Regulatory Scheme, to Assert His Claims, and Thus He Is Estopped From Avoiding the Terms' Arbitration Provision**

Assuming *arguendo* that the Court has jurisdiction to determine the question of arbitrability, Plaintiff must nevertheless be compelled to arbitrate his claims. Plaintiff does not dispute that the Terms constitute a valid agreement entered into by BHL and the alleged hackers. Plaintiff argues only that (1) equitable estoppel does not compel Plaintiff to arbitrate his claims under *Leidel v. Coinbase* and (2) the dispute falls outside the scope of the Arbitration Provision. Neither argument has merit.

1. <u>The Complaint Relies on the Provisions of the Terms That Authorize BHL to (1) Freeze Customer Assets and (2) Collect Transaction Fees</u>

As explained in Defendants' opening brief, Plaintiff's complaint is based on, and seeks benefits arising from, the Terms. (Br. at 9-10.) Specifically, the gravamen of the complaint is that unknown criminals stole Plaintiff's cryptocurrency from an unrelated exchange (Coinbase), then deposited the stolen cryptocurrency into Binance.com accounts, and thus Defendants are liable because BHL could have frozen Plaintiff's allegedly stolen cryptocurrency but did not to collect transaction fees. (*Id.*) Thus, a necessary component of each of Plaintiff's claims is that BHL could have, but failed to, freeze Plaintiff's allegedly stolen cryptocurrency. (*See, e.g.*, Compl. ¶¶ 73, 108.) Likewise, each cause of action relies on the allegation that BHL failed to freeze the criminals' purported transactions to "collect significant transaction fees." (*Id.* ¶¶ 101, 112, 116.) Indeed, Plaintiff seeks restitution and disgorgement because "Defendants were unjustly enriched by their

collection of transaction fees" due under the Terms. (*Id.* at 32.)

Plaintiff's theory of liability against BHL (and BAM) requires that (1) BHL could have, but did not, freeze Plaintiff's allegedly stolen cryptocurrency assets; and (2) BHL failed to do so to collect fees. The only reason Plaintiff is able to invoke this theory is because the alleged hackers—to make deposits and withdrawals on Binance.com—agreed to the Terms, which allowed BHL to suspend or freeze their assets and accounts, and to collect fees based on their transactions on the exchange. Thus, Plaintiff relies, as he must, on the Terms to establish his claims. But equitable estoppel "precludes a party from claiming the benefits of [some of the provisions] of a contract" in pleading their claims while attempting to avoid the arbitration provisions in the same contract. *Blinco v. Green Tree Servicing LLC*, 400 F.3d 1308, 1312 (11th Cir. 2005); Br. at 2.

2. Unlike the Defendant in *Leidel v. Coinbase*, the Complaint Does Not Allege BHL Is a Registered Money Services Business

Plaintiff's reliance on *Leidel v. Coinbase* is misplaced. The plaintiff in *Leidel* was a cryptocurrency investor who utilized an exchange called Cryptsy to exchange cryptocurrency. 729 Fed. App'x 883, 884 (11th Cir. 2018). Plaintiff sued Coinbase, alleging that Cryptsy's owner used Coinbase's service to steal and launder Plaintiff's cryptocurrency. *Id.* at 884-85. Coinbase argued that equitable estoppel bound plaintiff to the Coinbase user agreements' arbitration provision:

> Leidel's claims relied on there being some duty owed by Defendant to Cryptsy's customers, and that such a duty arose, if at all, under the User Agreements. It further noted that it would have had no relationship with Cryptsy or Vernon in the absence of the User Agreements. Accordingly, Defendant argued, all of Leidel's claims were "based upon" the User Agreements that established Cryptsy's and Vernon's accounts on Defendant's website.

*Id.* at 885. The Eleventh Circuit held that equitable estoppel did not apply because Coinbase is a "financial services company registered as a money services business with [FinCEN]" and thus the duties giving rise to plaintiff's complaint were imposed on Coinbase by the regulatory scheme, not Coinbase's User Agreement. *Id.* at 884. Thus, even if the User Agreement did not exist, Coinbase

would be under the same obligations and therefore plaintiff did not need to rely on the user agreement to assert his claims. *Id.* at 888. The instant case is distinguishable.

First, unlike the complaint in *Leidel*, which alleged that Coinbase is "financial services company registered as a money services business with the U.S. Department of the Treasury, Financial Crimes Enforcement Network" (*id.* at 884), Plaintiff here makes no such allegation regarding BHL. Plaintiff's discussion of a plea agreement that BHL entered into with the DOJ and a consent decree BHL entered into with the CFTC is a red herring. (Opp. at 9-10.) As a threshold matter, these allegations are entirely absent from the Complaint and improperly pleaded in the Opposition. Plaintiff "may not amend [his] complaint through argument in a brief." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). Plaintiff's reliance on the plea agreement is also improper because the Court has not taken judicial notice of the plea (nor has Plaintiff requested this). Judicial notice of plea agreements is not automatic, and courts refuse to judicially notice the veracity of the contents of plea agreements if they are used to shortcut proper pleading and proof of facts. *See Luria v. T-Moblie USA, Inc.*, 2022 WL 4363582, at *2 (S.D. Fla. Sept. 21, 2022) (refusing to take judicial notice of the "veracity of the contents" of plea agreement); *In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101, 1128 (S.D. Fla. 2019) (same).

Similarly, Plaintiff cannot rely on factual findings in the CFTC consent decree. *See Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) ("This is a consent judgment between a federal agency and a private corporation which is not the result of an actual adjudication of any of the issues [and] it cannot be used as evidence in subsequent litigation between that corporation and another party."); *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 594 (S.D.N.Y. 2011) (prohibiting plaintiffs from relying on a CFTC order to plead "underlying facts of liability"). Accordingly, because Plaintiff's claims are not viable without reliance on rights conferred by the Terms (including the Terms' transaction fee scheme), *Leidel* is

inapplicable and does not alter that Plaintiff is equitably estopped from avoiding the Terms' Arbitration Provision. (Br. at 11-15.); *Bailey*, 705 F.3d at 1321; *cf. Leidel* 729 Fed.Appx. at 891.

Second, the argument raised by Coinbase in *Leidel* is not the same argument presented by Defendants here. In *Leidel*, the defendant argued that plaintiff relied on the User Agreement to establish a duty that Coinbase owed plaintiff. Plaintiff's claims here are that Defendants could have frozen the hackers' accounts and did not do so to collect fees. Each of these rights were imposed on the Defendants by the Terms. Thus, unlike the plaintiff in *Leidel*, without the specific rights conferred by the Terms, Plaintiff's claims will fail. Plaintiff downplays these allegations and argues that Plaintiff's theory of liability encompasses many other practices that lead to his purported losses, including BHL's lack of KYC and AML protocols and other internal controls. (*See* Opp. at 8.) However, the common allegation for each cause of action is that BHL engaged in this conduct because it was able to "collect significant transaction fees" due under the Terms. (Compl. ¶¶ 101, 112, 116.) Thus, Plaintiff cannot rely on *Leidel* to avoid the Arbitration Provision.

**C. Plaintiff's Claims Fall Within the Scope of the Arbitration Provision**

1. *Kroma* Is Inapplicable Here

Again, assuming *arguendo* the Court does not enforce the Delegation Provision, this Court should compel arbitration pursuant to the theory of "direct benefits" estoppel as set forth in Defendants' opening brief and above.[2] Plaintiff argues that under *Kroma Makeup EU, LLC v. Boldface Licensing & Branding, Inc.* ("*Kroma*"), at least one version of the Terms requires arbitration of disputes "between you and Binance," which therefore renders the Arbitration Provision inapplicable to Plaintiff, regardless of equitable estoppel principles. (Opp. at 12, n.45.) This argument is misguided, and *Kroma* does not control for two material reasons.[3]

---

[2] Plaintiff does not distinguish the cases cited by Defendants in the opening brief. (Br. at 12 n.3.)
[3] Plaintiff admits that "you" is undefined in the Arbitration Provision. While Plaintiff argues that limits the applicability of the Arbitration Provision to a particular customer and BHL, the opposite

First, Plaintiff only cites to one version of the Terms. As set forth in Defendants' opening brief and as borne out by arbitration-related discovery, there are numerous versions of the Terms that were applicable during the time period at issue, including when the purported criminals opened Binance.com accounts and transacted on the exchange. (*See* Fracolli Decl., Exhs. 2-3.) Several of those Terms, including the Terms in effect when the initial purported criminal signed up for a Binance.com account and the most recent version of the Terms, contain Arbitration Provisions that do not purport to limit disputes to "between you and Binance."[4] Accordingly, Plaintiff's arguments and *Kroma*'s reasoning are not applicable on the face of these Terms. What Arbitration Provision applies to Plaintiff's claims is not decided and, in light of the separately enforceable Delegation Provision, this issue and the scope of any particular Arbitration Provision must be arbitrated.

Second, *Kroma* did not involve the same application of equitable estoppel invoked here. In *Kroma*, nonsignatory defendants attempted to compel arbitration against signatory plaintiffs on the theory that the signatory plaintiffs were invoking the terms of an agreement that contained an arbitration clause in asserting their claims. *See generally Kroma*, 845 F.3d 1351. Here, BHL is seeking to invoke its own Arbitration Provision against nonsignatories who rely on benefits arising from the Terms in asserting claims. (Br. at 13-15.) This application of "direct benefits" estoppel does not allow Plaintiff to ignore the Arbitration Provision regardless of whether that clause applies to disputes "between you and Binance." *See, e.g., Revis v. Schwartz*, 140 N.Y.S.3d 68, 75 (2020), *aff'd*, 38 N.Y.3d 939 (2022) (binding nonsignatory to arbitration pursuant to direct benefits estoppel despite the arbitration clause's applicability to disputes to "between Player and Contract

---

is equally true: "you" logically encompasses anyone that relies on the Terms.

[4] (*See* Fracolli Decl, Exh 3., 35-103 (mandating arbitration of "*any* claims relating to these Terms (including any question regarding their existence, validity, termination, or any services or products provided and any representations made by us)" (emphasis added); Declaration of Christopher N. LaVigne, dated February 29, 2024, Exh. 1 § 32.1 (Aug. 2023 Terms) ("[A]ny Claim shall be determined by mandatory final and binding individual (not class) arbitration.").)

Advisor"); *In re Lloyd's Reg. N. Am., Inc.*, 780 F.3d 283, 291 (5th Cir. 2015); *MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61 (2d Cir. 2001).

2. If *Kroma* Extends to This Case, There Is a Conflict and Hong Kong Law Applies

If this Court applies *Kroma* to the facts of this case, it gives rise to a conflict of laws requiring a choice of law analysis. *See Dresdner Bank AG v. M/V OLYMPIA VOYAGER*, 446 F.3d 1377, 1381 (11th Cir. 2006). *Kroma* is unique to the Eleventh Circuit. Hong Kong law governs the Terms, including the Arbitration Provision. (*See* Fracolli Decl., Exh. 2 § X.2.) Courts in this district have often applied the law chosen in the agreement to govern arbitrability questions, including whether a nonsignatory is bound. *SBMH Grp. DMCC v. Noadiam USA, LLC*, 297 F. Supp. 3d 1321, 1327 (S.D. Fla. 2017); *Nipro Corp.*, 2021 WL 8894430, at *11; *Sisca v. Hal Mar., Ltd.*, 2020 WL 6581608, at *5 (S.D. Fla. Nov. 10, 2020); *Haasbroek v. Princess Cruise Lines, Ltd.*, 286 F. Supp. 3d 1352, 1361–62 (S.D. Fla. 2017). Under Hong Kong law, arbitration agreements that contain "arising in connection with or relating in any way" language are interpreted broadly and are deemed to "cover all disputes other than one entirely unrelated to the transaction covered by the contract in question." (Tung Decl. ¶¶ 7-12.) Moreover, principles of equity determine whether a nonsignatory is bound under Hong Kong law, and nonsignatories are bound when rights are asserted under the agreement with the arbitration clause. (*Id.* ¶¶ 14-16.) Plaintiff fails to set forth any argument with respect to Hong Kong law, or why Hong Kong law should not apply. Therefore, Hong Kong law subjects this case to arbitration and renders *Kroma* irrelevant. This is all the more reason to delegate threshold questions regarding the Arbitration Provision to the HKIAC.

## III. CONCLUSION

In conclusion, Defendants request that the Court compel Plaintiff to arbitrate (1) the question of whether his claims are subject to arbitration, and (2) the merits of Plaintiff's claims.

Dated: February 29, 2024

By: s/ *Aaron S. Weiss*
Aaron S. Weiss (FBN 48813)
aweiss@carltonfields.com
Carlton Fields, P.A.
700 N.W. 1st Ave., Ste. 1200
Miami, Florida 33136
Telephone: 305-530-0050

Christopher N. LaVigne (pro hac vice)
christopher.lavigne@withersworldwide.com
Withers Bergman LLP
430 Park Avenue, 10th Fl.
New York, New York 10022
Telephone: 212-848-9800

*Counsel for Defendant Binance Holdings, LTD. d/b/a Binance*

By: s/ *Adam M. Foslid*
Adam M. Foslid (FBN 682284)
Email: afoslid@winston.com
Winston & Strawn LLP
200 S. Biscayne Blvd., Ste. 2400
Miami, Florida 33131
Telephone: 305-910-0646

*Counsel for Defendant BAM Trading Services Inc. d/b/a Binance.US*

# EXHIBIT 4

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**Case No.: 1:23-cv-22083-RUIZ/Sanchez**

MICHAEL OSTERER, individually and on behalf and all others similarly situated,

Plaintiff,

v.

BAM TRADING SERVICES INC. d/b/a BINANCE.US, a Delaware corporation, and BINANCE HOLDINGS, LTD. d/b/a BINANCE, a foreign company,

Defendants.
_______________________________________/

**PLAINTIFF'S MOTION AND INCORPORATED MEMORANDUM OF LAW FOR LEAVE TO FILE AMENDED CLASS ACTION COMPLAINT**

Plaintiff Michael Osterer ("Osterer"), pursuant to Federal Rule of Civil Procedure 15(a)(2), respectfully moves this Court for an Order granting leave to file an Amended Class Action Complaint (the "Amended Complaint") against existing defendants BAM Trading Services Inc. d/b/a Binance.US ("BAM Trading"), and Binance Holdings, Ltd. d/b/a Binance ("Binance"); adding defendant Changpeng Zhao ("CZ"), Binance's primary founder, majority owner, and CEO at all times relevant in the Amended Complaint (attached hereto as Exhibit A); as well as the addition of plaintiffs Phillip Martin, T.F. (Natalie) Tang, and Yatin Khanna, who all have been injured by the same wrongful practices of Defendants as Plaintiff Osterer was. Plaintiff Osterer also seeks to add a related claim for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1962(c)-(d). The proposed pleading is attached as Exhibit A.

## I. PROCEDURAL BACKGROUND

This nationwide class action was brought by Plaintiff Osterer, on behalf of himself and all similarly situated individuals (the "Class"), each of whom had cryptocurrency stolen from them and

deposited by unknown bad actors into accounts at Binance.com, Defendants' primary cryptocurrency exchange platform. As a result of Defendants' blatant disregard of federal laws and regulations and Defendants' willingness to turn a blind eye when presented with evidence of fraud, Plaintiff Osterer (as well as proposed added plaintiffs Martin, Tang, and Khanna) and all other members for the proposed Class suffered great financial losses. Each of those losses directly benefited Defendants through transaction fees earned as the stolen cryptocurrency flowed through Defendants' system.

On June 5, 2023, Plaintiff Osterer filed his Class Action Complaint (the "Complaint") with this Court, asserting the following three tort claims against Defendants for their facilitation of, and profiting from, the thefts from Plaintiff Osterer and the Class: (i) Conversion; (ii) Aiding and Abetting Conversion; and (iii) Unjust Enrichment. ECF 1. On July 21, 2023, Defendants moved to compel Plaintiff Osterer's claims to arbitration and to dismiss Plaintiff's lawsuit on other grounds as well. ECF 34. Defendants filed a motion to stay discovery the same day. ECF 35.

On August 1, 2023, the Court entered an order permitting the parties to engage in arbitration-related discovery and establishing that the Court would rule upon the portion of Defendants' request to send the case to arbitration before setting a separate briefing schedule for the parties to address the grounds upon which Defendants sought dismissal. ECF 39. Upon conclusion of that limited arbitration-related discovery, and at the direction of the Court, Defendants refiled their motion to compel arbitration, or in the alternative, dismiss Plaintiff Osterer's initial Complaint on December 8, 2023 (ECF 49), to which Plaintiff Osterer filed a response on February 2, 2024 (ECF 52), followed by Defendants' reply on February 29, 2024 (ECF 55). The Court has not yet ruled on Defendants' motion.

As the parties were concluding their arbitration-related discovery, the U.S. Department of Justice ("DOJ") – on November 21, 2023 – announced that Binance had pleaded guilty to conspiring

to violate the Bank Secrecy Act ("BSA"), failing to register as a money transmitting business, and violating the International Emergency Economic Powers Act.[1] Binance agreed to pay $4.3 billion in penalties and agreed to undertake compliance enhancement and remediation and retain an independent monitor. Simultaneously, new defendant CZ pleaded guilty to violating the BSA by causing Binance to fail to implement an effective anti-money laundering program. In connection with the guilty pleas, the DOJ also made public a statement of facts ("DOJ SOF") attached to the plea agreements to which both defendants CZ and Binance explicitly agreed as being true and accurate.

The new facts elicited from the DOJ SOF and other government settlements into which Binance entered at or around the same time revealed detailed information relating to the scheme Plaintiff Osterer had alleged in his initial Complaint and provide many corroborating details to support RICO claims against Defendants. Based on those facts, which were revealed for the first time after the filing of the initial Complaint, Plaintiff Osterer now seeks leave to amend the Complaint to add RICO claims and name CZ as a defendant.

Plaintiff Osterer provided Defendants with a copy of the proposed Amended Complaint and met and conferred with Defendants in a good-faith effort to avoid unnecessary motion practice. Defendants informed Plaintiff Osterer that they intend to oppose any request for leave to amend the Complaint. Plaintiff Osterer asked Defendants for the basis for their position but they wouldn't provide one.

[1] On the same day, Defendants also entered into settlements with the Commodity Futures Trading Commission ("CFTC"), U.S. Department of the Treasury ("DOT") through the Financial Crimes Enforcement Network ("FinCEN"), the Office of Foreign Assets Control ("OFAC"), and the Internal Revenue Service Criminal Investigation ("IRS CI").

## II. ARGUMENT

Under Rule 15(a), the decision to grant or deny leave to amend is within the court's discretion, and that discretion is limited in favor of granting leave to amend. *See Sec. Pest Control v. Wells Fargo Bank, Nat'l Ass'n*, 535 F. Supp. 3d 1214-15 (M.D. Ala. 2020) (citing *Espey v. Wainwright*, 734 F.2d 750 (11th Cir. 1984)). As the U.S. Supreme Court has made clear:

> In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the leave sought should, as the rules require, be "freely given.". . . [O]utright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Thomas v. Farmville Mfg. Co., Inc.*, 705 F.2d 1307, 1307-08 (11th Cir. 1983) ("[I]n the absence of a declared or apparent reason, an outright refusal to grant leave to amend is an abuse of discretion."). The dictate that leave be freely given is intended to facilitate determination of claims on the merits. *Sec. Pest Control*, 535 F. Supp. 3d at 1214; *see also Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1263 (11th Cir. 2004) ("'[D]enial of leave to amend is justified by futility when the complaint as amended is still subject to dismissal.'") (quoting *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1320 (11th Cir. 1999)); *cf. Bryant v. Dupree*, 252 F.3d 1161, 1163-64 (11th Cir. 2001) (reversing district court's decision to deny leave to amend a complaint because there was no evidence of prejudice to the defendant); *see also Smith v. Sch. Bd. of Orange Cnty.*, 487 F.3d 1361, 1366-67 (11th Cir. 2007) (Even if a party's motion for leave to amend is filed after a court-ordered deadline for the filing of all amended pleadings the party need only demonstrate good cause why leave should be granted, at which point Rule 15's liberal-amendment standard applies.).

Leave to amend should be "freely given" here, as this case is still in its infancy; and this is the first time Plaintiff Osterer has sought to amend the Complaint. Plaintiff Osterer's proposed amendment does not suffer from "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *See Foman*, 371 U.S. at 182. Plaintiff Osterer pursues the instant amendment prior to this Court's ruling on Defendants' motion to compel arbitration, or, in the alternative, dismiss Plaintiff Osterer's Complaint; and the proposed amendments in no way would alter the Court's analysis of the pending motion to compel arbitration. Moreover, Plaintiff Osterer has yet to respond to any substantive arguments made by Defendants in support of dismissal. As such, Defendants would suffer no prejudice from the amendment.

While Defendants may have to re-argue certain Rule 12 defenses after taking Plaintiff Osterer's new allegations into consideration, the amendment eliminates other arguments, such as those based on jurisdiction. *See, e.g.*, 18 U.S.C. §1965(d); *Republic of Pan. v. BCCI Holdings (Lux.) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997) (Section 1965(d) "provides for service [of a summons] in any judicial district in which [any] defendant is found" and thereby "becomes the statutory basis for personal jurisdiction" nationwide). Even if this Court had already granted Defendants' motion to dismiss, Rule 15(a)'s mandate that leave be freely given would weigh in favor of granting leave to amend. *See Thomas*, 705 F.2d at 1307 ("A grant of leave to amend is particularly appropriate following dismissal of a complaint for failure to state a claim . . . .").[2]

---

[2] Moreover, Defendants will not suffer any prejudice from permitting the amendment because the new plaintiffs, instead of joining with this action, would be entitled to lodge a new complaint against these same Defendants with these precise claims, which would create two separate actions. Contrary to creating a burden or prejudice, granting leave to amend here would promote efficiencies and

As to futility, the existing claims in the Complaint state a valid claim for relief; and the new facts alleged in the proposed Amended Complaint (*i.e.*, important admissions by Defendants outlined in the DOJ SOF attached to the Binance plea agreement and new detailed facts revealed in other government proceedings) strengthen Plaintiff Osterer's existing claims while not altering the balance of the arguments for or against arbitration. Therefore, any argument that these amendments are futile lacks merit – the Court has not yet decided the motion to dismiss, and any amendments only strengthen Plaintiff Osterer's position.

As for the new defendant CZ, he was at all relevant times Binance's primary founder, majority owner, and CEO; and therefore owned and controlled the existing Binance defendants. Thus, it is not futile to add CZ as a defendant to the initial (and new) claims against the related entities he created and operated. CZ was also on notice that he could be potentially named in this matter, because he was directly involved in the wrongful conduct at issue, as evidenced by his guilty plea and admission to the DOJ SOF attached to his settlement agreement.

Furthermore, the proposed RICO claim, which is based on the same underlying conduct pled in the initial Complaint, is not futile The RICO claim, which adequately alleges RICO violations, is based in large part on facts already agreed to by Binance and CZ and which provided a sufficient basis for holding them criminally liable, resulting in more than $4.3 billion in fines and penalties and prison time for CZ. The proposed Amended Complaint also incorporates new information elicited through Defendants' settlements with the CFTC, DOT, through FinCEN, OFAC, and IRS CI. Furthermore, the proposed Amended Complaint adds allegations based on a U.S. Securities and Exchange Commission action against Defendants for violations of the federal securities laws.

---

reduce the potential burden on Defendants because they would only need to defend one action instead of two or more. A single action would also promote efficiencies for the Class.

These new allegations elicited from the governmental proceedings reveal detailed information to support RICO claims against Defendants for the same wrongful conduct alleged in the initial Complaint. The futility bar to leave for amend is not a high one, and these proposed claims clearly pass it. *See Hall*, 367 F.3d at 1263.

## III. CONCLUSION

For the foregoing reasons, Plaintiff Osterer respectfully requests that the Court grant this Motion and permit the filing of the proposed Amended Complaint attached hereto as Exhibit A.

## IV. REQUEST FOR ORAL ARGUMENT

Plaintiff Osterer respectfully requests that the Court hear oral argument on this Motion, and respectfully submits that 30 minutes should be sufficient for all parties.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(a)(3)

In accordance with Rule 7.1(a)(3) of the Local Rules of the United States District Court for the Southern District of Florida, the undersigned attorneys for Plaintiff Osterer certify that in good faith, before filing this Motion, they communicated with counsel for Defendants, who stated that they oppose the relief requested herein.

DATED: May 24, 2024

Respectfully submitted,

**SILVER MILLER**
DAVID C. SILVER
Florida Bar No.: 572764
JASON S. MILLER
Florida Bar No. 072206

*/s/ David C. Silver*
DAVID C. SILVER

4450 NW 126th Avenue, Suite 101
Coral Springs, FL 33065
Telephone: 954/516-6000
dsilver@silvermillerlaw.com
jmiller@silvermillerlaw.com

**ROBBINS GELLER RUDMAN & DOWD LLP**
SAMUEL H. RUDMAN (admitted *pro hac vice*)
EVAN J. KAUFMAN (admitted *pro hac vice*)
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
ekaufman@rgrdlaw.com

**ROBBINS GELLER RUDMAN & DOWD LLP**
ERIC I. NIEHAUS (admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
ericn@rgrdlaw.com

*Attorneys for Plaintiff Osterer*

**HERMAN JONES LLP**
JOHN C. HERMAN
3424 Peachtree Road NE, Suite 1650
Atlanta, GA 30326
Telephone: 404/504-6500
404/504-6501 (fax)
jherman@hermanjones.com

*Additional Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing was electronically filed with the Clerk of Court on this 24th day of May 2024 by using the CM/ECF system which will send a notice of electronic filing to the following CM/ECF participant(s): **AARON S. WEISS, ESQ.**, CARLTON FIELDS, P.A., *Counsel for Defendant Binance Holdings, Ltd. d/b/a Binance*, 700 NW 1st Ave. - Suite 1200, Miami, Florida 33137, E-mail: aweiss@carltonfields.com; **CHRISTOPHER LAVIGNE, ESQ.**, WITHERS LLP, *Counsel for Defendant Binance Holdings, Ltd. d/b/a Binance*, 430 Park Avenue - 10th Floor, New York, NY 10022, E-mail: christopher.lavigne@withersworldwide.com; **ADAM FOSLID, ESQ., DANIEL T. STABILE, ESQ., and GABRIELA A. PLASENCIA, ESQ.**, WINSTON & STRAWN LLP, *Counsel for Defendant BAM Trading Services, Inc. d/b/a Binance.US*, Southeast Financial Center, 200 S. Biscayne Blvd. - 24th Floor, Miami, Florida 33131, E-mail: AFoslid@winston.com, DStabile@winston.com, GPlasencia@winston.com.

*/s/ David C. Silver*
DAVID C. SILVER



4888-6273-7597.v1

# EXHIBIT 5

# EXHIBIT A

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

Case No. 1:23-cv-22083-RUIZ/Sanchez

MICHAEL OSTERER, PHILIP MARTIN, T.F. (NATALIE) TANG, and YATIN KHANNA, Individually and on Behalf of All Others Similarly Situated,

Plaintiffs,

vs.

BAM TRADING SERVICES INC. d/b/a BINANCE.US, a Delaware corporation, BINANCE HOLDINGS, LTD. d/b/a BINANCE, a foreign company, and CHANGPENG ZHAO,

Defendants.

CLASS ACTION

**[PROPOSED] AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

**Page**

NATURE OF THE ACTION ....................1

JURISDICTION AND VENUE ....................5

PARTIES ....................6

Plaintiffs ....................6

Defendants ....................7

Key Non-Defendants ....................9

COMMON FACTUAL ALLEGATIONS ....................10

Overview of Defendants' Scheme and the Binance Crypto-Wash Enterprise ....................10

Binance Was Subject to Important U.S. Laws and Regulations ....................14

Defendants Plead Guilty to Violating U.S. Laws and Regulations and Settle with Regulators ....................18

DOJ Action ....................18

FinCEN and OFAC Settlement ....................22

CFTC ....................24

SEC Action ....................25

Background on Cryptocurrency Laundering ....................26

Binance Encouraged U.S. Users to Use Binance.com and Evade Binance's Own Compliance Controls Through the Use of VPNs and Other Methods ....................29

Defendants' Failure to Implement KYC and AML Procedures Enabled Bad Actors to Launder Crypto at the Binance Crypto-Wash Enterprise ....................31

In Violation of U.S. Law, Binance.com Permitted Transactions from Anonymous Users in the United States and by Users from Sanctioned Jurisdictions ....................39

Binance Created Binance.US to Distract Regulators so Binance.com Could Continue Doing "Business as Usual" with U.S. Customers and Bad Actors ....................44

**Page**

Plaintiffs and the Class Suffered Financial Harm from the Binance Crypto-Wash Enterprise ..... 50

Binance and CZ Controlled BAM and Binance and BAM Are Alter Egos ..... 54

RICO ALLEGATIONS ..... 60

The Binance Crypto-Wash Enterprise ..... 60

RICO Conspiracy ..... 65

Pattern of Racketeering Activity ..... 66

CLASS ACTION ALLEGATIONS ..... 71

CAUSES OF ACTION ..... 74

COUNT I ..... 74

Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1962(c)-(d) (Against All Defendants) ..... 74

COUNT II ..... 79

Conversion (Against Defendants Binance and Zhao) ..... 79

COUNT III ..... 81

Aiding and Abetting Conversion (Against All Defendants) ..... 81

COUNT IV ..... 83

Unjust Enrichment (Against All Defendants) ..... 83

PRAYER FOR RELIEF ..... 84

DEMAND FOR JURY TRIAL ..... 85

Plaintiffs Michael Osterer, Philip Martin, T.F. (Natalie) Tang, and Yatin Khanna (collectively, "Plaintiffs"), by and through their undersigned attorneys, bring this action on behalf of themselves and all others similarly situated against defendants BAM Trading Services Inc. d/b/a Binance.US ("BAM" or "BAM Trading"), Binance Holdings, Ltd. d/b/a Binance ("Binance"), and Changpeng Zhao ("CZ" or "Zhao") (collectively, "Defendants"). Plaintiffs allege the following based upon their own knowledge, or where there is no personal knowledge, upon the investigation of counsel and/or upon information and belief.

## NATURE OF THE ACTION

1. Defendant Binance formed and operates Binance.com, a major cryptocurrency exchange where customers deposit, trade, and withdraw, hundreds of types of digital assets, including cryptocurrencies and tokens (collectively, "cryptocurrency" aka "crypto"), such as Bitcoin ("BTC"), Ethereum ("ETH") and others. Since its founding in July 2017 by Defendant CZ, Binance.com has earned billions of dollars in fees on crypto transactions worth trillions of dollars and other services, and under CZ's control, Binance.com had become the world's largest cryptocurrency exchange by early 2018. Binance.com's rapid growth was fueled in large part by Binance.com targeting the large and lucrative U.S. crypto market and by ignoring and willfully violating numerous U.S. laws and regulations in place to protect consumers, investors, and American national security, which would have limited Binance.com's access to the U.S. market and slowed its growth.

2. Defendants, among other things, knowingly failed to register as a money services business ("MSB"), willfully violated the Bank Secrecy Act ("BSA") by failing to implement and maintain an effective anti-money laundering ("AML") program, disregarded crucial know your

customer ("KYC") rules, and willfully caused violations of U.S. economic sanctions issued pursuant to the International Emergency Economic Powers Act ("IEEPA"), in a deliberate and calculated effort to profit from the U.S. market, without implementing controls required by U.S. law.

3. Defendants' willful disregard of these important laws and regulations turned Binance.com into a magnet and hub for criminals, users from sanctioned jurisdictions, terrorists and other bad actors, because Binance.com became a critical part of their efforts to launder crypto which was stolen or obtained by other unlawful means. Binance.com became a preferred-choice as the "get-away driver" for a large number of bad actors.

4. Under normal circumstances, a core attribute of cryptocurrency transactions is that there is a permanent record of those transactions on the public blockchain and the chain-of-title of cryptocurrency is permanently and accurately traceable on the blockchain, which acts as a "ledger." Therefore, without a place to launder crypto, such as Binance.com, if a bad actor steals someone else's crypto, there is a risk the authorities would eventually track them down by retracing their steps on the blockchain and they would need to constantly look over their proverbial shoulders. Because CZ and others at Binance put profits before the law, Defendants, through the operation of Binance.com, generated substantial amounts of proceeds by offering bad actors a way to remove the connection between the ledger and their digital assets so the digital assets would no longer be traceable.

5. As Binance and CZ felt increasing regulatory pressure to implement KYC and AML policies, Defendants Binance, CZ, and BAM Trading formed a new crypto-exchange named Binance.US in 2019 (collectively, with Binance.com, the "Binance Platform"), which was purportedly for U.S.-customers. In reality, Binance.US was created as a distraction for U.S.

regulators so that Binance.com could continue targeting lucrative U.S.-based customers like business as usual.

6. Binance.com acted as a depository for millions of dollars of cryptocurrency removed from the digital wallets, accounts or protocols of individuals and entities located in the United States as a result of hacks, malware, theft or ransomware, including Plaintiffs and members of the Class. Defendants acted together in furtherance of a scheme to maximize revenues for Binance.com from all sources, including U.S.-based users, sanctioned users, criminals, crypto-thieves and accounts previously identified as being connected to illegal conduct. Defendants and co-conspirators operated the Binance Crypto-Wash Enterprise (defined below), which enabled bad actors to transfer assets generated through criminal activity to Binance.com, exchange those assets for different assets on Binance.com's exchange, and then transfer those newly "cleaned" assets out of Binance.com so the assets were no longer associated with the original assets or traceable on the ledger. Throughout the Class Period, the Binance Crypto-Wash Enterprise became a leading conduit of stolen cryptocurrency, enabling bad actors to seamlessly transfer stolen crypto around the U.S. and the world.

7. Eventually, the authorities caught up with Defendants. On November 21, 2023, Defendants Binance and CZ pled guilty to criminal charges and regulatory violations by the United States Department of Justice (the "DOJ"), arising out of the scheme alleged herein and paid more than $4.3 billion in penalties. In connection with their guilty pleas, Defendants Binance and CZ agreed to the statement of facts attached to the Binance plea agreement (the "DOJ SOF"). The Defendants also entered into settlements with the Commodity Futures Trading Commission ("CFTC"), U.S. Department of the Treasury ("DOT"), through the Financial Crimes Enforcement

Network ("FinCEN"), the Office of Foreign Assets Control ("OFAC"), and IRS Criminal Investigation (CI). And the U.S. Securities and Exchange Commission ("SEC") filed an action against Defendants for violations of the federal securities laws.

8. In an effort to be granted leniency in sentencing, CZ sent a letter to the judge overseeing the DOJ action and took full responsibility for Binance.com's failure to implement AML and KYC procedures as required under the law, stating in part:

> I should have focused on implementing compliance changes at Binance from the get-go, and I did not. ***There is no excuse for my failure to establish the necessary compliance controls*** at Binance.
>
> * * *
>
> Words cannot explain how deeply I regret my choices that result in me being before the Court. Rest assured that it will never happen again.

9. Plaintiffs bring claims on behalf of themselves and all persons or entities in the United States whose cryptocurrency was removed from a digital wallet, account, or protocol as a result of a hack, ransomware, or theft and, between June 6, 2019 and the date of Judgment, transferred to a Binance.com account, and who have not recovered all of their cryptocurrency which was transferred to Binance.com (the "Class").

10. Plaintiffs allege claims for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1962(c)-(d); conversion; aiding and abetting conversion; and unjust enrichment. Plaintiffs seek damages and equitable relief on behalf of themselves and the Class, including, but not limited to: treble their monetary damages; restitution; injunctive relief; damages; costs and expenses, including attorneys' and expert fees; interest; and any additional relief that this Court determines to be necessary or appropriate to provide complete relief to Plaintiffs and the Class.

## JURISDICTION AND VENUE

11. This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, because Plaintiffs' claims arise under the RICO Act, 18 U.S.C. §1962. The RICO Act provides for nationwide service of process, and Defendants conduct a substantial portion of their business in the United States. This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §§1965(b) and (d).

12. The Court also has jurisdiction over this action pursuant to 28 U.S.C. §1332(d), because the members of the putative class are of diverse citizenship from Defendants, there are more than 100 members of the putative class, and the aggregate amount in controversy exceeds $5,000,000, exclusive of costs and interest.

13. The Court has general personal jurisdiction over BAM because its principal place of business and headquarters is in Florida. The Court also has general personal jurisdiction over Binance because, as an alter ego of BAM, it would be inequitable under the circumstances to recognize Binance's existence as a separate entity. The Court has personal jurisdiction over CZ because he managed BAM.

14. In addition, the Court has specific personal jurisdiction over Defendants because they: (i) transact business in Florida; (ii) have substantial aggregate contacts with Florida; (iii) engaged in and are engaging in conduct that has and had a direct, substantial, and reasonably foreseeable, and intended effect of causing injury to persons in Florida; and (iv) purposely availed themselves of the laws of Florida. This Court also has specific personal jurisdiction over Binance and CZ for the additional reason that they asserted substantial control over BAM, as described below.

15. Exercising jurisdiction over Defendants in this forum is reasonable and comports with fair play and substantial justice.

16. Venue is proper in this District pursuant to 28 U.S.C. §1391 because BAM resides in this District, and Binance as a foreign entity may be sued in any judicial district. *See id.* §1391(c)(3).

**PARTIES**

**Plaintiffs**

17. Plaintiff Michael Osterer ("Osterer") is an individual citizen of New York who resides in Elmsford, New York. On or about April 7, 2021, at least 7.2 BTC and 449 ETH were stolen from his account at cryptocurrency exchange Coinbase. After extensive investigation, it was determined that cryptocurrency stolen from Plaintiff Osterer was sent to at least one account at Binance.com. At the time of the initial complaint in this action, 7.2 BTC and 449 ETH were collectively valued at approximately $1,635,000.00 (USD).

18. Plaintiff Philip Martin ("Martin") is a citizen of California who resides in Los Angeles, California. In December 2021, a third party stole at least tens of thousands of dollars-worth of cryptocurrency from his Coinbase account. After extensive investigation, it was determined that cryptocurrency stolen from Plaintiff Martin was sent to at least one account at Binance.com.

19. Plaintiff T.F. (Natalie) Tang ("Tang") is a citizen of California who resides in Los Angeles, California. In July 2022, a third party stole tens of thousands of dollars-worth of cryptocurrency from her Coinbase account. After extensive investigation, it was determined that cryptocurrency stolen from Plaintiff Tang was sent to at least one account at Binance.com.

20. Plaintiff Yatin Khanna ("Khanna") is a citizen of the state of New York who resides in New York, New York. In August 2022, a third party stole more than $1.5 million worth of cryptocurrency from him. After extensive investigation, it was determined that cryptocurrency stolen from Plaintiff Khanna was sent to at least one account at Binance.com.

21. Upon information and belief, Binance.com earned transaction fees on the crypto stolen from Plaintiffs without applying KYC and AML procedures to detect lawful ownership of the cryptocurrency.

**Defendants**

22. Defendant Binance Holdings Limited (Binance) is a Cayman Islands limited liability company founded and owned by CZ. Since at least July 2017, Binance has operated cryptocurrency trading platforms, including the platform located at Binance.com since 2017 and the platform located at Binance.US, since 2019.

(a) CZ, the founder and CEO of Binance has been publicly dismissive of "traditional mentalities" about corporate formalities and claims Binance's headquarters is "wherever [he] sit[s]" and "wherever [he] meet[s] somebody." Even though CZ and Binance claim to not have a physical headquarters, much of its infrastructure and many of its employees are located in the United States. A cloud computing platform and applications programming interface ("API") service owned by a technology service provider based in the State of Washington hosted the Binance.com website, stored Binance's data, and operated Binance's exchange platform or servers in Japan. Between around June 2017 and October 2022, more than a million U.S. retail users conducted more than 20 million deposit and withdrawal transactions worth $65 billion. These users conducted more than 900 million spot trades worth more than $550 billion. Over this same period, Binance relied on

U.S. trading firms to make markets on the exchange and provide needed liquidity, thereby making various digital assets available to trade by other customers at competitive prices.

(b) A number of key Binance employees reside in the United States. Binance's Vice President of Global Operations, Communications Director, Managing Director of the Binance X initiative, Senior Vice President of Charity, Senior Manager of User Acquisition, and at least one Risk Management employee all publicize that they reside in California. During the Class Period, Binance also issued job listings seeking California-based engineers to work on its blockchain, mobile, and security products.

23. Defendant BAM Trading d/b/a Binance.US (BAM Trading or BAM), is a Delaware corporation with a principal place of business in Miami, Florida. It is wholly owned by BAM Management U.S. Holdings Inc. ("BAM Management") which is 81 percent owned by CZ. Zhao and Binance created BAM Management and BAM Trading in the United States and claimed publicly that these entities independently controlled the operation of the Binance.US Platform. Behind the scenes, however, Zhao and Binance were intimately involved in directing BAM Trading's U.S. business operations and providing and maintaining the crypto asset services of the Binance.US Platform. During the Class Period, the Binance.US platform was available in approximately 46 U.S. states and 8 U.S. territories; was one of the top five crypto asset trading platforms in the United States by trading volume; and as of May 1, 2023, Binance.US's average 24-hour trading volume was valued at over $174 million.

24. Defendant Changpeng Zhao (CZ or Zhao) was Binance's primary founder, majority owner, and CEO. CZ founded Binance in or around June 2017. CZ was Chairman of BAM Trading's and BAM Management's Boards of Directors at least until approximately March 2022.

CZ, along with a core senior management group, made the strategic decisions for Binance, Binance.com, BAM and Binance.US and exercised day-to-day control over their operations and finances. According to the SEC Complaint, billions of dollars from Binance flowed through dozens of Binance- and CZ-owned U.S.-based bank accounts and between October 2022 and January 2023 alone, CZ personally received $62.5 million from one of the Binance bank accounts.

25. Binance, BAM, CZ and other related Binance entities, are sometimes collectively referred to herein as "Binance." Binace.com and Binance.US are sometimes collectively referred to herein as the "Binance Platform." Zhao has directly or indirectly owned the various entities that collectively operate the Binance Platforms.

**Key Non-Defendants**

26. Samuel Lim is a resident of Singapore and served as Binance's first Chief Compliance Officer ("CCO") from April 2018 to January 2022. Upon information and belief, Lim is "Individual 1" referenced in the DOJ SOF (see below).

27. Yi He is the Chief Marketing Officer ("CMO") of Binance and cofounded Binance along with Zhao and Roger Wang (discussed below). In her role as CMO, she oversees "all marketing efforts" and has touted that she increased "Binance's global influence to become a top cryptocurrency exchange." On information and belief, she resides in Malta.

28. Roger Wang is the Chief Technology Officer of Binance and co-founded Binance with Zhao and He. On information and belief, he resides in Malta.

29. Individual 1 in the DOJ SOF, whose identity is known to the DOJ and Binance, was Binance's CCO during much of the relevant period in the DOJ SOF. Individual 1 was hired by Binance in April 2018. Binance placed him on administrative leave beginning in or around June

2022. Individual 1's responsibilities included building and directing the compliance protocols and functions for Binance and certain affiliated exchanges offering, among other things, conversion between virtual and fiat currencies.

30. Individual 2 named in the DOJ SOF, whose identity is known to the DOJ and Binance, worked for Binance from in or around 2018, until in or around 2021. During that period, Individual 2 held the title of chief financial officer.

31. Individual 3 named in the DOJ SOF, whose identity is known to the DOJ and Binance, co-founded Binance and was one of Zhao's close advisors as part of Binance's senior management group.

32. Individual 4 named in the DOJ SOF, whose identity is known to the DOJ and Binance, co-founded Binance, was part of Binance's senior management group, and was Binance's operations director.

33. These senior level employees of Binance and BAM were involved in the strategy, decisions, and actions to ensure that bad actors could continue using Binance.com to launder cryptocurrency.

## COMMON FACTUAL ALLEGATIONS

### Overview of Defendants' Scheme and the Binance Crypto-Wash Enterprise

34. Binance launched its cryptocurrency exchange at Binance.com in 2017, where it enabled customers to open accounts and engage in cryptocurrency transactions. When a user opened an account, Binance assigned them a custodial virtual currency wallet – *i.e.*, a wallet in Binance's custody, which enabled the user to conduct various types of transactions on the platform, such as

swapping one crypto for another, transferring funds to other Binance accounts, withdrawing crypto out of Binance, and sending the crypto to external virtual currency wallets or fiat bank accounts.

35. Binance charges fees to customers for engaging in crypto transactions, so the more transactions customers completed the more Binance earned. Binance has a strong monetary incentive to encourage, facilitate, and allow as many transactions on its exchange as possible, even transactions involving stolen cryptocurrency.

36. Binance grew at a rapid rate after it was founded. By 2018, Binance had become the world's most active cryptocurrency exchange. In October 2019, Binance had reportedly earned more than $1 billion, and according to a post on Binance.com, in 2022 Binance's revenue reached approximately $12 billion, a ten-fold increase from two years earlier.

37. The amount of fees Binance charged a user varied based on a user's trading volume and higher-volume traders typically paid lower fees per trade. Higher-volume traders also helped provide liquidity on Binance's platform. Generating a large amount of trades and being highly liquid is very important for a crypto-exchange. A highly liquid market is generally more desirable from the end-user's standpoint because the bid and ask spreads will typically be narrower and larger trades can be conducted more easily. A highly liquid exchange also makes it easier for bad actors to exchange large amounts of stolen crypto.

38. For any crypto asset traded on its exchange, Binance needed individuals or entities to make markets in that cryptocurrency. To attract market makers, Binance rewarded them with "VIP" status, which conferred upon them certain benefits, including discounted transaction fees. Binance assessed a user's VIP status based on their prior 30-day trading volume and the user's holdings in Binance's proprietary token, BNB. The benefits increased in value as did the VIP user's trading

volume and value of BNB holdings. VIP users were an important part of Defendant's business model, and a significant number were U.S. users.

39. Binance.com had two "levels" or "tiers" of user accounts. Until in or around August 2021, Binance and its co-conspirators allowed users to open a "Level 1" or "Tier 1" account without submitting any KYC information. Instead, users could open Level 1 accounts simply by providing an email address and a password. Binance required no other information, such as the user's name, citizenship, or location.

40. A Level 1 account holder could deposit virtual currency into their account, and then transact in an unlimited number of virtual currencies. While Level 1 accounts had certain limitations, including a virtual currency withdrawal limit of up to the value of two BTC per day, Binance allowed users to open multiple Level 1 accounts by providing a new email address for each account, which effectively circumvented the withdrawal limit. Even if a user adhered to the daily two BTC withdrawal limit on a single account, for most of Binance's existence, the user could still withdraw thousands – and sometimes tens of thousands – of U.S. dollars in cryptocurrency due to the rising value of a single Bitcoin, which increased in value from approximately $3,000 in December 2018 to $63,000 in April 2021. To access greater withdrawal limits within a single account, users could open a "Level 2" or "Tier 2" account by submitting KYC information, including the user's name, citizenship, residential address, or government issued identification document or number. During the Class Period, Level 1 accounts comprised the vast majority of the user accounts on Binance.com.

41. Since Binance.com conducted a substantial portion of its business in the United States, its practice of permitting users to open accounts, conduct transactions, and withdraw

cryptocurrency with just a username and password violated U.S. laws and regulations. Defendants and co-conspirators knew Binance.com was required to, but failed to, implement KYC and AML procedures. Defendants and co-conspirators willfully violated these important U.S. laws and regulations in order to maximize fees and gain market share. Binance.com's failure to implement an effective AML program along with Defendants' prioritization of growth, market share and profits over compliance with U.S. law, enabled Binance.com to become the largest cryptocurrency exchange in the world.

42. Over time, Binance felt regulatory pressure to make it appear as if Binance.com was complying with U.S. law so Defendants implemented certain changes, such as prohibiting users who appeared to be from the U.S. based on their Internet Protocol ("IP") address. These changes were just for show because Defendants' goal was for high-value clients to continue using Binance.com in violation of any purported safeguards for regulatory compliance. Defendants, therefore, knew that bad actors were using the Binance.com platform, and not only did they not try to stop them, but Defendant Binance and CZ actively took steps to assist and encourage high-value clients, including bad actors, to evade policies which would have helped to prevent them from using Binance.com for illicit activities, including laundering stolen cryptocurrency.

43. Even though a portion of Binance.com's users may have been legitimate, Defendants' conduct turned Binance.com into a magnet and hub for bad actors to use Binance.com to launder stolen cryptocurrency and this portion of Binance's business served as the Binance Crypto-Wash Enterprise. Defendants and co-conspirators knew that Binance's failure to comply with KYC and AML procedures enabled bad actors, including criminals, crypto-thieves, and users located in

sanctioned jurisdictions, such as Iran, to use the Binance Crypto-Wash Enterprise to launder their digital assets so the assets would not be trackable by the authorities.

**Binance Was Subject to Important U.S. Laws and Regulations**

44. Once Binance.com began conducting business in the U.S., it became subject to strict regulations aimed at, among other things, creating a protocol for identifying suspicious activity that might indicate potential money laundering operations and other illegitimate activities by its customers. In addition, Binance.com was required to have procedures in place for reporting illicit activities to relevant authorities.

45. Specifically, Binance.com was a foreign-located cryptocurrency exchange that did business wholly or in substantial part within the U.S., including by providing services to a substantial number of U.S. customers. Binance.com was a "money transmitter," which is a type of money services business. 31 C.F.R. §1010.100(ff). As a cryptocurrency exchange, Binance.com was a money transmitter because it was "[a] person that provides money transmission services," meaning "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means," including through "an electronic funds transfer network" or "an informal value transfer system." *Id.* §1010.100(ff)(5).

46. Money transmitters, such as Binance.com, were required to register with FinCEN pursuant to 31 U.S.C. §5330 and 31 C.F.R. §1022.380 within 180 days of establishment or risk criminal penalties pursuant to 18 U.S.C. §1960. Binance.com, as a money transmitter, was also required to comply with the BSA, 31 U.S.C. §5311 *et seq.*, for example, by filing reports of suspicious transactions that occurred in the U.S., 31 U.S.C. §5318(g), 31 C.F.R. §1022.320(a), and

implementing an effective AML program "that [was] reasonably designed to prevent the money services business from being used to facilitate money laundering and the financing of terrorist activities," 31 C.F.R. §1022.210.

47. An AML program was required, at a minimum and within 90 days of the business's establishment, to "[i]ncorporate policies, procedures, and internal controls reasonably designed to assure compliance" with requirements that an MSB file reports, create and retain records, respond to law enforcement requests, and verify customer identification (KYC requirement). 31 C.F.R. §§1022.210(d)(1), (e).

48. Additionally, IEEPA, 50 U.S.C. §1701, *et seq.*, authorized the President of the United States to impose economic sanctions on countries, groups, entities, and individuals in response to any unusual and extraordinary threat to the national security, foreign policy, or economy of the United States when the President declared a national emergency with respect to that threat. Section 1705 provided, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued [pursuant to IEEPA]." 50 U.S.C. §1705(a).

49. The U.S. Department of the Treasury Office of Foreign Assets Control (OFAC) administered and enforced economic sanctions programs established by executive orders issued by the President pursuant to IEEPA. In particular, OFAC administered and enforced comprehensive sanctions programs that, with limited exception, prohibited U.S. persons from engaging in transactions with a designated country or region, including Iran, the Democratic People's Republic of Korea ("DPRK" or "North Korea"), Syria, and the Crimea, Donetsk, and Luhansk regions of Ukraine, among others.

50. FinCEN's Final Rule on Customer Due Diligence Requirements for Financial Institutions require that Binance.com establish and maintain written policies and procedures for AML and KYC protocols. Specifically, FinCEN's customer identification rules require that Binance.com maintain a written Customer Identification Program appropriate for its size and type of business that, at a minimum, includes "risk-based procedures for verifying the identity of each customer" that enable Binance.com to "form a reasonable belief that it knows the true identity of each customer." 31 C.F.R. §§1020.220(a)(1), (2).

51. The Bank Secrecy Anti-Money Laundering Manual promulgated by the Federal Financial Institutions Examination Council ("FFIEC Manual") also summarizes industry sound practices and examination procedures for customer due diligence on accounts that present a higher risk for money laundering and terrorist financing. The FFIEC Manual sets forth a matrix for identifying high risk accounts that require enhanced due diligence. Such accounts include those that have "large and growing customer[s] base[d] in a wide and diverse geographic area"; or "[a] large number of noncustomer funds transfer transactions and payable upon proper identification [] transactions"; and "[f]requent funds from personal or business accounts to or from higher-risk jurisdictions, and financial secrecy havens or jurisdictions," such as Binance.com's deposit accounts.

52. Binance was required to comply with heightened due diligence for its deposit accounts. According to the FFIEC Manual, ***Binance's due diligence was required to include assessments to determine the purpose of the account, ascertain the source and funding of the capital, identify account control persons and signatories, scrutinize the account holders' business operations, and obtain adequate explanations for account activities***.

53. Binance.com's general customer due diligence program was required to include protocols to predict the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, and furnish a means for Binance.com to notice unusual or suspicious transactions for each customer.

54. Furthermore, Binance.com's customer due diligence process must be able to identify any of a series of money laundering "red flags" as set forth in the FFIEC Manual, including: (a) frequent involvement of multiple jurisdictions or beneficiaries located in higher-risk offshore financial centers; (b) repetitive or unusual funds transfer activity; (c) funds transfers sent or received from the same person to or from different accounts; (d) unusual funds transfers that occur among related accounts or among accounts that involve the same or related principals; (e) transactions inconsistent with the account holder's business; (f) customer use of a personal account for business purposes; (g) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities; and (h) multiple high-value payments or transfers between shell companies without a legitimate business purpose. The due diligence process must also enable Binance.com to take appropriate action once such "red flags" are identified.

55. As alleged herein, Defendants willfully and flagrantly ignored these important U.S. rules and regulations, which enabled Binance.com to become a central hub of crypto trading for bad actors, including those who sought to utilize the Binance Crypto-Wash Enterprise.

56. Defendants were aware of the applicable U.S. laws and willfully violated them. For example, CZ stated the following during a June 9, 2019 management meeting:

> [T]here are a bunch of laws in the U.S. that prevent Americans from having any kind of transaction with any terrorist, and then in order to achieve that, if you serve U.S. or U.S. sanctioned countries there are about 28 sanctioned countries in the U.S. you would need to submit all relevant documents for review [***but that is not] very***

> ***suitable for our company structure to do so. So, we don't want to do that*** and it is very simple ***if you don't want to do that: you can't have American users***. Honestly it is not reasonable for the U.S. to do this. . . . .
>
> [U.S. regulators] can't make a special case for us. We are ***already doing a lot of things*** that are ***obviously not in line with the United States***.

57. According to the DOJ SOF, a chat exchange from February 2019 between Individual 1 and certain compliance employees show Defendants' knowledge that Binance.com's connections to the United States required it to comply with U.S. registration requirements and the BSA. As Individual 1 explained: "it is the activities performed that cause a person to be categorized as an MSB subject to anti-money laundering rules," and "an entity qualifies as an MSB based on its activity within the United States, not the physical presence of one or more of its agents, agencies, branches, or offices in the United States." Individual 1 also noted that "the Internet and other technological advances make it increasingly possible for persons to offer MSB services in the United States from foreign locations" and "FinCEN seeks to ensure that the BSA rules apply to all persons engaging in covered activities within the United States, regardless of physical location."

**Defendants Plead Guilty to Violating U.S. Laws and Regulations and Settle with Regulators**

<u>DOJ Action</u>

58. Defendant Binance and CZ each entered into plea agreements to settle claims alleged by the United States Department of Justice in the U.S. District Court for the Western District of Washington.

59. On November 21, 2023, Binance entered into a plea agreement with the DOJ and agreed to plead guilty to the following criminal charges contained in the Information filed by the DOJ against Binance (the "DOJ Binance Information"): (i) conspiracy to conduct an unlicensed

money transmitting business ("MTB") in violation of 18 U.S.C. §§1960(a) and 1960(b)(1)(B), and to fail to maintain an effective AML program, in violation of Title 31, United States Code, Sections 5318(h), 5322, in violation of 18 U.S.C. §371; (ii) conducting an unlicensed MTB in violation of 18 U.S.C. §§1960(a) and 1960(b)(1)(B), and 2; and (iii) violation of the IEEPA, in violation of 50 U.S.C. §1705 and 31 C.F.R. §560 *et seq*. In connection with the settlement, Binance agreed to forfeit $2,510,650,588 and to pay a criminal fine of $1,805,475,575 for a total financial penalty of $4,316,126,163. Additionally, Binance agreed to retain an independent compliance monitor for three years and remediate and enhance its AML and sanctions compliance programs.

60. On November 21, 2023, CZ entered into a plea agreement with the DOJ and agreed to plead guilty to the failure to maintain an effective AML program in violation of 31 U.S.C. §§5318(h), 5322(c), and 5322(e); 18 U.S.C. §2; and 31 C.F.R. §1022.210. In connection with his plea, CZ pled guilty to acting willfully and aiding and abetting and causing a MSB to fail to develop, implement, and maintain an effective AML program. CZ agreed to a fine in the amount of $50 million.

61. In connection with their guilty pleas, ***Binance and CZ admit, agree and stipulate that the factual allegations set forth in the Information filed by the DOJ and the DOJ SOF are true and correct, and that the Information and SOF accurately reflect Defendants' criminal conduct***.

62. On November 21, 2023, the DOJ issued a press release titled *Binance and CEO Plead Guilty to Federal Charges in $4B Resolution*, which discussed Binance's and CZ's guilty pleas, stating in part:

**Binance Admits It Engaged in Anti-Money Laundering, Unlicensed Money Transmitting, and Sanctions Violations in Largest Corporate Resolution to Include Criminal Charges for an Executive**

Binance Holdings Limited (Binance), the entity that operates the world's largest cryptocurrency exchange, Binance.com, pleaded guilty today and has agreed to pay over $4 billion to resolve the Justice Department's investigation into violations related to the Bank Secrecy Act (BSA), failure to register as a money transmitting business, and the International Emergency Economic Powers Act (IEEPA).

Binance's founder and chief executive officer (CEO), Changpeng Zhao, a Canadian national, also pleaded guilty to failing to maintain an effective anti-money laundering (AML) program, in violation of the BSA and has resigned as CEO of Binance.

Binance's guilty plea is part of coordinated resolutions with the Department of the Treasury's Financial Crimes Enforcement Network (FinCEN) and Office of Foreign Assets Control (OFAC) and the U.S. Commodity Futures Trading Commission (CFTC).

"Binance became the world's largest cryptocurrency exchange in part because of the crimes it committed – now it is paying one of the largest corporate penalties in U.S. history," said Attorney General Merrick B. Garland…

"***Binance turned a blind eye to its legal obligations in the pursuit of profit. Its willful failures allowed money to flow to terrorists, cybercriminals, and child abusers through its platform,"*** said Secretary of the Treasury Janet L. Yellen. "Today's historic penalties and monitorship to ensure compliance with U.S. law and regulations mark a milestone for the virtual currency industry. ***Any institution, wherever located, that wants to reap the benefits of the U.S. financial system must also play by the rules that keep us all safe from terrorists, foreign adversaries, and crime or face the consequences***."

"A corporate strategy that puts profits over compliance isn't a path to riches; it's a path to federal prosecution," said Deputy Attorney General Lisa O. Monaco…

"***Changpeng Zhao made Binance, the company he founded and ran as CEO, into the largest cryptocurrency exchange in the world by targeting U.S. customers, but refused to comply with U.S. law***," said Acting Assistant Attorney General Nicole M. Argentieri of the Justice Department's Criminal Division. "***Binance's and Zhao's willful violations of anti-money laundering and sanctions laws*** threatened the U.S. financial system and our national security, and each of them has now pleaded guilty. Make no mistake: when you place profits over compliance with the law, you will answer for your crimes in the United States."

* * *

> "***From the beginning of its existence, Binance and founder Changpeng Zhao chose growth and personal wealth over following financial regulations aimed at stopping the laundering of criminal cash***," said Acting U.S. Attorney Tessa M. Gorman for the Western District of Washington. "***Because Changpeng Zhao knowingly operated a financial platform without basic anti-money laundering safeguards, the company caused illegal transactions between U.S. users and users in sanctioned jurisdictions such as Iran, Cuba, Syria, and Russian-occupied regions of Ukraine*** – transactions for which Binance profited with significant fees."
>
> "Binance's activities undermined the foundation of safe and sound financial markets by ***intentionally avoiding basic, fundamental obligations that apply to exchanges, all the while collecting approximately $1.35 billion in trading fees from U.S. customers***," said Chairman Rostin Behnam of the Commodity Futures Trading Commission (CFTC). "American investors, small and large, have demonstrated eagerness to incorporate digital asset products into their portfolios. It is our duty to ensure that when they do so, the full protections afforded by our regulatory oversight are in place, and that illegal and illicit conduct is swiftly addressed. ***When, as here, an entity goes even further, deliberately avoiding to employ meaningful access controls, intentionally avoiding knowing customers' identities, and actively concealing the presence of U.S. customers on its platforms***, there is no question that the CFTC will strike hard and aggressively."
>
> * * *
>
> In addition, according to court documents, ***Zhao,*** Binance's founder, owner, and CEO, admitted that he ***understood that Binance served U.S. users and was thus required to register with FinCEN and implement an effective AML program***. Zhao knew that U.S. users were essential to Binance's growth and were a significant source of revenue and ***knew that an effective AML program would include KYC protocols that would mean that some customers would choose not to use Binance. Zhao told employees it was "better to ask for forgiveness than permission," and prioritized Binance's growth over compliance with U.S. law***. Without an effective AML program, Binance caused transactions between U.S. users and users in jurisdictions subject to U.S. sanctions. These illegal transactions were a clear and foreseeable result of Zhao's decision to prioritize Binance's profit and growth over compliance with the BSA.

63. In connection with his guilty plea, Defendant CZ was required to step down from his role as CEO and walk away from his management of Binance. On February 23, 2024, U.S. District Judge Richard A. Jones signed off on Binance's $4.3 billion plea deal on money laundering and bank fraud charges, stating from the bench that the cryptocurrency exchange's criminal violations

could not be explained away by mere ignorance and that Binance was motivated by financial gain and a calculated desire to avoid U.S. laws and regulations:

> This really is a case where the ethics of the company was compromised by greed . . . . This isn't a question of ignorance and lack of knowledge. It is a question of volition and choice.

FinCEN and OFAC Settlement

64. In a press release dated November 21, 2023, it was announced that Binance settled with the U.S. Department of the Treasury, through the Financial Crimes Enforcement Network (FinCEN), the Office of Foreign Assets Control (OFAC), and IRS Criminal Investigation (CI) in connection with Binance's violations of the U.S. AML and sanctions laws. According to the Consent Order entered into between FinCEN and Binance:

> FinCEN has determined that ***Binance willfully violated the BSA*** and its implementing regulations during the Relevant Time Period with regard to its obligation to register as an MSB, maintain an effective AML program, and report suspicious transactions. Specifically, FinCEN has determined that, as of January 10, 2018, ***Binance was required to register as an MSB with FinCEN and willfully failed to do so in violation of 31 U.S.C. §5330 and 31 C.F.R. §1022.380***. FinCEN has also determined that, as of October 12, 2017, Binance was required to develop, implement, and maintain an effective AML program that was reasonably designed to ***prevent it from being used to facilitate money laundering*** and the financing of terrorist activities, and ***willfully failed to do so*** in violation of 31 U.S.C. §5318(h)(1) and 31 C.F.R. §1022.210. Additionally, FinCEN has determined that, throughout the Relevant Time Period, Binance was required to accurately, and timely, report suspicious transactions to FinCEN, and willfully failed to do so in violation of 31 U.S.C. §5318(g) and 31 C.F.R. §1022.320.
>
> As explained in detail above: (1) Binance personnel knew that the company was doing extensive business in the United States and devised a strategy to retain the commercial benefits associated with this business without registering with FinCEN as an MSB; (2) Binance delayed implementation of an AML Program and maintained categorical gaps (most notably with respect to exempting large numbers of users from KYC requirements, allowing Exchange Brokers free reign, and failing to implement risk-based controls applicable to AECs) once implemented; and (3) Binance failed to file any SARs with FinCEN despite processing billions of dollars'

> worth of transactions involving a broad range of illicit activity, including ransomware actors and sanctioned entities.

65. The FinCEN investigation found that Binance's "willful failure to implement an effective [anti-money laundering] program," as required by the Bank Secrecy Act, "directly led to the [Binance] platform being used to process transactions" designed to "launder illicit proceeds" and "stolen funds." FinCEN also found that Binance's "willful failure to report to FinCEN hundreds of thousands of suspicious transactions inhibited law enforcement's ability to disrupt the illicit actors."

66. The November 21, 2023 press release stated in pertinent part:

> Today, ***Binance settled with FinCEN and OFAC for violations of the Bank Secrecy Act (BSA) and apparent violations of multiple sanctions programs.*** The violations include ***failure to implement programs to prevent and report suspicious transactions with terrorists — including Hamas' Al-Qassam Brigades, Palestinian Islamic Jihad (PIJ), Al Qaeda, and the Islamic State of Iraq and Syria (ISIS) — ransomware attackers, money launderers, and other criminals, as well as matching trades between U.S. users and those in sanctioned jurisdictions like Iran, North Korea, Syria, and the Crimea region of Ukraine. By failing to comply with AML and sanctions obligations, Binance enabled a range of illicit actors to transact freely on the platform.*** Today's settlements are part of a global agreement simultaneous with Binance's resolution of related matters with the Department of Justice (DOJ) and the Commodity Futures Trading Commission (CFTC).
>
> "***Binance turned a blind eye to its legal obligations in the pursuit of profit***. Its ***willful failures allowed money to flow to terrorists, cybercriminals, and child abusers through its platform,***" said Secretary of the Treasury Janet L. Yellen. "Today's historic penalties and monitorship to ensure compliance with U.S. law and regulations mark a milestone for the virtual currency industry. Any institution, wherever located, that wants to reap the benefits of the U.S. financial system must also play by the rules that keep us all safe from terrorists, foreign adversaries, and crime, or face the consequences."
>
> FinCEN's settlement agreement assesses a civil money penalty of $3.4 billion, imposes a five-year monitorship, and requires significant compliance undertakings, including to ensure Binance's complete exit from the United States. OFAC's settlement agreement assesses a penalty of $968 million and requires Binance to abide by a series of robust sanctions compliance obligations, including full cooperation with the monitorship overseen by FinCEN. To ensure that Binance fulfils the terms of its settlement — including that it does not offer services to U.S.

> persons — and to ensure that illicit activity is addressed, Treasury will retain access to books, records, and systems of Binance for a period of five years through a monitor. Failure to live up to these obligations could expose Binance to substantial additional penalties, including a $150 million suspended penalty, which would be collected by FinCEN if Binance fails to comply with the terms of the required compliance undertakings and monitorship.
>
> The monitor will oversee remedial undertakings necessary to address Binance's failure to comply with its anti-money laundering and sanctions obligations. The monitor will also conduct periodic reviews and report to FinCEN, OFAC, and the CFTC on its findings and recommendations to ensure Binance's ongoing compliance with the terms of the settlement agreements.

CFTC

67. On November 21, 2023, CZ, Binance and other Binance entities agreed to a proposed consent order with the CFTC, and on January 16, 2024, agreed to an amended consent order, to resolve charges against Binance and CZ for knowingly disregarding provisions of the Commodity Exchange Act to profit from their operation of an illegal digital assets derivative exchange. The consent order required, among other things, that Binance disgorge $1.35 billion in ill-gotten gains and pay a $1.35 billion civil monetary penalty to the CFTC, and that Zhao pay a $150 million civil monetary penalty to the CFTC. The CFTC consent order also, among other things, permanently enjoins Zhao and Binance from willfully evading the CEA and failing to have adequate KYC compliance controls among other illegal activities in the order and must certify that certain remedial measures have been implemented.

68. On December 14, 2023, Samuel Lim also entered into a consent order with the CFTC. Among other things, Lim consented to his liability for aiding and abetting Binance's failure to implement customer identification programs and failure to implement KYC and AML procedures. In the consent order, Lim agreed to "the use of the Findings of Fact and Conclusions of Law in this Consent Order in this proceeding or any other proceeding brought by the Commission or to which

the Commission is a party or claimant, and agrees that they shall be taken as true and correct and be given preclusive effect therein." The Findings of Fact stated, among other things, that:

> Beginning in June 2019, Binance added some ***superficial controls and "Know Your Customer" ("KYC") programs*** to ***make it appear that Binance would begin restricting U.S. customer access***. But, ***in reality, U.S. customer presence persisted because Defendants Lim, Zhao, and Binance deliberately allowed U.S. Customers to circumvent Binance's superficial controls and purported "KYC program***," by building in work-arounds, exceptions and, as to Defendant Lim specifically, advising, directing, and assisting Binance employees and customers how to circumvent Binance's controls.
>
> Further, at various times during the Relevant Period, Binance personnel, often acting at Lim's direction, assisted U.S. VIP customers to create "new" accounts using "new KYC" documentation in order to circumvent Binance's compliance controls.
>
> * * *
>
> Lim and other members of ***Binance's senior management*** failed to properly supervise Binance's activities during the Relevant Period and ***actively facilitated violations of U.S. law***, including by assisting and instructing customers located in the United States to evade the compliance controls Binance purported to implement to prevent and detect violations of U.S. law, by allowing customers that had not submitted proof of their identity and location to trade on the platform in violation of Binance's own Teams of Service, and by directing VIP customers with ultimate beneficial owners, key employees who control trading decisions, trading algorithms, and other assets all located in the United States to open Binance accounts under the name of newly incorporated shell companies to evade Binance's compliance controls.

<u>SEC Action</u>

69. On June 5, 2023, the SEC filed a complaint in the United States District Court for the District of Columbia against CZ, Binance, BAM Trading Services Inc., and BAM Management US Holdings Inc. for violations of the federal securities laws for providing illegal platforms to offer and sell crypto assets securities to U.S. investors, and for operating unregistered broker and clearing services (the "SEC Complaint").

70. The SEC alleges, among other things, that even though CZ and Binance "claimed publicly that [BAM Trading and BAM Management] independently controlled the operation of the Binance.US Platform," behind the scenes, "***Zhao and Binance were intimately involved in directing BAM Trading's U.S. business operations*** and providing and maintaining the crypto asset services of the Binance.US Platform." The SEC Complaint also alleges, "[a]s a second part of Zhao's and Binance's plan to shield themselves from U.S. regulation, they consistently claimed to the public that the Binance.com Platform did not serve U.S. persons, while simultaneously concealing their efforts to ensure that the most valuable U.S. customers continued trading on the platform."

**Background on Cryptocurrency Laundering**

71. A cryptocurrency wallet is an application that functions as a wallet for your cryptocurrency. It is called a wallet because it is used similarly to a wallet you put cash and cards in. Instead of holding these physical items, it stores the passkeys you use to sign for your cryptocurrency transactions and provides the interface that lets you access your crypto on the blockchain, and interact with protocols, such as decentralized exchanges ("DEX") and bridges enabling users to send crypto across different blockchains. When someone sends their cryptocurrency to another wallet on the blockchain or engages with a protocol, such as a DEX or bridge, a permanent record is created on the ledger for the blockchain so all transactions on the blockchain are trackable.

72. Blockchain transactions are inherently immutable and transparent and recorded on digital ledgers distributed across a decentralized network of nodes. These transactions, encompassing details such as sender and recipient addresses, transaction amounts, and timestamps, are permanently recorded, ensuring the integrity and security of the data. If a bad actor removes

someone's crypto without their permission from their wallet or a protocol and then transfers the crypto to their own wallet or tries to withdraw the funds as fiat currency to a bank account, the bad actor could potentially be caught because experts can employ tools and services to trace the movement of stolen digital assets, facilitating potential recovery. Therefore, unlike cash or other types of fungible property, cryptocurrency can be tracked after it is removed from the owner's wallet or protocol.

73. A February 1, 2023 article published on a website of crypto-tracing analysis firm Chainalysis.com titled *2022 Biggest Year Ever For Crypto Hacking with $3.8 Billion Stolen, Primarily from DeFi Protocols and by North Korea-linked Attackers*, discussed the tracking benefits of the blockchain, stating in part:

> When every transaction is recorded in a public ledger, it means that law enforcement always has a trail to follow, even years after the fact, which is invaluable as investigative techniques improve over time. Their growing capabilities, combined with the efforts of agencies like OFAC to cut off hackers' preferred money laundering services from the rest of the crypto ecosystem, means that these hacks will get harder and less fruitful with each passing year.

74. As such, the laundering of the crypto, *i.e.*, the removal of the ability for the stolen cryptocurrency to be tracked on the ledger, is a key part of the theft of cryptocurrency.

75. The 2022 Crypto Crime Report by Chainalysis highlights the importance of crypto-laundering as part of the overall theft:

> Cybercriminals dealing in cryptocurrency share one common goal: Move their ill-gotten funds to a service where they can be kept safe from the authorities and eventually converted to cash. ***That's why money laundering underpins all other forms of cryptocurrency-based crime. If there's no way to access the funds, there's no incentive to commit crimes involving cryptocurrency in the first place.***

76. The Binance Crypto-Wash Enterprise provided an effective way for bad actors to steal and launder crypto. Once someone steals crypto stored in a wallet or in a protocol, they would

deposit the stolen cryptocurrency into their Binance.com wallet. Next, they would engage in transactions within the exchange, trading the stolen cryptocurrency for other cryptocurrencies or tokens offered on the platform. Once the funds are sufficiently converted, the thief would withdraw them from the exchange, potentially through multiple accounts or wallets, to further complicate tracing efforts. By leveraging the anonymity and liquidity provided by the Binance Crypto-Wash Enterprise, individuals laundered cryptocurrency and evaded detection.

77. Defendants' refusal and failure to implement AML and KYC policies and protocols at Binance.com enabled bad actors to launder crypto at Binance.com. Had Binance.com and CZ complied with the law and ensured Binance.com implemented AML and KYC policies, Binance.com would have identified potential crypto laundering transactions on Binance.com and reported them to the authorities, and would have prevented the crypto belonging to Plaintiffs and the members of the Class from being laundered and withdrawn from Binance.com.

78. A key reason for this is because a substantial portion of crypto laundered by bad actors are transferred to Binance.com from crypto wallets previously identified as wallets associated with illicit crypto activities. In fact, a January 18, 2024 Reuters article titled *Illicit crypto addresses received at least $24.2 billion in 2023 – report*, stated: "At least $24.2 billion worth of crypto was sent to illicit crypto wallet addresses in 2023, including addresses identified as sanctioned or linked to terrorist financing and scams," according to crypto research firm Chainalysis.

79. During the Class Period, Defendants had access to tools, platforms and services which would have enabled them to easily identify if crypto was transferred to a Binance.com account from a crypto wallet which had been identified as being associated with illicit activity. According to a March 11, 2022 article on CoinDesk.com titled *How Authorities Track Criminal*

*Crypto Transactions*, blockchain analytic firms like Chainalysis and CipherTrace have created tools that identify wallets associated with illicit activities and that "it is possible to ascertain how many wallets a criminal controls from a single transaction that might've occurred after a hack, rug pull or any type of unlawful cyber activity was perpetrated."

**Binance Encouraged U.S. Users to Use Binance.com and Evade Binance's Own Compliance Controls Through the Use of VPNs and Other Methods**

80. Beginning in around September 2019, the United States was a "restricted" jurisdiction for Binance.com so users located in the U.S. should not have been permitted to access the platform. To purportedly enforce the restriction, Binance.com implemented IP address-based compliance controls, sometimes referred to as "geofencing," that collected a customer's IP address and compared it to the list of countries Binance.com had purportedly "restricted" from its platform. The geofencing controls implemented by Binance.com, as Defendants' intended, were not effective at preventing customers from restricted countries, such as the U.S., from opening accounts and using the Binance.com platform.

81. In fact, Binance.com provided U.S.-based users with instructions for how to evade Binance.com's geofence. One method was through the use of virtual private networks, or "VPNs." To evade geo-location tracking monitors, a customer need only use a VPN that "spoofs" the user's actual location. Instead of marking his or her IP address with a location in the United States, the Binance.com user employs a VPN so that Binance.com's records will reflect that the user is logging in from a non-U.S. territory supported by Binance.

82. At least as early as April 2019, Binance.com published a guide on the "Binance Academy" section of its website called "A Beginner's Guide to VPNs," which hinted, "you might want to use a VPN to unlock sites that are restricted in your country."

83. One such VPN specifically promoted by Binance is PureVPN, which describes the simple process as follows:




84. As PureVPN explains, as long as the location the user chooses through his/her VPN is a non-U.S. country supported by Binance.com, the user's log-in to Binance will proceed unfettered:



85. Binance's senior management, including Zhao, knew the Binance VPN guide was used to teach U.S. customers to circumvent Binance.com's IP address-based compliance controls. According to the CFTC Complaint, in a March 2019 chat, Lim explained to his colleagues that "CZ wants people to have a way to know how to vpn to use [a Binance functionality] . . . it's a biz decision." And in an April 2019 conversation between Binance's Chief Financial Officer and Lim regarding Zhao's reaction to controls that purported to block customers attempting to access Binance from U.S.-based IP addresses, Lim said: "We are actually pretty explicit about [encouraged VPN use] already – even got a fking guide. Hence CZ is ok with blocking even usa."

86. Binance senior management, including Lim, have used other workarounds to indirectly instruct Binance.com customers to evade Binance's IP address-based compliance controls. For example, according to the CFTC Complaint, in a July 8, 2019 conversation regarding customers that ought to have been "restricted" from accessing the Binance platform, Lim explained to a subordinate: "they can use vpn but we are not supposed to tell them that . . . it cannot come from us…but we can always inform our friends/third parties to post (not under the umbrella of Binance) hahah."

**Defendants' Failure to Implement KYC and AML Procedures Enabled Bad Actors to Launder Crypto at the Binance Crypto-Wash Enterprise**

87. Even though Binance.com operated in substantial part in the U.S., Binance's KYC and AML protocols, as required by the BSA, were inadequate and essentially nonexistent and failed to come close to industry standards. Defendants' decision to prioritize growth over compliance with U.S. legal requirements meant that it facilitated billions of dollars of cryptocurrency transactions on behalf of its customers without implementing appropriate KYC procedures or conducting adequate transaction monitoring.

88. Thieves laundered stolen cryptocurrency through Binance.com because Binance failed to implement security measures that would confirm its accountholders lawfully possessed the cryptocurrency deposited in Binance.com accounts, including the ones in which Plaintiffs' stolen cryptocurrency were deposited.

89. A primary way that Binance.com facilitated transactions by bad actors was by permitting customers to open accounts, trade crypto on its exchange, and withdraw substantial amounts of cryptocurrency without requiring more than a user's email address and password. Unlike legitimate virtual currency exchanges, Binance.com does not require these users to validate their identity information by providing official identification documents, given that Binance.com does not require an identity at all. Accounts were therefore easily opened anonymously, including by users in the United States within Florida.

90. Binance's practices encouraged cryptocurrency hackers and thieves to steal cryptocurrency and launder it at Binance.com by breaking the cryptocurrency into amounts of 2 BTC or less, depositing it at Binance.com, converting the illegally-obtained asset, and withdrawing it from Binance.com – all without providing identification. As a direct and proximate result of Defendants and co-conspirators failure to comply with KYC and AML rules and regulations, Plaintiffs and the Class had crypto stolen and laundered at the Binance Crypto-Wash Enterprise.

91. Due in part to Binance's failure to implement KYC and an effective AML program, bad actors used Binance.com's exchange in various ways, including: (i) operating mixing services that obfuscated the source and ownership of cryptocurrency; (ii) transacting illicit proceeds from ransomware variants; and (iii) moving proceeds of darknet market transactions, exchange hacks, and various internet-related scams.

92. Defendants had actual knowledge that their KYC and AML policies were inadequate but knowingly kept them in place to drive revenue and profit. Defendants knew that U.S. users, in violation of U.S. law, accessed Binance.com with a VPN and got around KYC by breaking down withdrawals into amounts of up to 2 BTC per day.

93. According to a chat referenced in the CFTC Complaint, in February 2019, Lim chatted to CZ: "a huge number" of Binance's "TIER 1 [meaning customers trading via the two BTC-no KYC loophole] could be U.S. citizens in reality. They have to get smarter and VPN through non-U.S. IP." And, according to the CFTC Complaint, CZ stated during a management meeting in June 2019 that the "under 2 BTC users is [sic] a very large portion of our volume, so we don't want to lose that," although he also understood that due to "very clear precedents," Binance's policy of allowing "those two BTCs without KYC, this is definitely not possible in the United States."

94. According to a January 2019 chat referenced in the CFTC Complaint between Lim and a senior member of the compliance team discussing their plan to "clean up" the presence of U.S. customers on Binance, Lim explained: ***"Cz doesn't wanna do us kyc on [binance].com."*** And according to the CFTC Complaint, Lim acknowledged in February 2020 that Binance had a financial incentive to avoid subjecting customers to meaningful KYC procedures, as ***Zhao believed that if Binance's compliance controls were "too stringent" then "[n]o users will come."***

95. According to the CFTC Complaint, in an October 2020 chat between Lim and a Binance colleague, Lim explained:

> [Because you attended a telephone conference on which Zhao participated] then you will also know that as a company, we are probably not going to remove no kyc (email registration) because its too painful . . . i think cz understands that there is risk in doing so, but I believe this is something which concerns our firm and its survivability. If Binance forces mandatory KYC, then [competing digital asset exchanges] will be VERY VERY happy.

96. According to a May 13, 2021 article in Bloomberg titled *Binance Faces Probe by U.S. Money-Laundering and Tax Sleuths*, more funds connected with criminal activity flowed through Binance.com than any other crypto exchange:

> Binance Holdings Ltd. is under investigation by the [United States] Justice Department and Internal Revenue Service, ensnaring the world's biggest cryptocurrency exchange in U.S. efforts to ***root out illicit activity*** that's thrived in the red-hot but mostly unregulated market.
>
> The firm, like the industry it operates in, has succeeded largely outside the scope of government oversight. Binance is incorporated in the Cayman Islands and has an office in Singapore but says it lacks a single corporate headquarters. Chainalysis Inc., a blockchain forensics firm whose clients include U.S. federal agencies, concluded last year that among transactions that it examined, ***more funds tied to criminal activity flowed through Binance than any other crypto exchange***.

97. Defendants Binance and CZ admit in their DOJ Plea Agreements that due to Binance's "willful failure to implement an effective AML program, ***[Binance] processed transactions by users who operated illicit mixing services and laundered proceeds of darknet market transactions, hacks, ransomware, and scams***."

98. Instead of preventing bad actors from using Binance.com as required under U.S. law, Defendants took steps to ensure bad actors had access to the Binance Crypto-Wash Enterprise by turning a blind eye to the wide variety of money and cryptocurrency laundering they knowingly facilitated through Binance.com. As of May 2022, Binance had not filed a single Suspicious Activity Report ("SAR") in the United States. According to the FinCEN Consent Order, however, "FinCEN identified well ***over a hundred thousand suspicious transactions*** that Binance failed to timely and accurately report to FinCEN." In fact, according to the FinCEN Consent Order, Binance's former CCO "reported to other Binance personnel that the senior management policy was to never report any suspicious transactions."

99. The unreported suspicious transactions fall into several categories, including ransomware, terrorist financing, high-risk jurisdictions, darknet markets and scams. Ransomware is malicious software that restricts the victim's access to a computer in exchange for a specified ransom, usually paid in bitcoin. If the specified ransom is not paid, the victim may be threatened with the loss or exposure of their personal data, including personally identifiable information ("PII"), such as account numbers and social security numbers. According to the FinCEN Consent Order: "***[s]ome ransomware operators, including those located in Iran and North Korea, have purposefully targeted U.S. hospitals, schools, and other vital public services***"; "***Binance reportedly became one of the large receivers of ransomware proceeds***"; and "Binance was ***aware of the significant uptick in ransomware activity as early as February 2019***." And even though "Binance was aware of many specific movements of ransomware proceeds through the platform," Binance railed to file SARs with the FinCEN, according to the FinCEN Consent Order.

100. ***The FinCEN Consent Order lists numerous suspicious transactions involving tens of millions of dollars*** which Binance ignored and failed to file SARs. According to the FinCEN Consent Order, "Binance addresses transacted directly with CVC [convertible virtual currency - the preferred payment method of ransomware perpetrators] obtained via attacks associated with at least 24 different unique strains of ransomware, including: Bitpaymer, Cerber, Cryptolocker, CryptoWall, CrySIS-Dharma, Erebus, Hermes, Locky, NetWalker, NotPetra, Nozelesn, Phobos, Popotic, Ryuk, SamSam, Satan, Snatch, Sodinokibi, Spora, TorrentLocker, and both strains of WannaCry."

101. In 2019, even though ***Binance.com deposit addresses were directly linked to millions of dollars' worth of Nozelesn ransomware proceeds***, "Binance's former Chief Compliance Officer instructed his team to take no action as the addresses were associated with a high-value client who

had indirect exposure to a darknet market." And when Binance was notified by law enforcement of suspicious activity, it often resisted cooperating and demanded indemnification before proving any reporting.

102. Binance's lack of KYC and AML procedures also enabled numerous terrorist organizations to benefit from Binance's platform. According to the FinCEN Consent Order, "Binance user addresses were found to interact with bitcoin wallets associated with the Islamic State of Iraq and Syria (ISIS), Hamas' Al-Qassam Brigades, Al Qaeda, and the Palestine Islamic Jihad (PIJ)."

103. According to the FinCEN Consent Order, Binance had significant, ongoing exposure to Russian illicit finance, including:

> (i) processing hundreds of millions of dollars in transactions for a CVC exchange co-owned by a Russian citizen who pled guilty to money laundering in February 2023, including transactions effected after this individual's guilty plea; (ii) processing several million dollars for a CVC exchange that allowed its users to "cash out" at a Russian bank designated by OFAC and that had substantial exposure to the Russian darknet market Hydra Market; and (iii) as recently as the summer of 2023, continuing to effect transactions with the darknet market Russia Market, one of the largest cybercrime service websites in the world.

104. Between August 2017 and April 2022, there were direct transfers of approximately ***$106 million*** in bitcoin to Binance.com wallets ***from Hydra***, a popular Russian darknet marketplace frequently utilized by criminals that facilitated the sale of illegal goods and services. These transfers occurred over time to a relatively small number of unique addresses, which indicates "cash out" activity by a repeat Hydra user, such as a vendor selling illicit goods or services.

105. From February 2018 to May 2019, Binance processed more than ***$275 million*** in deposits and more than ***$273 million*** in withdrawals ***from BestMixer*** – one of the largest cryptocurrency mixers in the world until it was shut down by Dutch authorities in May 2019.

106. According to the CFTC Complaint, in February 2019, after receiving information ***"regarding HAMAS transactions" on Binance***, Lim explained to a colleague that terrorists usually send "small sums" as "large sums constitute money laundering." Lim's colleague replied: "can barely buy an AK47 with 600 bucks." And referring to certain Binance.com customers, including customers from Russia, Lim acknowledged in a February 2020 chat: ***"Like come on. They are here for crime."*** Binance's Money Laundering Reporting Officer agreed that ***"we see the bad, but we close 2 eyes."***

107. Even when illicit actors or high-risk users were identified in certain instances, Defendants allowed those individuals to continue to access the platform - particularly if they were VIP users. ***Defendant CZ was against getting rid of users who were affiliated with illegal activities*** and if an account was identified as suspicious, his preferred method of handling the situation was for the user to create a new account. For example, Defendants Binance and CZ admit in their DOJ plea agreements to the following from the DOJ SOF:

(a) In July 2020, Binance's chief compliance officer ("Individual 1" or "Binance's CCO") and others discussed a VIP user who was off boarded after being publicly identified as among the "top contributors to illicit activity." Individual 1 wrote that, as a general matter, Binance's compliance and investigation teams should check a user's VIP level before off boarding them, and then Binance.com could "give them a new account (if they are important/VIP)" with the instructions "not to go through XXX channel again."; and

(b) In another conversation, Binance's CCO referenced Hydra. With respect to the same specific VIP user, Binance's CCO wrote, "[c]an let him know to be careful with his flow of

funds, especially from darknet like hydra . . . [h]e can come back with a new account . . . [b]ut this current one has to go, its tainted."

108. According to the CFTC Complaint, Defendant Lim's instruction to a Binance employee to allow a customer "very closely associated with illicit activity" to open a new account and continue trading on the platform is consistent with CZ's business strategy, which has counseled against off-boarding customers even if they presented regulatory risk. The CFTC Complaint cited a September 2020 chat where Lim explained to Binance employees that they "Don't need to be so strict" and "Offboarding = bad in cz's eyes."

109. According to the FinCEN Consent Order, "Binance also received substantial proceeds from the September 2018 hack of the Zaif exchange by facilitating hundreds of transactions involving stolen funds. Binance acknowledged that CVC wallet addresses on Binance were used to launder 1,451.7 bitcoin (over $9.5 million) from the hack, which was broken into 1.99-2 (over $13,000) bitcoin transactions." According to the FinCEN Consent Order, "A senior Binance manager recommended against closing these accounts, stating, 'I think there is no meaning to take more effort to these addresses. It's a type of standard money laundering…'"

110. According to the CFTC Complaint, Lim has displayed a nuanced understanding of applicable regulatory requirements and the potential individual liability that may accompany a failure to comply with U.S. law. For example, in October 2020 Lim chatted to a colleague:

> US users = CFTC = civil case can pay fine and settle
>
> no kyc = BSA act [sic] = criminal case have to go [to] jail

**In Violation of U.S. Law, Binance.com Permitted Transactions from Anonymous Users in the United States and by Users from Sanctioned Jurisdictions**

111. A substantial amount of cryptocurrency theft is perpetrated by users located in sanctioned nations and Defendants were aware that Binance.com had a significant customer base from comprehensively sanctioned jurisdictions from its inception. For example, according to a February 1, 2023 report on Chainalysis.com titled *2022 Biggest Year Ever For Crypto Hacking with $3.8 Billion Stolen, Primarily from DeFi Protocols and by North Korea-linked Attackers*, in 2022, "North Korea-linked hackers such as those in cybercriminal syndicate Lazarus Group" stole "an estimated $1.7 billion worth of cryptocurrency across several hacks." Additionally, individuals and groups based in Russia, some of whom have been sanctioned by the United States, "account for a disproportionate share of activity in several forms of cryptocurrency-based crime," according to the 2022 Crypto Crime Report by Chainalysis. According to that report, approximately $400 million in crypto illegally obtained through ransomware in 2021 was affiliated with Russia.

112. Nevertheless, Defendants refused to implement policies required under U.S. law in order to prevent bad actors from sanctioned nations from using Binance.com's platform. Since a substantial amount of cryptocurrency theft is perpetrated by individuals located in sanctioned jurisdictions, Defendants' failure to restrict those transactions proximately caused the laundering of stolen crypto at the Binance Crypto-Wash Enterprise.

113. Defendants knew that U.S. law prohibited U.S. persons from conducting certain financial transactions with countries, groups, entities, or persons sanctioned by the U.S. government. Defendants knew that Binance.com serviced users from these comprehensively sanctioned jurisdictions and that these users were prohibited from conducting transactions with U.S. persons. Defendants further knew that Binance.com's matching engine, which matched customer bids and

offers to execute cryptocurrency trades, had been designed to execute cryptocurrency trades based on price and time without regard to whether the matched customers were prohibited by law from transacting with one another.

114. Defendants knew that Binance.com did not block transactions between users subject to U.S. sanctions and U.S. users and that its matching engine would necessarily cause such transactions, in violation of U.S. law. Nevertheless, Defendants did not implement the necessary controls that would have prevented Binance.com from causing U.S. users to conduct cryptocurrency transactions with users in comprehensively sanctioned jurisdictions. Accordingly, Defendant Zhao and others knew that Binance.com would violate U.S. law by matching U.S. users with users in comprehensively sanctioned jurisdictions, but it did not implement effective controls to prevent such sanctions violations from occurring.

115. According to the DOJ SOF, Individual 1 was aware of developments in the U.S. sanctions laws through regular email updates regarding U.S. sanctions from OFAC and other third parties. Individual 1 disseminated some of this information about U.S. sanctions to colleagues and senior leaders, including CZ.

116. According to the DOJ SOF, in an October 2018 chat, Individual 1 sent a message to Zhao about the sanctions risk to Binance.com's business and the need to develop a sanctions strategy: "Cz I know it's a pain in the ass but its [sic] my duty to constantly remind you . . . [a]re we going to proceed to block sanctioned countries ip addresses ([as] we currently have users from sanction countries on [Binance ].com)[.]" Individual 1 continued to note, "[d]ownside risk is if fincen or ofac has concrete evidence we have sanction [sic] users, they might try to investigate or blow it up big on worldstage." While Zhao responded "yes, let's do it," Zhao and Binance senior

management knew that IP address blocks could be circumvented by users accessing Binance through a VPN. Binance did not, in any event, block IP addresses of sanctioned countries at that time.

117. Senior leaders understood that Binance.com risked violating sanctions laws. For example, on or about June 9, 2019, after a meeting among senior leaders about Binance's U.S. strategy, CZ explained Binance.com's sanctions risk to another senior leader: "The United States has a bunch of laws to prevent you and Americans from any transaction with any terrorist," adding, "you only need to serve Americans or service U.S. sanctioned country" and then Binance would need to "give all data" to the U.S. government.

118. Knowing the risk of violating U.S. sanctions, CZ authorized a remediation of Binance.com's sanctions risk between late 2018 and early 2019, whereby Binance.com's compliance team would identify users from comprehensively sanctioned jurisdictions and work with Binance's operations team to implement controls to prevent those users from accessing the platform. However, as Defendants Binance and CZ admit in the DOJ Plea Agreements, Defendants refused to devote sufficient resources to the remediation effort so Binance.com continued to permit users from sanctioned jurisdictions.

119. According to the DOJ SOF, Individual 1 explained the goal of the remediation was to "ensure OFAC compliance" and "ensure we have documented records and steps taken should we be approached by various regulators." However, senior Binance leaders including CZ and Individual 4 (Binance's operations director and member of senior management) knew that the remedial measures Binance.com purported to implement, such as limited KYC and IP blocking, would be ineffective, since most users at that time provided Binance.com with limited KYC information, and users could

easily access Binance's platform by using VPNs to change their IP address to an address associated with a country that was not comprehensively sanctioned.

120. Despite Binance.com's purported remediation in 2018 and 2019, users in the United States and from comprehensively sanctioned countries continued to access Binance.com, and Binance's matching engine continued to cause transactions between U.S. persons and users in comprehensively sanctioned jurisdictions, in violation of U.S. law.

121. In November 2019, about a year after Binance.com claimed it had begun to block users in comprehensively sanctioned jurisdictions, an FBI inquiry caused Binance.com to identify approximately 600 "verified level 2" users from Iran.

122. According to Defendants' own data detailed in the DOJ SOF, between August 2017 and October 2022, Binance caused millions of dollars of transactions between U.S. users and users in other comprehensively sanctioned jurisdictions, including Cuba, Syria, and the Ukrainian regions of Crimea, Donetsk, and Luhansk. Defendants profited from the transactions that it caused in violation of IEEPA and various U.S. sanctions regimes.

123. According to the settlement agreement between Binance and the OFAC, Binance.com permitted at least 1,667,153 virtual currency transactions valued at approximately $706,068,127 in apparent violation of the below U.S. sanctions programs:

(a) **Iran**: Binance.com matched and executed 1,205,784 trades totaling $599,515,938 in virtual currency and futures products between U.S. persons and persons located in Iran in apparent violation of the prohibition against the direct or indirect exportation, reexportation, sale or supply of goods or service to Iran.

(b) **Syria**: Binance.com matched and executed 42,609 trades totaling $17,965,226 in virtual currency and futures products between U.S. persons and persons located in Syria in apparent violation of the prohibition against the direct or indirect exportation, reexportation, sale or supply of goods or service to Syria.

(c) **North Korea**: Binance.com matched and executed 80 trades totaling $43,745.88 in virtual currency and futures products between U.S. persons and persons located in Iran in apparent violation of the prohibition against the direct or indirect exportation, reexportation, sale or supply of goods or service to North Korea.

(d) **Crimea Region of Ukraine**: Binance.com matched and executed 409,295 trades totaling $86,977,789 in virtual currency and futures products between U.S. persons and persons located in the Crimea Region of Ukraine in apparent violation of the prohibition against the direct or indirect exportation, reexportation, sale or supply of goods or service to the Crimea Region of Ukraine.

(e) **Cuba**: Binance.com matched and executed 9,315 trades totaling $1,535,225 in virtual currency and futures products between U.S. persons and persons located in Cuba in apparent violation of the prohibition against the direct or indirect exportation, reexportation, sale or supply of goods or service to Cuba.

124. Had Defendants implemented sufficient controls to prevent U.S. users from transacting with users in comprehensively sanctioned jurisdictions, it could have prevented Binance.com's matching engine from causing those users to transact on Binance.com's platform.

**Binance Created Binance.US to Distract Regulators so Binance.com Could Continue Doing "Business as Usual" with U.S. Customers and Bad Actors**

125. Defendants knew Binance.com's substantial U.S. user base required it to register with FinCEN and comply with the BSA. Rather than registering with FinCEN and complying with the BSA, in furtherance of the Binance Crypto-Wash Enterprise, Defendants established Binance.US as a U.S.-based exchange in 2019, which would register with FinCEN and conduct KYC, and purportedly be targeted for Binance's U.S. users. Binance.US registered as an MSB with FinCEN in or around June 2019. Binance.US was wholly owned by CZ through the legal entity BAM Trading Services, Inc.

126. In reality, a primary purpose of Binance.US was to enable Binance.com to continue evading U.S. legal and regulatory requirements and reduce regulatory pressure on Binance.com. Even though Binance blocked some U.S. users who did not use a VPN on Binance.com and redirected them to Binance.U.S., Defendants continued to allow U.S.-based users to use Binance.com with a VPN and took steps to ensure that some of the largest U.S. users remained on the Binance.com platform.

127. CZ, who controlled the operations of Binance.US, kept information reflecting Binance.US's customer base secret even from certain senior managers and was cautious about sharing data with a broad audience. According to the CFTC Complaint, in a March 2019 discussion regarding the circulation of data that categorized Binance users by geographic location, CZ said, "Let me see it first then, and not distribute it, especially guys who have to deal with US regulators." And in an August 2020 chat referenced in the CFTC Complaint, CZ instructed a Binance employee that transaction volume data concerning U.S. [Application Program Interface] customers should not be published to a group; rather, such data should be sent only to CZ.

128. The idea for the creation of Binance.US as a distraction for U.S. regulators was proposed in late 2018 when Binance engaged a consultant for managing its risk related to U.S. law enforcement. The consultant outlined various aspects of Binance's exposure to U.S. laws, including federal MSB registration, BSA compliance, AML policies and procedures, sanctions laws, and state money transmitting licensing, among other legal and regulatory requirements. The consultant proposed various avenues through which Defendants could mitigate Binance's regulatory exposure, ranging from the "low-risk" option of fully complying with U.S. laws, the "moderate-risk" option of establishing a formal U.S. presence subject to U.S. laws that would absorb U.S. regulatory scrutiny, and the "high-risk" option of maintaining the status quo, whereby Binance would continue to operate in the U.S. without taking steps to comply with U.S. laws. The consultant further provided guidance for Defendants to pursue the "moderate-risk" option: establishing a U.S. entity, indirectly controlled by Binance, which would become the focus of U.S. law enforcement and regulatory authorities and allow Binance to continue to profit from the U.S. market.

129. Although Defendants did not adopt the consultant's recommendations as offered, Binance's senior leaders decided to create and launch a U.S.-based exchange that would register with FinCEN and conduct KYC on all users. Defendants' "retail" users would, gradually, be directed to move from Binance.com to the new U.S.-based exchange. But Defendants would develop and execute various strategies to allow some high-volume, VIP U.S. users to continue to access Binance.com. Importantly, any user which desired to continue using Binance.com needed only a VPN to do so.

130. According to the DOJ SOF, in February 2019, CZ established "U.S. Exchange and Main Exchange - Compliance [P]arameters" within which Binance would allow U.S. users from

U.S.-located internet protocol (IP) addresses with non-U.S. KYC information to continue to access Binance.com through an API. A senior manager advised CZ that "U.S. legal" had identified a strategy "to allow the US big traders to be able [] to trade via API on the main site, but not everyone." CZ proposed that these U.S. users could "remain on main exchange [Binance] or move over to US exchange. However if they want to move over to US exchange, they have to perform US KYC."

131. In or around June 2019, Binance publicly announced that it would block U.S. users from Binance.com and launch a separate U.S. exchange. According to the DOJ SOF, Zhao and Individuals 1 and 2 helped launch the new U.S. exchange, including registering it as an MSB with FinCEN and obtaining state money transmitting licenses ("MTLs"). Individual 2 reported to Binance's other senior leaders regarding the status of the entity's MSB registration and MTLs, which they understood the new entity would need to operate lawfully in the United States.

132. As described above and detailed in the DOJ SOF, although Binance announced it would block U.S. users and establish a separate exchange that would serve the U.S. market, Binance retained a substantial portion of its U.S. user base on Binance.com, with a particular focus on the largest U.S.-based VIPs, including the trading firms that made markets on Binance.com. On or about June 3, 2019, Zhao sought and requested information regarding the number of U.S. VIPs on Binance.com as identified by KYC, and his assistant informed him that Binance.com had more than 1,100 U.S. KYC VIP users. On a June 9, 2019 recorded call among senior Binance leaders, including Zhao, Individual 3 stated that Binance had more than 3,500 VIPs from the United States, based on KYC and IP address information, and the total number of U.S. and non-U.S. VIP and enterprise users accounted for more than 70% of Binance.com's revenue. On a June 25, 2019 call

among senior leaders, Individual 3 further noted that Binance's approximately 11,000 VIPs accounted for more than 70% of its trading revenue. Of that 70% of trading revenue, U.S. VIPs accounted for about one-third.

133. According to the DOJ Information, rather than lose high-volume U.S. VIP users, Binance employees, acting on instruction from Binance's senior leaders, including Zhao and Individuals 1, 3, and 4, encouraged such users to conceal and obfuscate their U.S. connections, including by creating new accounts and submitting non-U.S. KYC information in connection with those accounts. Senior Binance leaders discussed this strategy on internet-based calls in or around June 2019.

134. For example, during a June 25, 2019 call alleged in the DOJ Information, including, among others, Zhao and Individuals 1, 3, and 4, the participants discussed and agreed to strategies to keep U.S. VIPs on Binance.com and, as Zhao noted to, "achieve a reduction in our own losses and, at the same time, to be able to have U.S. supervision agencies not cause us any troubles" and to achieve the "goal" of having "US users slowly turn into to [sic] other users." Zhao acknowledged that Binance "cannot say this publicly, of course."

135. As alleged in the DOJ Information, during the same call on or around June 25, 2019, Binance employees and executives, including Individuals 3 and 4, told Zhao that they were implementing the plan by contacting U.S. VIP users "offline," through direct phone calls, "leav[ing] no trace." If a U.S. VIP user owned or controlled an offshore entity, *i.e.*, located outside of the United States, Binance's VIP team would help the VIP user register a new, separate account for the offshore entity and transfer the user's VIP benefits to that account, while the user transferred their holdings to the new account. As Binance's VIP manager acknowledged, however, some of these

offshore entities were owned by U.S. persons. On the same call on or around June 25, 2019, Individual 3 described a script that Binance employees could use in communications with U.S. VIPs to encourage them to provide non-U.S. KYC information to Binance by falsely suggesting that the user was "misidentified" in Binance's records as a U.S. customer. Zhao authorized and directed this strategy, explaining on the call, "[W]e cannot say they are U.S. users and we want to help them. We say we mis-categorized them as U.S. users, but actually they are not."

136. Also during the call on or around June 25, 2019, Individual 1 provided guidance on what Binance should not do: "We cannot advise our users to change their KYC. That's, that's of course against the law." Individual 1 provided an alternative route to the same end: "But what we can tell them is through our internal monitoring, we realize that your account exhibits qualities which makes us believe it is a US account . . . if you think we made a wrong judgment, please do the following, you know, and we have a dedicated customer service VIP service officer." Individual 1 described Defendants' plan as "international circumvention of KYC."

137. According to the DOJ Information, Defendants agreed to and implemented this strategy to keep U.S. VIP users on Binance.com as documented in an internal document titled "VIP handling." Document metadata reflects that the "VIP handling" document was last modified by Individual 1 on June 27, 2019.

138. The "VIP handling" document provided templates for messages that employees would send to U.S. users "in batches . . . as recommended by CZ" describing the impending and purported block of U.S. users from Binance.com and launch of Binance.US. The document also provided scripts for Binance representatives to use in follow-up communications by phone or

through an encrypted internet-based messaging service to help U.S. users continue to access Binance.com despite the purported block.

139. For VIP users that had submitted U.S. KYC documents, the "VIP handling" document instructed Binance representatives to, among other things, "[m]ake sure the user has completed his/her new account creation with no US documents allowed," and to "[m]ake sure to inform user to keep this confidential." The document further instructed representatives: "We cannot tell users in any way we are changing their KYC, this is not compliant. We are basically correcting previously inaccurate records in light of new evidence."

140. For VIP users that had not submitted KYC information and were blocked due to accessing Binance via a U.S. IP address, the "VIP handling" ***document instructed Binance representatives to surreptitiously counsel the user to hide their U.S. location*** by, among other things, "[i]nform the user that the reason why he/she cant [sic] use our [binance.com url] is because his/her IP is detected as US IP [sic]," and ***"[i]f the user doesn't get the hint, indicate that IP is the sole reason why he/she can't use .com."*** The document further instructed representatives not to "[e]xplicitly instruct user to use different IP. We cannot teach users how to circumvent controls. If they figure it out on their own, its [sic] fine."

141. Through these strategies, including after Binance.US went live in September 2019, Binance maintained a substantial number of U.S. users on Binance.com, including U.S.-based VIP users and bad actors, that at times conducted virtual currency transactions equivalent to billions of U.S. dollars per day, helping provide the liquidity necessary for Binance.com.

142. Defendants' strategy of launching Binance.US to enable Binance.com to continue doing business in the U.S. was successful. By September 2020, Binance.com attributed

approximately 16% of its total registered user base to the United States, more than any other country on Binance.com, according to an internal monthly report that listed the approximate number and percentage of registered users by country. The following month, Binance.com removed the United States label from this report and recategorized U.S. users with the label "UNKWN." In October 2020, according to the internal monthly report, "UNKWN" users represented approximately 17% of Binance.com's registered user base.

143. According to Binance.com's own transaction data, U.S. users conducted trillions of dollars in transactions on the platform between August 2017 and October 2022 alone, generating approximately $1,612,031,763 in profit for Binance.

**Plaintiffs and the Class Suffered Financial Harm from the Binance Crypto-Wash Enterprise**

144. As a result of Binance's conduct and systemic failures to require KYC and implement AML, Plaintiffs and Class Members have been damaged.

145. For example, on or about April 7, 2021, an unauthorized person(s) without permission infiltrated Plaintiff Osterer's Coinbase account and stole approximately 8.06 BTC and 449 ETH.

146. The 8.06 BTC were transferred to a High Risk (or "Illicit") wallet (ICGMU9***) which is known in the cryptocurrency industry to have been maintained by suspected criminals or dark web users beyond KYC or AML standard protocols and which has been marked for its potential or likely illicit activity as a "high risk address."

147. From that known high risk wallet, the assets stolen from Plaintiff Osterer were then deposited into three Binance.com deposit addresses. The following is a graphic representation of the path of those stolen assets, with the three Binance recipient addresses denoted in red:



148. Similarly, the 449 ETH stolen from Plaintiff Osterer were commingled with other stolen assets and – within a few short, readily traceable steps – were deposited into Binance addresses as well (also denoted in red):




149. The ~7.2 BTC transferred from Plaintiff Osterer's Coinbase account were placed into three Binance.com deposit addresses (each of the three Binance.com addresses with Bitcoin are listed in the second column below entitled "Destination Address"), and the ~449 ETH transferred from Plaintiff Osterer's Coinbase account were placed into two Binance.com deposit addresses (addresses listed in the "Destination Address" column of the second table below) (the "Binance Addresses"):

| Owner name (Destination Address) | Destination Address | Cryptocurrency Unit | Transaction Hash | Transaction Data (UTC) | Assets Traced |
|---|---|---|---|---|---|
| Binance | 1CuK7WJzhMFKjMbaAjGdr9AS8yPyLKCWKV | BTC | 99cff9ebc3ba9df19e4eadc72021684976573b0288ff1c5f0f17d18b52c319a6 | 2021-04-19 01:48:57 | 0.99118689 |
| Binance | 1CuK7WJzhMFKjMbaAjGdr9AS8yPyLKCWKV | BTC | 4ad15110f932f1ab2d9e4ac1ffc7a16998ec62dc99adb34e8444581d447b8f58 | 2021-04-20 22:22:07 | 0.99120653 |

| Owner name (Destination Address) | Destination Address | Cryptocurrency Unit | Transaction Hash | Transaction Data (UTC) | Assets Traced |
|---|---|---|---|---|---|
| Binance | 1CuK7WJzhMFKjMbaAjGdr9AS8yPyLKCWKV | BTC | 5aac10367738095ba1504a67e4f3158ac0e97d37dd105fd542956fd55551ed3c | 2021-04-20 22:22:07 | 0.24782794 |
| Binance | 1CuK7WJzhMFKjMbaAjGdr9AS8yPyLKCWKV | BTC | 677ba3b35784f43a0720cb8262738a936d85770b9477f7f10688ca0640d35ed8 | 2021-04-21 00:47:31 | 1.58496257 |
| Binance | 1DWGELgbxLbUx4hnQ6xHZ5vf9PWdrbDG3d | BTC | c26be788548d43f39015bdf1b14920cd66b133df8dfb7455f55c420d615f5db4 | 2021-04-08 11:01:10 | 0.47896794 |
| Binance | 1DWGELgbxLbUx4hnQ6xHZ5vf9PWdrbDG3d | BTC | e4aacf5d4460dd49fdfddb6c61d441b1be1d74b6ea78ea4cf150b7eaf7725ed0 | 2021-04-09 09:22:38 | 0.95446480 |
| Binance | 1HNpJxeuDAFKdiuwP4nM4Kiy2qDLBsfvwW | BTC | 0b6796cdc14ad86c4f71d2a6071b696810c0ea0c388955be0387de246145208a | 2021-04-27 09:45:14 | 1.96331746 |

| Owner name (Destination Address) | Destination Address | Cryptocurrency Unit | Transaction Hash | Transaction Data (UTC) | Assets Traced |
|---|---|---|---|---|---|
| Binance | 464dbcfb2c0c19a69f256f6939bf0f7ec431029b | ETH | bac5a2eea5c01d43231021027588d172fb747639300c50ae5f93f33cb660f884 | 2021-04-20 10:48:41 | 0.56377600 |
| Binance | 464dbcfb2c0c19a69f256f6939bf0f7ec431029b | ETH | 7e423a5666009ef152a203aae0035cd0bbe28b234d41dc84ccac45a4a5c3da41 | 2021-04-22 20:59:13 | 37.04301406 |
| Binance | 464dbcfb2c0c19a69f256f6939bf0f7ec431029b | ETH | 03d9e21ba7c7b936e3a221b85961d5218384326b96571b8bb4f52c47f7b4db6a | 2021-04-22 21:04:15 | 181.1834608 1 |
| Binance | fa83a2caaee8f9999eef09bb8072a4c665f543e5 | ETH | a491efc7f124f441e6cb29844abae976607a8e4bd5fbb09f036f0aac556b13ba | 2021-04-27 09:50:20 | 96.16559617 |
| Binance | fa83a2caaee8f9999eef09bb8072a4c665f543e5 | ETH | 38148d296463bc8e8b677caa092a8533e739ec5eaabe4d763c8087b3068740a1 | 2021-04-27 10:03:05 | 96.35504905 |
| Binance | fa83a2caaee8f9999eef09bb8072a4c665f543e5 | ETH | 618b6ec5f7d5aec0fe86c910b62a7756e6f00f80373d6be589eb8bc6d58c39b | 2021-05-03 06:47:13 | 37.99143571 |

150. All the transfers of Plaintiff Osterer's BTC to Binance.com were within Binance's 2 BTC limit under which no form of identification was required to deposit cryptocurrency.

151. As of the date this action was initiated, the approximately 7.2 BTC and 449 ETH are together valued equivalent to about $1,635,000.00 (USD).

152. The crypto taken from the other Plaintiffs and members of the Class and transferred to Binance.com followed similar types of paths as those described above with respect to Plaintiff

Osterer's crypto. Each of the Plaintiffs and members of the Class had their crypto removed from their wallets as a result of a hack, ransomware, or theft and ultimately laundered at Binance.com. As a direct and proximate result of Binance's policies and failures described herein, Plaintiffs and Class members suffered financial harm when their digital assets were taken and laundered through Binance.com.

**Binance and CZ Controlled BAM and Binance and BAM Are Alter Egos**

153. Plaintiffs are informed and believe, based on information available in the public domain, that BAM's and Binance's operations at all times material hereto have both been controlled entirely by CZ, and the entities' operations and funds are commingled to such an extent that it would be inequitable to recognize their existence as separate entities.

154. At all relevant times, and in connection with the matters alleged herein, CZ controlled and owned the majority of Binance and BAM and they constitute a single enterprise with unity of interest. CZ has been an officer and director of BAM and Binance at all relevant times. According to the SEC Complaint, between October 2022 and January 2023, CZ personally received $62.5 million from one of the Binance bank accounts.

155. According to the SEC Complaint, the ownership structure of Defendants, their platforms, and related entities can be visualized as follows:




156. At all relevant times, and in connection with the matters alleged herein, each Defendant acted as an agent, servant, partner, joint venturer, and/or alter ego of the other, and acted in the course and scope of such agency, partnership, and relationship and/or in furtherance of such joint venture. Each Defendant acted with the knowledge and consent of the other Defendant and/or directed, authorized, affirmed, consented to, ratified, encouraged, approved, adopted, and/or participated in the acts or transactions of the other Defendants as described herein. Recognition of the privilege of separate existence under such circumstances would promote injustice, as described below.

157. As alleged above, Binance created BAM Trading in 2019 as a de-facto subsidiary to draw the scrutiny of U.S. regulators away from Binance.com. An October 29, 2020 Forbes article titled *Leaked Tai Chi Document Reveals Binance's Elaborate Scheme to Evade Bitcoin Regulators* discusses how Binance.US was formed as a distraction, stating in part:



4860-9392-3265.v1

> The 2018 document details plans for a yet-unnamed U.S. company dubbed the "Tai Chi entity," in an allusion to the Chinese martial art whose approach is built around the principle of "yield and overcome," or using an opponent's own weight against him. While Binance appears to have gone out of its way to submit to U.S. regulations by establishing a compliant subsidiary, Binance.US, an ulterior motive is now apparent. Unlike its creator Binance, Binance.US, which is open to American investors, does not allow highly leveraged crypto-derivatives trading, which is regulated in the U.S.
>
> The leaked Tai Chi document, a slideshow believed to have been seen by senior Binance executives, is a strategic plan to execute a bait and switch. While the then-unnamed entity set up operations in the United States to distract regulators with feigned interest in compliance, measures would be put in place to move revenue in the form of licensing fees and more to the parent company, Binance. All the while, potential customers would be taught how to evade geographic restrictions while technological work-arounds were put in place.

158. According to the CFTC Complaint, "Binance personnel, including [CZ], have dictated [BAM's] corporate strategy, launch, and early operations. At [CZ's] direction, [BAM's] marketing and branding has mirrored that of Binance.com. [BAM] has licensed Binance's trademarks to advertise in the United States. [BAM] has also relied on one of Binance's matching engines through a software licensing agreement."

159. According to the CFTC Complaint, in the first three months of 2021, Binance transferred more than $400 million from BAM to a trading firm managed by CZ (Merit Peak Ltd.), some of which was later sent to the Silvergate Bank account of a Seychelles-incorporated firm called Key Vision Development Limited, which was another entity controlled by CZ.

160. A March 8, 2023 article on CNBC.com titled *Crypto-focused bank Silvergate is shutting operations and liquidating after market meltdown*, stated that Susan Li, a Binance finance executive, had full access to the BAM account at California-based Silvergate Bank, which in May 2023 shut down operations and liquidated its assets.

161. On June 5, 2023, *Reuters* reported in an article titled *Crypto giant Binance controlled "independent" U.S. affiliate's bank accounts*, that Binance executive Guangyin Chen was authorized by Silvergate Bank to operate five bank accounts belonging to BAM: "Employees at the affiliate, [BAM], had to ask Chen's team to process payments, even to cover the firm's payroll, company messages show."

162. The CFTC Complaint states in part:

> Binance's corporate organizational chart includes over 120 entities incorporated in numerous jurisdictions around the world. At times, at least certain of those entities, including Binance Holdings, Binance IE, and Binance Services have commingled funds, relied on shared technical infrastructure, and engaged in activities to collectively advertise and promote the Binance brand.
>
> Binance's reliance on a maze of corporate entities to operate the Binance platform is deliberate; it is designed to obscure the ownership, control, and location of the Binance platform . . .
>
> Binance is so effective at obfuscating its location and the identities of its operating companies that it has even confused its own Chief Strategy Officer. For example, in September 2022 he was quoted as saying that "Binance is a Canadian company." The Chief Strategy Officer's statement was quickly corrected by a Binance spokesperson, who clarified that Binance is an "international company."

163. Binance does not observe corporate formalities. It has no board of directors but was controlled entirely by CZ at all times materially herein. The CFTC Complaint states: "As part of [an] audit, the Binance employee who held the title of Money Laundering Reporting Officer ("MLRO") lamented that she 'need[ed] to write a fake annual MLRO report to Binance board of directors wtf.' [Chief Compliance Officer Samuel] Lim, who was aware that Binance did not have a board of directors, nevertheless assured her, 'yea its fine I can get mgmt. to sign' off on the fake report."

164. According to the CFTC Complaint, CZ has managed all aspects of both Binance.com's and Binance.US's operations, stating in part: "Zhao is ultimately responsible for evaluating the legal and regulatory risks associated with Binance's business activities, including those related to the launch of [BAM]."

165. CZ was involved in the hiring of BAM's first CEO, who reported to and was directed by CZ and the Binance CFO throughout her tenure from June 2019 through about March 2021, according to the SEC Complaint. She referred to Binance as the "mothership" and provided weekly updates to CZ and Binance concerning BAM's operations. At least for a significant period of time after BAM Trading launched, Binance held and controlled BAM data offshore, and at least for much of 2021, BAM employees could not obtain certain real-time trading data for the Binance.US platform without CZ's personal approval.

166. According to the SEC Complaint, BAM Trading's second CEO testified to SEC staff that the "level of . . . connection" between Binance and BAM was a "problem" and that he had concluded that BAM "need[ed] to migrate the technology to full [BAM] control." As of at least BAM's second CEO's resignation in August 2021, no such transfer of control had happened.

167. According to a June 10, 2023 article on Forbes.com titled *5 Most Surprising Revelations from the SEC's Binance Lawsuit*, Brian Brooks, a former chief executive of Binance.US who resigned three months after taking the job, said that "what became clear to me at a certain point was CZ was the CEO of BAM Trading, not me."

168. According to the CFTC Complaint, CZ micromanaged all aspects of Defendants' operations. For example, in January 2021, a month in which Binance earned over $700 million in revenue, CZ personally approved an approximately $60 expense related to office furniture.

Moreover, according to the SEC Complaint, CZ's approval was required for all BAM expenditures over $30,000 through at least January 30, 2020. BAM regularly sought approval from CZ and Binance concerning routine business expenditures including rent, franchise taxes, legal expenses, Amazon Web Services fees to host BAM customer data, and even an $11,000 purchase of Binance-branded hooded sweatshirts.

169. According to the SEC Complaint, BAM "employees referred to [CZ's] and Binance's control of [BAM's] operations as 'shackles' that often prevented [BAM] employees from understanding and freely conducting the business of running and operating the Binance.US platform – so much so that, by November 2020, [BAM's] then-CEO told Binance's CFO that her 'entire team feels like [it had] been duped into being a puppet.'" The same day the Binance.US platform was announced, a consultant for Binance provided Binance with internal guidelines advising that: "On the U.S. launch, it is important to NOT link it to the .COM IP blocking [of U.S. investors]. That would suggest both that Binance is aware of previous violation and that BAM and .COM are alter egos of each other coordinating the work."

170. Binance required that CZ and/or the Binance Back Office Manager had signatory authority over BAM bank accounts, according to the SEC Complaint. Until at least December 2020, the Binance Back Office Manager was a signatory of BAM's bank accounts. Until at least July 2021, she was also a signatory on BAM Trading Trust Company B accounts that contained BAM customers' fiat deposits.

171. Furthermore, Binance's finance team managed payment of BAM's expenses, including by executing money transfers between bank accounts and depositing cash injections from Merit Peak when BAM operating funds were low, according to the SEC Complaint. Binance's

finance team was even able to make substantial fund transfers without BAM's knowledge, including in June 2020 as to billions of dollars in BAM's own accounts.

172. In addition, at least through December 2022, Binance was the designated custodian for crypto assets deposited, held, traded, and/or accrued on BAM, and could authorize transfer of crypto assets, including between various omnibus wallets, without then need for any authorization from BAM, according to the SEC Complaint. And, as of May 2023, CZ still had signatory authority over BAM's account that held BAM's customers' funds.

## RICO ALLEGATIONS

173. Defendants engaged in a fraudulent scheme, common course of conduct and conspiracy to gain market share and generate revenues for Binance by enabling bad actors to launder stolen cryptocurrency through Binance.com.

174. To achieve these goals, Defendants set up and managed the Binance Platform, including Binance.com and Binance.US, in a manner that willfully violated U.S. laws and regulations requiring adequate KYC or AML policies so that bad actors and U.S. sanctioned entities could create accounts, engage in cryptocurrency transactions, and deposit and withdraw cryptocurrency. As a direct result of their conspiracy and fraudulent scheme, Defendants generated massive amounts of fees and bad actors laundered cryptocurrency through the Binance Platform which was taken from Plaintiffs and the Class as a result of hacks, ransomware, and theft.

### The Binance Crypto-Wash Enterprise

175. Binance was formed in 2017 and since that time has operated cryptocurrency trading platforms, including the platform located at Binance.com. Defendant CZ was Binance's primary founder, majority owner, and CEO and made the strategic decisions for Binance and exercised day-

to-day control over its operations and finances. Additionally, in his pursuit of maximizing revenues and market share, CZ oversaw and directed Binance's strategy of willfully disregarding KYC and AML laws and regulations so that customers could use Binance.com anonymously, from the United States, and from sanctioned jurisdictions.

176. Defendant BAM Trading is a Delaware corporation with a principal place of business in Miami, Florida. BAM Management is a Delaware corporation and the parent of BAM Trading and other affiliated entities. When the Binance.US Platform launched in 2019, BAM Management was wholly owned by BAM Management Company Limited, a Cayman Islands company, which in turn was wholly owned by CPZ Holdings Limited, a British Virgin Islands company that was owned and controlled by CZ.

177. Zhao, along with a core senior management group, made the strategic decisions for Binance, BAM Trading, and the Binance Platform, and exercised day-to-day control over their operations and finances.

178. Defendants Zhao and Binance, including the Binance.com platform, constituted an "enterprise" (the "Binance Crypto-Wash Enterprise") within the meaning of 18 U.S.C. §1961(4) since the start of the Class Period, through which Defendants Binance and Zhao (and later BAM Trading) conducted the pattern of racketeering activity described herein.

179. During 2019, in connection with and in furtherance of the Binance Crypto-Wash Enterprise, Binance and CZ expanded the Binance Crypto-Wash Enterprise to include Defendant BAM Trading, including the Binance.US platform. At all times relevant herein, CZ owned 100 percent of CPZ Holdings Limited, which owned 100 percent of BAM Management Company Limited, which in turn owned 81 percent of BAM Management, which in turn owned 81 percent of

BAM Trading, including Binance.US. Alternatively, BAM Trading and the Binance.US platform were associated-in-fact with Binance and CZ for a number of common and ongoing purposes, including executing and perpetrating the scheme alleged herein, and constituted an "enterprise" within the meaning of 18 U.S.C. §1961(4), the activities of which affected interstate commerce, because it involved commercial and financial activities across state lines, including through the operation of websites over the Internet and the transmission of cryptocurrency.

180. Therefore, the Binance Crypto-Wash Enterprise operated the Binance.com platform beginning in 2017 and operated both the Binance.com and Binance.US platforms beginning in 2019 (collectively, the "Binance Platform"). Zhao has directly or indirectly owned the various entities that collectively operate the Binance Platform. The Binance Crypto-Wash Enterprise engaged in, and its activities affected, interstate commerce, including through the operation of websites over the Internet and through the transmission of cryptocurrency.

181. Zhao has directly or indirectly owned the various entities that collectively operate the Binance Platform. Zhao, along with a core senior management group, made the strategic decisions for Binance, BAM Trading and the Binance Platforms and exercised day-to-day control over their operations and finances.

182. Defendant Zhao exercised substantial control over the affairs of the Binance Crypto-Wash Enterprise, through, among other methods and means, the following:

(a) Providing the initial operating capital and holding most of the shares of Binance and holding approximately 81 percent of the shares of BAM Trading;

(b) Devising the strategy to maximize revenues and gain market share by violating the BSA by willfully causing Binance.com to fail to implement and maintain the necessary KYC requirements or an effective AML program;

(c) Communicating to Binance's employees his overall strategy of maximizing revenues and gaining market share by not requiring the collection of the necessary KYC information and thereby willfully violating KYC and AML laws;

(d) Deciding to create BAM Trading and orchestrating the scheme to use Binance.US as a distraction for U.S. regulators so that Binance.com could continue serving U.S. customers and customers from sanctioned jurisdictions; and

(e) Managing the day-to-day affairs of Binance.com and Binance.US with the purpose of ensuring Binance's most valuable customers could continue using the Binance.com platform.

183. Defendants Binance, BAM Trading and Zhao exercised control over and directed the affairs of the Binance Crypto-Wash Enterprise through, among other things, using Binance's and BAM Trading's core senior management group to direct critical aspects of the Binance Crypto-Wash Enterprise operations, including the following:

(a) Individual 1 identified in the DOJ SOF served as Binance's CCO from April 2018 until around June 2022. Individual 1 built and directed the compliance protocols of Binance and BAM Trading during much of the Class Period which failed to comply with KYC and AML laws and regulations. Individual 1 also instructed other Binance employees to avoid complying with those laws, communicated Defendant Zhao's strategy of willfully avoiding the laws, and provided

suggestions to employees about what to communicate to customers to ensure they could continue to use Binance.com, even though it violated KYC and AML laws and regulations.

(b) Zhao and Individuals 1, 3, and 4 encouraged users to conceal and obfuscate their U.S. connections, including by creating new accounts and submitting non-U.S. KYC information in connection with those accounts. Senior Binance leaders discussed this strategy on internet-based calls in or around June 2019.

(c) Zhao and Individuals 1 and 2 helped launch the new U.S. exchange, including registering it as an MSB with FinCEN and obtaining state money transmitting licenses.

184. The Binance Crypto-Wash Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. §1961(4), as individuals and other entities associated-in-fact for the common purpose of engaging in Defendants' profit-making scheme.

185. The Binance Crypto-Wash Enterprise was an ongoing and continuing organization consisting of legal entities, such as a corporation and limited liability company, as well as individuals associated for the common or shared purpose of ensuring that Binance did not implement adequate KYC or AML policies so that Binance.com could generate massive fees and liquidity from the maximum number of people and increase market share, in violation of the law.

186. The Binance Crypto-Wash Enterprise functions by generating fees from cryptocurrency transactions by customers. Many customers were not bad actors and used the Binance Platform for legitimate purposes. However, Defendants, through the Binance Crypto-Wash Enterprise, have engaged in a pattern of racketeering activity which also enabled bad actors to use the Binance Platform to launder stolen cryptocurrency so that it could not be tracked or recovered.

187. The Binance Crypto-Wash Enterprise engages in and affects interstate commerce because it involves commercial and financial activities across state boundaries, such as through the operation of the Binance.com and Binance.US platforms over the Internet and through the transmission of cryptocurrency into and out of Binance.com, and over Binance.com's exchange.

188. At all relevant times herein, each participant in the Binance Crypto-Wash Enterprise was aware of the scheme.

189. Defendants were each knowing and willing participants in the scheme and reaped revenues and/or profits therefrom.

190. The Binance Crypto-Wash Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants engaged. The Binance Crypto-Wash Enterprise is separate and distinct from each of the Defendants.

**RICO Conspiracy**

191. Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy.

192. Defendants have engaged in a conspiracy to maximize revenues and/or market share for Defendants and their unnamed co-conspirators through the scheme alleged herein.

193. The objectives of the conspiracy are: (a) to execute the scheme; (b) to enable customers to use Biance.com without Binance.com requiring KYC or implementing AML policies, including U.S.-based users and users from sanctioned jurisdictions; and (c) to gain market share and maximize fees and liquidity.

194. To achieve these goals, Defendants willfully disregarded U.S. laws and regulations and encouraged bad actors to launder crypto at Binance.com. Defendants have also agreed to

participate in other illicit and fraudulent practices, all in exchange for agreement to, and participation in, the conspiracy.

195. Each Defendant and member of the conspiracy, with knowledge and intent, has agreed to the overall objectives of the conspiracy and participated in the common course of conduct to enable U.S.-based users and sanctioned users to launder crypto at Binance.com.

196. As a result of Defendants' illegal scheme and conspiracy, Plaintiffs and the Class had crypto taken from them as a result of hacks, ransomware, or theft and laundered at Binance.com. But for Defendants' scheme, Plaintiffs and the Class would not have had their crypto stolen and then laundered at Binance.com so that the crypto was no longer traceable on the blockchain. Therefore, the damages that Defendants caused Plaintiffs and the Class may be measured, at a minimum, by the dollar value of the cryptocurrency taken from Plaintiffs and the Class as the result of illegal conduct, such as hacks, ransomware or theft, which was laundered through Binance.com.

**Pattern of Racketeering Activity**

197. Defendants, each of whom is a person associated-in-fact with the Binance Crypto-Wash Enterprise, knowingly, willfully, and unlawfully conducted or participated, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5) and 1962(c). The racketeering activity was made possible by Defendants' regular and repeated use of the facilities, services, distribution channels, and employees of the Binance Crypto-Wash Enterprise.

198. Defendants each committed multiple "Racketeering Acts," as described below, including aiding and abetting such acts.

199. The Racketeering Acts were not isolated, but rather were related in that they had the same or similar purposes and results, participants, victims, and methods of commission. Further, the Racketeering Acts were continuous, occurring on a regular, and often daily, basis beginning in July 2017 and depending upon the act, continuing until 2022/23 or today, and the harm of those Racketeering Acts continue to today.

200. Defendants participated in the operation and management of the Binance Crypto-Wash Enterprise by directing its affairs, as described above.

201. In devising and executing the scheme to enable Binance.com to be used by U.S.-based customers and sanctioned users, including bad actors laundering cryptocurrency, Defendants *inter alia*, (i) committed, and aided and abetted, acts constituting indictable offenses under 18 U.S.C. §1960 (relating to illegal money transmitters) and 18 U.S.C. §1961(1)(E) (act indictable under the Currency and Foreign Transactions Reporting Act aka the Bank Secrecy Act (BSA), and (ii) aided and abetted acts constituting indictable offenses under 18 U.S.C. §§1956 (laundering of monetary instruments), 1957 (engaging in monetary transactions in property derived from specified unlawful activity), and 2314 (relating to interstate transportation of stolen property). For the purpose of executing the scheme to maximize revenues and market share for Binance.com in violation of KYC and AML rules and regulations, Defendants committed these Racketeering Acts, which number in the millions, intentionally, and knowingly with, the specific intent to advance the illegal scheme.

202. Defendants committed, and aided and abetted, acts constituting indictable offences under 18 U.S.C. §1960 (relating to illegal money transmitters) and the BSA as follows:

(a) Defendants understood that because Binance.com served a substantial number of U.S. users, it was required to register with FinCEN as an MSB and therefore required under the

BSA to implement an effective AML program. Nevertheless, Binance.com did not register with FinCEN as an MSB or implement an effective AML program. In fact, Defendants willfully violated the BSA by enabling and causing Binance.com to have an ineffective AML program, including a failure to collect or verify KYC information from a large share of its users.

(b) Defendants Binance and CZ, aided and abetted by Defendant BAM, conducted, and conspired to conduct, Binance as an unlicensed MTB from approximately July 2017 to at least October 2022 in violation of 18 U.S.C. §§1960(a) and 1960(b)(1)(B), and failed to maintain an effective AML program, in violation of the BSA, including, 31 U.S.C. §§5318(h), 5322.

(c) Binance was required to develop, implement, and maintain an effective AML program that was reasonably designed to prevent Binance.com from being used to facilitate money laundering and the financing of terrorist activities, and Defendants Binance and CZ willfully failed to do so in violation of 31 U.S.C. §5318(h)(1) and 31 C.F.R. §1022.210. Additionally, Binance was required to accurately, and timely, report suspicious transactions to FinCEN, and Defendants Binance and CZ willfully failed to do so in violation of 31 U.S.C. §5318(g) and 31 C.F.R. §1022.320.

(d) Defendants CZ and BAM Trading aided and abetted the conducting of Binance as an unlicensed MTB in violation of 18 U.S.C. §§1960(a) and 1960(b)(1)(B); and 2, as CZ admitted in his plea agreement with the DOJ, and in that Binance.US was used to distract U.S. regulators from focusing on Binance's violations of the law which enabled Binance.com to act as an unlicensed MTB without adequate KYC or AML policies and serve U.S.-based bad actors and customers from sanctioned jurisdictions. As alleged above, Defendants Binance, CZ, and BAM Trading created Binance.US as a distraction to regulators to enable Binance to continue doing

business with U.S.-based customers and customers located in sanctioned jurisdictions, including bad actors who used Binance.com to launder cryptocurrency taken from Plaintiffs and the Class a result of hacks, ransomware or theft.

(e) These Racketeering Acts were not isolated, but rather were related in that they had the same or similar purposes and results, participants, victims, and methods of commission. For example, between June 2017 and into 2022 alone, more than a million U.S. retail users from around the nation conducted more than 20 million deposit and withdrawal transactions worth $65 billion on Binance.com. These users conducted more than 900 million spot trades worth more than $550 billion. Over this same period, Binance.com relied on U.S. trading firms to make markets on the exchange and provide needed liquidity.

(f) As a result of Binance's and CZ's failure to implement adequate controls requiring KYC and AML policies and blocking illegal transactions with sanctioned users and bad actors, Defendants Binance and CZ willfully enabled bad actors to launder cryptocurrency at Binance.com.

203. Additionally, Defendants aided and abetted acts constituting indictable offenses under 18 U.S.C. §§1956 (laundering of monetary instruments), 1957 (engaging in monetary transactions in property derived from specified unlawful activity), and 2314 (relating to interstate transportation of stolen property) as follows:

(a) Defendants' scheme of maximizing revenues from all customers, including bad actors and users in sanctioned jurisdictions, by failing to implement KYC and AML procedures for Binance.com, turned Binance.com into a hub and magnet for criminals and other bad actors to

launder cryptocurrency. The operation of Binance.com as a means to launder crypto aided and abetted the laundering of the crypto by bad actors.

(b) Since approximately July 2017, Binance.com processed millions of dollars in transactions by bad actors who took cryptocurrency from Plaintiffs and the Class as a result of hacks, ransomware, or theft and utilized Binance.com to launder the crypto and/or to transfer the crypto through their Binance.com accounts and out of Binance.com in violation of 18 U.S.C. §1956 (laundering of monetary instruments) and 18 U.S.C. §1957 (engaging in monetary transactions in property derived from specified unlawful activity). Additionally, the illegally obtained cryptocurrency was transported, transmitted, or transferred in interstate or foreign commerce to or from Binance.com in violation of 18 U.S.C. §2314 (relating to interstate transportation of stolen property). Defendants Binance and CZ aided and abetted those actions constituting indictable offenses.

(c) These Racketeering Acts were not isolated, but rather were related in that they had the same or similar purposes and results, participants, victims, and methods of commission. For example, between August 2017 and April 2022, there were direct transfers of approximately $106 million in bitcoin to Binance.com wallets from Hydra, a popular Russian darknet marketplace frequently utilized by criminals. Similarly, from February 2018 to May 2019, Binance.com processed more than $275 million in deposits and more than $273 million in withdrawals from BestMixer – one of the largest cryptocurrency mixers in the world.

(d) Furthermore, even though Binance and CZ have entered into a settlement with the DOJ and agreed to implement KYC and AML procedures, to this day bad actors continue to

attempt to use Binance.com as a means to launder crypto and have transferred stolen cryptocurrency to Binance.com as late as March 2024, if not later.

204. Defendants and third parties have exclusive custody or control over the records reflecting the precise dates, amounts, locations and details of the millions of transactions at Binance.com in violation of the Racketeering Acts in violation of 18 U.S.C. §1960 (relating to illegal money transmitters), 18 U.S.C. §1961(1)(E) (act indictable under the Currency and Foreign Transactions Reporting Act aka the Bank Secrecy Act ("BSA"), 18 U.S.C. §§1956 (laundering of monetary instruments), 1957 (engaging in monetary transactions in property derived from specified unlawful activity), and 2314 (relating to interstate transportation of stolen property).

## CLASS ACTION ALLEGATIONS

205. Plaintiffs bring this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Class:

> All persons or entities in the United States whose cryptocurrency was removed from a digital wallet, account, or protocol as a result of a hack, ransomware, or theft and, between June 6, 2019 and the date of Judgment, transferred to a Binance.com account, and who have not recovered all of their cryptocurrency which was transferred to Binance.com (the "Class").

206. Excluded from the proposed Class are Defendants and co-conspirators, and their officers, directors, agents, trustees, parents, corporations, trusts, representatives, employees, principals, partners, joint ventures and entities controlled by Defendants; their heirs, successors, assigns or other persons or entities related to, or affiliated with, Defendants; and the Judge(s) assigned to this action; and any member of their immediate families. Also excluded from the proposed Class are any persons or entities which engaged in the hack, ransomware, or theft which

resulted in the removal of the Class members' cryptocurrency or any persons or entities which transferred the crypto to Binance.com.

207. Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment, amended complaint or at class certification proceedings.

208. **Numerosity**: Class Members are so numerous that joinder of all individual members is impracticable. While the exact number and identities of the Class Members are unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs allege that the Class is comprised of thousands of individual members geographically disbursed throughout the United States. The number of Class Members and their geographical disbursement renders joinder of all individual members impracticable if not impossible. Upon information and belief, Binance and third-parties, including firms such as Chainalysis, possess lists of wallet addresses which would enable Plaintiffs to identify crypto which has been taken from Plaintiffs and members of the class as a result of a hack, ransomware, or theft and transferred to Binance.com by bad actors.

209. **Existence and Predominance of Common Questions**: There are questions of fact and law common to Plaintiffs and the Class Members that predominate over any questions affecting solely individual members including, *inter alia*, the following:

(a) Whether Binance knowingly failed to implement or maintain adequate KYC and AML policies;

(b) Whether Binance and CZ employed a strategy of maximizing revenues and gaining market share by encouraging U.S.-based customers to use Binance.com;

(c) Whether Defendants used Binance.US as a distraction for regulators so Binance.com could continue doing business with U.S.-based users and sanctioned users;

(d) Whether Defendants committed civil RICO violations pursuant to 18 U.S.C. §§1962(c)-(d);

(e) Whether Defendants aided and abetted the conversion of cryptocurrency stolen from Plaintiffs and Class members;

(f) Whether Plaintiffs and Class Members have been harmed and the proper measure of relief;

(g) Whether Defendants' actions proximately caused harm to Plaintiffs and Class Members;

(h) Whether Defendants were unjustly enriched as a result of their wrongful conduct;

(i) Whether Plaintiffs and the Class Members are entitled to an award of damages, treble damages, attorneys' fees and expenses; and

(j) Whether Plaintiffs and the Class Members are entitled to equitable relief, and if so, the nature of such relief.

210. **Typicality**: Plaintiffs' claims are typical of the claims of the members of the proposed Class. Plaintiffs and Class Members have been injured by the same wrongful practices of Defendants. Plaintiffs' claims arise from the same practices and conduct that give rise to the claims of all Class Members and are based on the same legal theories.

211. **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' claims are coextensive with, and not antagonistic to, the claims of other Class Members.

Plaintiffs are willing and able to vigorously prosecute this action on behalf of the Class, and Plaintiffs have retained competent counsel experienced in litigation of this nature.

212. **Superiority**: A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for Class Members, on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, even if Class Members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

213. Adequate notice can be given to Class Members directly using information maintained in Defendants' and/or third-party records or through notice by publication.

## CAUSES OF ACTION

## COUNT I

### Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1962(c)-(d) (Against All Defendants)

214. Plaintiffs re-allege and adopt by reference the allegations above contained in ¶¶1-152, 173-213, as if fully set forth herein.

215. This Count I is brought against Defendants Binance, BAM Trading, and Zhao.

216. This claim arises under 18 U.S.C. §§1962(c) and (d), which provide in relevant part:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .
>
> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section.

217. At all relevant times, Defendants were "persons" within the meaning of 18 U.S.C. §1961(3), because each Defendant was an individual or "capable of holding a legal or beneficial interest in property." Defendants were associated with an illegal enterprise, as described below, and conducted and participated in that enterprise's affairs though a pattern of racketeering activity, as defined by 18 U.S.C. §1961(5), consisting of numerous and repeated uses of the interstate wire communications to execute a scheme to operate Binance.com in violation of the law in violation of 18 U.S.C. §1962(c).

218. The Binance Crypto-Wash Enterprise was created and/or used as a tool to carry out the elements of Defendants' illicit scheme and pattern of racketeering activity. The Binance Crypto-Wash Enterprise has ascertainable structures and purposes beyond the scope and commission of Defendants' predicate acts and conspiracy to commit such acts. The enterprise is separate and distinct from Defendants.

219. The members of the RICO enterprise all had the common purpose to maximize Binance's revenues and market share by running Binance.com as a crypto exchange with virtually non-existent KYC or AML policies to serve U.S.-based customers and customers from sanctioned

jurisdictions, including bad actors who engaged in the laundering of cryptocurrency obtained as the result of hacks, ransomware, and theft.

220. The Binance Crypto-Wash Enterprise has engaged in, and its activities affected, interstate and foreign commerce by operating two websites on the Internet (Binance.com and Binance.US) which served customers located throughout the United States, and received and sent cryptocurrency throughout the United States and the world and operated cryptocurrency exchanges facilitating the exchange of cryptocurrency between users in the United States and around the world.

221. The Binance Crypto-Wash Enterprise actively disguised the nature of Defendants' wrongdoing and concealed or misrepresented Defendants' participation in the conduct of the Binance Crypto-Wash Enterprise to maximize profits and market share while minimizing their exposure to criminal and civil penalties.

222. Each of the Defendants exerted substantial control over the Binance Crypto-Wash Enterprise, and participated in the operation and managed the affairs of the enterprise as described herein.

223. Defendants have committed or aided and abetted the commission of at least two acts of racketeering activity, *i.e.*, indictable violations of 18 U.S.C. §§1960, 1961(1)(E), 1956, 1957, and 2314, within the past ten years. The multiple acts of racketeering activity which Defendants committed and/or conspired to, or aided and abetted in the commission of, were related to each other, began in 2017 and would have continued and posed a threat of continued racketeering activity if it were not for the DOJ and other actions against Defendants, and therefore constitute a "pattern of racketeering activity."

224. Even after Defendants Binance and Zhao agreed to comply with AML and KYC regulations and settled with the DOJ, some of the acts of racketeering activity are continuing since bad actors continue to launder crypto at the Binance Crypto-Wash, including stolen crypto sent to Binance.com as late as March 2024.

225. Defendants' predicate acts of racketeering within the meaning of 18 U.S.C. §1961(1) include, but are not limited to:

(a) **Operated Unlicensed MTB and Violated BSA**: Defendants Binance and CZ, aided and abetted by Defendant BAM Trading, conducted, and conspired to conduct, Binance.com as an unlicensed MTB from approximately July 2017 to at least October 2022 in violation of 18 U.S.C. §§1960(a) and 1960(b)(1)(B), and failed to maintain an effective AML program, in violation of the BSA, including, 31 U.S.C. §§5318(h), 5322. Defendants willfully violated the BSA by causing Binance to have an ineffective AML program, including a failure to collect or verify KYC information from a large portion of its users.

(b) Defendants CZ and BAM Trading aided and abetted the conducting of Binance.com as an unlicensed MTB in violation of 18 U.S.C. §§1960(a) and 1960(b)(1)(B); and 2, in that Binance.US was used to distract U.S. regulators from focusing on Binance's violations of the law which enabled Binance.com to act as an unlicensed MTB without adequate KYC or AML policies and serve U.S.-based bad actors and customers from sanctioned jurisdictions. Defendants' failure to implement KYC or AML policies and targeting of U.S.-based users turned Binance.com into a magnet and hub for illicit cryptocurrency transactions.

226. **Monetary Laundering and Transportation of Stolen Property**: Binance.com processed millions of dollars in transactions by bad actors who took cryptocurrency from Plaintiffs

and the Class through hacks, ransomware, theft and/or deceptive conduct and utilized Binance.com to remove the ability to track the crypto and/or to transfer the crypto through their Binance.com accounts and/or out of Binance.com in violation of 18 U.S.C. §1956 (laundering of monetary instruments) and 18 U.S.C. §1957 (engaging in monetary transactions in property derived from specified unlawful activity). Additionally, the illegally obtained cryptocurrency was transported, transmitted, or transferred in interstate or foreign commerce to or from Binance.com in violation of 18 U.S.C. §2314 (relating to interstate transportation of stolen property). Defendants aided and abetted those violations as alleged above.

227. Many of the precise dates and details of the use of Binance.com to launder and transfer cryptocurrency cannot be alleged without access to Defendants' books and records. Indeed, the success of Defendants' scheme depended upon secrecy, and Defendants have withheld details of the scheme from Plaintiffs and Class Members. Generally, however, Plaintiffs have described occasions on which the predicate acts alleged herein would have occurred. They include the transfer of millions of dollars in cryptocurrency over several years.

228. Defendants have obtained money and property belonging to Plaintiffs and the Class as a result of these statutory violations. Plaintiffs and Class Members have been injured in their business or property by Defendants' overt acts, and by their aiding and abetting the acts of others.

229. In violation of 18 U.S.C. §1962(d), Defendants conspired to violate 18 U.S.C. §1962(c), as alleged herein. Various other persons, firms and corporations, not named as defendants in this Complaint, have participated as co-conspirators with Defendants in these offenses and have performed acts in furtherance of the conspiracy.

230. Each Defendant aided and abetted violations of the above laws, thereby rendering them indictable as a principal in the 18 U.S.C. §§1960, 1961(1)(E), 1956, 1957, and 2314, offenses pursuant to 18 U.S.C. §2.

231. Plaintiffs and the Class have been injured in their property by reason of Defendants' violations of 18 U.S.C. §§1962(c) and (d), including the value of their cryptocurrency taken by bad actors which was transferred to Binance.com. In the absence of Defendants' violations of 18 U.S.C. §§1962(c) and (d), Plaintiffs and the Class would not have had their crypto taken and laundered through Binance.com.

232. Plaintiffs' and the Class's injuries were directly and proximately caused by Defendants' racketeering activity.

233. Defendants willfully violated the laws requiring KYC and AML policies and knew that bad actors were transferring crypto to and from Binance.com, and exchanging that crypto on Binance.com's exchange, and that, as a result, the crypto would no longer be trackable on the public blockchain.

234. Under the provisions of 18 U.S.C. §1964(c), Plaintiffs are entitled to bring this action and to recover treble damages, the costs of bringing this suit and reasonable attorneys' fees. Defendants are accordingly liable to Plaintiffs and the Class for three times their actual damages as proven at trial plus interest and attorneys' fees.

## COUNT II

## Conversion
## (Against Defendants Binance and Zhao)

235. Plaintiffs re-allege and adopt by reference the allegations above contained in ¶¶1-172, 205-213, as if fully set forth herein.

236. This Count II is brought against Defendants Binance and Zhao (the "Count II Defendants").

237. At the time their cryptocurrency was taken by bad actors by hacks, ransomware, or theft, Plaintiffs owned and had the right to immediately possess the cryptocurrency in their respective private cryptocurrency wallets, protocols, and/or accounts at cryptocurrency exchanges other than Binance.com, not just a mere right to payment for the value of that cryptocurrency.

238. Class members also owned and had the right to immediately possess their stolen cryptocurrency that was later deposited into Binance.com addresses.

239. As can be done with Plaintiffs' specific, identifiable cryptocurrency, Class members' cryptocurrency assets at issue are specific, identifiable property and can be traced to and from Binance.com accounts.

240. At all relevant times, the Count II Defendants had actual or constructive knowledge that cryptocurrency stolen from Plaintiffs and Class members had been transferred to accounts on Binance.com's exchange.

241. Notwithstanding the knowledge of the custody of stolen assets in a Binance.com account, Binance and CZ accepted the benefit of exchanging Plaintiffs' and Class members' cryptocurrency for other cryptocurrency, thereby converting Plaintiffs' and Class members' cryptocurrency.

242. The Count II Defendants knowingly maintained inadequate KYC and AML policies at Binance.com which enabled cryptocurrency hackers and thieves to launder cryptocurrency through the Binance.com ecosystem without providing valid or sufficient personal identification and proof of lawful possession of the cryptocurrency.

243. The Count II Defendants knew Binance.com KYC and AML policies and procedures, including any tracing analysis of where funds originated, were nonexistent or inadequate. Nevertheless, those inadequacies were ignored, and no effort was taken to utilize reasonable measures to remedy those dangerous shortcomings.

244. As a result of the knowingly inadequate KYC and AML policies, the Count II Defendants were able to retain possession of stolen cryptocurrency, collect significant transaction fees, increase liquidity on the Binance.com exchange, and drive revenue and profits by furthering Binance.com's image as promoters of anonymous and unregulated financial transactions, attracting bad actors, fraudsters and other transacting parties seeking to evade scrutiny.

245. Plaintiffs and Class members are entitled to the value of their stolen cryptocurrency placed in Binance.com addresses and an amount of damages to be proven at trial, plus interest.

**COUNT III**

**Aiding and Abetting Conversion**
**(Against All Defendants)**

246. Plaintiffs re-allege and adopt by reference the allegations above contained in ¶¶1-172, 205-213, as if fully set forth herein.

247. This Count III is brought against Defendants Binance, BAM Trading, and Zhao.

248. At the time their cryptocurrency was taken by bad actors by hacks, ransomware, or theft, Plaintiffs owned and had the right to immediately possess the cryptocurrency in their respective private cryptocurrency wallets, protocols, and/or accounts at cryptocurrency exchanges other than Binance.com, not just a mere right to payment for the value of that cryptocurrency.

249. As can be done with Plaintiffs' specific, identifiable cryptocurrency, Class members' cryptocurrency assets at issue are specific, identifiable property and can be traced to and from Binance.com accounts.

250. At all relevant times, Defendants had actual knowledge that cryptocurrency taken from Plaintiffs and Class members had been transferred to accounts on Binance.com's exchange.

251. Notwithstanding the actual knowledge of the custody of stolen assets in a Binance.com address, Binance did not halt the further movement of that stolen property, which allowed a thief to abscond with, and convert to their own benefit, Plaintiffs' and other Class members' property. Instead, Binance enabled thieves to complete the conversion of cryptocurrency assets.

252. Defendants rendered knowing and substantial assistance to cryptocurrency thieves in their commission of conversion through which they obtained Plaintiffs' and other Class members' cryptocurrency, such that they culpably participated in the conversion.

253. Defendants ignored the law and knowingly maintained inadequate KYC and AML policies which enable cryptocurrency hackers and thieves to launder cryptocurrency through the Binance.com ecosystem without providing valid or sufficient personal identification and proof of lawful possession of the cryptocurrency.

254. Defendants knew that the Binance.com KYC and AML policies and procedures, including any tracing analysis of where funds originated, were nonexistent or inadequate. Nevertheless, they ignored those inadequacies and made no effort to utilize reasonable measures to remedy those dangerous shortcomings. This amounts to "driving the getaway car" for the cryptocurrency thieves with full awareness of the harm being committed.

255. As a result of the knowingly inadequate KYC and AML policies, Binance.com and CZ were able to collect significant transaction fees, increase liquidity on the Binance.com exchange, and drive revenue and profits by furthering their image as promoters of anonymous and unregulated financial transactions, attracting bad actors, fraudsters and other transacting parties seeking to evade scrutiny.

256. In effect, Defendants were consciously participating in the conversion of Plaintiffs' and Class members' cryptocurrency to drive their revenue and profits, such that their assistance in the conversion was pervasive, systemic, and culpable.

257. Defendants knew that Binance.US was being used as a distraction for regulators so that Binance.com could continue serving U.S.-based customers and users from sanctioned entities and that Binance.com had become a magnet and hub for bad actors to launder cryptocurrency.

258. Plaintiffs and Class members are entitled to the value of their stolen cryptocurrency placed in Binance.com addresses and an amount of damages to be proven at trial, plus interest.

**COUNT IV**

**Unjust Enrichment**
**(Against All Defendants)**

259. Plaintiffs re-allege and adopt by reference the allegations above contained in ¶¶1-172, 205-213, as if fully set forth herein.

260. This Count IV is brought against Defendants Binance, BAM Trading, and Zhao.

261. As a result of the stolen cryptocurrency laundered through Binance.com accounts, Defendants were able to collect significant transaction fees, increase liquidity on Binance.com, and drive revenue and profits by furthering their image as promoters of anonymous and unregulated

financial transactions, attracting bad actors, fraudsters and other transacting parties seeking to evade scrutiny.

262. Plaintiffs and Class members conferred benefits upon Defendants in the form of the transaction fees for their cryptocurrency and increased trading liquidity.

263. It would be inequitable for the Defendants to retain those benefits, including profits derived from those benefits.

264. Defendants should reimburse Plaintiffs and Class members for the inequitable retention of the transaction fees and other financial benefits and disgorge their ill-gotten gains into a fund for the benefit of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully pray for relief as follows:

A. Declaring that this action is properly maintainable as a class action and certifying Plaintiffs as the Class representatives and their counsel as Class counsel;

B. Declaring that Defendants' actions, as set forth above, converted Plaintiffs' and Class members' cryptocurrency, or alternatively, aided and abetted conversion of that cryptocurrency, where they knowingly failed to follow KYC or AML policies;

C. Declaring that Defendants were unjustly enriched by their collection of transaction fees on Plaintiffs' and Class members' cryptocurrency taken without permission;

D. Declaring that Defendants committed civil RICO violations pursuant to 18 U.S.C. §§1962(c)-(d);

E. Awarding Plaintiffs and the Class actual, compensatory, and treble damages as allowed by applicable law;

F. Awarding Plaintiffs and the Class restitution and disgorgement of Defendants' ill-gotten gains;

G. Awarding pre-judgment and post-judgment interest at the highest rate allowed by law;

H. Awarding costs, including experts' fees, and attorneys' fees and expenses, and the costs of prosecuting this action; and

I. Granting such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury, pursuant to Fed. R. Civ. P. 38(b), on all issues so triable.

DATED: May 24, 2024

SILVER MILLER
DAVID C. SILVER
Florida Bar No. 572764
JASON S. MILLER
Florida Bar No. 072206

s/ David C. Silver
DAVID C. SILVER

4450 NW 126th Avenue, Suite 101
Coral Springs, FL 33065
Telephone: 954/516-6000
dsilver@silvermillerlaw.com
jmiller@silvermillerlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN (admitted *pro hac vice*)
EVAN J. KAUFMAN (admitted *pro hac vice*)
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
ekaufman@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
ERIC I. NIEHAUS (admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
ericn@rgrdlaw.com

Attorneys for Plaintiff Osterer

HERMAN JONES LLP
JOHN C. HERMAN
3424 Peachtree Road, N.E., Suite 1650
Atlanta, GA 30326
Telephone: 404/504-6555
404/504-6501 (fax)
jherman@hermanjones.com

Additional Attorneys for Plaintiffs

# EXHIBIT 6

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 1:23-cv-22083-RUIZ/Sanchez**

MICHAEL OSTERER,

*Plaintiff*,

v.

BAM TRADING SERVICES, INC. *et al*.,

*Defendants*.

_______________________________________/

# DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO AMEND CLASS ACTION COMPLAINT

## I. INTRODUCTION

Plaintiff Michael Osterer's Motion for Leave to File Amended Class Action Complaint (ECF No. 62) ("Mot." or "Motion for Leave") should be denied as futile because it unduly delays the inevitable: compelling Plaintiff to arbitrate his claims.

Plaintiff filed his Complaint in June 2023. (ECF No. 1.) On July 21, 2023, Defendants[1] filed their Motion to Compel Arbitration or, in the Alternative, to Dismiss Plaintiff's Complaint and Class Action Allegations (ECF Nos. 34 and 49[2]) ("Motion to Compel"). Pursuant to the parties' stipulation, the Court decided it would address the Motion to Compel before requiring the parties to brief (or take discovery on) Defendants' motions to dismiss for lack of jurisdiction and failure to state a claim. (ECF No. 39.) Plaintiff filed his Response to the Motion to Compel on February 2, 2024 (ECF No. 52), and Defendants filed their Reply on February 29, 2024 (ECF No. 55), and a Notice of Supplemental Authority on April 30, 2024 (ECF No. 56).

[1] Defendants are Binance Holdings, Ltd. ("BHL") and BAM Trading Services Inc. ("BAM").

[2] Per the Court's December 5, 2023, order (ECF No. 48), Defendants refiled the Motion to Compel for administrative purposes on December 8, 2023.

Now, after stipulating to the Court first deciding the Motion to Compel, Plaintiff seeks to amend his Complaint based on plea agreements and settlements announced more than 6 months ago and *before* Plaintiff opposed the Motion to Compel. And Plaintiff admits the plea agreements, settlements, and proposed Amended Complaint have no bearing on the pending Motion to Compel. Simply put, Plaintiff's lack of diligence is obvious, and the Motion for Leave should be denied for this reason alone. Moreover, Plaintiff's Motion should be denied because it is futile in light of the pending Motion to Compel and will cause undue delay in deciding what the parties and Court determined to be the threshold issue: arbitrability of Plaintiff's claims.

To be sure, Plaintiff's proposed amendment and the addition of several similarly situated plaintiffs who had their crypto-assets stolen and allegedly deposited onto BHL's cryptocurrency exchange, Binance.com, does not change Plaintiff's theory of liability or Defendants' arguments for compelling arbitration. Plaintiff concedes as much, stating that the proposed Amended Complaint does not "alte[r] the balance of the arguments for or against arbitration." (Mot. at 6.)

At bottom, Plaintiff's Motion for Leave should be denied as futile because the amendment would be immaterial to the Court's determination of the fully-briefed threshold arbitration issues. Indeed, allowing Plaintiff to amend in this way and at this point in the proceeding would unduly delay the Court's resolution of the Motion to Compel, which would, in turn, unfairly prejudice Defendants. For these reasons, the Court should deny leave until the Motion to Compel is decided. *See, e.g., Rivera v. AT & T Corp.*, 420 F. Supp. 2d 1312, 1323 (S.D. Fla. 2006) (compelling arbitration and denying motion for leave to amend where leave was requested after parties fully briefed the motion to compel arbitration, and holding motions for leave to amend should be "denied where leave would cause undue delay or prejudice to the

opposing party," "where prior amendments have failed to cure deficiencies," "if the motive of the amendment is dilatory," or if "the amendment would be futile.").

## II. LEAVE TO AMEND SHOULD BE DENIED

### A. Plaintiff's Lack of Diligence

As a threshold matter, Plaintiff's Motion for Leave should be denied due to Plaintiff's lack of diligence and undue delay. The bases for Plaintiff's Motion for Leave are the purported "new" facts regarding certain guilty pleas and settlements involving, among others, BHL that were announced on November 21, 2023. (*See* Mot. at 2-3). Before the pleas and settlements were announced, however, the Court stayed merits, class, and jurisdictional discovery and ordered Plaintiff to respond to Defendants' Motion to Compel before the parties and Court engage with Defendants' jurisdictional and substantive pleading challenges. (*See* August 1, 2023, Order, ECF No. 39.) Yet Plaintiff waited until now, six months after the guilty pleas and settlements, to offer an Amended Complaint, despite Defendants refiling their Motion to Compel or Dismiss on December 8, 2023. (ECF No. 49.) Rather than seek to amend his Complaint in response to Defendants' renewed motion, Plaintiff responded to the Motion to Compel and waited another three months after that briefing completed before seeking to file the Amended Complaint.

In other words, despite having almost two months to amend his Complaint as a matter of right under Fed. R. Civ. P. 15(a)(1) to include these "new" facts, he decided against doing so. Instead of amending at that time, Plaintiff filed a response in opposition to Defendants' Motion to Compel on February 2, 2024, including argument regarding the very purported facts that he wishes to now include in his Amended Complaint. (*See* ECF No. 52.) Defendants filed a Reply, and completed briefing on the Motion to Compel on February 29, 2024. (ECF No. 55.) Only now, six months after the pleas and settlements, and only after fully digesting the arguments

presented in Defendants' Motion to Compel, does Plaintiff seek to amend his Complaint. (ECF No. 62.)

This is the type of delay that courts find weighs against granting leave to amend. *See, e.g.*, *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1232 (11th Cir. 2008) (finding lack of diligence where the plaintiff waited some **three months** after learning of the need to amend before requesting leave) (emphasis added); *Southern Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1241 n. 3, 1242 (11th Cir. 2009) (finding lack of diligence where the plaintiff "dallied too long" by waiting **over a month** after discovering the need to amend before requesting leave) (emphasis added).

### B. Amendment Would be Futile and Cause Undue Delay Because, as Plaintiff Concedes, It Does Not Alter The Pending Motion to Compel Arbitration

Plaintiff's Motion for Leave should be denied for the additional reason that amendment would be futile. Plaintiff's Motion admits that the Amended Complaint does not "alte[r] the balance of the arguments for or against arbitration." (Mot. at 6.) Since the Amended Complaint does not change the arbitrability of this case, the Motion for Leave is futile and would be nonsensical. Permitting amendment would unnecessarily delay this case by requiring Defendants to re-file a motion to compel arbitration that Plaintiff essentially concedes will carry the same effect as the current, fully-briefed, Motion to Compel. (*See id.*) This is especially true because, as set forth in the Motion to Compel (*see* ECF No. 49), (1) there is a binding and enforceable delegation clause, which grants the arbitrator jurisdiction to decide the threshold issues of arbitrability and (2) if the Court grants the Motion to Compel as to Plaintiff, it is divested of jurisdiction over Plaintiff's claims—meaning Plaintiff would have no claims to amend.

More specifically, Plaintiff's new allegations do nothing to change the fact that the delegation provision within BHL's Terms of Use dictates that all matters of arbitrability,

including who is bound and what claims are arbitrable, are to be decided by the arbitrator in the first instance. In other words, the delegation provision should be enforced, whether the Complaint is amended or not, to determine arbitrability. Thus, Plaintiff's "new" allegations and purported claims are futile since they are "insufficient to avoid arbitration." *See Rivera*, *supra*, 420 F. Supp. 2d at 1323 ("[I]t is noteworthy that Plaintiffs did not file their motion to amend their complaint until after they had reviewed Defendants' papers and evidence supporting the motion to compel arbitration. Plaintiffs' attempt to avoid arbitration by amending their complaint to include non-arbitrable claims is without merit. The new allegations are insufficient to avoid arbitration."); *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008) (denying motion to amend as futile where claims asserted in proposed amended complaint also subject to parties' arbitration agreement).[3]

Moreover, Plaintiff's alleged theory of the case—that '*Defendants intentionally failed to freeze certain assets on the Binance.com exchange in order to obtain transaction fees*'—remains the same. Again, Plaintiff concedes as much. (Mot. at 6.) As set forth by Defendants in their Motion to Compel, this theory of the case is necessarily reliant upon the terms and benefits within BHL's Terms of Use and is therefore subject to arbitration under, among other things, doctrines of estoppel. (*See, e.g.*, ECF No. 49.)[4] Plaintiff's proposed amendment does nothing to

---

[3] Further, notwithstanding the delegation provision, the parties have already presented argument regarding the very facts Plaintiff now wishes to include in the Amended Complaint in the context of Defendants' Motion to Compel. (*See* ECF Nos. 52 and 55.) *See, e.g.*, *Rivera*, 420 F. Supp. 2d at 1323 ("Plaintiffs have already raised these issues in their opposition to AT & T's Motion to Compel Arbitration."). Thus, amendment is wholly unnecessary to the Court's determination of the Motion to Compel.

[4] Plaintiff's new purported RICO claim tries to avoid using the word "transaction fees" to escape arbitration. (*See* Mot., Ex. A ¶ 219 (using phrase "*Binance's revenues*" instead of transaction fees).) This is a distinction without a difference and a futile attempt to try and plead around the Terms of Use.

change this analysis. *See Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 242, 107 S. Ct. 2332, 2345-46, 96 L. Ed. 2d 185 (1987) ("[W]e find no basis for concluding that Congress intended to prevent enforcement of agreements to arbitrate RICO claims. The [Plaintiffs] may effectively vindicate their RICO claim in an arbitral forum[.]").

Furthermore, whether pursuant to the delegation clause in the Terms of Use or pursuant to Defendants' other arbitration arguments, if the Court grants Defendants' Motion to Compel, it is divested of jurisdiction to hear the substance of Plaintiff's claims. *See Maestre v. Am. Express Co.*, 2014 WL 12605504, at *1 (S.D. Fla. Nov. 18, 2014) ("Motions to compel arbitration are treated generally as motions to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1)."); *Barnes v. StubHub, Inc.*, 2019 WL 11505575, at *2 (S.D. Fla. Oct. 3, 2019) (same). Therefore, the threshold issue of whether Plaintiff's claims must be referred to arbitration—and the reasons for the parties' stipulation and the Court's August 1, 2023, Order (ECF No. 39)—remain intact. That is, if the Motion to Compel is granted, Plaintiff has no claims in this Court.

Therefore, the Court should deny the Motion for Leave without prejudice and decide the Motion to Compel as the parties and Court agreed. Plaintiff would not be prejudiced no matter the Court's ultimate decision on the Motion to Compel: (1) if the Court grants the Motion to Compel, the amended filing can be filed in arbitration, or (2) if the Court denies the Motion to Compel, Plaintiff may then renew its Motion for Leave.

Plaintiff's Motion for Leave should therefore be denied as futile because the case belongs in arbitration.[5]

---

[5] Independently, Plaintiff's purported Amended Complaint fails to plead a colorable RICO claim and thus the Motion for Leave should be denied for this reason as well. *See Garcia v.*

## CONCLUSION

In conclusion, Defendants respectfully request that the Court deny Plaintiff's Motion for Leave.

Dated: May 31, 2024

By: s/ *Aaron S. Weiss*
Aaron S. Weiss (FBN 48813)
aweiss@carltonfields.com
Carlton Fields, P.A.
700 N.W. 1st Ave., Ste. 1200
Miami, Florida 33136
Telephone: 305-530-0050

Christopher N. LaVigne (pro hac vice)
christopher.lavigne@withersworldwide.com
Withers Bergman LLP
430 Park Avenue, 10th Fl.
New York, New York 10022
Telephone: 212-848-9800

*Counsel for Defendant Binance Holdings, LTD. d/b/a Binance*

By: s/ *Adam M. Foslid*
Adam M. Foslid (FBN 682284)
afoslid@winston.com
Winston & Strawn LLP
200 S. Biscayne Blvd., Ste. 2400
Miami, Florida 33131
Telephone: 305-910-0646

*Counsel for Defendant BAM Trading Services Inc. d/b/a Binance.US*

---

*Copenhaver, Bell & Assocs., M.D.'s, P.A.*, 104 F.3d 1256, 1263 (11th Cir. 1997); *cf. Waller v. Nelson*, 2023 WL 4106250, at *8 (W.D. Va. June 21, 2023) ("The court cannot exercise personal jurisdiction pursuant to RICO's nation-wide service of process provision because Plaintiffs' underlying RICO claim is not colorable as alleged in the amended complaint."). For efficiency's sake, Defendants do not presently oppose Plaintiff's Leave to Amend on these grounds, though Defendants reserve all rights to make jurisdictional and substantive motions to dismiss, should the Motion to Compel be denied (per the Court's August 1, 2023, Order (ECF No. 39)).

# EXHIBIT 7

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No. 1:23-cv-22083-RUIZ/Sanchez

| | | |
|---|---|---|
| MICHAEL OSTERER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>BAM TRADING SERVICES INC. d/b/a BINANCE.US, a Delaware corporation, et al.,<br><br>Defendants. | ) | CLASS ACTION |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE AMENDED CLASS ACTION COMPLAINT**

# I. INTRODUCTION

Instead of directly responding to the straightforward Motion and Incorporated Memorandum of Law for Leave to File Amended Class Action Complaint ("Motion" or "Pltf's Mot.") (ECF 62), filed by Plaintiff Michael Osterer ("Plaintiff") – a standard motion which is routinely granted by courts across the United States at this stage of the proceedings – Defendants BAM Trading Services Inc. d/b/a Binance.US ("BAM" or "BAM Trading") and Binance Holdings, Ltd. d/b/a Binance ("Binance") (collectively "Defendants") dedicate most of their Opposition to Plaintiff's Motion ("Defs' Opp.") (ECF 63) to needlessly making repetitive and baseless arguments aimed at bolstering their fully-briefed pending Motion to Compel (ECF 34). But as both parties agree, the proposed Amended Complaint does not "alte[r] the balance of the arguments for or against arbitration." Pltf's Mot. at 6; Defs' Opp. at 4. Therefore, Defendants would suffer no prejudice or undue delay from the amendment, and the amendment would actually put the parties in a better position to move forward expeditiously in the proper forum upon the Court's ruling on Defendants' Motion to Compel. Had Defendants not disregarded their meet and confer obligations and provided undersigned counsel for Plaintiff the basis for Defendants' objection as requested (*see* Pltf's Mot. at 3), the parties could have attempted to reach an agreement to avoid unnecessary motion practice. Defendants' focus seems to instead rest on propping up its Motion to Compel rather than properly responding to the merits of Plaintiff's Motion.

As to any purported lack of diligence or undue delay by Plaintiff, Defendants fail to acknowledge that their unfounded Motion to Compel – which casts aside the key facts that Plaintiff never had an account with Binance or entered into an arbitration agreement, let alone any contractual agreement at all with Defendants – has delayed this case for months. Instead of simply sitting idle and awaiting a determination by the Court on Defendants' Motion to Compel, Plaintiff diligently gathered new and highly-material evidence from numerous government proceedings

against Binance and its now-incarcerated former Chief Executive Officer (Changpeng Zhao ("CZ")) and informed Defendants as early as April 16, 2024 that he intended to amend his Complaint. Plaintiff now seeks leave to amend the Complaint in a timely manner. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) ("[L]eave sought should, as the rules require, be 'freely given.'"). The Court should grant Plaintiff's Motion and allow this litigation to finally proceed on its merits as to these Defendants.

### A. Plaintiff Acted Diligently in Amending the Complaint

Despite Defendants' improper characterization of Plaintiff's efforts to strengthen his pleading by incorporating, *inter alia*, new facts elicited from the U.S. Department of Justice's Statement of Facts ("DOJ SOF") and other government settlements, Plaintiff acted diligently in navigating a complex set of ancillary proceedings to demonstrate and support his viable claims in this matter. When Plaintiff filed his initial Complaint, material facts gleaned from these government proceedings were unavailable to Plaintiff. Courts routinely permit amendment upon discovery of new facts, even long after the close of discovery. *See, e.g.*, *Port Auth. Police Benevolent Assoc., Inc. v. Port Auth. of N.Y.& N.J.*, 2016 WL 6083956, at *5 (S.D.N.Y. Oct. 17, 2016) ("Courts have consistently recognized that if a party learns new facts through discovery that were unavailable prior to the applicable deadline and moves promptly to name new parties based on such facts, leave to amend is appropriate.").[1]

Defendants' effort to portray Plaintiff as unduly delaying the proposed amendment is inconsistent with the law in the Eleventh Circuit, as described by the court in *Parker v. Exterior Restorations, Inc.*, 601 F. Supp. 3d 1221, 1227 (S.D. Ala. 2022):

> The Eleventh Circuit cases upholding denials of leave to amend based on undue delay in moving to amend involve delays measured in years and/or extending beyond key deadlines. Because the delay of which the defendants complain is

[1] All emphasis is added and citations and internal quotations are omitted unless otherwise noted.

measured in months, and because no deadline for amendments has even been established, must less expired, their undue delay argument must fail.

Indeed, the overwhelming weight of authority supports granting Plaintiff's Motion. *See, e.g.*, *Rodriguez v. Imperial Brands plc*, 2022 WL 2231431, at *5 (S.D. Fla. Mar. 9, 2022) (granting motion to amend complaint even though defendant claims plaintiffs were aware of the new facts ***twenty-one months*** before filing); *Williams v. Select Portfolio Servicing, Inc.*, 2016 WL 9450469, at *6-*7 (N.D. Ga. Dec. 20, 2016) (granting motion to amend where defendant claims the new factual allegations were known to plaintiff for ***"'almost one year'" prior to filing*** and refusing to find undue prejudice where "***[d]iscovery has not yet commenced***" and this was the plaintiff's "***first attempt to seek leave*** of Court to amend h[is] complaint"); *Collins v. Int'l Dairy Queen*, 190 F.R.D. 633, 635 (M.D. Ga. 2000) (finding no undue delay and granting motion to amend almost ***six years*** after initial complaint because "***discovery has not yet completed*** and a ***trial date has not yet been set***"); *Wyatt v. BellSouth, Inc.*, 176 F.R.D. 627, 630 (M.D. Ala. 1998) (granting motion to amend and finding no undue delay or prejudice even though motion was filed ***eighteen months*** after initial complaint and ***after discovery and depositions had begun***); *Gropp v. United Airlines, Inc.*, 847 F. Supp. 941, 945-46 (M.D. Fla. 1994) (granting motion to amend to ***include a RICO claim*** even though court determined plaintiffs had knowledge of the allegations at the time of the initial complaint ***a year earlier***, and stating, "[p]laintiffs have the right to amend in an attempt to present to the Court their most meritable claims").

Furthermore, the length of time Plaintiff spent on his extensive factual investigation before amending his pleading (for the first time) in this case is entirely distinguishable from the type of delay in Defendants' cited authorities. *See, e.g.*, *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1232 (11th Cir. 2008) (denying a third amended complaint because the motion for leave was filed "over ***twenty months*** after filing the original complaint, ***more than a year*** after the

expiration of the deadline for amending the pleadings, and ***only six weeks before trial***"); *S. Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1241 n.3, 1242 (11th Cir. 2009) (denying a third amended complaint because "the deadline to amend pleadings had come and gone ***five months earlier*** [], both parties had filed their initial briefs in support of their motions for summary judgment almost a month earlier [], and fact discovery had been closed for a few weeks"). Defs' Opp. at 4. Accordingly, Plaintiff's Motion should not be denied due to any ill-ascribed lack of diligence suggested by Defendants.

**B. <u>Amendment Would not be Futile or Cause Undue Delay</u>**

Defendants argue that "[p]ermitting amendment would unnecessarily delay this case by requiring Defendants to re-file a motion to compel arbitration." Defs' Opp. at 4. As a threshold matter, Plaintiff does not seek to amend the initial Complaint to cure any purported deficiencies raised in Defendants' renewed Motion to Compel, and the briefing would not need to be re-opened. As unequivocally stated in Plaintiff's Motion, as to futility, the existing claims in the initial Complaint state a valid claim for relief; and the new facts alleged in the proposed Amended Complaint (*i.e.*, important admissions by Defendants outlined in the DOJ SOF attached to the Binance Plea Agreement and new detailed facts revealed in other government proceedings) strengthen Plaintiff's existing claims while not altering the balance of the arguments for or against arbitration. Pltf's Mot. at 6.[2] Therefore, any argument that Plaintiff's amendments are futile lacks merit. The Court has not yet decided the Motion to Dismiss, and the amendments strengthen

[2] Defendants cited authority is inapposite, as Plaintiff here is not amending for the sole purpose of including "non-arbitrable claims." *See Rivera v. AT&T Corp.*, 420 F. Supp. 2d 1312, 1323 (S.D. Fla. 2006). Defs' Opp. at 5. Plaintiff's position continues to be that none of the claims asserted in this action (in the initial Complaint and proposed Amended Complaint) are subject to arbitration for the reasons set forth in Plaintiff's Opposition to Defendants' Motion to Compel (ECF 52).

Plaintiff's position on its merits. *See Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1263 (11th Cir. 2004) (the futility bar to leave for amend is not a high one).

Granting Plaintiff's Motion would promote efficiencies as opposed to causing undue delay, as Defendants incorrectly suggest. Indeed, if the Court denies Defendants' Motion to Compel, the parties will be able to move forward promptly with Defendants' anticipated Motion to Dismiss, instead of first waiting for Plaintiff to file a renewed Motion for Leave to Amend. Alternatively, if the Court mandates arbitration, the parties will be in a better position to move expeditiously in that forum with the proper claims asserted against Defendants.

Finally, Defendants erroneously assert that Plaintiff's claims must be arbitrated, and "there is a binding and enforceable delegation clause, which grants the arbitrator jurisdiction to decide the threshold issues of arbitrability" over Plaintiff's claims. Def's Opp. at 4. Even though Defendants essentially re-argue their Motion to Compel in opposition to Plaintiff's Motion, they neglect to acknowledge that, on May 23, 2024, the Supreme Court in *Coinbase, Inc. v. Suski*, 144 S. Ct. 1186 (2024), made clear that this Court - and not an arbitrator – should determine the issue of arbitrability over Plaintiff's claims and that Defendants' Motion to Compel should be denied.

The Supreme Court reiterated in *Coinbase* that, "[g]iven that arbitration agreements are simply contracts, "'[t]he first principle that underscores all of our arbitration decisions" is that [a]rbitration is strictly a matter of consent,'" and the Supreme Court has "long held that disputes are subject to arbitration ***if, and only if***, the parties actually agreed to arbitrate those disputes." *Coinbase*, 144 S. Ct. at 1191-92 (internal citations and quotations omitted). As stated in *Coinbase*, "the first question in any arbitration dispute must be: What have these parties agreed to?" *Id.* at 1192. "'[B]efore referring a dispute to an arbitrator,' therefore, 'the court determines whether a valid arbitration agreement exists.'" *Id.* at 1193. And "'[c]ourts should not assume that the parties

agreed to arbitrate arbitrability unless there is ***"clea[r] and unmistakabl[e]" evidence*** that they did so.'" *Id.*

Here, it cannot be disputed Plaintiff never agreed to arbitrate any disputes with Defendants and therefore never agreed to have an arbitrator decide the issue of arbitrability. As held in *Coinbase*, before "the delegation provision . . . can be enforced, a court needs to decide what the parties have agreed to. . . ." *Id.* at 1192. Plaintiff flatly disputes the existence of any agreement that would compel arbitration of Plaintiff's claims, and "'[i]f a party challenges the validity . . . of the precise agreement to arbitrate at issue, the ***federal court*** must consider the challenge before ordering compliance with that [arbitration] agreement.'" *Id.* at 1194.

Furthermore, Defendants incorrectly state that Plaintiff's "theory of the case is necessarily reliant upon the terms and benefits within BHL's Terms of Use and is therefore subject to arbitration under, among other things, doctrines of estoppel." Def's Opp. at 5. Defendants' argument is as unfounded now as it was when they first erroneously proffered it in the Motion to Compel. Plaintiff alleges Defendants failed to implement Know Your Customer ("KYC") and anti-money laundering ("AML") policies and procedures in violation of the law, which caused Binance to become a hub and magnet for bad actors to launder cryptocurrency. Plaintiff's claims do not remotely rely upon the terms and benefits within Binance's Terms of Use. Accepting Defendants' tenuous (at best) estoppel argument to require Plaintiff to arbitrate his claims, or have an arbitrator determine arbitrability, would be inconsistent with the principles underlying the Supreme Court's holding and reasoning in *Coinbase*, as well as the many cases cited in Plaintiff's opposition to Defendants' Motion to Compel which resolutely demonstrate the folly of Defendants' argument.

## II. CONCLUSION

Defendants' opposition to Plaintiff's Motion for Leave is nothing but a naked attempt to take a second bite at the apple Defendants proffered in their Motion to Compel, but that attempt bears no better fruit now than it did when Defendants lodged it earlier in this case. As such, Defendants' argument should rightfully be rejected; and the Court should grant Plaintiffs' Motion for Leave to Amend the Complaint.

DATED: June 7, 2024

**SILVER MILLER**
DAVID C. SILVER
Florida Bar No.: 572764
JASON S. MILLER
Florida Bar No. 072206

*/s/ David C. Silver*
DAVID C. SILVER
4450 NW 126th Avenue, Suite 101
Coral Springs, FL 33065
Telephone: 954/516-6000
E-mail: dsilver@silvermillerlaw.com
E-mail: jmiller@silvermillerlaw.com

**ROBBINS GELLER RUDMAN & DOWD LLP**
SAMUEL H. RUDMAN (admitted *pro hac vice*)
EVAN J. KAUFMAN (admitted *pro hac vice*)
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
E-mail: srudman@rgrdlaw.com
E-mail: ekaufman@rgrdlaw.com

**ROBBINS GELLER RUDMAN & DOWD LLP**
ERIC I. NIEHAUS (admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
E-mail: ericn@rgrdlaw.com

*Attorneys for Plaintiff Osterer*

**HERMAN JONES LLP**
JOHN C. HERMAN
3424 Peachtree Road NE, Suite 1650
Atlanta, GA 30326
Telephone: 404/504-6500
404/504-6501 (fax)
jherman@hermanjones.com

*Additional Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing was electronically filed with the Clerk of Court on this 7th day of June 2024 by using the CM/ECF system which will send a notice of electronic filing to the following CM/ECF participant(s): **AARON S. WEISS, ESQ.**, CARLTON FIELDS, P.A., *Counsel for Defendant Binance Holdings, Ltd. d/b/a Binance*, 700 NW 1st Ave. – Suite 1200, Miami, Florida 33137, E-mail: aweiss@carltonfields.com; **CHRISTOPHER LAVIGNE, ESQ.**, WITHERS LLP, *Counsel for Defendant Binance Holdings, Ltd. d/b/a Binance*, 430 Park Avenue – 10th Floor, New York, NY 10022, E-mail: christopher.lavigne@withersworldwide.com; **ADAM FOSLID, ESQ., DANIEL T. STABILE, ESQ., and GABRIELA A. PLASENCIA, ESQ.**, WINSTON & STRAWN LLP, *Counsel for Defendant BAM Trading Services, Inc. d/b/a Binance.US*, Southeast Financial Center, 200 S. Biscayne Blvd. – 24th Floor, Miami, Florida 33131, E-mail: AFoslid@winston.com, DStabile@winston.com, GPlasencia@winston.com.

*/s/ David C. Silver*
DAVID C. SILVER

# EXHIBIT 8

KeyCite Yellow Flag
Distinguished by Ya Mon Expeditions, LLC v. International Yacht Brokers Association, Inc., 11th Cir.(Fla.), June 10, 2026

753 F.Supp.3d 1289
United States District Court, S.D. Florida.

Michael OSTERER, individually and on behalf of all others similarly situated, Plaintiff,
v.
BAM TRADING SERVICES INC. d/b/a Binance.us, a Delaware corporation, and Binance Holdings, Ltd. d/b/a Binance, a foreign company, Defendants.

CASE NO. 23-CV-22083 RAR
|
Signed July 31, 2024

**Synopsis**
**Background:** Cryptocurrency account holder brought action against foreign cryptocurrency exchange and its domestic affiliate, alleging defendants' policies allowed a hacker to steal plaintiff's cryptocurrency, transfer it to foreign exchange, and withdraw it. Defendants moved to compel arbitration, and plaintiff moved for leave to file amended class action complaint.

**Holdings:** The District Court, Rodolfo A. Ruiz, II, J., held that:

[1] court had jurisdiction to determine threshold issues regarding enforceability and validity of arbitration and delegation provisions of exchange's terms of use, and

[2] arbitration and delegation provisions were enforceable under doctrine of equitable estoppel under Florida law, federal common law, and Hong Kong law, and thus court would compel arbitration.

Defendant's motion granted, plaintiff's motion denied as moot.

**Procedural Posture(s):** Motion to Compel Arbitration; Motion to Amend the Complaint.

West Headnotes (14)

[1] **Alternative Dispute Resolution** Construction in favor of arbitration

Under the Federal Arbitration Act (FAA), any doubts concerning the arbitrability of a dispute should be resolved in favor of arbitration. 9 U.S.C.A. § 3.

[2] **Alternative Dispute Resolution** Validity

**Alternative Dispute Resolution** Disputes and Matters Arbitrable Under Agreement

**Alternative Dispute Resolution** Waiver or Estoppel

Under the Federal Arbitration Act (FAA), a district court must compel arbitration if (1) a valid written agreement to arbitrate exists, (2) an arbitrable issue exists, and (3) the right to arbitrate has not been waived. 9 U.S.C.A. § 3.

2 Cases that cite this headnote

[3] **Alternative Dispute Resolution** Constitutional and statutory provisions and rules of court

The Federal Arbitration Act (FAA) reflects the fundamental principle that arbitration is a matter of contract. 9 U.S.C.A. § 1 et seq.

[4] **Alternative Dispute Resolution** In general; formation of agreement

Like any contract, parties can form multiple levels of agreements concerning arbitration.

[5] **Alternative Dispute Resolution** Arbitrability of dispute

**Alternative Dispute Resolution** Merits of controversy

In addition to agreeing to an arbitrator resolving disputes on the merits, the parties to an arbitration agreement can also agree by contract

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes.

1 Case that cites this headnote

[6] **Alternative Dispute Resolution** Validity
**Alternative Dispute Resolution** Validity of assent

A party may resist an arbitration agreement by asserting one of two types of challenges under the Federal Arbitration Act (FAA); the first type challenges specifically the validity of the agreement to arbitrate, while the second challenges the contract as a whole, either on a ground that directly affects the entire agreement (e.g., the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid. 9 U.S.C.A. § 2.

[7] **Alternative Dispute Resolution** Arbitrability of dispute

Only a challenge to the validity of the agreement to arbitrate may defeat a delegation provision; thus, a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate. 9 U.S.C.A. § 2.

[8] **Alternative Dispute Resolution** Existence and validity of agreement

When a challenge to one part of a contract applies equally to the whole contract and to an arbitration or delegation provision, a court must address that challenge. 9 U.S.C.A. § 2.

[9] **Alternative Dispute Resolution** Existence and validity of agreement

District court had jurisdiction to determine threshold issues regarding enforceability and validity of arbitration and delegation provisions of foreign cryptocurrency exchange's terms of use, in cryptocurrency account holder's action against exchange and its domestic affiliate, alleging defendants' policies allowed hacker to steal plaintiff's cryptocurrency, transfer it to foreign exchange, and withdraw it, where plaintiff specifically disputed validity of arbitration and delegation provisions by arguing that he never agreed to them, and in disputing very existence of an agreement, plaintiff contested enforceability and validity of those provisions. 9 U.S.C.A. § 2.

[10] **Alternative Dispute Resolution** Evidence

While there is generally a presumption in favor of arbitration, the presumption does not apply to the determination of whether an arbitration agreement exists.

1 Case that cites this headnote

[11] **Federal Courts** Alternative dispute resolution

When a party challenges the existence of an arbitration agreement, the court must apply ordinary state-law principles that govern the formation of contracts when determining if a valid agreement to arbitrate exists.

1 Case that cites this headnote

[12] **Alternative Dispute Resolution** Waiver or Estoppel

Under the doctrine of equitable estoppel, a party may compel arbitration against a non-signatory to a contract if the plaintiff is relying on a contract to assert its claims and the scope of the arbitration clause in that contract covers the dispute.

1 Case that cites this headnote

[13] **Alternative Dispute Resolution** Waiver or Estoppel
**Federal Courts** Alternative dispute resolution

Florida law, federal common law, and Hong Kong law all apply the doctrine of equitable estoppel in the same way to bind a non-signatory

© 2026 Thomson Reuters. No claim to original U.S. Government Works. 

to a contract's arbitration provision when the non-signatory relies on the contract to state his claims.

[14] Alternative Dispute Resolution Waiver or Estoppel

Arbitration and delegation provisions of foreign cryptocurrency exchange's terms of use were enforceable under doctrine of equitable estoppel under Florida law, federal common law, and Hong Kong law, and thus court would compel arbitration, in cryptocurrency account holder's action against exchange and its domestic affiliate, alleging that their policies allowed hacker to steal plaintiff's cryptocurrency, transfer it to exchange, and withdraw it, despite plaintiff's argument that his claims arose from "Know Your Customer" and anti-money-laundering rules and failure to create or comply with adequate internal policies; plaintiff's allegation as to defendants' failure to freeze deposited funds had no connection to any statutory obligation to properly identify customers or trace origin of deposited funds, plaintiff's claims required determination of defendants' obligations under terms, and plaintiff could not rely upon terms to establish his claims while avoiding obligation to arbitrate.

1 Case that cites this headnote

**Attorneys and Law Firms**

***1291** David Chad Silver, Silver Miller, Coral Springs, FL, Eric Ian Niehaus, Pro Hac Vice, Robbins Geller Rudman and Dowd LLP, San Diego, CA, Evan J. Kaufman, Pro Hac Vice, Jonathan A. Ohlmann, Pro Hac Vice, Samuel H. Rudman, Pro Hac Vice, Robbins Geller Rudman & Dowd LLP, Melville, NY, for Plaintiff.

Adam Michael Foslid, Daniel Tramel Stabile, Gabriela Ana Plasencia, Winston & Strawn LLP, Miami, FL, for Defendant BAM Trading Services Inc.

Aaron Stenzler Weiss, Carlton Fields, P.A., Miami, FL, Adam Michael Foslid, Winston & Strawn, Miami, FL, Christopher N. Lavigne, Pro Hac Vice, Withers LLP, New York, NY, Vahe Mesropyan, Pro Hac Vice, Withers Bergman LLP, Los Angeles, CA, for Defendant Binance Holdings, Ltd.

**ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION**

RODOLFO A. RUIZ II, UNITED STATES DISTRICT JUDGE

**THIS CAUSE** comes before the Court upon Defendant Binance Holdings, Ltd. ("Binance") and Defendant BAM Trading Services Inc.'s ("BAM") Motion to Compel Arbitration ("Motion"), [ECF No. 49]; Plaintiff's Response in Opposition, [ECF No. 52]; Defendants' Reply in Support of their Motion, [ECF No. 55]; and Defendants' ***1292** Notice of Filing Supplemental Authority, [ECF No. 65]. Having carefully considered the Motion, the related briefing, the record, and being otherwise fully advised, it is hereby

**ORDERED AND ADJUDGED** that the Motion, [ECF No. 49], is **GRANTED** for the reasons set forth herein.

**BACKGROUND**

Binance was founded in 2017 as a foreign cryptocurrency exchange that allows its users to purchase and trade cryptocurrencies and digital assets such as Bitcoin ("BTC") and Ether ("ETH"). Complaint, [ECF No. 1], ¶¶ 6–8. BAM is a separate and independent cryptocurrency exchange that operates in the United States. Compl. ¶ 9. Before a user can deposit, withdraw, or trade assets on Binance's exchange, the user must first register and create an account with Binance. *See* Terms of Use ("Terms"), [ECF No. 49-1] at 1. To create an account, the user must read and agree to Binance's Terms by affirmatively checking a box confirming that they "agree to Binance's Terms of Use." *Id.* The words "Terms of Use" in this sentence are hyperlinked to the Terms themselves. *Id.*

The Terms plainly explain that the "Terms constitute a legal agreement and create a binding contract" between the user and Binance. Terms § II.1.a. Additionally, the Terms give Binance "the right to immediately suspend your Binance Account (and any accounts beneficially owned by related entities or affiliates), freeze or lock the Digital Assets or funds in all such accounts, and suspend your access to Binance for any reason ...." *Id.* § VI.1. Users also agree to confer on Binance "the right ... to permanently freeze (cancel) the authorizations

© 2026 Thomson Reuters. No claim to original U.S. Government Works. 

of your Binance Account on Binance and withdraw the corresponding Binance Account" in case of certain events. *Id.* § VI.2.

Additionally, as is relevant here, the Terms bind both the user and Binance to mandatory binding arbitration. *Id.* § X.2 ("Arbitration Provision"). The Arbitration Provision provides that:

> You and Binance Operators agree that, subject to paragraph 1 above, *any dispute, claim, or controversy* between you and Binance (and/or Binance Operators) arising in connection with or relating in any way to these Terms or to your relationship with Binance (and/or Binance Operators) as a user of Binance Services (*whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory, and whether the claims arise during or after the termination of these Terms) will be determined by mandatory final and binding individual (not class) arbitration*, except as set forth below under Exceptions to Agreement to Arbitrate.

Arbitration Provision (emphasis added). The Arbitration Provision also provides: "[t]hese Terms (including this arbitration agreement) shall be governed by, and construed in accordance with, the laws of Hong Kong" administered in English by the Hong Kong International Arbitration Centre ('HKIAC')." *Id.*

Additionally, the Terms include a provision providing that any threshold questions as to, among others, the jurisdiction, applicability, or scope of the Arbitration Provision are subject to mandatory arbitration. Terms § X.2 ("Delegation Provision"). Specifically, the Delegation Provision states:

> You and Binance Operators further agree that the arbitrator shall have the ***1293** exclusive power to rule on his or her own jurisdiction, including without limitation any objections with respect to the existence, scope or validity of the Agreement to Arbitrate, or to the arbitrability of any claim or counterclaim ....

Delegation Provision.

Turning now to the allegations unique to this case, Plaintiff maintained an account at U.S.-based cryptocurrency exchange Coinbase. Compl. ¶ 76. Plaintiff alleges that, on or about April 7, 2021, an unauthorized person or persons infiltrated Plaintiff's Coinbase account and stole approximately 8 BTC and 449 ETH from Plaintiff. Compl. ¶ 77. Plaintiff further alleges that the approximately 8 BTC and the 449 ETH transferred from Plaintiff's Coinbase account were routed into several Binance accounts. Compl. ¶¶ 78–82. Under Binance's policies, the unknown depositor was not required to provide any sort of identification prior to making the deposit because each deposit was under 2 BTC. Compl. ¶ 82. The hacker allegedly later withdrew the stolen funds from the Binance accounts and absconded with the money. Compl. ¶¶ 78–81.

Plaintiff alleges that Defendant Binance's "policies and failures" were the direct and proximate cause of the financial harm he suffered. Compl. ¶ 84. Plaintiff claims that Binance could have frozen the alleged hacker's accounts and stopped their transactions "before some or all of the stolen cryptocurrency left the Binance exchange." Compl. ¶¶ 72–73. Plaintiff similarly alleges that Binance knowingly engaged in this allegedly culpable conduct "for the purpose of earning Binance transaction fees ...." Compl. ¶ 75. As a result, Plaintiff claims that he is entitled to damages, including the disgorgement of fees purportedly collected by Binance on the hacker's alleged transactions. Compl. ¶¶ 1, 3.

## LEGAL STANDARD

**[1]** **[2]** The Arbitration Provision is governed by the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA"). Under the FAA, a district court must grant a motion to compel arbitration if it is satisfied that there is an "issue referable to arbitration under an agreement in writing for such arbitration[.]" *See* 9 U.S.C. § 3; *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) ("[T]he [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration ...."). "[A]ny doubts" concerning the arbitrability of a dispute "should be resolved in favor of arbitration[.]" *Moses H Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *see also Attix v. Carrington Mortg. Servs., LLC*, 35 F.4th 1284, 1294 (11th Cir. 2022). Under the FAA, a district court must compel arbitration if (1) a valid written agreement to arbitrate exists, (2) an arbitrable issue exists, and (3) the right to arbitrate has not been waived. *Integrated Sec. Servs. v. Skidata, Inc.*, 609 F. Supp. 2d 1323, 1324 (S.D. Fla. 2009).

## ANALYSIS

**I. The Court has jurisdiction to determine threshold issues regarding the validity of the Arbitration and Delegation Provisions.**

**[3] [4] [5]** The FAA "reflects the fundamental principle that arbitration is a matter of contract." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010). Like any contract, ***1294** "parties can form multiple levels of agreements concerning arbitration." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 148, 144 S. Ct. 1186, 1192, 218 L.Ed.2d 615 (2024). In addition to agreeing to an arbitrator resolving disputes on the merits, the parties can also "agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes." *Id.* (citing *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65, 139 S.Ct. 524, 202 L.Ed.2d 480 (2019)). The Supreme Court has recognized that parties can use these so-called "delegation provisions" to agree to arbitrate threshold issues "such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Ctr., W., Inc.*, 561 U.S. at 70, 130 S.Ct. 2772.

**[6] [7] [8]** A party may resist an arbitration agreement by asserting one of two types of challenges under § 2 of the FAA. The first type "challenges specifically the validity of the agreement to arbitrate," while the second "challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.,* the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." *Rent-A-Ctr., W., Inc.*, 561 U.S. at 70, 130 S.Ct. 2772 (citing *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006)). Only the first type of challenge may defeat a delegation provision. *Id.* Thus, "a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate." *Id.* And when the challenge to one part of the contract "applies 'equally' to the whole contract and to an arbitration or delegation provision, *a court* must address that challenge." *Coinbase, Inc.*, 144 S. Ct. at 1194 (emphasis added).

**[9]** Here, Defendants maintain the Court lacks jurisdiction to address the validity of the Arbitration and Delegation Provisions because Plaintiff has not specifically challenged their enforceability. Reply at 3. But Plaintiff has specifically disputed the validity of the Arbitration and Delegation Provisions by arguing that he never agreed to them, maintaining that "[t]here exists no evidence, let alone clear and unmistakable evidence, that Plaintiff did, or even could, agree to arbitrate with Defendants; given that Plaintiff had no idea his cryptocurrency would be stolen and deposited into Binance accounts." Resp. at 14. Clearly, in disputing the very existence of an agreement, Plaintiff is contesting the enforceability and validity of the Arbitration and Delegation Provisions. *See Coinbase, Inc.*, 144 S. Ct. at 1194. ("Arbitration and delegation agreements are simply contracts, and, normally, if a party says that a contract is invalid, the court must address that argument before deciding the merits of the contract dispute."). Accordingly, the Court has jurisdiction to determine threshold issues regarding the enforceability and validity of the Arbitration and Delegation Provisions.[1]

**II. There is a valid agreement to arbitrate under the doctrine of equitable estoppel.**

Having found that it has jurisdiction to answer the question, the Court now turns ***1295** to whether there was a valid agreement to arbitrate.

**[10] [11] [12] [13]** While there is generally a presumption in favor of arbitration, the presumption "does not apply to the determination of whether an arbitration agreement exists." *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1115–16 (11th Cir. 2014). Instead, the Court must "apply ordinary state-law principles that govern the formation of contracts" when determining if a valid agreement to arbitrate exists. *Id.* (citations omitted). Additionally, under the doctrine of equitable estoppel, a party may compel arbitration against a non-signatory to a contract if the "plaintiff is relying on a contract to assert its claims and [ ] the scope of the arbitration clause in that contract covers the dispute." *Leidel v. Coinbase, Inc.*, 729 F. App'x 883, 887 (11th Cir. 2018).[2]

**[14]** Here, the parties agree that it was the unknown hacker, not Plaintiff, who agreed to the Terms containing the Arbitration Provision. Mot. at 11; Resp. at 5. Nevertheless, Defendants argue that Plaintiff is bound by the Arbitration Provision under well-settled principles of equitable estoppel. Mot. at 11. Specifically, Defendants argue that Plaintiff's theory of liability against Defendants requires that "(1) Binance could have, but did not, freeze Plaintiff's allegedly stolen cryptocurrency assets; and (2) Binance failed to do so in order to earn transaction fees." Mot. at 13. Defendants argue that Binance's legal right "to suspend, freeze or lock [ ] assets and accounts, and to collect fees based on [ ] transactions on the exchange" is created only by the Terms.

© 2026 Thomson Reuters. No claim to original U.S. Government Works. 

*Id.* (citing to Terms § II(D)(1)). Plaintiff responds that his theory of liability encompasses many other practices including inadequate anti-money laundering protocols, lack of identification requirements, lack of internal controls, and failure to comply with various regulatory schemes. Resp. at 8–9.

The Court finds *Blinco v. Green Tree Servicing LLC* to be instructive here. There, two married plaintiffs, Mr. and Mrs. Blinco, sued a group of defendants for alleged violations of the Real Estate Settlement Procedures Act ("RESPA") for ***1296** failing to provide a required notice under RESPA. *Blinco v. Green Tree Servicing LLC*, 400 F.3d 1308, 1310 (11th Cir. 2005) *abrogated on other grounds, as recognized in Lawson v. Life of the South Ins. Co.*, 648 F.3d 1166, 1171 (11th Cir. 2011). While Mr. Blinco signed the underlying note containing an arbitration clause, Mrs. Blinco did not. *Id.* When defendants attempted to compel arbitration against Mrs. Blinco, she argued that her claims "ar[ose] solely from statutory rights created by RESPA" and therefore she could not be bound by the arbitration agreement in the underlying note through equitable estoppel. *Id.* at 1312. However, the Court rejected this argument because her statutory claims "derive[d] from ... the [underlying] note." Accordingly, Mrs. Blinco "[could] not rely upon the Note to establish her RESPA claims while avoiding her obligation under the Note to arbitrate such claims." *Id.*

Like Mrs. Blinco attempting to couch her claim solely under RESPA, Plaintiff argues that his claim only arises from Know Your Customer and Anti-Money Laundering rules, as well as Defendants' failure to create or comply with adequate internal policies. Resp. at 8–9. But, just as in *Blinco*, Plaintiff's claims "derive" from the underlying Terms. Plaintiff specifically alleges in his Complaint that Binance failed to "halt the further movement of [Plaintiff's] stolen property." Compl. ¶ 108. Additionally, in his prayer for relief, Plaintiff seeks a declaration that "Defendants were unjustly enriched by their collection of transaction fees" as well as "restitution and disgorgement of Defendants' ill-gotten gains." Compl. at 32. In other words, Plaintiff is suing Defendants for failing to exercise a right created by the Terms—and for collecting funds pursuant to the Terms. *See Jackson v. Shakespeare Found., Inc.*, 108 So. 3d 587, 593 (Fla. 2013) (holding a claim arises from the terms of the contract if it emanates from an inimitable duty created by the parties' unique contractual relationship). Accordingly, Plaintiff may not "rely upon the [Terms] to establish [his] claims while avoiding [his] obligations under the [Terms] to arbitrate such claims." *Blinco*, 400 F.3d 1308 at 1312.[3]

Further, Plaintiff's reliance on *Leidal v. Coinbase* is misplaced. There, a cryptocurrency investor sued Coinbase after the exchange's services were allegedly used to steal his cryptocurrency. *Leidel v. Coinbase*, 729 F. App'x 883, 884 (11th Cir. 2018). When Coinbase attempted to compel the plaintiff to arbitration based on an arbitration provision agreed to by the thief, the plaintiff objected on the grounds that he was a non-signatory to the agreement. In holding that the plaintiff could not be bound by the agreement under equitable estoppel, the Eleventh Circuit noted that "Florida courts draw a distinction between clauses that require arbitration of claims 'arising out of' the subject contract and those that require arbitration of claims 'arising out of *or relating to*' the contract." *Leidel*, 729 F. App'x at 887 (citing to *Jackson*, 108 So. 3d at 593). The former are "considered to be 'narrow in scope' and apply only to 'those claims that have a direct relationship to a contract's ***1297** terms and provisions.' " *Id.* The latter are "considered to be 'broad in scope' and apply to 'claims that are described as having a 'significant relationship' to the contract ....' " *Id.*

Ultimately, the court found that plaintiff's claims had neither a significant relationship nor a direct relationship to the arbitration provisions because his claims were based on the defendant's "alleged failure to (1) adequately monitor or investigate [the thief's] use of Defendant's website; (2) detect [the thief's] theft of [the plaintiff's] Bitcoin; and (3) report suspicious activity by [the thief] to the appropriate authorities." *Leidel*, 729 F. App'x at 888. These duties were "imposed on Defendant by the Bank Secrecy Act and its implementing regulations not for the protection of Defendant's customers, but to detect money laundering and other suspicious or illegal activities by Defendant's customers" and therefore did not bear a significant relationship or direct relationship to the contract. *Id.*

Here, however, the facts are readily distinguishable from those in *Leidel*. For starters, the arbitration provision at issue is broad in scope. *See* Arbitration Provision (requiring arbitration of claims "arising in connection with or relating in any way to these Terms"). Additionally, although Plaintiff does allege that Defendants failed to comply with Know Your Customer and Anti-Money Laundering protocols and tethers certain allegations to similar statutory obligations, *see* Compl. ¶¶ 58, 99, 101, 110–112, Plaintiff also alleges that Binance

failed to "halt the further movement of [Plaintiff's] stolen property." Compl. ¶ 108. This particular allegation regarding Defendants' failure to freeze the deposited funds has no connection to Defendant's failure (or statutory obligation) to properly identify customers or trace the origin of deposited funds. Nor does Plaintiff attempt to make such a connection. *See generally* Resp.[4] And determining whether Defendants had the ability and obligation to freeze funds will require referencing § II(D)(1) of the Terms. Accordingly, Plaintiff's claims have a significant relationship to the Terms. *See Jackson*, 108 So. 3d at 593 (holding there is a significant relationship when "the claim presents circumstances in which the resolution of the disputed issue requires either reference to, or construction of, a portion of the contract").

In sum, having found the Arbitration and Delegation Provisions under the Terms enforceable pursuant to the doctrine of equitable estoppel, the Court must enforce these "agreement[s] to arbitrate threshold issues." *Rent-A-Ctr., W., Inc.*, 561 U.S. at 70, 130 S.Ct. 2772. Here, the threshold issues specifically include the "scope" of the Arbitration Provision as challenged by Plaintiff. *See* Delegation Provision; Resp. at 12–14.[5] This matter must therefore proceed to arbitration.[6]

***1298** Finally, courts are split as to whether a stay or dismissal is proper when all claims in a complaint are compelled to arbitration. *See Valiente v. Holiday CVS, LLC*, No. 20-20382, 2020 WL 2404701, at *2–3 (S.D. Fla. May 12, 2020) (collecting cases). The Eleventh Circuit, however, has indicated that a stay is the more sound approach. *See id.* Accordingly, the Court will grant the Motion and stay the case pending arbitration—rather than dismiss it.

## CONCLUSION

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1. The Motion, [ECF No. 49], is **GRANTED**.

2. Plaintiffs are **COMPELLED** to arbitrate their claims against Defendants pursuant to the Terms.

3. This case is **STAYED** pending the conclusion of arbitration proceedings.

4. In light of the stay, Plaintiff's Motion for Leave to File Amended Class Action Complaint, [ECF No. 62], is hereby **DENIED AS MOOT**.

5. The parties shall provide the Court with joint status reports every **sixty (60) days** regarding the status of arbitration proceedings.

6. The Clerk shall **CLOSE** this case for administrative purposes only.

**DONE AND ORDERED** in Miami, Florida, this 31st day of July, 2024.

**All Citations**

753 F.Supp.3d 1289

Footnotes

1 Defendants themselves note that "Plaintiff only posits that because the arbitration provision 'uses the following language: 'any dispute, claim, or controversy between you and Binance (and/or Binance Operators) arising in connection with or relating in any way to these Terms or your relationship with Binance,' the delegation provision is unenforceable." Reply at 3 (emphasis added). Thus, Defendants' argument that Plaintiff has not challenged the validity of the Arbitration and Delegation Provisions is entirely misplaced.

2 The Court agrees with Defendants that it need not engage in any choice-of-law analysis here because there is no conflict among the potentially applicable laws with respect to the doctrine of equitable estoppel. *In re January 2021 Short Squeeze Trading Litig.*, 584 F. Supp. 3d 1161, 1179 (S.D. Fla. 2022) ("Under Florida's choice-of-law rules, courts need not decide a choice-of-law dispute unless a true conflict of laws exists[.]"). Florida law (forum), federal common law, and Hong Kong law (selected by the Terms' choice-of-law provision) all apply the doctrine of equitable estoppel in the same way to bind a non-signatory to a contract's arbitration provision when the non-signatory relies on the contract to state his claims. *Tiffany Tate & Quantum Luxury Props., LLC v. Ibis Prop. Owners Ass'n*, No. 17-81005, 2018 WL 11585481, at *6 (S.D. Fla. Feb. 20, 2018) (applying Florida law and binding non-signatory to contract containing arbitration provision under "direct benefits" theory of estoppel because the non-signatory's suit sought to benefit under contract); Declaration of

Sherlin Tung ("Tung Decl."), [ECF No. 49-2], ¶ 15 (recognizing that "in the appropriate circumstances, non-signatories may be bound to written arbitration agreements under the theory of estoppel.") (citing *Dickson Valora Group (Holdings) Co., Ltd. v. Fan Ji Qian*, [2019] HKCFI 482 (binding, under Hong Kong law, non-signatory to arbitration clause where non-signatory sought to enforce contractual rights under contract containing arbitration clause)); *Shamsi v. Levin*, No. 17-80372, 2017 WL 7803807, at *4 (S.D. Fla. Oct. 27, 2017) (applying federal law on equitable estoppel and compelling arbitration where plaintiff's claims implicated a contract that included an arbitration clause). Plaintiff does not dispute this point. *See generally* Resp.

3 Plaintiff argues that the present case is also distinguishable from *Blinco* because "Plaintiff [does not] have any relation to the individual who allegedly entered into the agreement with Defendants." Resp. at 6. While it is true that the non-signatory in *Blinco* was married to the signatory, the Eleventh Circuit did not rely on this relationship in its equitable estoppel analysis. *See Blinco*, 400 F.3d 1308 at 1312. Thus, the Court does not find *Blinco* to be distinguishable from the present case.

4 Notably, even if Plaintiff had identified such a statutory scheme in his response, it would not change the outcome here. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (holding Plaintiff "may not amend [his] complaint through argument in a brief").

5 The Delegation Provision explicitly states that: "You and Binance Operators further agree that the arbitrator shall have the exclusive power to rule on his or her own jurisdiction, including without limitation any objections with respect to the existence, scope or validity of the Agreement to Arbitrate, or to the arbitrability of any claim or counterclaim."

6 Defendants move to compel arbitration of Plaintiff's claims against both BAM and Binance. Mot. at 17–18. Plaintiff does not separately address or object to the arbitration of his claims against BAM. *See generally* Resp. Arbitration against multiple defendants is appropriate when the claims are based on the same facts and inherently inseparable from the alleged misconduct by a signatory. *Physician Consortium Servs., LLC v. Molina Healthcare, Inc.*, 414 F. App'x 240, 243 (11th Cir. 2011). Such is the case here. Accordingly, all parties shall be compelled to arbitrate Plaintiff's claims.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 9

2025 WL 1159213
Only the Westlaw citation is currently available.
United States District Court, W.D. Washington,
at Seattle.

Philip MARTIN, T.F. (Natalie) Tang, and Yatin Khanna, Individually and on Behalf of All Others Similarly Situated, Plaintiffs,
v.
BINANCE HOLDINGS, LTD. d/b/a Binance, BAM Trading Services Inc. d/b/a Binance.US, a Delaware corporation, and Changpeng Zhao, Defendants.

Case No. 2:24-cv-1264-BJR
|
Signed April 21, 2025

**Attorneys and Law Firms**

David Silver, Pro Hac Vice, Jason Stuart Miller, Pro Hac Vice, Silver Miller, Coral Springs, FL, Derek W. Loeser, Lynn Lincoln Sarko, Chris N. Ryder, Keller Rohrback LLP, Seattle, WA, Eric Ian Niehaus, Pro Hac Vice, Robbins Geller Rudman & Dowd LLP, San Diego, CA, Evan J. Kaufman, Pro Hac Vice, Jonathan Anthony Ohlmann, Pro Hac Vice, Samuel H. Rudman, Pro Hac Vice, Robbins Geller Rudman & Dowd LLP, Melville, NY, John C. Herman, Pro Hac Vice, Herman Jones LLP, Atlanta, GA, for Plaintiffs Phillip Martin, T.F. (Natalie) Tang.

Derek W. Loeser, Lynn Lincoln Sarko, Chris N. Ryder, Keller Rohrback LLP, Seattle, WA, Eric Ian Niehaus, Pro Hac Vice, Robbins Geller Rudman & Dowd LLP, San Diego, CA, Evan J. Kaufman, Pro Hac Vice, Jonathan Anthony Ohlmann, Pro Hac Vice, Samuel H. Rudman, Pro Hac Vice, Robbins Geller Rudman & Dowd LLP, Melville, NY, Jason Stuart Miller, Pro Hac Vice, Silver Miller, Coral Springs, FL, John C. Herman, Pro Hac Vice, Herman Jones LLP, Atlanta, GA, for Plaintiff Yatin Khanna.

Christopher N. LaVigne, Pro Hac Vice, Tyler Goss, Pro Hac Vice, Withers Bergman LLP, New York, NY, Kimberly A. Pallen, Pro Hac Vice, Withers Bergman LLP, San Francisco, CA, Vahe Mesropyan, Pro Hac Vice, Withers Bergman LLP, Los Angeles, CA, Sean David Jackson, Ballard Spahr LLP, Seattle, WA, for Defendant Binance Holdings, Ltd.

Athanasia (Thania) Charmani, Pro Hac Vice, Winston & Strawn, New York, NY, Daniel T. Stabile, Pro Hac Vice, Gabriela A. Plasencia, Pro Hac Vice, Winston & Strawn LLP, Miami, FL, Blake Edward Marks-Dias, Todd T. Williams, Corr Cronin LLP, Seattle, WA, for Defendant BAM Trading Services Inc.

Avi Perry, Pro Hac Vice, Quinn Emanuel Urquhart & Sullivan LLP, Washington, DC, Brenna Ledvora, Pro Hac Vice, Quinn Emanuel Urquhart & Sullivan, Chicago, IL, Michael Linneman, Pro Hac Vice, Peter Fountain, Pro Hac Vice, Quinn Emanuel Urquhart & Sullivan LLP, New York, NY, Alicia Cobb, Quinn Emanuel Urquhart & Sullivan LLP, Seattle, WA, for Defendant Changpeng Zhao.

**ORDER GRANTING DEFENDANTS' MOTION TO TRANSFER OR COMPEL ARBITRATION**

Barbara Jacobs Rothstein, United States District Court Judge

## I. INTRODUCTION

***1** This matter is before the Court on a Motion to Transfer Pursuant to the First-to-File Rule or Compel Arbitration, Dkt. No. 67, by Binance Holdings, LTD ("BHL"), BAM Trading Services, Inc. ("BAM"), and Changpeng Zhao (collectively, "Defendants"). Having fully considered the materials and the relevant legal authorities, the Court grants Defendants' motion. The reasoning for the Court's decision follows.

## II. BACKGROUND

This case (the "*Martin* action") is the third in a set of three related putative class actions. *See Martin* Compl., Dkt. No. 1.; *Osterer v. BAM Trading Servs. Inc., et al.*, No. 23-cv-22083 (S.D. Fla. 2023) [hereinafter *Osterer*]; *Kattula v. Coinbase Glob., Inc., et al.*, No. 22-cv-03250 (N.D. Ga. 2022). Plaintiffs in each of the actions allege claims arising from third-party hackers' theft of cryptocurrency from Coinbase, a cryptocurrency exchange and storage platform, and subsequent use of Binance.com, another cryptocurrency exchange and storage platform, to untraceably exchange the stolen assets. By this Motion, Defendants seek to transfer this action to the Southern District of Florida under the first-to-file rule, or in the alternative, to compel arbitration. Defendants' first-to-file argument is premised on similarities between this

action and the earlier-filed *Osterer* action. The procedural histories of the relevant actions are discussed below.

### A. The *Osterer* Action

In 2023, Michael Osterer initiated a putative class action against BHL and BAM, alleging claims for (1) conversion, (2) aiding and abetting conversion, and (3) unjust enrichment. *Osterer* Compl., Dkt. No. 1. BHL and BAM moved to compel arbitration, or in the alternative, dismiss the complaint for failure to state a claim and lack of personal jurisdiction. *Osterer* Mot. to Compel Arb., Dkt. No. 49. Osterer moved for leave to amend the complaint to add Zhao as a defendant and Philip Martin, T.F. Tang, and Yatin Khanna as named plaintiffs. *Osterer* Mot. for Leave to Amend at 1, Dkt. No. 62. Osterer also sought to add a single claim for violations of the Racketeer Influenced and Corrupt Organizations Act. (“RICO”).[1] *Id.* In July 2024, the district court granted BHL and BAM's motion to compel arbitration, stayed the district court proceedings, and denied as moot Osterer's motion for leave to amend the complaint. *Osterer* Arb. Or. at 11, Dkt. No. 71.

### B. The *Martin* Action

The month after the *Osterer* court granted BHL and BAM's motion to compel arbitration, the three proposed plaintiffs that Osterer sought to add by amendment—Martin, Tang, and Khanna (collectively, “Plaintiffs”)—filed the instant action in this Court. *Martin* Compl. Defendants in this action include BHL and BAM, the same defendants from the *Osterer* action, and Zhao, the proposed defendant that Osterer sought to add to the *Osterer* action by amendment. *Id.* Plaintiffs allege claims for (1) RICO violations, (2) conversion, and (3) aiding and abetting conversion. *Id.*

## III. LEGAL STANDARD

The first-to-file rule is a “generally recognized doctrine of federal comity which permits a district court to decline jurisdiction over an action when a complaint involving the same parties and issues has already been filed in another district.” *Pacesetter Sys., Inc. v. Medtronic, Inc.*, 678 F.2d 93, 94-95 (9th Cir. 1982). The purpose of the first-to-file rule is to promote efficiency and to avoid duplicative litigation, and thus, the doctrine “should not be disregarded lightly.” *Church of Scientology of California v. U.S. Dep't of Army*, 611 F.2d 738, 750 (9th Cir. 1979), *overruled in part on other grounds by Animal Leg. Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987 (9th Cir. 2016). Under the first-to-file rule, a district court may transfer, stay, or dismiss the second action if it determines that it would be in the interest of judicial economy and convenience of the parties. *Alltrade, Inc. v. Uniweld Prods., Inc.*, 946 F.2d 622, 623 (9th Cir. 1991); *Pacesetter,* 678 F.2d at 95.

## IV. DISCUSSION

***2** There are two issues before this Court: (1) the applicability of the first-to-file rule and (2) whether transferring this matter to the Southern District of Florida is appropriate. The Court addresses each argument in turn.

### A. The Threshold Factors of The First-to-File Rule Weigh in Favor of Application

Courts analyze three factors in determining whether to apply the first-to-file rule: (1) chronology of the actions; (2) similarity of the parties; and (3) similarity of the issues. *Alltrade*, 946 F.2d at 625. In this case, all three factors weigh in favor of applying the first-to-file rule.

#### 1. The *Osterer* Action Was Filed Before this Action

First, it is undisputed that *Osterer* was filed in the Southern District of Florida in June 2023, more than a year before the instant action. *Compare Osterer* Compl., *with Martin* Compl. Accordingly, the chronology of the actions weighs in favor of applying the first-to-file rule. *See Wallerstein v. Dole Fresh Vegetables, Inc.*, 967 F. Supp. 2d 1289, 1294 (N.D. Cal. 2013) (finding the chronology factor satisfied where the second action was filed more than three weeks after the first action).

#### 2. The Parties Are “Substantially Similar”

Regarding the second factor, “the first-to-file rule requires only substantial similarity of parties.” *Kohn L. Group, Inc. v. Auto Parts Mfg. Mississippi, Inc.*, 787 F.3d 1237, 1240 (9th Cir. 2015). When assessing the similarity of plaintiffs in the class action context, “a court should compare the putative classes, rather than the named plaintiffs, to determine whether the classes encompass at least some of the same individuals.” *Edmonds v. Amazon.com, Inc.*, No. C19-1613, 2020 WL 5815745, at *4 (W.D. Wash. Sept. 30, 2020); *see also Bewley v. CVS Health Corp.*, No. C17-802, 2017 WL 5158443, at *2 (W.D. Wash. Nov. 7, 2017).

Here, the putative classes in *Osterer* and this action are effectively identical. The putative class in *Osterer* includes "[a]ll persons or entities in the United States within the applicable statute of limitations period through class certification who had their stolen cryptocurrency deposited in a Binance account." *Osterer* Compl. ¶ 85. The putative class in this action includes:

> [a]ll persons or entities in the United States whose cryptocurrency was removed from a non-Binance/BAM digital wallet, account, or protocol as a result of a hack, ransomware, or theft and, between August 16, 2020 and the date of Judgment (the "Class Period"), transferred to a Binance.com account, and who have not recovered all of their cryptocurrency that was transferred to Binance.com (the "Class").

*Martin* Compl. ¶ 202. Although the two Complaints describe the proposed classes in slightly different terms, both encompass the same proposed class of individuals whose cryptocurrency was stolen and transferred to a Binance.com account during the relevant period. Therefore, this Court concludes that the classes of plaintiffs are sufficiently similar to warrant application of the first-to-file rule. *See* *Edmonds,* 2020 WL 5815745, at *4.

As to the similarity of the defendants, the instant action includes the same two defendants as in *Osterer*—BHL and BAM—but adds Zhao. *Compare Osterer* Compl., *with Martin* Compl. However, even with Zhao added as a defendant, the parties in the two actions are substantially similar.[2] *See* *Kohn,* 787 F.3d at 1240 ("We conclude that the omission of [a defendant] from the present action does not defeat application of the first-to-file rule."); *Bewley*, 2017 WL 5158443, at *2 ("The presence of one additional defendant ... does not change the fact that the parties on the whole are substantially similar.").

### 3. The Issues Are "Substantially Similar"

***3** As with the "similarity of the parties" factor, the third factor requires only that the issues presented in the relevant actions are "substantially similar." *Kohn*, 787 F.3d at 1240-41. When analyzing whether issues are substantially similar for purposes of the first-to-file rule, district courts in the Ninth Circuit consider if the common facts, taken together, would lead to the same central question between the cases. *See, e.g.*, *Booker v. Am. Honda Motor Co.*, No. 2:20-CV-5166, 2020 WL 7263538, at *3 (C.D. Cal. Oct. 20, 2020); *Adoma v. Univ. of Phoenix, Inc.*, 711 F. Supp. 2d 1142, 1149 (E.D. Cal. 2010). Plaintiffs argue that the issues in this action are dissimilar from those in *Osterer*, because unlike in *Osterer*, the Complaint here (1) does not allege unjust enrichment, and (2) adds a RICO claim. Pls.' Resp. at 5, Dkt. No. 70. The Court is unpersuaded. Plaintiffs' attempts to distinguish this case from *Osterer* do not change the fact that the two cases arise from the same factual predicate and concern the same central issue. *See* *Bates-Ferreira v. Swedish Match N.A., LLC*, No. 2:24-CV-987, 2025 WL 950506, at *4 (E.D. Cal. Mar. 28, 2025) ("Even if a plaintiff presents alternative theories compared to another pending action, it does not necessarily prevent the application of the first-to-file rule because common facts may give rise to a central issue between the cases."). Indeed, the *Osterer* Complaint and *Martin* Complaint contain numerous identical or nearly identical allegations. *Compare, e.g.*, *Osterer* Compl. ¶ 99 ("Defendants ignored their own internal policies and procedures and knowingly maintained inadequate KYC and AML policies which enabled cryptocurrency hackers and thieves to launder cryptocurrency through the Binance ecosystem without providing valid or sufficient personal identification and proof of lawful possession of the cryptocurrency."), *with Martin* Compl. ¶ 254 ("Defendants ignored the law and knowingly maintained inadequate KYC and AML policies which enable cryptocurrency hackers and thieves to launder cryptocurrency through the Binance.com ecosystem without providing valid or sufficient personal identification and proof of lawful possession of the cryptocurrency."). It is apparent from comparing the factual allegations in the two Complaints that the central issue in both cases is whether the relevant defendants may be held responsible for acting in a manner that enabled hackers to launder cryptocurrency through Binance.com. *Compare Osterer* Compl., *with Martin* Compl. Accordingly, the third and final factor weighs in favor of applying the first-to-file rule.

## B. Transfer to the Southern District of Florida is Appropriate

Because the threshold requirements of the first-to-file rule are satisfied, this Court next considers whether transfer of this action to the Southern District of Florida is appropriate given relevant statutory requirements and considerations of fairness and convenience.

### 1. This Action "Might Have Been Brought" in the Southern District of Florida

Under the first-to-file rule an action may be transferred to a district "where it might have been brought." *In re Bozic,*

© 2026 Thomson Reuters. No claim to original U.S. Government Works. 

888 F.3d 1048, 1053 (9th Cir. 2018) (quoting 28 U.S.C. § 1404(a)). Here, Plaintiffs allege a federal RICO claim. *Martin* Compl. ¶¶ 211-32. Therefore, the Southern District of Florida can exercise subject matter jurisdiction. 28 U.S.C. § 1331. Additionally, venue is proper in the Southern District of Florida because BAM resides there while BHL and Zhao are foreign defendants. *Id.* § 1391(b)-(c); *Martin* Compl. ¶¶ 23-24.

***4** Regarding personal jurisdiction, Plaintiffs argue that this action cannot be transferred to the Southern District of Florida because that court lacks personal jurisdiction over Plaintiffs. Pls.' Resp. at 5-6. Plaintiffs assert that they are not citizens of Florida and have not purposefully availed themselves of any privileges in Florida by contracting there. *Id.* at 6. This argument is without merit. In transferring a case, "there is no due-process concern, at least to the level of requiring minimum contacts with the new forum, for plaintiff[s]." *Murray v. Scott,* 176 F. Supp. 2d 1249, 1255 (M.D. Ala. 2001); *see also* *F.T.C. v. Watson Pharm., Inc.*, 611 F. Supp. 2d 1081, 1090 (C.D. Cal. 2009).[3] Accordingly, this action "might have been brought" in the Southern District of Florida.

**2. Additional Considerations Weigh in Favor of Transfer**

Even if the threshold factors of the first-to-file rule are met, a court may refuse to apply the rule based on considerations of fairness and convenience. *Inherent.com v. Martindale-Hubbell*, 420 F. Supp. 2d 1093, 1097-98 (N.D. Cal. 2006). Plaintiffs argue that the fact that the *Osterer* proceedings are stayed pending arbitration is a "significant consideration" weighing against transfer. Pls.' Resp. at 8. Plaintiffs contend that, if this case is transferred, "the resolution of both matters would likely be further postponed to the detriment of all plaintiffs." *Id.* However, the fact that the first-filed action has been stayed does not preclude transfer under the first-to-file rule. *See* *Alltrade*, 946 F.2d at 628 ("The most basic aspect of the first-to-file rule is that it is discretionary ...."). And this Court is not persuaded that the stay in the *Osterer* proceedings is a significant consideration weighing against transfer here.

Notably, it is not apparent that transferring this action would delay its resolution or resolution of *Osterer.* If anything, that the *Osterer* court has compelled arbitration and stayed those proceedings makes it unlikely that transferring this case will delay *Osterer.* Moreover, transferring this action to the Southern District of Florida would further the first-to-file rule's purpose of promoting efficiency and avoiding duplicative litigation because the Southern District of Florida has already addressed the merits of the arbitrability issue. *See* *Church of Scientology*, 611 F.2d at 750; *Pars Equality Ctr. v. Pompeo*, No. C18-1122, 2018 WL 6523135, at *7 (W.D. Wash. Dec. 12, 2018) ("To allow two parallel class actions to proceed in separate districts would be duplicative and inefficient."). Thus, transfer of this action to the Southern District of Florida is warranted under the first-to-file rule.

## V. CONCLUSION

For the foregoing reasons:

1. Defendants' Motion to Transfer Pursuant to the First-to-File Rule or Compel Arbitration (Dkt. No. 67) is GRANTED.

2. This case is hereby TRANSFERRED to the United States District Court for the Southern District of Florida.

### All Citations

Not Reported in Fed. Supp., 2025 WL 1159213

### Footnotes

1 18 U.S.C. § 1962(c)-(d).

2 The Court notes that Zhao was the defendant that would have added in the *Osterer* action if the motion for leave to amend were granted. *Osterer* Mot. for Leave to Amend at 1.

3 This Court recognizes that the *Osterer* court has not addressed whether it has personal jurisdiction over the defendants in that action. *See Osterer* Or. Granting Stip. at 3, Dkt. No. 39; *Osterer* Arb. Or.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 10

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 25-cv-22100-RAR**
**Case No. 25-cv-22202-RAR**

**PHILIP MARTIN**, *et al.*,
*individually and on behalf of*
*all others similarly situated,*

Plaintiffs,

v.

**BINANCE HOLDINGS, LTD.**
*d/b/a* **BINANCE**, *et al.*

Defendants.
_______________________________________/

**CHARLES BARATTA**, *et al.*,
*individually and on behalf of*
*all others similarly situated,*

Plaintiffs,

v.

**BINANCE HOLDINGS, LTD.**
*d/b/a* **BINANCE**, *et al.*

Defendants.
_______________________________________/

**DEFENDANTS' MOTION TO COMPEL ARBITRATION**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

II. PROCEDURAL HISTORY OF RELATED CASES ..... 5

A. *Osterer* Is Filed in This Court on Behalf of the Putative Class ..... 5

B. While the Arbitration Motion Was Pending, Plaintiffs' Counsel Sought Leave to Add the *Martin* Plaintiffs and a RICO Claim ..... 6

C. The Court Found Plaintiffs' Claims Rely on BHL's Terms, Compelled Arbitration, and Denied Leave to Amend as Moot ..... 7

D. Plaintiffs Attempt to End-Run the *Osterer* Arbitration Order by Filing Two Copycat Complaints in the Western District of Washington ..... 7

E. Judge Rothstein Finds *Martin* and *Baratta* Are Substantially Similar to *Osterer* ..... 9

III. ARGUMENT ..... 10

A. Because the Claims in *Martin* and *Baratta* Are Based on the Same Factual Predicate and Concern the Same Central Issues as *Osterer*, the *Martin* and *Baratta* Plaintiffs Should Likewise Be Compelled to Arbitration ..... 10

1. Legal Standard ..... 10

2. As the *Osterer* Arbitration Order Held, a Valid Agreement to Arbitrate Exists Under the Doctrine of Equitable Estoppel ..... 11

B. Plaintiffs Should Be Judicially Estopped from Asserting Their Claims Are Different from Those in *Osterer* ..... 13

C. Plaintiffs Should Be Compelled to Arbitrate Their Claims Based on Collateral Estoppel Principles ..... 15

1. The Issue of Arbitrability Was Presented in the Prior Proceeding, Necessary to the Prior Determination, and Actually Litigated in *Osterer* ..... 15

2. The Parties Are Sufficiently Similar ..... 16

D. BAM and Mr. Zhao May Invoke the Arbitration Provision to Compel Plaintiffs to Arbitrate ..... 18

IV. CONCLUSION ..... 19

V. REQUEST FOR HEARING ..... 19

VI. S.D. FLA. L.R. 7.1(A)(2) CERTIFICATION ..... 20

## TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Attix v. Carrington Mortg. Servs., LLC*,
35 F.4th 1284 (11th Cir. 2022) ....................10

*Baratta v. Binance Holdings, Ltd.*,
2025 WL 1383369 (W.D. Wash. May 13, 2025)....................3

*Boneta v. Am. Med. Sys., Inc.*,
524 F. Supp. 3d 1304 (S.D. Fla. 2021) (Ruiz, J.) ....................15

*Brown v. Zabala*,
2025 WL 1392212 (11th Cir. May 14, 2025) ....................15, 16

*California v. Texas*,
459 U.S. 1096 (1983)....................17

*Caporicci U.S.A. Corp. v. Prada S.p.A.*,
2018 WL 2264194 (S.D. Fla. May 7, 2018) ....................18

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985)....................10

*Green Tree Fin. Corp.- Alabama v. Randolph*,
531 U.S. 79 (2000)....................10

*Herrera v. West Flagler Assocs., Ltd.*,
2017 WL 9324515 (S.D. Fla. Apr. 5, 2017) ....................18

*Inetianbor v. CashCall, Inc.*,
923 F. Supp. 2d 1358 (S.D. Fla. 2013) ....................11

*Integrated Sec. Servs. v. Skidata, Inc.*,
609 F. Supp. 2d 1323 (S.D. Fla. 2009) ....................10

*JPay, Inc. v. Kobel*,
904 F.3d 923 (11th Cir. 2018) ....................10

*Martin v. Binance Holdings, Ltd.*,
2025 WL 1159213 (W.D. Wash. Apr. 21, 2025)....................3

*Meadows v. Am. Airlines*,
2024 WL 5248006 (S.D. Fla. Oct. 22, 2024), *report and recommendation adopted sub nom. Meadows v. Am. Airlines, Inc.*, 2024 WL 5245945 (S.D. Fla. Dec. 30, 2024)....................14

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983)....................10

*Osterer v. BAM Trading Servs. Inc.*,
753 F. Supp. 3d 1289 (S.D. Fla. 2024)....................2

*Physician Consortium Servs., LLC v. Molina Healthcare, Inc.*,
414 F. App'x 240 (11th Cir. 2011)....................18

*Semtek Int'l Inc. v. Lockheed Martin Corp.*,
531 U.S. 497 (2001)....................15

*Slater v. United States Steel Corp.*,
871 F.3d 1174 (11th Cir. 2017)....................13, 14

*Taylor v. Sturgell*,
553 U.S. 880 (2008)....................16, 17, 18

*United States v. Munoz*,
112 F.4th 923 (11th Cir. 2024)....................14

**State Cases**

*Fernandez v. Cruz*,
341 So. 3d 410 (Fla. 3d DCA 2022)....................16

*Marquardt v. State*,
156 So. 3d 464 (Fla. 2015)....................15

**Federal Statutes**

9 U.S.C. § 3....................10

Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*....................10

**Rules**

Southern District of Florida Local Rule
7.1(A)(2)....................20
7.1(b)(2)....................19

Defendant Binance Holdings, Ltd., BAM Trading Services Inc., and Changpeng Zhao ("Defendants") respectfully move the Court to enter an order compelling arbitration of the above-captioned actions. In support of this motion, Defendants state as follows:

## I. INTRODUCTION

In a related case, *Michael Osterer v. Binance Holdings, Ltd., et al.* ("*Osterer*"),[1] this Court found that the claims of the named plaintiff and similarly situated putative class members are subject to mandatory individual arbitration. Osterer sought to hold Defendants Binance Holdings, Ltd. ("BHL") and BAM Trading Services Inc. ("BAM") liable for cryptocurrency purportedly stolen from his Coinbase account by unknown hackers, which, allegedly, was eventually transferred to Binance.[2] Osterer claimed that BHL and BAM are liable to him and the putative class because BHL knowingly ignored Know Your Customer and Anti-Money Laundering policies, knew that fraudulent activity was occurring on its exchange, and had the ability to freeze the fraudulent transactions, but did not do so in order to collect transaction fees.

BHL and BAM moved to compel arbitration in *Osterer* under equitable estoppel principles, arguing that *Osterer's* theory of liability—that BHL had the ability to stop the fraudulent transactions, but intentionally did not do so to collect transaction fees—relies on rights created by the Binance.com Terms of Use ("Terms"). Therefore, Osterer and the putative class are bound by the Terms, which includes mandatory arbitration and class waiver provisions.

While the motion to compel arbitration was pending, Osterer sought leave to amend his complaint to add additional named plaintiffs and a RICO cause of action. These additional named

[1] Changpeng Zhao was not named as a defendant in *Osterer*.

[2] As the Court noted in its Order granting the defendants' motion to compel arbitration in *Osterer*, BAM operates "a separate and independent" exchange, Binance.US. [*Osterer*, ECF No. 71, at 1-2.]

plaintiffs and additional causes of action rely on the same basic facts and same theory alleged by Osterer. Osterer and the proposed new plaintiffs acknowledged this to the Court and represented they would be accordingly bound by the Court's order on the motion to compel.

This Court in *Osterer* granted the motion to compel arbitration, denied the motion for leave to amend as moot, and explicitly rejected Plaintiffs' argument that the claims are based on statutory rights, not the Terms. [*Osterer*, ECF No. 71 ("*Osterer* Arbitration Order"), which is reported as *Osterer v. BAM Trading Servs. Inc.*, 753 F. Supp. 3d 1289 (S.D. Fla. 2024)]. The Court held that "Plaintiff is suing Defendants for failing to exercise a right created by the Terms [freezing the hackers' accounts]—and for collecting funds pursuant to the Terms" [*id.* at 8] and compelled "Plaintiffs . . . to arbitrate their claims" [*id.* at 11].

In an apparent effort to circumvent the Court's order in *Osterer*, counsel for Osterer and the putative class filed two duplicative class action complaints in the Western District of Washington. These new class actions were filed on behalf of the *same* putative class, based on the *same* central facts and issues and almost identical allegations, against the *same* defendants. The first of these cases, *Martin et al. v. Binance Holdings, Ltd. et al.* ("*Martin*"), was filed on behalf of the same plaintiffs—Philip Martin, Yatin Khanna, and T.F. (Natalie) Tang (the "*Martin*" Plaintiffs")—who previously sought leave to join *Osterer* and represented to the Court that their claims are materially the same as Osterer's and they would be bound by the *Osterer* Arbitration Order.[3] Defendants, among other things, moved the Honorable Barbara J. Rothstein of the Western District of Washington to transfer *Martin* back to this Court pursuant to the first-to-file-rule. While the motion to transfer was pending, Plaintiffs' Counsel initiated the second copycat action, *Baratta*

---

[3] The *Martin* docket [ECF No. 34] reflects service of the summons and complaint upon Mr. Zhao on September 18, 2024.

*v. Binance Holdings, Ltd.* ("*Baratta*"),[4] on behalf of Plaintiffs Charles Baratta, Jason Rappaport, Donald Douty, Thomas Viola, and Hyacinth Ahuruonye (the "*Baratta* Plaintiffs") (collectively with the *Martin* Plaintiffs, "Plaintiffs").

Judge Rothstein saw *Martin* and *Baratta* for what they are: attempts to forum shop and evade this Court's *Osterer* Arbitration Order. Judge Rothstein ruled that the parties and issues in *Martin* are substantially similar to the claims in *Osterer* and transferred *Martin* to this Court. [*Martin*, ECF No. 75, which is reported as *Martin v. Binance Holdings, Ltd.*, 2025 WL 1159213 (W.D. Wash. Apr. 21, 2025)].

Similarly, Judge Rothstein later entered an order granting the *Baratta* parties' stipulated motion to transfer *Baratta* to this Court. Notably, rather than rubberstamp the parties' proposed transfer order [*see Baratta*, ECF No. 12], Judge Rothstein prepared and issued a reasoned order holding that her "reasoning in *Martin* that transfer of that action was necessary to promote efficiency and avoid duplicative litigation is equally applicable [to *Baratta*]." [*Baratta*, ECF No. 14 at 3, which is reported as *Baratta v. Binance Holdings, Ltd.*, 2025 WL 1383369 (W.D. Wash. May 13, 2025)]. In other words, Judge Rothstein held that the parties and claims in *Baratta* are substantially similar to those in *Osterer*.

After *Martin* and *Baratta* were transferred to this Court, the Court issued the Order Consolidating Cases [*Martin*, ECF No. 108 ("Consolidation Order")] finding that *Martin* and *Baratta* were both transferred to this Court "under the first-to-file rule based on common issues of law and fact with *Osterer*"; consolidating *Martin* and *Baratta* for purposes of the Motion to Compel Arbitration Motion; and administratively closing *Baratta*.

---

[4] Mr. Zhao has not been served in the *Baratta* case.

At bottom, two courts have already held that, regardless of any additional causes of action or newly named plaintiffs, *Martin* and *Baratta* are substantially similar to *Osterer*. The *Martin* Plaintiffs admitted as much to this Court before attempting to refile in Washington. Accordingly, the reasoning set forth in the *Osterer* Arbitration Order applies with equal force to the consolidated cases now before the Court. Specifically, each of the three actions—*Osterer*, *Martin*, and *Baratta*—concerns a putative class whose members had their cryptocurrency stolen by third-party hackers and allegedly deposited into a BHL account, seeking to hold Defendants liable under the theory that Defendants could have prevented the transactions, but did not in order to collect transaction fees. As this Court held in *Osterer*, Plaintiffs' theory relies on BHL's ability to (1) freeze user accounts and (2) collect fees, which are rights created by the Terms, and thus Plaintiffs' claims must be arbitrated pursuant to the Terms' individual arbitration provision under the principles of equitable estoppel.

Plaintiffs attempt to distinguish *Martin* and *Baratta* from *Osterer* by (1) omitting the unjust enrichment claim alleged in *Osterer* and (2) adding a RICO cause of action and, in *Baratta*, additional state law causes of action. Judge Rothstein rejected these efforts to distance the cases from *Osterer*:

> Plaintiffs' attempts to distinguish this case from *Osterer* do not change the fact that the two cases arise from the same factual predicate and concern the same central issue. . . . It is apparent from comparing the factual allegations in the [*Osterer* and *Martin*] Complaints that the central issue in both cases is whether the relevant defendants may be held responsible for acting in a manner that enabled hackers to launder cryptocurrency through Binance.com.

[*Martin*, ECF No. 75 at 6-7.]

Indeed, Plaintiffs should be estopped from arguing otherwise. The *Martin* Plaintiffs sought leave to file an amended complaint naming them as additional plaintiffs, adding BHL's former CEO—Changpeng Zhao—as a defendant, and adding a RICO cause of action. [*Osterer*, ECF No.

62 ("Motion for Leave")]. The *Martin* Plaintiffs repeatedly averred to this Court that they are part of the same putative class as Osterer and they "have been injured by [Defendants'] same wrongful practices," [*id.* at 1-2] and that the additional allegations and RICO claim are based on the "same wrongful conduct alleged in the initial [*Osterer*] Complaint" [*id.* at 6-7].

Accordingly, the same result should follow here. The Court should find that Plaintiffs' claims are subject to the Terms' mandatory individual arbitration provision and grant Defendants' Motion to Compel.

## II. PROCEDURAL HISTORY OF RELATED CASES

### A. *Osterer* Is Filed in This Court on Behalf of the Putative Class

In the first-filed complaint, on June 5, 2023, Plaintiffs' Counsel filed a complaint on behalf of Michael Osterer and a putative class (the "*Osterer* Complaint") against BHL and BAM, asserting claims for conversion, aiding and abetting conversion, and unjust enrichment. [*Osterer*, ECF No. 1.] Osterer alleged that unidentified third-party hackers infiltrated his Coinbase account, stole his cryptocurrency, deposited the cryptocurrency in BHL accounts, and then ultimately withdrew the funds. [*Id.* ¶¶ 76-81.] Osterer alleged that the financial harm he and the class suffered as a result of this theft was a "direct and proximate result of [BHL]'s policies and failures" [*id.* ¶ 84], and that BHL and BAM are liable because BHL "had the ability to freeze those accounts and stop transactions," and "could have" but did not do so "for the purpose of earning [BHL] transaction fees" [*id.* ¶¶ 73-75].

BHL and BAM moved to compel arbitration of these claims on equitable estoppel grounds, arguing that Osterer's individual and class claims are based on rights created by BHL's Terms of Use—the right to freeze accounts and charge transaction fees—and, therefore, he was also bound by the Terms' arbitration and class waiver provisions. [*Osterer*, ECF No. 49 ("*Osterer* Arbitration Motion").]

In Osterer's opposition to the *Osterer* Arbitration Motion, [*Osterer*, ECF No. 52], his chief argument was that the claims are not premised on BHL's ability to freeze accounts and collect fees (thus not premised on the Terms), but are based on BHL's "practices that led to Plaintiff and Class Members' losses," including, Defendants' "inadequate KYC and AML protocols"; policy allowing deposits and withdrawals of up to 2 Bitcoin per day without verification; and "lack of internal controls" and tracing policies. [*Id.* at 8.]

**B. While the Arbitration Motion Was Pending, Plaintiffs' Counsel Sought Leave to Add the *Martin* Plaintiffs and a RICO Claim**

While the *Osterer* Arbitration Motion was pending, Osterer filed a Motion for Leave [*Osterer*, ECF No. 62 ("*Osterer* Motion for Leave")] and attached a proposed amended complaint [*Osterer*, ECF No. 62-1 ("*Osterer* Amended Complaint")], which sought to add (1) the *Martin* Plaintiffs as named plaintiffs, (2) BHL's former CEO, Changpeng Zhao, as a defendant, (3) a RICO claim, and (4) additional detail regarding the government proceedings Osterer relied on in opposing arbitration. The *Martin* Plaintiffs assured the Court that "the proposed amendments in no way would alter the Court's analysis of the pending motion to compel arbitration." [*Osterer* Motion for Leave at 5.] They argued that the *Martin* Plaintiffs, ***and "all other members for the proposed Class . . . all have been injured by the same wrongful practices of Defendants as Plaintiff Osterer was***." [*Id.* at 1-2 (emphasis added).] Similarly, the *Martin* Plaintiffs represented that "the new facts alleged" "strengthen [the] existing claims while not altering the balance of the arguments for or against arbitration." [*Id.* at 6; *Osterer*, ECF No. 64 at 4 ("*Osterer* Motion for Leave Reply").] Additionally, the *Martin* Plaintiffs argued "these new allegations . . . support RICO claims against Defendants for the same wrongful conduct alleged in the initial Complaint." [*Osterer* Motion for Leave at 6-7.] Ultimately, the *Martin* Plaintiffs argued leave would promote

efficiencies because they "will be in a better position to move expeditiously" to arbitrate if the Court compels it. [*Osterer* Motion for Leave Reply at 5.]

### C. <u>The Court Found Plaintiffs' Claims Rely on BHL's Terms, Compelled Arbitration, and Denied Leave to Amend as Moot</u>

The Court granted the *Osterer* Arbitration Motion and issued the *Osterer* Arbitration Order, agreeing that because Osterer alleged Binance failed to "halt the further movement of [Plaintiff's] stolen property, … Plaintiff is suing Defendants for failing to exercise a right created by the Terms—and for collecting funds pursuant to the Terms." [*Osterer* Arbitration Order at 8.] Accordingly, the Court held Osterer was equitably estopped from "rely[ing] upon the [Terms] to establish [his] claim while avoiding [his] obligations under the [Terms] to arbitrate such claims." [*Id.* at 8-9.] The Court rejected Osterer's argument that his claims and the claims of the putative class are rooted in a statutory scheme. [*Id.* at 10.] The Court explained that "Defendants' failure to freeze the deposited funds has no connection to Defendant's failure (or statutory obligation) to properly identify customers or trace the origin of deposited funds. . . . And determining whether Defendants had the ability and obligation to freeze funds will require referencing . . . of the Terms." [*Id.*] The Court ordered, *inter alia*, that: (1) "Plaintiffs are **COMPELLED** to arbitrate their claims against Defendants pursuant to the Terms"; and (2) "Plaintiff's Motion for Leave . . . is hereby **DENIED AS MOOT.**" [*Id.* at 11.]

### D. <u>Plaintiffs Attempt to End-Run the *Osterer* Arbitration Order by Filing Two Copycat Complaints in the Western District of Washington</u>

Disregarding their prior representations to this Court, Plaintiffs filed two copycat complaints in the Western District of Washington—*Martin* and *Baratta.* For instance, the proposed class is identical [*compare*, *Martin* Compl. ¶ 202 and *Baratta* Compl. ¶ 253, *with Osterer* Am. Compl. ¶ 205]; the Defendants are the same [*compare*, *Martin* Compl. ¶ 175 and *Baratta* Compl. ¶ 224, *with Osterer* Am. Compl. ¶ 178]; and the alleged facts and issues are nearly identical

[*compare*, *Martin* Compl. ¶¶ 211-259 and *Baratta* Compl. ¶¶ 266-333, *with Osterer* Am. Compl. ¶¶ 214-264]. [*See* Declaration of Christopher LaVigne ("LaVigne Decl."), Ex. 1 (Redline comparison of *Martin* Compl. and *Osterer* Am. Compl.; and Ex. 2 (Redline comparison of *Baratta* Compl. and *Osterer* Am. Compl.)].[5]

Indeed, the *Martin* and *Baratta* Complaints are near carbon-copies of the *Osterer* Amended Complaint except that the Plaintiffs tried to superficially plead around the *Osterer* Arbitration Order. ***First***, Plaintiffs, in conclusory fashion, allege they "are not relying on any contracts or agreements entered into between Binance or BAM" to establish their claims. [*E.g.*, *Martin* Compl. ¶ 10, *Baratta* Compl. ¶ 11.] ***Second***, they merely rephrased (without any material change) their allegations regarding BHL's ability to freeze accounts and collect fees. For instance, whereas the *Osterer* Complaint alleged that BHL "had the ability to freeze those accounts and stop transactions . . . Binance failed to interrupt the money laundering process when it could have done so" [*Osterer* Compl. ¶¶ 73-74], the *Martin* and *Baratta* complaints allege that Defendants "made no effort to utilize reasonable measures" to stop transactions on the Binance.com exchange involving the same alleged stolen cryptocurrency [*see Martin* Compl. ¶¶ 242, 255; *Baratta* Compl. ¶¶ 299, 312].

***Third***, Plaintiffs' Counsel tried to sanitize the *Martin* and *Baratta* Complaints by removing explicit references to BHL's ability to collect transaction fees by omitting terms like "ill-gotten gains" and "disgorgement." However, *Martin* still seeks restitution [*Martin* Compl. ¶ 12], and both *Martin* and *Baratta* still allege that Defendants failed to stop the alleged hackers from transacting on the Binance.com exchange due to their desire to collect "massive" transaction fees. [*See, e.g.*, *Martin* Compl. ¶ 36 ("Binance has a strong monetary incentive to encourage. . . transactions

---

[5] The LaVigne Declaration and its Exbibits (1-4) are attached as **Exhibit A**.

involving stolen cryptocurrency."); *id.* ¶ 171 ("Defendants generated massive amounts of fees" from "their conspiracy and fraudulent scheme"); *id.* ¶ 183 ("The Binance Crypto-Wash Enterprise functions by generating fees from cryptocurrency transactions by customers."); *Baratta* Compl. ¶ 232 ("Binance did not implement adequate KYC or AML policies so that Binance.com could generate massive fees and liquidity from the maximum number of people and increase market share[.]").]

### E. Judge Rothstein Finds *Martin* and *Baratta* Are Substantially Similar to *Osterer*

Plaintiffs' efforts do not alter what this Court already determined: no matter how artfully Plaintiffs attempt to reframe their claims, they still derive from the Terms. [*See Osterer* Arbitration Order at 8.] Judge Rothstein agreed, finding that the parties and issues in *Martin* are substantially similar to those in *Osterer*. Specifically, Judge Rothstein held that "[a]lthough the two Complaints describe the proposed classes in slightly different terms, both encompass the same proposed class of individuals whose cryptocurrency was stolen and transferred to a Binance.com account during the relevant period" and "are [thus] sufficiently similar[.]" [*Martin*, ECF No. 75 at 5.] Judge Rothstein also held the addition of Mr. Zhao as a defendant does not change that the defendants in *Osterer* and *Martin* are substantially similar.

Judge Rothstein explicitly rejected Plaintiffs' argument that "the issues in [*Martin*] are dissimilar from those in *Osterer*, because unlike in *Osterer*, the Complaint here (1) does not allege unjust enrichment, and (2) adds a RICO claim." [*Id.* at 6.] Judge Rothstein held:

> The Court is unpersuaded. ***Plaintiffs' attempts to distinguish this case from Osterer do not change the fact that the two cases arise from the same factual predicate and concern the same central issue.*** . . . Indeed, the *Osterer* Complaint and *Martin* Complaint contain numerous identical or nearly identical allegations. . . . It is apparent from comparing the factual allegations in the two Complaints that the central issue in both cases is whether the relevant defendants may be held responsible for acting in a manner that enabled hackers to launder cryptocurrency through Binance.com.

[*Id.* at 6-7 (emphasis added; citations omitted).]

Similarly, Judge Rothstein entered an order transferring *Baratta* to this Court, finding that her "reasoning in *Martin* that transfer of that action was necessary to promote efficiency and avoid duplicative litigation is equally applicable [to *Baratta*]." [*Baratta*, ECF No. 14 at 3.]

## III. ARGUMENT

### A. Because the Claims in *Martin* and *Baratta* Are Based on the Same Factual Predicate and Concern the Same Central Issues as *Osterer*, the *Martin* and *Baratta* Plaintiffs Should Likewise Be Compelled to Arbitration

#### 1. Legal Standard

The Arbitration Provision is governed by the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. (the "FAA"). Under the FAA, a district court must grant a motion to compel arbitration if it is satisfied that there is an "issue referable to arbitration under an agreement in writing for such arbitration[.]" *See* 9 U.S.C. § 3; *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) ("[T]he [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration . . . ."); *see also JPay, Inc. v. Kobel*, 904 F.3d 923, 929 (11th Cir. 2018).

Given the FAA's liberal policy favoring arbitration, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000). "[A]ny doubts" concerning the arbitrability of a dispute "should be resolved in favor of arbitration[.]" *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *see also Attix v. Carrington Mortg. Servs., LLC*, 35 F.4th 1284, 1294 (11th Cir. 2022).

Under the FAA, a district court must compel arbitration if (1) a valid written agreement to arbitrate exists, (2) an arbitrable issue exists, and (3) the right to arbitrate has not been waived. *Integrated Sec. Servs. v. Skidata, Inc.*, 609 F. Supp. 2d 1323, 1324 (S.D. Fla. 2009). A plaintiff

challenging the enforcement of an arbitration agreement must establish, by substantial evidence, any defense to the enforcement of the agreement. *Inetianbor v. CashCall, Inc.*, 923 F. Supp. 2d 1358, 1362 (S.D. Fla. 2013). Here, all three of these factors compel arbitration.

### 2. As the *Osterer* Arbitration Order Held, a Valid Agreement to Arbitrate Exists Under the Doctrine of Equitable Estoppel

At the outset, the first and third factors are met because the Court has already held (and Plaintiffs did not dispute) that the arbitration provision of the Terms is a valid clickwrap agreement [*see Osterer* Arbitration Order at 6-7], and Defendants have not waived their right to arbitrate.

The second factor is also met because Plaintiffs' claims are subject to the arbitration provision under the principles of equitable estoppel. "[U]nder the doctrine of equitable estoppel, a party may compel arbitration against a non-signatory to a contract if the 'plaintiff is relying on a contract to assert its claims and . . . the scope of the arbitration clause in that contract covers the dispute.'" [*Osterer* Arbitration Order at 6 (*citing Leidel v. Coinbase, Inc.*, 729 F. App'x 883, 887 (11th Cir. 2018)).]

***First***, as explained above, like named class plaintiff Osterer, Plaintiffs here rely on the Terms to establish their claims. Plaintiffs' theory of liability is that (1) BHL could have, but did not, "use reasonable measures" to stop the alleged money laundering, and (2) it did so knowingly, to earn "massive" transaction fees. [*Supra* § II.D.] This Court already held that BHL's right to stop customer transactions and to collect fees on those transactions derives from the Terms. [*See Osterer* Arbitration Order at 8 ("Plaintiff is suing Defendants for failing to exercise a right created by the Terms—and for collecting funds pursuant to the Terms.")]. Although Plaintiffs attempt to scrub any reference to BHL's ability to "freeze" accounts, they cannot avoid that their claims are based on BHL's ability to "preven[t] the crypto belonging to Plaintiffs and the members of the Class from being laundered and withdrawn from Binance.com." [*Martin* Compl. ¶ 50; *Baratta*

Compl. ¶ 82.) Indeed, Plaintiffs ask that Defendants "freez[e] all cryptocurrency [belonging] to Plaintiffs and the Class[.]" [*Martin* Compl. at p. 72; *Baratta* Compl. at 81.]

Furthermore, Plaintiffs' claims still rely on BHL's ability to collect transaction fees, which is a right that derives solely from the Terms. [*See, e.g.*, *Martin* Compl. ¶ 36 ("Binance has a strong monetary incentive to encourage. . . transactions involving stolen cryptocurrency."); *id.* ¶ 171 ("Defendants generated massive amounts of fees" from "their conspiracy and fraudulent scheme"); *id.* ¶ 183 ("The Binance Crypto-Wash Enterprise functions by generating fees from cryptocurrency transactions by customers."); *Baratta* Compl. ¶ 232 ("Binance did not implement adequate KYC or AML policies so that Binance.com could generate massive fees and liquidity from the maximum number of people and increase market share[.]").]

***Second***, Plaintiffs cannot escape arbitration by claiming their claims are based on statutory obligations. Indeed, this Court already considered and flatly rejected this argument in the *Osterer* Arbitration Order. The Court held:

> Plaintiff argues that his claim only arises from Know Your Customer and Anti-Money Laundering rules, as well as Defendants' failure to create or comply with adequate internal policies. But . . . Plaintiff's claims "derive" from the underlying Terms. Plaintiff specifically alleges in his Complaint that Binance failed to "halt the further movement of [Plaintiff's] stolen property." . . . Plaintiff is suing Defendants for failing to exercise a right created by the Terms—and for collecting funds pursuant to the Terms.

[*Osterer* Arbitration Order at 8 (internal citations omitted).] The Court further held:

> [A]lthough Plaintiff does allege that Defendants failed to comply with Know Your Customer and Anti-Money Laundering protocols and tethers certain allegations to similar statutory obligations, **Plaintiff also alleges that Binance failed to "halt the further movement of [Plaintiff's] stolen property."** This particular allegation regarding Defendants' failure to freeze the deposited funds has no connection to Defendant's failure (or statutory obligation) to properly identify customers or trace the origin of deposited funds. Nor does Plaintiff attempt to make such a connection. And determining whether Defendants had the ability and obligation to freeze funds will require referencing § II(D)(1) of the Terms.

[*Id.* at 10 (internal citations omitted and emphasis added).]

Despite superficial revisions, the core theory underlying the allegations in *Martin* and *Baratta* remains identical. Plaintiffs allege that BHL failed to "preven[t] the crypto belonging to Plaintiffs and the members of the Class from being laundered and withdrawn from Binance.com" [*Martin* Compl. ¶ 50; *Baratta* Compl. ¶ 82], and this failure was motivated by a desire to generate "massive amounts of fees" [*Martin* Compl. ¶ 171; *Baratta* Compl. ¶ 220].

Plaintiffs have admitted that the addition of statutory claims does not alter the analysis. [*Supra* § II.B; *Osterer* Motion for Leave at 6-7; *Osterer* Motion for Leave Reply at 5.] Judge Rothstein agreed and held the different causes of action asserted in *Martin* and *Baratta* do not change that both "cases arise from the same factual predicate and concern the same central issue" as *Osterer*. [*Martin*, ECF No. 75 at 6-7.]

Thus, Plaintiffs' claims fall squarely within the Terms' broad and all-encompassing arbitration provision, which mandates that "any" claim, "whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory," "arising in connection with or relating in any way to" the Terms "will be determined by mandatory final and binding individual (not class) arbitration" [LaVigne Decl., Ex 3 (Fracolli Decl.) at ¶ 15, Ex. 2 § X.2; *Osterer* Arbitration Order at 10 ("[T]he arbitration provision at issue is broad in scope . . . requiring arbitration of claims 'arising in connection with or relating in any way to these Terms.'")]

Accordingly, the Court should compel Plaintiffs to arbitrate their claims pursuant to the Terms.

### B. Plaintiffs Should Be Judicially Estopped from Asserting Their Claims Are Different from Those in *Osterer*

The equitable doctrine of judicial estoppel is intended to "prevent the perversion of the judicial process" and "protect [its] integrity . . . by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Slater v. United States Steel Corp.*, 871 F.3d

1174, 1180 (11th Cir. 2017) (citations omitted). This doctrine rests on the principle that "absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." *Id.* at 1180-81. When applying judicial estoppel, district courts in this Circuit consider (1) "the plaintiff's actions—whether he made inconsistent statements—and" (2) "his motive—whether he intended to make a mockery of the judicial system." *Id.* at 1181; *United States v. Munoz*, 112 F.4th 923, 935 (11th Cir. 2024) (describing the "mockery" inquiry as "whether the plaintiff actually intended to manipulate the judicial system to his advantage"). There are no "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel." *Slater*, 871 F.3d at 1181.

Here, Plaintiffs' Counsel represented "unequivocally" to this Court that their allegations in the *Osterer* Amended Complaint, which is identical to the *Martin* Complaint [*see Martin*, ECF No. 75 at 6-7; LaVigne Decl. Ex. 1], do "not [alter] the balance of the arguments for or against arbitration" [*Osterer* Motion for Leave at 6; *Osterer* Motion for Leave Reply at 4]. They also averred that the *Martin* Plaintiffs' and class members' allegations and injuries are based on the same wrongful conduct by Defendants [*Osterer* Motion for Leave at 1-2], and the "same wrongful conduct alleged in the initial [*Osterer*] Complaint" [*id.* at 6-7]. Plaintiffs also agreed that an order compelling arbitration on named class plaintiff *Osterer* would have the same force and effect on them. [*Id.* at 5.] Plaintiffs should be estopped from taking the opposite position simply to avoid arbitration and the *Osterer* Arbitration Order. *See, e.g., Meadows v. Am. Airlines*, 2024 WL 5248006, at *8 (S.D. Fla. Oct. 22, 2024), *report and recommendation adopted sub nom. Meadows v. Am. Airlines, Inc.*, 2024 WL 5245945 (S.D. Fla. Dec. 30, 2024) (holding a plaintiff was judicially estopped from arguing he is an employee of defendant company when he argued in a prior litigation that defendant terminated him as an employee).

### C. Plaintiffs Should Be Compelled to Arbitrate Their Claims Based on Collateral Estoppel Principles

Florida state law[6] recognizes collateral estoppel, or issue preclusion, which precludes a litigant from re-litigating an issue that has been previously decided. Collateral estoppel consists of five elements: (1) the identical issue was presented in a prior proceeding; (2) the issue was a critical and necessary part of the prior determination; (3) there was a full and fair opportunity to litigate the issue; (4) the parties to the prior action were identical to the parties of the current proceeding; and (5) the issue was actually litigated. *Marquardt v. State*, 156 So. 3d 464, 481 (Fla. 2015). All five elements are satisfied here.

#### 1. The Issue of Arbitrability Was Presented in the Prior Proceeding, Necessary to the Prior Determination, and Actually Litigated in *Osterer*

The first element is satisfied because the issue presented here (the arbitrability of Plaintiffs' claims), was presented in the *Osterer* Arbitration Motion. As explained above, [*see, supra* § II.D], despite their best efforts to omit and reword allegations to distance themselves from *Osterer*, the

---

[6] The preclusive effect of a judgment rendered by a federal court sitting in diversity is governed by federal common law, which in turn incorporates the law of the state where the rendering court sits. *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508-09 (2001); *Boneta v. Am. Med. Sys., Inc.,* 524 F. Supp. 3d 1304, 1319 (S.D. Fla. 2021) (Ruiz, J.) (same). Because Plaintiffs alleged diversity jurisdiction, the preclusive effect of the *Osterer* Arbitration Order is governed by Florida law, unless Florida law is "incompatible with federal interests." *Lockheed Martin*, 531 U.S. at 509. Here, federal law is virtually identical regarding collateral estoppel. *See Brown v. Zabala*, 2025 WL 1392212, at *3 (11th Cir. May 14, 2025) ("The following conditions must be present for a federal court to apply collateral estoppel: (1) the issue at stake is identical to the one involved in the prior litigation; (2) the issue was actually litigated in the prior suit; (3) the determination of the issue in the prior litigation was a critical and necessary part of the judgment in that action; and (4) the party against whom the earlier decision is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding.").

material facts and theory underlying their claims remain the same. And importantly, Plaintiffs have represented to this Court that the claims and issues are the same. [*Supra*, § II.B.]

Similarly, the second, third, and fifth elements are satisfied because the issue of arbitrability of Plaintiffs' claims was (naturally) a critical and necessary part of the Arbitration Motion and was fully and fairly litigated resulting in the well-reasoned *Osterer* Arbitration Order. Indeed, this Court considered this exact argument—including that the *Martin* Plaintiffs' and the class's claims arise from statutory rights, not BHL's Terms—and explicitly rejected it when issuing the Arbitration Order. [*See generally Osterer* Arbitration Order; *supra*, § III.B.; *see also Martin*, ECF No. 75 at 6-7.]

**2. The Parties Are Sufficiently Similar**

The fourth collateral estoppel element—that the parties in the proceedings are identical—is also satisfied, even though the *Martin* Plaintiffs were denied leave to join as named plaintiffs in *Osterer* and the *Baratta* Plaintiffs were not named plaintiffs. As an initial matter, Judge Rothstein already recognized the mutuality of the parties, holding that

> Although the [*Martin* and *Osterer*] Complaints describe the proposed classes in slightly different terms, both encompass the same proposed class of individuals whose cryptocurrency was stolen and transferred to a Binance.com account during the relevant period. . . . [E]ven with [Mr.] Zhao added as a defendant, the parties in the two actions are substantially similar."

[*Martin*, ECF No. 75 at 5.]

Further, both Florida and federal law recognize the mutuality of parties requirement is not a strict requirement, and has well-recognized exceptions. *See Fernandez v. Cruz*, 341 So. 3d 410, 414 (Fla. 3d DCA 2022) (recognizing that preclusion doctrines' requirement for mutuality of parties is not strictly enforced and has been dispensed "where special fairness or policy considerations appear to compel it"); *Taylor v. Sturgell*, 553 U.S. 880, 893 (2008) (under federal law, a nonparty may be precluded by a prior order in several circumstances); *see also Brown*, 2025

WL 1392212, at *4 ("[T]he Supreme Court has eliminated the mutuality requirement 'in applying collateral estoppel to bar relitigation of issues decided in earlier federal-court suits.'") (*citing Allen v. McCurry*, 449 U.S. 90, 94-95 (1980)).

Among others, the Supreme Court has recognized three exceptions pursuant to which Plaintiffs are bound by the *Osterer* Arbitration Order.

***First***, "'[a] person who agrees to be bound by the determination of issues in an action between others is bound in accordance with the terms of his agreement.'" *Sturgell*, 553 U.S. at 893-94; *California v. Texas*, 459 U.S. 1096, 1097 (1983) (dismissing certain defendants from a suit based on a stipulation "that each of said defendants . . . will be bound by a final judgment of this Court" on a specified issue). As discussed above, Plaintiffs represented to this Court that the *Martin* Complaint and *Osterer* Amended Complaint are based on the same claims and theory of liability, and the *Martin* Plaintiffs agreed that an order compelling arbitration on one would have the same force and effect on the other. (*Supra,* § III.B). Therefore, they agreed to be bound by the *Osterer* Arbitration Order.

***Second***, "a nonparty may be bound by a judgment because she was adequately represented by someone with the same interest who was a party to the suit." *Sturgell*, 553 U.S. at 894 (cleaned up). The Plaintiffs concede this point as well. There can be no question that Osterer has the same interest as the Plaintiffs here because the *Martin* Plaintiffs sought to be added as additional named plaintiffs on behalf of the same class and claim that they have all been injured by the same wrongful practices by Defendants. (*See Osterer* Motion for Leave at 1-2.) Nor can the Plaintiffs argue against the adequacy of representation because their current counsel represented them in *Osterer* and in the Western District of Washington.

***Third***, "a nonparty is bound by a judgment if [he] assumed control over the litigation in which that judgment was rendered. Because such a person has had the opportunity to present proofs and argument[s], he has already had his day in court even though he was not a formal party to the litigation." *Sturgell*, 553 U.S. at 895 (cleaned up). The *Martin* Plaintiffs filed their Motion for Leave to join as additional named plaintiffs while the Motion to Compel Arbitration was pending. Indeed, in their Motion for Leave and Reply papers, they had the opportunity to (and did) present arguments regarding arbitration. Thus, they have had their day in court and are bound by the *Osterer* Arbitration Order.

***Finally***, because the *Baratta* Complaint is identical to the *Martin* Complaint and the Plaintiffs are represented by the same counsel, collateral estoppel equally applies to *Baratta*. Indeed, Plaintiffs' Counsel agreed that the only difference is that *Baratta* added "two state statutory claims" [LaVigne Decl. Ex. 4 (May 19, 2025, Status Conference Tr.) at 10:16-19].

Accordingly, Plaintiffs should be precluded from re-litigating the issue of arbitrability which was already decided by the *Osterer* Arbitration Order.

### D. <u>BAM and Mr. Zhao May Invoke the Arbitration Provision to Compel Plaintiffs to Arbitrate</u>

A plaintiff bound by an arbitration agreement must arbitrate claims against a nonsignatory defendant if those claims are "both based on the same facts" and "inherently inseparable from the alleged" misconduct by a signatory. *Physician Consortium Servs., LLC v. Molina Healthcare, Inc.*, 414 F. App'x 240, 243 (11th Cir. 2011); *Caporicci U.S.A. Corp. v. Prada S.p.A.*, 2018 WL 2264194 at *3 (S.D. Fla. May 7, 2018); *accord Herrera v. West Flagler Assocs., Ltd.*, 2017 WL 9324515, at *5 (S.D. Fla. Apr. 5, 2017). This rule exists for good reason: requiring arbitration of interrelated claims against non-signatories prevents plaintiffs from "attempting an 'end run'" around their obligation to arbitrate. *Physician Consortium Servs.*, 414 F. App'x at 243.

The Court should require Plaintiffs to arbitrate their claims against BAM and Mr. Zhao because there is no dispute that the claims against BAM and Mr. Zhao are "based on the same facts" and "inherently inseparable from the alleged" misconduct asserted against BHL. Indeed, Plaintiffs allege that all of the Defendants were part of the same alleged conspiracy giving rise to their claims, and there are no independent allegations against BAM or Mr. Zhao. [*See e.g., Martin* Compl ¶ 192; *Baratta* Compl. ¶ 242.] For this exact reason, the Court held that Plaintiffs should be compelled to arbitrate against BAM, and it should again compel all parties to arbitrate Plaintiffs' claims. [*Osterer* Arbitration Order at 11 n. 6.]

## IV. CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion to Compel Arbitration and compel Plaintiffs to arbitrate their claims pursuant to the Terms, and stay the proceedings.

## V. REQUEST FOR HEARING

Pursuant to S.D. L.R. 7.1(b)(2), Defendants respectfully request oral argument on this motion. Given the different legal issues in the motion, Defendants believe that an opportunity to address any questions the Court may have concerning these issues may assist the Court. Defendants estimate that ninety minutes will be a sufficient amount of time.

## VI. S.D. FLA. L.R. 7.1(A)(2) CERTIFICATION

Pursuant to S.D. L.R. 7.1(a)(2), counsel have met and conferred and were unable to come to an agreement on the requested relief herein.

Dated: July 25, 2025

By: ***/s/ Aaron S. Weiss***

Aaron S. Weiss (FBN 48813)
aweiss@carltonfields.com
Carlton Fields, P.A.
700 N.W. 1st Ave., Ste. 1200
Miami, Florida 33136
Telephone: (305) 530-0050

Christopher N. LaVigne (*pro hac vice*)
christopher.lavigne@withersworldwide.com
Tyler Goss (*pro hac vice*)
tyler.goss@withersworldwide.com
Withers Bergman LLP
430 Park Avenue, 10th Floor
New York, New York 10022
Telephone: (212) 848-9800

Kimberly Pallen (*pro hac vice*)
kimberly.pallen@withersworldwide.com
909 Montgomery Street, Suite 300
Withers Bergman LLP
San Francisco, California 94133
Telephone: (415) 872-3200

Vahe Mesropyan (*pro hac vice*)
vahe.mesropyan@withersworldwide.com
10250 Constellation Blvd., Suite 1400
Withers Bergman LLP
Los Angeles, California 90067
Telephone: (310) 277-9930

*Attorneys for Defendant Binance Holdings, Ltd. d/b/a Binance*

By: ***/s/ Daniel Stabile***

Daniel Stabile (FBN 95750)
dstabile@winston.com
Gabriela Plasencia (FBN 115788)
gplasencia@winston.com
Winston & Strawn LLP
200 S. Biscayne Blvd., Suite 2400
Miami, Florida 33131
Telephone: (305) 910-0500

Thania Charmani (*pro hac vice*)
acharmani@winston.com
Winston & Strawn LLP
200 Park Avenue
New York, NY 10166-4196
Telephone: (212) 294-6700

*Attorneys for Defendant BAM Trading Services Inc. d/b/a/ BINANCE.US*

By: ***/s/ Harold S. Vogel, Jr.***

Harold S. Vogel, Jr. (FBN 432784)
Email: hvogel@dickinson-wright.com
Dickinson Wright PLLC
350 E. Las Olas Blvd., Ste 1750
Fort Lauderdale, Florida 33301
Telephone: (954) 991-5420
Email: hvogel@dickinson-wright.com

*Attorneys for Defendant Changpeng Zhao*

# EXHIBIT 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| PHILIP MARTIN, T.F. (NATALIE) TANG, and YATIN KHANNA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>BINANCE HOLDINGS, LTD. d/b/a BINANCE, BAM TRADING SERVICES INC. d/b/a BINANCE.US, a Delaware corporation, and CHANGPENG ZHAO,<br><br>Defendants. | CONSOLIDATED CASES<br><br>Case No. 1:25-cv-22100-RAR<br><br>Case No. 1:25-cv-22202-RAR<br><br>CLASS ACTION |
| CHARLES BARATTA, JASON RAPPAPORT, DONALD DOUTY, THOMAS VIOLA, and HYACINTH AHURUONYE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>BINANCE HOLDINGS, LTD. d/b/a BINANCE, BAM TRADING SERVICES INC. d/b/a BINANCE.US, a Delaware corporation, and CHANGPENG ZHAO,<br><br>Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION**

# TABLE OF CONTENTS

Page

I. PRELIMINARY STATEMENT ....................1

II. ARGUMENT ....................4

A. No Valid Arbitration Agreement Exists between Plaintiffs and Defendants ....................4

B. Plaintiffs' Claims Derive from Defendants' Statutory Obligations and Therefore Equitable Estoppel Does Not Apply ....................6

C. The Arbitration Agreement Is Unconscionable ....................8

1. The Arbitration Agreement Is Procedurally Unconscionable ....................8

a. The Arbitration Agreement Is a Contract of Adhesion by Which Plaintiffs Never Agreed to Be Bound ....................8

b. Plaintiffs Had No Notice of the Arbitration Agreement ....................9

2. The Arbitration Agreement Is Substantively Unconscionable ....................10

a. The Arbitration Agreement Exists Solely to Insulate Defendants from Liability ....................10

b. The Arbitration Agreement Contains Numerous Substantively Unconscionable Mechanisms ....................11

D. Defendants Cannot Enforce an Illegal Contract ....................13

E. The Doctrine of Effective Vindication Renders the Arbitration Agreement Unenforceable ....................13

1. The Arbitration Agreement Does Not Effectively Vindicate Plaintiffs' Rights to Pursue Statutory Remedies ....................14

2. The HKIAC's Fee Structure and Cost-Splitting Procedures Preclude Effective Vindication of Statutory Claims ....................16

F. Judicial Estoppel Does Not Apply ....................17

G. Collateral Estoppel Does Not Preclude Plaintiffs from Opposing Arbitration on New Grounds ....................19

1. Plaintiffs Raise New Issues Based on New Facts ....................19

**Page**

2. Plaintiffs Were Nonparties in *Osterer* and Are Not Sufficiently Similar ..... 19

III. CONCLUSION ..... 20

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Adler v. Fred Lind Manor*,
153 Wash. 2d 331 (2004) .......... 9, 12

*Agency Holding Corp. v. Malley-Duff & Assoc.*,
483 U.S. 143 (1987) .......... 12

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) .......... 14

*Ashbey v. Archstone Prop. Mgmt., Inc.*,
785 F.3d 1320 (9th Cir. 2015) .......... 5

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) .......... 8

*B.F. by & through Fields v. Amazon*,
2019 WL 9364164
(W.D. Wash. Oct. 21, 2019) .......... 7

*Basulto v. Hialeah Auto.*,
141 So. 3d 1145 (Fla. 2014) .......... 8, 9

*Bremen v. Zapata Off–Shore Co.*,
407 U.S. 1 (1972) .......... 11

*Canal Elec. Co. v. Westinghouse Elec. Corp.*,
406 Mass. 369 (1990) .......... 15

*Comedy Club, Inc. v. Improv W. Assocs.*,
553 F.3d 1277 (9th Cir. 2009) .......... 6

*Correa v. Soho House & Co.*,
2024 WL 4905197
(C.D. Cal. Nov. 27, 2024) .......... 5

*E. W. Bank v. Bingham*,
992 F. Supp. 2d 1130 (W.D. Wash. 2014) .......... 7

*Emiddio v. Fla. Office of Fin. Regul.*,
147 So.3d 587 (Fla. Dist. Ct. App. 2014) .......... 19

**Page**

*Escobar v. Celebration Cruise Operator, Inc.*,
805 F.3d 1279 (11th Cir. 2015) ....................16

*Gibbs v. Haynes Inves., LLC*,
967 F.3d 332 (4th Cir. 2020) ....................14

*Gorden v. Lloyd Ward & Assocs., P.C.*,
180 Wash. App. 552 (2014) ....................11

*Green Tree Fin. Corp. Ala. v. Randolph*,
531 U.S. 79 (2000) ....................16

*Hannon v. Original Gunite Aquatech Pools, Inc.*,
385 Mass. 813 (1982) ....................15, 16

*Holt v. O'Brien Imports of Fort Myers, Inc.*,
862 So. 2d 87 (Fla. Dist. Ct. App. 2003) ....................15

*I.U.B.A.C. Loc. Union No. 31 v. Anastasi Bros. Corp.*,
600 F. Supp. 92 (S.D. Fla. 1984) ....................13

*In re BAM Trading Servs. Inc. Sec. Litig.*,
733 F. Supp. 3d 854 (N.D. Cal. 2024) ....................12

*Integrated Sec. Servs. v. Skidata, Inc.*,
609 F. Supp. 2d 1323 (S.D. Fla. 2009) ....................5

*Jimenez v. ViaCord, LLC*,
2022 WL 4271337
(S.D. Fla. Sep. 14, 2022) ....................5

*Knutson v. Sirius XM Radio Inc.*,
771 F.3d 559 (9th Cir. 2014) ....................5

*Kroma Makeup EU, LLC v. Boldface Licensing*,
845 F.3d 1351 (11th Cir. 2017) ....................5

*Lee v. Foris Dax, Inc.*,
2025 WL 2578239
(N.D. Cal. Sep. 5, 2025) ....................7

**Page**

*Leidel v. Coinbase, Inc.*,
729 F. App'x 883 (11th Cir. 2018) ....................6

*Loc. No. 234 of United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Can. v. Henley & Beckwith, Inc.*,
66 So.2d 818 (Fla. 1953) ....................13

*Marquardt v. State*,
156 So. 3d 464 (Fla. 2015) ....................19

*McGill v. Citibank, N.A.*,
2 Cal.5th 945 (2017) ....................15

*McKee v. AT & T Corp.*,
164 Wash. 2d 372 (2008) ....................13

*Meadows v. American Airlines*,
2024 WL 5248006
(S.D. Fla. Oct. 22, 2024) ....................18

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
473 U.S. 614 (1985) ....................10

*Montana v. U.S.*,
440 U.S. 147 (1979) ....................20

*Morrison v. Cir. City Stores, Inc.*,
317 F.3d 646 (6th Cir. 2003) ....................15

*Mundi v. Union Sec. Life Ins. Co.*,
555 F.3d 1042 (9th Cir. 2009) ....................6, 7

*Nagrampa v. MailCoups, Inc.*,
469 F.3d 1257 (9th Cir. 2006) ....................11

*Nesbitt v. FCNH, Inc.*,
74 F. Supp. 3d 1366 (D. Colo. 2014),
*aff'd*, 811 F.3d 371 (10th Cir. 2016) ....................17

*New Hampshire v. Maine*,
532 U.S. 742 (2001) ....................18

Page

*Osterer v. BAM Trading Servs. Inc.*,
753 F. Supp. 3d 1289 (S.D. Fla. 2024.....2, 3, 19

*Paquin v. Campbell*,
378 So.3d 686 (Fla. Dist. Ct. App. 2024) .....7

*Parker v. Tenneco, Inc.*,
114 F.4th 786 (6th Cir. 2024) .....15

*Patterson v. Jump Trading, LLC*,
2025 WL 215519
(9th Cir. Jan. 16, 2025) .....6

*Platt v. Sodexo, S.A.*,
2025 WL 2203415
(9th Cir. Aug. 4, 2025).....13, 14

*Pokorny v. Quixtar, Inc.*,
601 F.3d 987 (9th Cir. 2010) .....11

*Porter v. Saddlebrook Resorts, Inc.*,
679 So.2d 1212 (Fla. Dist. Ct. App. 1996) .....19

*Powertel, Inc. v. Bexley*,
743 So. 2d 570 (Fla. 1st DCA 1999) .....8, 9

*Pugh v. Lady Jane's Haircuts for Men Holding Co., LLC*,
660 F. Supp. 3d 712 (M.D. Tenn. 2023).....16, 17

*Raab v. Nu Skin Enters., Inc.*,
28 Wash. App. 2d 365, 396-97 (2023).....8, 9

*Rajagopalan v. NoteWorld, LLC*,
718 F.3d 844 (9th Cir. 2013) .....6, 7

*Reichert v. Keefe Commissary Network LLC*,
542 F. Supp. 3d 1133 (W.D. Wash. 2021).....5

*ripKurrent LLC v. Richard Ballard IRA LLC*,
530 F. Supp. 3d 1281 (S.D. Fla. 2021) .....19

**Page**

*Ronderos v. USF Reddaway, Inc.*,
114 F.4th 1080 (9th Cir. 2024) ....................10, 12

*Shankle v. B-G Maint. Mgmt. of Colo., Inc*,
163 F.3d 1230 (10th Cir. 1999) ....................16

*Slater v. U.S. Steel Corp.*,
871 F.3d 1174 (11th Cir. 2017) ....................17, 18

*Smith v. Bd. of Dirs. of Triad Mfg., Inc.*,
13 F.4th 613 (7th Cir. 2021) ....................15

*State Farm Mutual Automobile Insurance co. v. Tri-Borough NY Medical Practice P.C.*,
120 F.4th 59 (2d Cir. 2024) ....................14, 15

*Taylor v. Sturgell*,
553 U.S. 880 (2008) ....................19, 20

*United States v. Munoz*,
112 F.4th 923 (11th Cir. 2024) ....................18

*Uthe Tech. Corp. v. Aetrium, Inc.*,
808 F.3d 755 (9th Cir. 2015) ....................14

*Ward v. AMS Serv., LLC*,
606 Fed. App'x 506 (11th Cir. 2015) ....................18

*Zephyr Haven Health & Rehab Center, Inc. v. Hardin ex rel. Hardin*,
122 So.3d 916 (Fla. Dist. Ct. App. 2013) ....................12

**STATUTES, RULES, AND REGULATIONS**

9 U.S.C.
§2....................8

18 U.S.C.
§1962(c)-(d) ....................2
§1964(c) ....................14, 15

**Page**

California Unfair Competition Law, Cal. Bus. & Prof. Code
§17200.....................................................................................................................2

Massachusetts Consumer Protection Act, M.G.L.
93A §2.....................................................................................................................2

Plaintiffs Philip Martin, T.F. (Natalie) Tang, Yatin Khanna (collectively, the "*Martin* Plaintiffs"), Charles Baratta, Jason Rappaport, Donald Douty, Thomas Viola, and Hyacinth Ahuruonye (collectively, the "*Baratta* Plaintiffs," and together with the *Martin* Plaintiffs, "Plaintiffs"), respectfully submit their opposition to Defendants' Motion to Compel Arbitration (the "Motion" or "Mot.") (ECF No. 137).

## I. PRELIMINARY STATEMENT[1]

Binance, its founder and controlling shareholder CZ, and its subsidiary BAM, engaged in a scheme to grow Binance into the world's largest crypto-exchange by unlawfully doing business in the U.S. and willfully violating numerous U.S. laws. ¶¶35-43. Even though Defendants knew bad actors laundered stolen crypto at Binance, they refused to comply with the Bank Secrecy Act ("BSA") and other U.S. laws, or implement basic Know-Your-Customer ("KYC") or anti-money laundering ("AML") policies to prevent crypto-laundering. ¶¶87-113; B ¶¶99-106. For years, Binance became a magnet and hub for laundering stolen crypto. ¶6.

The authorities caught up with Defendants on November 21, 2023, when Binance and CZ pled guilty to criminal charges and regulatory violations brought by the United States Department of Justice (the "DOJ") arising out of Defendants' scheme. ¶¶67-70. Binance paid more than $4.3 billion in penalties, and CZ paid a $50 million fine, was forced to step down from his role at Binance, and was sentenced to prison. ¶¶68-72.

---

[1] As used herein, references to "¶" or "¶¶" refer to the Class Action Complaint in *Martin* (Case No. 1:25-cv-22100-RAR, ECF No. 1). References to "B ¶" or "B ¶¶" refer to the Class Action Complaint in *Baratta* (Case No. 1:25-cv-22202-RAR, ECF No. 1). "Defendants" refers to Defendants Binance Holdings, Ltd. ("Binance"), BAM Trading Services, Inc. ("BAM"), and Changpeng Zhao ("Zhao" or "CZ"). Throughout this memorandum, unless otherwise noted, emphasis is added and internal quotation marks and citations are omitted.

Plaintiffs (and the potentially thousands of Class members) were harmed by Defendants' refusal to comply with their statutory obligations.[2] Plaintiffs had cryptocurrency stolen by bad actors who laundered their crypto at Binance, thereby eliminating Plaintiffs' ability to track, prove ownership over, and potentially recover their crypto. ¶¶147-153; B ¶¶196-202. Plaintiffs allege claims against Defendants for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1962(c)-(d), conversion, and aiding and abetting conversion. ¶¶211-259; B ¶¶266-316. The *Baratta* Plaintiffs also allege claims for violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code §17200 and Massachusetts Consumer Protection Act, M.G.L. 93A §2. B ¶¶317-333.

Plaintiffs did not have accounts with Binance and never agreed to arbitrate or waive their ability to bring a class action. ¶¶19-21; B ¶¶29, 36, 41, 46, 50. Nevertheless, Defendants seek to force Plaintiffs (and all Class members) to arbitrate their claims before the HKIAC under Hong Kong law based on an agreement that Plaintiffs never consented to in any form. Defendants argue Plaintiffs must arbitrate their claims against Defendants because the Court compelled the plaintiff to arbitration in *Osterer v. BAM Trading Servs. Inc.*, 753 F. Supp. 3d 1289 (S.D. Fla. 2024) (the "*Osterer* Arbitration Order")[3]; Mot. at 11-13.

Even though both Plaintiffs and Mr. Osterer seek to hold Defendants accountable for their role in laundering stolen crypto, there are critical differences in their claims that warrant denial of the Motion. Instead of addressing these differences, Defendants rely exclusively on the *Osterer* Arbitration Order, falsely describe Plaintiffs' claims as "identical" to those in *Osterer* (Mot. at 2),

---

[2] *See, e.g.*, Declaration of David C. Silver in Support of Plaintiffs' Opposition to Defendants' Motion to Compel Arbitration (the "Silver Decl."), submitted herewith, ¶3. References to the exhibits attached to the Silver Decl. appear herein as "Ex."

[3] *Osterer v. BAM Trading Servs. Inc.*, Case No. 1:23-CV-22083-RAR (S.D. Fla.) ("*Osterer*").

and mischaracterize W.D. Wash. District Judge Rothstein's order transferring the *Martin* action from Seattle (ECF No. 75) as having addressed issues relevant to the Motion, even though Judge Rothstein's holding focused solely on Defendants' motion to transfer. Mot. at 9-10.

The Court has acknowledged the *Osterer* Arbitration Order does not apply to Plaintiffs[4] and indicated it would "look at [Plaintiffs' claims] separate and distinct from what" was done in *Osterer*. Osterer Tr. at 46:18-21. A review of Plaintiffs' claims here will demonstrate Defendants' Motion should be denied. The *Osterer* Arbitration Order, which compelled arbitration based on the doctrine of equitable estoppel, focused on allegations related to Mr. Osterer's unjust enrichment claim, which sought restitution of fees Binance earned pursuant to the Terms of Use (the "Terms"). *Osterer*, 753 F. Supp. 3d at 1296-97. Here, equitable estoppel does not apply because Plaintiffs' claims are unrelated to the Terms. Plaintiffs do not allege unjust enrichment or seek restitution of fees. In fact, Plaintiffs' complaints expressly disclaim they are relying on any Binance contracts to assert any claims, that any of Plaintiffs' claims derive from the underlying terms of any agreement, and that Plaintiffs rely on any actions Defendants have or could have taken pursuant to the terms of any contracts or agreements with users of Binance. ¶10; B ¶11.

Additionally, the Court should deny the Motion based on several new legal arguments Plaintiffs raise that the Court did not previously consider because they were not presented in *Osterer*. First, Defendants have not established a valid arbitration agreement existed between Binance and Plaintiffs or each of the bad actors who laundered Plaintiffs' crypto.

Second, even if Defendants satisfy their burden of establishing a valid agreement, the Court should deny the Motion because the arbitration agreement is unconscionable. Among other things,

[4] *See* Status Conference Transcript, dated December 19, 2024, Ex. 1 (the "Osterer Tr.") at 33:18-20.

the arbitration costs in Hong Kong before the HKIAC are so exorbitant it will effectively deprive Plaintiffs, as well as a substantial number of Class members, of their day in court. As detailed below and in the Declaration of Terence Wong submitted herewith (the "Wong Decl."), a Hong Kong solicitor and experienced practitioner before the HKIAC, arbitrations before the HKIAC are prohibitively expensive for all claimants other than those with massive claims. In fact, based on HKIAC's fee structure, plaintiff Viola, who had nearly $10,000 stolen and laundered at Binance, will likely be required to spend nearly $36,000 to arbitrate his claims, or 3.6 times his injury. Wong Decl. ¶¶14, 16. Compelling arbitration will force Mr. Viola and potentially thousands of Class members to abandon their claims because arbitration before the HKIAC would be cost prohibitive. Silver Decl. ¶¶3-8. And those costs do not include the amounts they would be responsible for if they do not prevail in the arbitration, as the HKIAC under Hong Kong law often forces the loser to pay the other side's attorneys' fees and expenses. Wong Decl. ¶¶21-26.

Third, it was illegal for Binance to conduct business in the U.S. or enter into a contract with U.S. users. Therefore, it would be illegal and against public policy to enforce the Binance Terms against any U.S. residents, including Plaintiffs and the Class. Finally, mandating arbitration in Hong Kong will prevent Plaintiffs from effectively pursuing their RICO or state statutory claims, or obtaining RICO treble damages, and therefore the arbitration agreement is unenforceable under the effective vindication doctrine.

For the reasons set forth herein, the Court should deny Defendants' Motion.

## II. ARGUMENT

### A. No Valid Arbitration Agreement Exists between Plaintiffs and Defendants

The party seeking to compel arbitration has the burden "to show (1) the existence of a valid, written agreement to arbitrate; and, if it exists, (2) that the agreement to arbitrate encompasses the

dispute at issue." *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015); *Integrated Sec. Servs. v. Skidata, Inc.*, 609 F. Supp. 2d 1323, 1324 (S.D. Fla. 2009). The movant must prove "the existence of an agreement to arbitrate by a preponderance of the evidence." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014). Where the district court is "considering a motion to compel arbitration which is opposed on the grounds that there is no binding agreement to arbitrate, [it] should give the opposing party the benefit of all reasonable doubts and inferences that may arise." *Reichert v. Keefe Commissary Network LLC*, 542 F. Supp. 3d 1133, 1141 (W.D. Wash. 2021); *see also Jimenez v. ViaCord, LLC*, 2022 WL 4271337, at *1-2 (S.D. Fla. Sep. 14, 2022).

Defendants do not (and cannot) show that any arbitration agreement between the parties exists.[5] Defendants admit Plaintiffs never created or owned Binance accounts, and therefore never agreed to the Terms. BHL RFA Responses at 3:23-25. And Defendants have not presented evidence identifying the hackers who stole Plaintiffs' digital assets or showing they agreed to arbitrate.[6] BHL RFA Responses at 4:18-21. This lack of evidentiary showing is dispositive. Moreover, Binance regularly modified its Terms, and even though Defendants have produced

---

[5] Defendants have not even presented the full arbitration agreement for any date, as they failed to produce the "Exceptions to Agreement to Arbitrate" section referenced in the arbitration clauses of the Terms. Ex. 2, ECF No. 137-1 ¶2. Since Defendants withheld these exceptions, Defendants have not shown that Plaintiffs' claims are not excluded. *See* Ex. 3, ECF No. 71-2 (the "BHL RFA Responses") at 5:27-6:5. A complete copy of the agreement is "essential" to determining the agreement's scope. *Correa v. Soho House & Co.*, 2024 WL 4905197, at *7 (C.D. Cal. Nov. 27, 2024) (denying motion to compel arbitration where defendants failed to produce full arbitration agreement).

[6] Further, Plaintiffs are not within the scope of "You" because they are not parties to the agreement. "You" refers to the unnamed criminals who laundered Plaintiffs' crypto, who are not parties to this case. ECF No. 71-3 at 2; *see also Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 845 F.3d 1351, 1355 (11th Cir. 2017) (disputes involving anyone not a "party" to the agreement fall outside the scope of the agreement and could not be compelled to arbitration).

several agreements from April 20, 2020 to June 24, 2022, they have not established that any of those agreements were in effect with respect to any of the Plaintiffs, or which Terms were in effect for Plaintiffs who had crypto laundered at Binance during 2023 or 2024.[7] ECF No. 137-1, Ex. 3 (Declaration of Erin Fracolli, dated July 19, 2023 ("Fracolli Decl.") ¶7).

### B. Plaintiffs' Claims Derive from Defendants' Statutory Obligations and Therefore Equitable Estoppel Does Not Apply

Courts apply state contract law when deciding whether to compel a nonparty to arbitration. *Rajagopalan v. NoteWorld, LLC*, 718 F.3d 844, 847 (9th Cir. 2013) ("[T]raditional principles of state law determine whether a contract [may] be enforced by or against nonparties to the contract through . . . estoppel."); *see also Leidel v. Coinbase, Inc.*, 729 F. App'x 883, 886 (11th Cir. 2018) ("State law controls on the issue of whether an arbitration clause in a contract can be enforced against a nonsignatory to that contract.").[8] "[G]enerally arbitration clauses and contracts do not bind non-parties in the absence of such extraordinary relationships" like "an intended third party beneficiary, an agent, or an assignee." *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1287 (9th Cir. 2009). Here, the Court should not compel arbitration under the doctrine of equitable estoppel.

Defendants seek to vastly expand the scope of equitable estoppel, which applies to a non-signatory "where the nonsignatory knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement." *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d

---

[7] Plaintiffs Baratta, Rappaport, Douty, and Viola, had their stolen cryptocurrency laundered at Binance in July-December 2024, and Ahuruonye in 2023, one to two years after the June 2022 Terms. B ¶¶20-49.

[8] The result would be the same under federal common law, however, because Plaintiffs allege only statutory and conversion claims. *See Patterson v. Jump Trading, LLC*, 2025 WL 215519, at *1 (9th Cir. Jan. 16, 2025) (applying federal law and finding equitable estoppel did not apply to purely statutory claims).

1042, 1046 (9th Cir. 2009); *see also Paquin v. Campbell*, 378 So.3d 686, 690 (Fla. Dist. Ct. App. 2024) (explaining an arbitration agreement only applies to non-signatories when they sue for breach of contract or receive direct benefits from the contract). Neither situation under *Mundi* or *Paquin* applies here.[9] A non-signatory plaintiff "knowingly exploits a contract *only* where he or she brings contract-based claims that arise under the contract containing the arbitration agreement." *B.F. by & through Fields v. Amazon*, 2019 WL 9364164, at *6 (W.D. Wash. Oct. 21, 2019); *Paquin*, 378 So.3d at 690. Here, Plaintiffs' claims are based on Defendants' BSA and RICO violations, not a contract.

Defendants rely on the Court's ruling in *Osterer* based on a different complaint to suggest Plaintiffs' claims relate to the Terms. But the Court acknowledged that the *Osterer* Arbitration Order did not consider the RICO claim or other amendments in the proposed amended complaint:

> I don't know that I necessarily weighed in on when you guys were seeking amendment throughout the pendency of my decision on the motion to compel arbitration here . . . I don't know that I weighed in on all -- I'm talking about some of these new allegations regarding RICO, and some of the things that they're telling me are going to take it outside.

Osterer Tr. at 32:5-14.

Plaintiffs base their claims on Defendants' RICO violations and failure to implement KYC and AML procedures as required by the BSA. The *Baratta* Plaintiffs' also allege violations of California and Massachusetts statutes. Because Plaintiffs' "statutory claims 'd[o] not arise out of or relate to the contract that contained the arbitration agreement[,]'" equitable estoppel does not apply. *Rajagopalan*, 718 F.3d at 848. *See, e.g.*, *Lee v. Foris Dax, Inc.*, 2025 WL 2578239, at *11 (N.D. Cal. Sep. 5, 2025) (recognizing plausibility of claims against crypto exchange for BSA violations).

---

[9] While the *Mundi* court applies California state law, "the Washington Supreme Court has cited *Mundi* favorably with respect to its analysis of equitable estoppel in the arbitration context." *E. W. Bank v. Bingham*, 992 F. Supp. 2d 1130, 1133 (W.D. Wash. 2014).

### C. The Arbitration Agreement Is Unconscionable

Under the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. §2. "The final phrase of §2 . . . permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability[.]" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).

"Unconscionability is a common law doctrine that courts have used to prevent the enforcement of contractual provisions that are overreaches by one party to gain an unjust and undeserved advantage which it would be inequitable to permit him to enforce." *Basulto v. Hialeah Auto.*, 141 So. 3d 1145, 1157 (Fla. 2014). Unconscionability is delineated into two categories, procedural and substantive. Procedural unconscionability is "[t]he absence of meaningful choice when entering into the contract" and "relates to the manner in which the contract was entered." *Id.*; *see also Raab v. Nu Skin Enters., Inc.*, 28 Wash. App. 2d 365, 396-97 (2023) (same). Substantive unconscionability relates to "the unreasonableness of the terms" and "focuses on the agreement itself." *Hialeah Auto.*, 141 So. 3d at 1157-59 (noting courts use "balancing approach . . . allowing one prong to outweigh another provided that there is at least a modicum of the weaker prong."); *see also Nu Skin Enters.*, 28 Wash. App. 2d at 396-97.

Under either Washington or Florida law, the Terms are both procedurally and substantively unconscionable, and therefore unenforceable.

#### 1. The Arbitration Agreement Is Procedurally Unconscionable

##### a. The Arbitration Agreement Is a Contract of Adhesion by Which Plaintiffs Never Agreed to Be Bound

Contracts of adhesion are procedurally unconscionable. *Powertel, Inc. v. Bexley*, 743 So. 2d 570, 575 (Fla. 1st DCA 1999) ("One of the hallmarks of procedural unconscionability is the absence

of any meaningful choice on the part of the consumer."). In determining whether a contract is an adhesion contract, courts consider: "(1) whether the contract is a standard form printed contract, (2) whether it was prepared by one party and submitted to the other on a take it or leave it basis, and (3) whether there was no true equality of bargaining power between the parties." *Adler v. Fred Lind Manor*, 153 Wash. 2d 331, 347 (2004).

Here, Plaintiffs, who never held Binance accounts and were not parties to the Terms, had absolutely no bargaining power. ¶¶19-21; B ¶¶29, 36, 41, 46, 50. Further, users who do hold Binance accounts are given a standard form printed contract with an arbitration agreement prepared by Binance with no ability to negotiate. Fracolli Decl. ¶3. Additionally, Binance could modify the Terms at any time. *Id.* Since using a Binance account constituted agreement to the Terms, users storing crypto at Binance forced them to agree to the terms to withdraw their assets, reflecting lack of meaningful choice. *See Bexley*, 743 So. 2d at 575 ("One of the hallmarks of procedural unconscionability is the absence of any meaningful choice on the part of the consumer.").

**b. Plaintiffs Had No Notice of the Arbitration Agreement**

"When analyzing unconscionability, courts must bear in mind the bargaining power of the parties involved and the interplay between procedural and substantive unconscionability. In the typical case of consumer adhesion contracts, where there is virtually no bargaining between the parties, the commercial enterprise or business responsible for drafting the contract is in a position to unilaterally create one-sided terms that are oppressive to the consumer, the party lacking bargaining power." *Hialeah Auto.*, 141 So. 3d at 1160–61.

Here, Plaintiffs are individual crypto investors, not sophisticated business parties. *Nu Skin Enters.*, 28 Wash. App. 2d at 402 ("Washington courts have recognized . . . that it makes a difference whether the plaintiff is a consumer[.]"). The arbitration agreement contains a delegation clause and

provides for a forum with a cost-splitting and a choice of law provision, which is "procedurally unconscionable" because it is "difficult (even for a lawyer) to figure out whether [plaintiff] would have to pay half the arbitration costs or not." *Ronderos v. USF Reddaway, Inc.*, 114 F.4th 1080, 1092 (9th Cir. 2024).

Indeed, the Superior Court of Justice for Ontario found Binance's arbitration agreement unconscionable and unenforceable for precisely this reason. Ex. 4, Decision in *Lochan v. Binance Holdings Ltd.*, 2023 ONSC 6714 (CanLII). The Ontario Court held the plaintiffs, who held Binance accounts, were not bound by the arbitration provision because "the details, including the changeable location, of the arbitration clause were buried out of sight, and the logistical complexity and expense of arbitration were not revealed anywhere." *Id.* at 9-10. Accordingly, the court found that "the inequality of information and inequality of power in the bargaining relationship that resulted from this informational deficit was at a maximum." *Id.* at 9. Here, the inequality is more profound, as Plaintiffs never agreed to the Terms, never used the Binance platform, and had no possible reason to know they would be forced to arbitrate claims related to the theft of their assets in Hong Kong under Hong Kong law.

**2. The Arbitration Agreement Is Substantively Unconscionable**

**a. The Arbitration Agreement Exists Solely to Insulate Defendants from Liability**

A contract may be set aside if enforcing its forum selection clause "would be unreasonable and unjust; or that proceedings in the contractual forum will be so gravely difficult and inconvenient that [the resisting party] will for all practical purposes be deprived of his day in court." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 632 (1985). For the venue of an arbitration agreement to be enforceable, "the place chosen [must have] some logical nexus to one of the parties or the dispute" and "the selected jurisdiction must be suitable, available, and able to

accomplish substantial justice." *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1288 (9th Cir. 2006) (citing *Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 17 (1972)).

Here, no party has any nexus to HKIAC or Hong Kong. No Defendant is domiciled in Hong Kong or maintains a physical presence there. ¶¶23-25. Binance is not even licensed to operate in Hong Kong.[10] Defendants seek to compel Plaintiffs to arbitrate their claims in a foreign country and under foreign law, neither of which is related to *any* party, solely to deter Plaintiffs from bringing their meritorious claims. *See Gorden v. Lloyd Ward & Assocs., P.C.*, 180 Wash. App. 552, 565 (2014) (noting "[c]ontracts to assist individuals with financial setbacks should not include a dispute resolution provision that is prohibitively expensive and one-sided").

**b. The Arbitration Agreement Contains Numerous Substantively Unconscionable Mechanisms**

Hong Kong law and HKIAC rules impose a cost-splitting model where all parties pay out-of-pocket expenses, and the loser of the arbitration is potentially liable for all costs, including the legal fees and expenses of opposing parties. Wong Decl. ¶¶13-18, 21-26. The high cost and risk of being saddled with Defendants' costs is substantively unconscionable for Plaintiffs, who bring RICO, state statutory, and common law claims that would allow them to recover attorney's fees with little to no reciprocal risk of having to pay Defendants' fees. *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 1004 (9th Cir. 2010) (finding "loser pays" provision substantively unconscionable and noting "litigation in federal court provides for a successful RICO plaintiff to recover attorney's fees, but does not expose such a plaintiff to the risk of having to pay the defendant's fees if the suit is unsuccessful").

Even if Plaintiffs were not required to pay if they lose, the payment of Plaintiffs' fees and expenses to arbitrate their claims alone would be cost prohibitive and unconscionable, as described

---

[10] Exs. 5-6.

in the Wong Decl., where, for example, a claim for under $37,000 would likely cost more than the value of the claim and a claim for $5,000 would cost approximately $35,000, or 6 times losses. Wong Decl. ¶¶13-17.[11] These arbitration costs are prohibitive and will deter potential plaintiffs from bringing claims against Defendants. "[O]nce prohibitive costs are established, the opposing party [Defendants] must present contrary offsetting evidence to enforce arbitration." *Adler*, 153 Wash. 2d at 354-53 (noting that the fee-splitting provision may be substantively unconscionable if prohibitive fees are established); *see Zephyr Haven Health & Rehab Center, Inc. v. Hardin ex rel. Hardin*, 122 So.3d 916 (Fla. Dist. Ct. App. 2013). Defendants have not presented any offsetting evidence showing the arbitration costs or payment of Defendants' litigation fees are reasonable.

Additionally, the Terms establish a unilateral one-year limit to bring *any claim* against Binance – but this limit does not apply to Binance's claims. Wong Decl., Ex. 1 at 22, Terms of Use; *see also Ronderos*, 114 F.4th 1094-95) (finding arbitration agreement unconscionable where "[m]ost egregiously, the filing provision effectively imposes the one-year statute of limitations on only [plaintiff's] claims."). Plaintiffs would otherwise have four years, for example, to bring their RICO claim. *See Agency Holding Corp. v. Malley-Duff & Assoc.*, 483 U.S. 143, 156 (1987). Plaintiffs' time to bring RICO and state law claims cannot be unfairly reduced.

Finally, the arbitration agreement's class action waiver is substantively unconscionable because certain plaintiffs (including, plaintiff Viola), and potentially a substantial number of Class members, lost less than the fees to prosecute a claim in HKIAC, and class-wide relief would be their

---

[11] These costs are entirely different from arbitration costs with the AAA based on contracts of adhesion, where defendants pay all costs other than a small $225 filing fee. Ex. 7. And to avoid unconscionability issues, defendants often pay the filing fee where claimants have small losses. *In re BAM Trading Servs. Inc. Sec. Litig.*, 733 F. Supp. 3d 854, 870-72 (N.D. Cal. 2024) (holding AAA arbitration agreement not unconscionable where, *inter alia*, BAM pays all fees, including filing fees for claims under $10,000).

only avenue for recovery. Wong Decl. ¶¶14-17; Silver Decl. ¶¶3-8. It would be nearly impossible for potential plaintiffs who lost less than, or close to, the exorbitant fees charged by HKIAC to find adequate counsel willing to represent them. *McKee v. AT & T Corp.*, 164 Wash. 2d 372, 397 (2008) ("Without access to class-wide relief, competent counsel would not be available to redress many meritorious claims.").

### D. Defendants Cannot Enforce an Illegal Contract

As a separate ground for denying Defendants' Motion, Plaintiffs submit Defendants are seeking to enforce an illegal contract. Plaintiffs and the putative Class were not Binance customers and never agreed to Binance's Terms; nor could they have. Binance was not licensed or authorized to do business in the United States. To the contrary, Binance has asserted it intentionally had no business dealings in the U.S. Fracolli Decl. ¶8.

In entering into the Plea Agreement with the DOJ, however, Binance admitted and pleaded guilty to conspiring to conduct, and conducting, an unlicensed MTB in the U.S. in violation of federal law. Therefore, it would be illegal to enforce the Binance Terms against any U.S. residents (including Plaintiffs and the Class). Florida courts have long held a court cannot enforce an illegal contract or illegal arbitration agreement. *See, e.g.*, *Loc. No. 234 of United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Can. v. Henley & Beckwith, Inc.*, 66 So.2d 818 (Fla. 1953); *see also I.U.B.A.C. Loc. Union No. 31 v. Anastasi Bros. Corp.*, 600 F. Supp. 92 (S.D. Fla. 1984).

### E. The Doctrine of Effective Vindication Renders the Arbitration Agreement Unenforceable

"Under the effective vindication doctrine, an arbitration provision is unenforceable if it 'operate[s] as a prospective waiver of a party's right to pursue statutory remedies,' including a prohibition on 'the assertion of certain statutory rights.'" *Platt v. Sodexo, S.A.*, 2025 WL 2203415,

at *7 (9th Cir. Aug. 4, 2025). Here, Binance's Terms violate the effective vindication doctrine and are therefore unenforceable.

**1. The Arbitration Agreement Does Not Effectively Vindicate Plaintiffs' Rights to Pursue Statutory Remedies**

The effective vindication doctrine applies to "an arbitration agreement forbidding the assertion of certain statutory rights." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 236 (2013). RICO provides that an injured person may sue in "any appropriate United States district court" and ensures that a victorious plaintiff "***shall*** recover threefold [their] damages[.]" 18 U.S.C. §1964(c). The arbitration agreement, however, prohibits Plaintiffs from pursuing RICO, as well as state statutory claims, because these are U.S. federal and state statutory claims, the Terms apply Hong Kong law, and the arbitration would be located in Hong Kong.

In *State Farm Mutual Automobile Insurance co. v. Tri-Borough NY Medical Practice P.C.*, the Second Circuit held an arbitration agreement was unenforceable because it prevented the plaintiff from effectively vindicating its RICO cause of action. 120 F.4th 59, 91 (2d Cir. 2024) ("[T]erms in an arbitration agreement that have the effect of prospectively waiving a party's statutory remedies are not enforceable."). There, as here, even though the terms of the arbitration agreement did "not expressly prohibit [plaintiff] from bringing federal statutory claims, enforcement of the agreement would have the *effect* of preventing [plaintiff] from effectively vindicating its RICO claims[.]" *Id.* ("[w]e conclude that the arbitrations materially interfere with [plaintiff's] ability to seek relief under RICO," such that "[plaintiff] would be prevented from effectively vindicating its RICO cause of action").[12]

[12] The Ninth Circuit held that substituting Singapore law for federal law provides "too great" a disparity since there was no remedy "equivalent to RICO treble damages" under Singapore law. *Uthe Tech. Corp. v. Aetrium, Inc.*, 808 F.3d 755, 761 (9th Cir. 2015). The Fourth Circuit is also in accord. *See Gibbs v. Haynes Inves., LLC*, 967 F.3d 332, 344–45 (4th Cir. 2020).

Given an injured person's right to treble damages under RICO, arbitration through the HKIAC will "materially interfere" with Plaintiffs' ability to recover treble damages. *State Farm*, 120 F.4th at 91; 18 U.S.C. §1964(c). Federal courts across the country have routinely held arbitration agreements that "restrict[] monetary relief" that is a "substantive statutory remed[y]" as "unenforceable as a prospective waiver of . . . statutory rights." *Parker v. Tenneco, Inc.*, 114 F.4th 786, 798 (6th Cir. 2024); *Sodexo*, 2025 WL 2203415, at *7; *Smith v. Bd. of Dirs. of Triad Mfg., Inc.*, 13 F.4th 613, 621 (7th Cir. 2021) (finding arbitration agreement unenforceable where "the plain text of [the statute] and the terms of the arbitration provision cannot be reconciled: what the statute permits, the plan precludes"). Because the arbitration agreement "significantly undermines [RICO's] remedial purpose[,]" it is "not enforceable." *Morrison v. Cir. City Stores, Inc.*, 317 F.3d 646, 673 (6th Cir. 2003).

The same is true for Plaintiffs' state statutory claims. Under the prospective waiver doctrine, states recognize that waiving statutory remedies violates public policy. Under Florida law, "an individual cannot waive the protection of a statute that is designed to protect both the public and the individual." *Holt v. O'Brien Imports of Fort Myers, Inc.*, 862 So. 2d 87, 89 (Fla. Dist. Ct. App. 2003). The same is true of California law. *See McGill v. Citibank, N.A.*, 2 Cal.5th 945, 962 (2017).

Massachusetts law is in chorus: "a statutory right may not be disclaimed if the waiver could do violence to the public policy underlying the legislative enactment." *Canal Elec. Co. v. Westinghouse Elec. Corp.*, 406 Mass. 369, 378 (1990). Under this standard, Massachusetts courts have held that a waiver of consumers' rights under the Massachusetts Consumer Protect Act ("MCPA") are not enforceable. *Id.* And a consumer cannot be required to submit a MCPA claim to arbitration. *Hannon v. Original Gunite Aquatech Pools, Inc.*, 385 Mass. 813, 826 (1982) (holding a consumer was not required to submit to arbitration on a Ch. 93A claim). A stay pending arbitration

improperly limits a person's ability to bring a claim under Ch. 93A §9(6). *Id.* Accordingly, Plaintiff Douty and the Massachusetts Subclass cannot be sent to arbitration and have their state statutory claim stayed.

### 2. The HKIAC's Fee Structure and Cost-Splitting Procedures Preclude Effective Vindication of Statutory Claims

Under HKIAC's 2024 rules, Plaintiffs must pay exorbitant fees to prosecute the arbitration. Wong Decl. ¶¶9-18. Large arbitration costs can "preclude" a plaintiff "from effectively vindicating" their federal statutory rights in arbitration. *Green Tree Fin. Corp. Ala. v. Randolph*, 531 U.S. 79, 90 (2000). For some plaintiffs, and potentially thousands of Class members, the costs to arbitrate exceed their damages. Wong Decl. ¶¶15-17. This "place[s] [Plaintiffs] between the proverbial rock and a hard place—it prohibit[s] use of the judicial forum, where a litigant is not required to pay for a judge's services, and the prohibitive cost substantially limit[s] use of the arbitral forum." *Shankle v. B-G Maint. Mgmt. of Colo., Inc*, 163 F.3d 1230, 1235 (10th Cir. 1999) (finding arbitration agreement "failed to provide an accessible forum" to resolve "statutory rights").[13]

Moreover, Hong Kong law and HKIAC rules impose a model where the loser pays all costs, including the opposing parties' fees and costs.[14] Wong Decl. ¶¶21-26. For Plaintiffs and a substantial portion of the Class, "the possibility" of paying these costs would "deter" them from vindicating their rights. *Pugh v. Lady Jane's Haircuts for Men Holding Co., LLC*, 660 F. Supp. 3d

[13] Defendants will likely argue that risk of "prohibitive costs" is "too speculative" to invalidate the arbitration agreement. *Randolph*, 531 U.S. at 91. But these costs are not speculative, as they are the actual fees based on HKIAC rules. *See* Wong Decl. ¶¶9-18. Indeed, Mr. Osterer has already incurred some of these costs. *Id.* ¶20.

[14] While the Eleventh Circuit has held a challenge to the cost-splitting provision of an arbitration agreement is appropriate at the award-enforcement stage, the court found it dispositive that the defendant would "pay the initial cost of arbitration." *Escobar v. Celebration Cruise Operator, Inc.*, 805 F.3d 1279, 1292 (11th Cir. 2015). Here, Plaintiffs bear the burden of the initial costs, such that they lack "access to the forum." *Id.*; *see also* Wong Decl. ¶13.

712, 724 (M.D. Tenn. 2023) (finding a cost-splitting provision unenforceable because of its chilling effect on vindicating federal statutory rights); *see also Nesbitt v. FCNH, Inc.*, 74 F. Supp. 3d 1366, 1374 (D. Colo. 2014), *aff'd*, 811 F.3d 371 (10th Cir. 2016) (finding fee splitting provision in arbitration agreement "would effectively preclude [plaintiff] from pursuing her claims").[15]

**F. Judicial Estoppel Does Not Apply**

Defendants argue judicial estoppel precludes Plaintiffs from asserting their claims differ from those in *Osterer*. The judicial estoppel doctrine prohibits a party from changing their positions when that party makes inconsistent statements to make a mockery of the judicial system. *Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1180 (11th Cir. 2017). It does not apply here because Plaintiffs have never asserted the legal claims in *Osterer* are the same as alleged in *Martin* and *Baratta*. Each Complaint contains distinct legal claims and Defendants make no showing that Plaintiffs intended to mislead the Court.

First, Defendants anchor their judicial estoppel argument on statements made by counsel in *Osterer* that the *Martin* Plaintiffs' "allegations and injuries are based on the same wrongful conduct by Defendants" and the "same wrongful conduct alleged in the initial [*Osterer*] Complaint." Mot. at 14; *Osterer* ECF No. 62 at 1-2, 6-7 ("*Osterer* Motion for Leave"). But Defendants exaggerate the breadth of these statements. Despite factual overlap regarding Defendants' wrongful conduct, each complaint has distinct legal claims and liability theories.

The *Osterer* complaint included claims for unjust enrichment, conversion, and aiding and abetting conversion. The *Martin* Complaint, however, includes claims for civil RICO, conversion,

[15] Plaintiffs might also be forced to provide security for arbitration costs in advance under HKIAC rules, as Defendants intend to force Mr. Osterer to provide security for arbitration costs. Wong Decl. ¶¶27-29; *see also Pugh*, 660 F. Supp. 3d at 724 (finding arbitration agreement unenforceable because "the plaintiffs would be at least potentially liable and could be required to deposit half of the anticipated costs in advance").

and aiding and abetting conversion.[16] Finally, the *Baratta* complaint includes claims for civil RICO, conversion, aiding and abetting conversion, California's Unfair Competition Law, and the MCPA. These distinct legal claims are determinative in whether Defendants' arbitration agreement is unconscionable or violates the effective vindication doctrine.

For the second factor, the Court must determine whether "a plaintiff intended to mislead the court." *Slater*, 871 F.3d at 1186. Here, Defendants fail to present any evidence regarding Plaintiffs' intent or how Plaintiffs purportedly derived any "unfair advantage." *Ward v. AMS Serv., LLC*, 606 Fed. App'x 506, 510 (11th Cir. 2015). That Plaintiffs point out the *Martin* and *Baratta* Complaints plainly assert different claims provides no unfair advantage. And the *Martin* Plaintiffs did not succeed in amending the *Osterer* Complaint, so Defendants cannot point to any advantage resulting from Plaintiffs' statements. *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001) ("Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations [] and thus poses little threat to judicial integrity.").

Against this backdrop, the cases Defendants cite are easily distinguished. *Slater* involved a plaintiff who failed to disclose a lawsuit in a bankruptcy proceeding. 871 F.3d 1174. Next, *United States v. Munoz* dealt with a criminal defendant who lied about engaging in criminal activity under oath during a prior proceeding. 112 F.4th 923, 935 (11th Cir. 2024). And *Meadows v. American Airlines* dealt with a plaintiff who argued he was employed by the defendant after previously arguing the defendant terminated him. 2024 WL 5248006, at *8 (S.D. Fla. Oct. 22, 2024). Here, however, the Court denied the *Martin* Plaintiffs' motion for leave to file an amended complaint as moot and

---

[16] Defendants fail to compare the operative *Osterer* complaint to the current *Martin* and *Baratta* complaints. Mot. at 11-14. The proposed amended *Osterer* complaint is irrelevant to the Court's ruling on Defendants motion to compel in *Osterer*.

did not rely on Plaintiffs' statements in issuing the *Osterer* Arbitration Order. *See Osterer*, 753 F. Supp. 3d at 1298.

Lastly, Defendants fail to argue judicial estoppel applies to the *Baratta* Plaintiffs, so it is waived. *See ripKurrent LLC v. Richard Ballard IRA LLC*, 530 F. Supp. 3d 1281, 1297 (S.D. Fla. 2021). Nor could they, as the *Baratta* Plaintiffs did not attempt to join the *Osterer* litigation.

### G. Collateral Estoppel Does Not Preclude Plaintiffs from Opposing Arbitration on New Grounds

#### 1. Plaintiffs Raise New Issues Based on New Facts

For collateral estoppel to apply, an identical issue must be presented in a prior proceeding and actually litigated. *Marquardt v. State*, 156 So. 3d 464, 481 (Fla. 2015). Collateral estoppel does not apply to issues not litigated in a prior proceeding. *Porter v. Saddlebrook Resorts, Inc.*, 679 So.2d 1212, 1215 (Fla. Dist. Ct. App. 1996).

Collateral estoppel does not apply. Plaintiffs assert new legal claims that, as the Court acknowledged, were not previously addressed. *See* Osterer Tr. at 32:5-14. Additionally, Plaintiffs raise several new potentially dispositive legal arguments that were not litigated in Osterer, including that the arbitration agreement is unconscionable, unenforceable as an illegal contract, and violates the effective vindication doctrine. And Plaintiffs were unaware of the details of the costs or risks of arbitrating in Hong Kong until after the *Osterer* arbitration commenced. *Emiddio v. Fla. Office of Fin. Regul.*, 147 So.3d 587, 590 (Fla. Dist. Ct. App. 2014) (collateral estoppel is inapplicable "if there is a change in circumstances creating a new issue to be litigated").

#### 2. Plaintiffs Were Nonparties in *Osterer* and Are Not Sufficiently Similar

Defendants cite *Taylor v. Sturgell* for three different theories under which nonparties can be subject to collateral estoppel. *See* 553 U.S. 880, 893-94 (2008). None apply here. First, as

explained above, Plaintiffs did not concede the *Martin* and *Osterer* complaints are based on the same legal claims. The *Martin* complaint materially differs from the proposed amended complaint in *Osterer*. And the *Baratta* complaint differs from all *Martin* or *Osterer* complaints.

Second, the "limited circumstances" in which a nonparty is bound because they were "adequately represented by someone with the same interests who [wa]s a party to the suit" include certified "class actions" and "suits brought by trustees, guardians, and other fiduciaries." *Sturgell*, 553 U.S. at 894. None of these circumstances are present here, as Defendants' sole basis is that the *Martin* Plaintiffs unsuccessfully attempted to join in *Osterer*. *See id.*

Third, Plaintiffs did not assume control over the *Osterer* litigation. The court in *Taylor* points to *Montana v. U.S.*, where the Supreme Court held collateral estoppel applies if a party assumes control over the litigation in which that judgment was rendered. 440 U.S. 147, 154 (1979). But in *Montana*, the United States exercised control over the prior proceeding because it, *inter alia*, reviewed and approved the operative complaint and directed an appeal to the Supreme Court. *Id.* Here, Defendants cannot show any Plaintiffs exercised control over *Osterer*.

## III. CONCLUSION

For the forgoing reasons. Plaintiffs respectfully request that the Court deny Defendants' Motion in its entirety.

DATED: September 12, 2025

Respectfully submitted,

SILVER MILLER
DAVID C. SILVER
Florida Bar No.: 572764

*/s/ David C. Silver*
DAVID C. SILVER

JASON S. MILLER
Florida Bar No.: 072206
4450 NW 126th Avenue, Suite 101
Coral Springs, FL 33065
Telephone: 954/516-6000
dsilver@silvermillerlaw.com
jmiller@silvermillerlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
ERIC I. NIEHAUS (admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
ericn@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN (admitted *pro hac vice*)
EVAN J. KAUFMAN (admitted *pro hac vice*)
JONATHAN A. OHLMANN (admitted *pro hac vice*)
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
ekaufman@rgrdlaw.com
johlmann@rgrdlaw.com

HERMAN JONES LLP
JOHN C. HERMAN
3424 Peachtree Road NE, Suite 1650
Atlanta, GA 30326
Telephone: 404/504-6500
404/504-6501 (fax)
jherman@hermanjones.com

KELLER ROHRBACK L.L.P.
LYNN LINCOLN SARKO
DEREK W. LOESER (admitted *pro hac vice*)
CHRIS N. RYDER (admitted *pro hac vice*)
1201 Third Avenue, Suite 3400
Seattle, WA 98101
Telephone: 206/623-1900
206/623-3384 (fax)
lsarko@kellerrohrback.com
dloeser@kellerrohrback.com
cryder@kellerrohrback.com

Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was electronically filed with the Clerk of Court on this 12th day of September 2025 by using the CM/ECF system which will send a notice of electronic filing to the following CM/ECF participant(s): All Counsel of Record.

*/s/ David C. Silver*
DAVID C. SILVER

# EXHIBIT 12

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 25-cv-22100-RAR**
**Case No. 25-cv-22202-RAR**

**PHILIP MARTIN**, *et al.*,
*individually and on behalf of*
*all others similarly situated,*

Plaintiffs,

v.

**BINANCE HOLDINGS, LTD.**
*d/b/a* **BINANCE**, *et al.*

Defendants.
_________________________________________/

**CHARLES BARATTA**, *et al.*,
*individually and on behalf of*
*all others similarly situated,*

Plaintiffs,

v.

**BINANCE HOLDINGS, LTD.**
*d/b/a* **BINANCE**, *et al.*

Defendants.
_________________________________________/

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........ 1

II. ARGUMENT ........ 2

A. The *Osterer* Arbitration Order Applies to *Martin* and *Baratta* Because All Three Cases are Based on the Same Factual Predicate and Underlying Issues ........ 2

B. Plaintiff's Policy Arguments Are Meritless and Do Not Alter the Force and Effect of the *Osterer* Arbitration Order ........ 4

1. Plaintiffs' Policy Arguments Must Go to the Arbitrator ........ 4

2. The Terms Are Not Procedurally or Substantively Unconscionable ........ 5

3. The Effective Vindication Argument Fails Because This Court Will Retain Jurisdiction and Provide Plaintiffs With a Subsequent Opportunity for Review ........ 8

4. Plaintiffs' Illegality Argument is a Red Herring ........ 10

III. CONCLUSION ........ 10

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Bielski v. Coinbase, Inc.*
87 F.4th 1003 (9th Cir. 2023) ....................5

*Cruz v. Cingular Wireless, LLC*,
648 F.3d 1205 (11th Cir. 2011)....................5

*Fred Lurie Assocs., Inc. v. Glob. All. Logistics, Inc.*,
453 F.Supp.2d 1351 (S.D. Fla. 2006), *order clarified*, 2006 WL 3626296
(S.D. Fla. Aug. 15, 2006) ....................6

*Green Tree Fin. Corp.-Alabama v. Randolph*,
531 U.S. 79 (2000) ....................8

*Kakawi Yachting, Inc. v. Marlow Marine Sales, Inc.*,
2014 WL 12650701 (M.D. Fla. Oct. 3, 2014) ....................3

*Lambert v. Signature Healthcare*, LLC,
2022 WL 2571959 (11th Cir. July 8, 2022) ....................5

*Lee v. Foris Dax, Inc.*,
2025 WL 2578239 (N.D. Cal. Sep. 5, 2025) ....................3

*Lindo v. NCL (Bahamas), Ltd.*,
652 F.3d 1257 (11th Cir. 2011)....................8, 9

*Lipcon v. Underwriters at Lloyd's, London*,
148 F.3d 1285 (11th Cir. 1998)....................9

*P & S Bus. Machs., Inc. v. Canon, USA, Inc.*
331 F.3d 804 (11th Cir. 2003) ....................7

*Payne v. Savannah Coll. of Art & Design, Inc.*,
81 F.4th 1187 (11th Cir. 2023) ....................7, 8

*Rent–A–Center, West, Inc. v. Jackson*,
561 U.S. 63 (2010)....................5

*Ronderos v. USF Reddaway, Inc.*,
114 F.4th 1080 (9th Cir. 2024) ....................7

*Venture Gen. Agency, LLC v. Wells Fargo Bank, N.A.*,
2019 WL 3503109 (N.D. Cal. Aug. 1, 2019) ....................3

**State Cases**

*FI-Tampa, LLC v. Kelly-Hall*,
135 So.3d 563 (Fla. 2d DCA 2014) ....................9

*Just. Admin. Comm'n v. Wahid*,
390 So.3d 705 (Fla. 3d DCA 2024) ....................5

*Kendall Imports, LLC v. Diaz*,
215 So.3d 95 (Fla. 3d DCA 2017) ....................5

*Zephyr Haven Health & Rehab Ctr., Inc. v. Hardin ex rel. Hardin*,
122 So.3d 916 (Fla. 2d DCA 2013) ....................7

**Other Authorities**

GLOBAL ARBITRATION NEWS (Sep. 19, 2024), available at
https://www.globalarbitrationnews.com/2024/09/19/hong-kong-arbitration-as-an-ideal-mechanism-for-resolving-crypto-disputes/ ....................6

SILVER MILLER LAW, available at: https://www.silvermillerlaw.com/about-us/who-we-are/ ....................8

## I. INTRODUCTION

This Court's *Osterer* Arbitration Order should apply with equal force here, and Plaintiffs' Opposition fails to raise any valid reason for a different outcome.[1] At the May 19, 2025, conference, this Court—like Judge Rothstein in the Western District of Washington, who transferred these cases here—noted the stark similarities between *Martin*, *Baratta*, and *Osterer*, and consolidated the *Martin* and *Baratta* cases for the issue of arbitrability. The Court noted that because it already decided the claims in *Osterer* are subject to arbitration, the *Martin* and *Baratta* parties should "focus on whatever daylight plaintiffs believe exists between" these cases "and the *Osterer* opinion," because "that's really all this comes down to."[2]

Plaintiffs have had numerous opportunities to distinguish their claims from those asserted in *Osterer*, including here and in other federal courts. Plaintiffs' Opposition[3] does not address the Court's "key question." The only distinguishing factor they point to is that, unlike *Osterer*, the *Martin* and *Baratta* Complaints include statutory, including RICO, claims. But Plaintiffs previously told this Court that those purported changes—which were all before the Court in the *Osterer* Proposed Amended Complaint—had "not alter[ed] the balance of the arguments for or against arbitration." [ECF No. 137 at 6-7 (citations omitted).] In that vein, this Court and Judge Rothstein have already rejected Plaintiffs' attempts to distinguish the *Martin* and *Baratta* Complaints from the *Osterer* Complaint. Indeed, Judge Rothstein transferred these cases to this Court because "Plaintiffs' attempts to distinguish this case from *Osterer* do not change the fact that the two cases arise from the same factual predicate and concern the same central issue [as

---

[1] Other than terms defined herein, all capitalized terms retain the same meaning as in Defendants' Motion to Compel Arbitration [ECF No. 137] (the "Motion").
[2] Declaration of Christopher N. LaVigne, dated October 3, 2025 ("LaVigne Decl."), Ex. 1 at 18:18-21. The LaVigne Declaration and its Exhibit are attached hereto as Exhibit A.
[3] "Opposition" or "Opp." means the Opposition to Defendants' Motion [ECF No. 138].

*Osterer*].” [ECF No. 75 at 6.] No matter what statutory claims Plaintiffs add to their complaints, they are still “suing Defendants for failing to exercise a right created by the Terms [freezing the hackers’ accounts]—and for collecting funds pursuant to the Terms.” [*Osterer* Arb. Order at 8.]

Recognizing they cannot meaningfully distinguish these cases from *Osterer*, Plaintiffs now pivot to arguments about the purported unconscionability of the Arbitration Provision. But the Delegation Provision makes clear that issues of purported unconscionability are reserved for the arbitrator and not this Court. Plaintiffs do not specifically attack the Delegation Provision and thus they have waived any challenge to its enforceability. Moreover, the weight of caselaw dictates what this Court already determined regarding the Terms and the Arbitration Provision: they are valid and binding.

Accordingly, Plaintiffs’ claims must be compelled to arbitration.

## II. ARGUMENT

### A. The *Osterer* Arbitration Order Applies to *Martin* and *Baratta* Because All Three Cases are Based on the Same Factual Predicate and Underlying Issues

As explained in Defendants’ Motion, *Martin* and *Baratta* are copycats of *Osterer*. [ECF No. 137 at 7-9.] All three complaints seek to hold the *same* defendants liable to the *same* putative class for the *same* purported wrongful acts. Specifically, each seeks to hold BAM, BHL, and Mr. Zhao[4] liable to a class of individuals whose cryptocurrency was stolen and transferred to Binance.com, under the theory that Defendants are responsible because they enabled hackers to launder cryptocurrency through Binance.com. [*Id.*] Indeed, in transferring these cases to this Court, Judge Rothstein recognized as much, noting that Plaintiffs’ attempts in *Martin* and *Baratta* to alter their allegations to “distinguish this case from *Osterer* do not change the fact that the [c]ases arise

---

[4] Mr. Zhao was not initially named as a defendant in *Osterer*, but Osterer sought leave to add him.

from the same factual predicate and concern the same central issue." [ECF No. 75 at 6-7.]

Plaintiffs fail again to create any material distinction between these cases and *Osterer*. Plaintiffs do not dispute that all three are essentially the same case; instead they argue the Court should divert from its reasoning in the *Osterer* Arbitration Order because Plaintiffs here "base their claims on Defendants' RICO violations and failure to implement KYC and AML procedures as required by the BSA." [Opp. at 7.][5] However, Plaintiffs made the same argument in *Osterer*, and this Court explicitly considered and rejected it. [*See Osterer* Arb. Order at 10-11.] Plaintiffs argue that by adding a RICO claim and state claims, the *Osterer* Arbitration Order's reasoning does not apply here, but they fail to provide any cogent analysis why alleging additional causes of action *based on the same underlying facts and purported wrongful acts* should render a different result. Indeed, Judge Rothstein aptly recognized that adding new causes of action does not change the fact that the cases are substantially similar. [ECF No. 75 at 5-7]; *see also Kakawi Yachting, Inc. v. Marlow Marine Sales, Inc.*, 2014 WL 12650701, at *8 (M.D. Fla. Oct. 3, 2014) (nonsignatory estopped from avoiding arbitration because, "[r]egardless of how such is couched, the allegations

---

[5] Notably, Plaintiffs cannot base their claims on the BSA. *Venture Gen. Agency, LLC v. Wells Fargo Bank, N.A.*, 2019 WL 3503109, at *7 (N.D. Cal. Aug. 1, 2019) ("While [the BSA and Patriot Act] provide for civil and criminal penalties, a defendant's liability [is to the government]. For this reason, courts are unanimous in holding that there is no private right of action under the BSA or Patriot Act.") (citing cases). Plaintiffs mischaracterize the holding in *Lee v. Foris Dax, Inc.*, 2025 WL 2578239, at *11 (N.D. Cal. Sep. 5, 2025). There, plaintiff did not allege a claim directly under the BSA. Instead, the court found plaintiff's claim under California's Unfair Competition Law premised on Crypto.com's alleged failure to adhere to BSA obligations were sufficiently plausible to survive a motion to dismiss. The court did not address the issue this Court and Judge Rothstein already decided: no matter what statute Plaintiffs' trot out, the legal theory and facts underlying Plaintiffs' claims derive from the Terms, not the BSA. [*Osterer* Arb. Order at 10-11 ("[Plaintiffs'] particular allegation regarding Defendants' failure to freeze the deposited funds has no connection to Defendant's failure (or statutory obligation) to properly identify customers or trace the origin of deposited funds.").] Further, Plaintiffs' assertion that "Defendants . . . refused to comply with the [BSA] and other U.S. laws, or implement basic [KYC] or [AML] policies," cannot reasonably include BAM. Plaintiffs themselves concede that BAM's U.S. platform was created to register with FinCEN and comply with KYC and BSA requirements. (*Martin* Compl. ¶¶ 24, 128.)

relate to and derive from the [agreement.]").

Plaintiffs also repeat the argument that they raised in *Osterer*, *i.e.*, that they never agreed to the Terms (so no contract exists) and thus equitable estoppel does not bind them because they are not relying on the Terms. [Opp. at 4-7.] But, as in *Osterer*, Plaintiffs do not (and cannot) dispute that for the hackers to deposit the purportedly stolen assets into a Binance.com account, they must have created accounts and agreed to the Terms. [*Osterer* Arb. Order at 7 ("Here, the parties agree that it was the unknown hacker, not Plaintiff, who agreed to the Terms containing the Arbitration Provision."); Fracolli Decl. ¶¶ 3-7.] Thus, Defendants have carried their burden to show a valid, enforceable arbitration provision exists by virtue of the hackers using the Binance.com exchange.[6] And, again, because Plaintiffs' claims against BHL, for failing to freeze the purportedly stolen funds due to a desire to collect transaction fees, derive from those Terms, Plaintiffs are bound to the Terms by equitable estoppel. [*Osterer* Arb. Order at 10-11; ECF No. 75 at 6-7.]

At bottom, Plaintiffs have failed to show any "daylight [that] exists between the *Martin* case, the [*Baratta*] case, and the *Osterer* opinion." [LaVigne Decl., Ex. 1 (May 19, 2025, Status Conference Tr.) at 18:18-20.] Accordingly, just as the Court did in *Osterer*, the Court should compel *Martin* and *Baratta* to arbitration.

### B. Plaintiff's Policy Arguments Are Meritless and Do Not Alter the Force and Effect of the *Osterer* Arbitration Order

#### 1. Plaintiffs' Policy Arguments Must Go to the Arbitrator

Plaintiffs raise three policy arguments to avoid arbitration: unconscionability, effective

---

[6] Four of the *Baratta* Plaintiffs allege that their crypto assets were stolen in 2023 and "July-December 2024," which is "one to two years after the June 2022 Terms," [Opp. at 6 n.7]. They argue Defendants have not shown what Terms were in effect at that time. Not so. Defendants offered Terms which were in effect in 2023 and 2024 as support in their prior motion to compel in *Martin,* which contain the same Arbitration and Delegation Provisions. [*See* ECF No. 68-10 (Terms, last revised June 3, 2024, retrieved on January 13, 2025).]

vindication, and illegality. If these arguments are not already waived, they are impermissible. When a delegation provision requires questions of arbitrability to be decided by an arbitrator (as here),[7] "courts only retain jurisdiction to review a challenge to [the delegation provision itself]." *Attix v. Carrington Mortg. Servs., LLC*, 35 F.4th 1284, 1303 (11th Cir. 2022). In conducting this limited review, the Court must "ensure that [Plaintiffs'] challenge asserted *really* is about the delegation agreement." *Id.* at 1304 (emphasis in original). Rather than identifying any flaws specific to the Delegation Provision, Plaintiffs' policy arguments solely attack the Arbitration Provision. Eleventh Circuit case law requires that the "'substantive nature of the party's challenge meaningfully goes to the parties' precise agreement to delegate[.]'" *Id.* Accordingly, the Delegation Provision must be enforced. *Rent–A–Center, West, Inc. v. Jackson*, 561 U.S. 63, 73-74 (2010) (enforcing delegation provision when arguments were not directed specifically at that provision).

**2. The Terms Are Not Procedurally or Substantively Unconscionable**

Plaintiffs' argument that the Arbitration Provision should be invalidated because it is a contract of adhesion is not supported by law. While adhesion contracts contain "some level of procedural unconscionability," *Bielski v. Coinbase, Inc.* 87 F.4th 1003, 1014 (9th Cir. 2023), they are routinely enforced. *See, e.g.*, *Lambert v. Signature Healthcare*, LLC, 2022 WL 2571959, at *6 (11th Cir. July 8, 2022); *Just. Admin. Comm'n v. Wahid*, 390 So.3d 705, 711 (Fla. 3d DCA 2024); *Kendall Imports, LLC v. Diaz*, 215 So.3d 95, 110 (Fla. 3d DCA 2017). Indeed, consumer contracts are almost universally "adhesive," yet routinely enforced to compel arbitration. *Cruz v. Cingular Wireless, LLC*, 648 F.3d 1205, 1211 (11th Cir. 2011).

---

[7] There is a delegation provision in the Terms as well as in the HKIAC Rules (the "Delegation Provision"), which delegate questions concerning scope or validity of the Arbitration Provision to the arbitrator. [*See* Terms § X.2; *e.g.*, HKIAC Art. 19.2.]

Nor should the Arbitration Provision be invalidated because, as Plaintiffs argue, they "had no possible reason to know they would be forced to arbitrate claims[.]" [Opp. at 10.] This simply repeats Plaintiffs' complaint that because they did not sign the Terms they should not be bound by them, and should be rejected for the same reason this Court compelled Osterer to arbitrate. [*Supra* § II.A.] As this Court previously noted, "the parties agree that it was the unknown hacker, not Plaintiff[s], who agreed to the Terms containing the Arbitration Provision." [*Osterer* Arb. Order at 7.] That Plaintiffs were unaware of the Arbitration Provision is irrelevant to the Court's equitable estoppel analysis. [*Id.* at 6-12.][8]

Neither is the Arbitration Provision substantively unconscionable. *First*, Plaintiffs allege the Terms' selection of Hong Kong as the venue exists solely to insulate Defendants from liability, purportedly because Defendants are not citizens of Hong Kong. [Opp. at 11.] But this is not the appropriate inquiry. Plaintiffs' speculative claim about Defendants' relation to Hong Kong, does not meet their "heavy burden [to show] that the forum selection clauses are unreasonable and should be set aside." *Fred Lurie Assocs., Inc. v. Glob. All. Logistics, Inc.*, 453 F. Supp. 2d 1351, 1357 (S.D. Fla. 2006), *order clarified*, 2006 WL 3626296 (S.D. Fla. Aug. 15, 2006). In fact, with operations globally, BHL's choice of Hong Kong is both rational and commercially sensible.[9]

*Second*, Plaintiffs' argument that the Arbitration Provision is unconscionable because the "Terms establish a unilateral one-year limit to bring *any claim* against Binance" is likewise

---

[8] Plaintiffs' citation to *Lochan v. Binance Holdings Ltd.*, 2023 ONSC 6714 (CanLII)) is irrelevant. [Opp. at 10.] That case concerns the Canadian law of unconscionability, and is based upon Canadian public policy—neither of which is at issue here. [ECF No. 140-4 ¶¶ 36, 52.] Placing any reliance on *Lochan* would contravene and undermine the FAA and U.S. policy regarding arbitration.

[9] Hanusch, P. "Hong Kong arbitration as an ideal mechanism for resolving crypto-disputes," GLOBAL ARBITRATION NEWS (Sept. 19, 2024), available at: https://www.globalarbitrationnews.com/2024/09/19/hong-kong-arbitration-as-an-ideal-mechanism-for-resolving-crypto-disputes/.

meritless. [Opp. at 12.] Plaintiffs omit that the Terms also expressly state that "[i]f applicable law prohibits a one-year limitation period for asserting claims, any claim must be asserted within the shortest time period permitted by applicable law." [Terms at 23.][10]

*Third*, Plaintiffs' argument that the Arbitration Provision is unconscionable because of the cost-shifting provision is speculative and unsupported. [Opp. at 11-12.][11] Generally, "[t]he financial difficulty that a party might have in litigating in the selected forum is not a sufficient ground by itself for refusal to enforce a valid forum selection clause." *P & S Bus. Machs., Inc. v. Canon, USA, Inc.* 331 F.3d 804, 807 (11th Cir. 2003). "[F]or [Plaintiffs] to prove that [the Arbitration Provision] is unconscionable because of the agreement's cost-shifting provision, [they] must provide evidence of (1) the amount of fees [they are] likely to incur and (2) [their] inability to pay those fees." *Payne v. Savannah Coll. of Art & Design, Inc.*, 81 F.4th 1187, 1196 (11th Cir. 2023) ("*Payne*") (cleaned up).

Plaintiffs have not presented any evidence of their inability to pay costs. Nor have they shown that they *will* incur costs. The only evidence Plaintiffs provide is the Wong Declaration, which states the "arbitral tribunal *may* make an order requiring a party to provide security." [ECF No. 139 ("Wong Decl.") ¶ 28 (citing HKIAC Article 24).] But the Wong Declaration conveniently omits that pursuant to HKIAC Article 34 the tribunal (i) may *limit* the recoverable costs of the

---

[10] Plaintiffs' reliance on *Ronderos v. USF Reddaway, Inc.*, 114 F.4th 1080, 1094-95 (9th Cir. 2024) is misplaced. There, the court applied California law and held the time limit rendered the arbitration provision unconscionable because it deprived plaintiff of tolling arguments. In contrast, the Terms toll the one-year period until "the party asserting the claim first knows or *reasonably should know* of the act, omission or default giving rise to the claim." [Terms at 23.]

[11] Plaintiffs' Washington cases are inapplicable. [Opp. at 12.] The one Florida case Plaintiffs cite helps Defendants' position. *Zephyr Haven Health & Rehab Ctr., Inc. v. Hardin ex rel. Hardin*, 122 So. 3d 916 (Fla. 2d DCA 2013) (holding the "alleged inability to pay the cost of arbitration was insufficient to establish that arbitration agreement was unconscionable.").

arbitration and (ii) may apportion all or part of the costs *only if* the tribunal "determines that apportionment is reasonable." [HKIAC Art. 34.2, 34.3.] Moreover, as advertised on Plaintiffs' counsel's website, Plaintiffs will not be required to pay costs unless they prevail.[12] Thus, all Plaintiffs have shown is that they *may* incur costs, which is insufficient to invalidate the Arbitration Provision. *Payne*, 81 F.4th at 1196-97 ("risk" of upfront costs does not demonstrate Plaintiffs "will incur those costs"); *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000) ("The 'risk' that Randolph will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement."). Finally, Plaintiffs' argument that the Arbitration Provision is unconscionable because they *may* end up being liable for Defendants' costs was rejected by *Payne*: "[t]he 'problem' for [Plaintiffs] is that [they] might win. And if [they] were to prevail, [Defendants] would be required to pay for the arbitration." *Payne*, 81 F.4th at 1196-97.[13]

### 3. The Effective Vindication Argument Fails Because This Court Will Retain Jurisdiction and Provide Plaintiffs With a Subsequent Opportunity for Review

Plaintiffs' attempt to invalidate the Arbitration Provision based on the effective vindication doctrine also fails. As a threshold issue, the doctrine does not apply here because this Court will retain jurisdiction over the matters and there will be a subsequent opportunity for review at the award-enforcement stage. *Lindo v. NCL (Bahamas), Ltd.*, 652 F.3d 1257, 1269 (11th Cir. 2011) (effective vindication doctrine applies only if there is "no subsequent opportunity for review."). Plaintiffs' argument also fails on the merits.

---

[12] "Who We Are," SILVER MILLER LAW, available at: https://www.silvermillerlaw.com/about-us/who-we-are/ ("If we are not successful in helping recover money or property for our clients in a contingency-fee case, they do not have to pay us a fee[,]" and that "we only get paid if we have successfully secured for our clients actual, demonstrable recoveries.").

[13] Because this substantive unconscionability argument overlaps with Plaintiffs' effective vindication argument, Plaintiffs' arguments regarding the potential costs being more than a potential award are addressed in Section II.B.3 *infra* at 9-10.

First, they argue that the Terms' choice of Hong Kong law prohibits them from pursuing their statutory claims in arbitration. [Opp. at 14.] But Plaintiffs also do not demonstrate that Hong Kong law would deny them remedies similar to those they seek here. *Lindo*, 652 F.3d at 1269; *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285 (11th Cir. 1998) (in case where plaintiff asserted statutory claims under the Securities Exchange Act, and choice of law and forum provisions which provided for application of English law, court found the provisions enforceable "since English law provided adequate remedies to vindicate policies underlying U.S. securities law"); *see generally Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228 (2013). Indeed, as the Eleventh Circuit held, "choice-of-law clauses may be enforced even if the substantive law applied in arbitration potentially provides reduced remedies . . . than those available under U.S. law[.]" *Lindo*, 652 F.3d at 1269 (11th Cir. 2011).

Second, Plaintiffs argue the effective vindication doctrine invalidates the Arbitration Provision because some of the Plaintiffs' or Class members' costs may exceed their potential award. But they provide only one Plaintiff as an example. Plaintiff Viola alleges she lost only $9,717 and according to Mr. Wong, her fees will be more than her award. This again is speculative because (1) the HKIAC may reduce the costs, and (2) there is no indication that Plaintiffs are paying any costs. In any event, as clearly espoused by the Supreme Court, "the fact that it is not worth the expense involved in proving a statutory remedy does not constitute the elimination of the right to pursue that remedy." *Italian Colors*, 570 U.S. at 236; *FI-Tampa, LLC v. Kelly-Hall*, 135 So.3d 563, 568 (Fla. 2d DCA 2014) (finding no evidence "that the costs of arbitration were so clearly prohibitive as to prevent any resident of the nursing home from pursuing her statutory

remedies.”).[14]

#### 4. Plaintiffs’ Illegality Argument is a Red Herring

## III. CONCLUSION

For the foregoing reasons, the Court should grant Defendants’ Motion to Compel.

**Dated: October 3, 2025**

By: ***/s/ Aaron S. Weiss***
Aaron S. Weiss (FBN 48813)
aweiss@carltonfields.com
Carlton Fields, P.A.
700 N.W. 1st Ave., Ste. 1200
Miami, Florida 33136
Telephone: (305) 530-0050

Christopher N. LaVigne (*pro hac vice*)
christopher.lavigne@withersworldwide.com
Tyler Goss (*pro hac vice*)
tyler.goss@withersworldwide.com
Withers Bergman LLP
430 Park Avenue, 10th Floor
New York, New York 10022
Telephone: (212) 848-9800

Kimberly Pallen (*pro hac vice*)
kimberly.pallen@withersworldwide.com
909 Montgomery Street, Suite 300
Withers Bergman LLP
San Francisco, California 94133
Telephone: (415) 872-3200

Vahe Mesropyan (*pro hac vice*)
vahe.mesropyan@withersworldwide.com
10250 Constellation Blvd., Suite 1400
Withers Bergman LLP
Los Angeles, California 90067
Telephone: (310) 277-9930

*Attorneys for Defendant Binance*

By: ***/s/ Daniel Stabile***
Daniel Stabile (FBN 95750)
dstabile@winston.com
Gabriela Plasencia (FBN 115788)
gplasencia@winston.com
Winston & Strawn LLP
200 S. Biscayne Blvd., Suite 2400
Miami, Florida 33131
Telephone: (305) 910-0500

Thania Charmani (*pro hac vice*)
acharmani@winston.com
Winston & Strawn LLP
200 Park Avenue
New York, NY 10166-4196
Telephone: (212) 294-6700

*Attorneys for Defendant BAM Trading Services Inc. d/b/a/ BINANCE.US*

By: ***/s/ Harold S. Vogel, Jr.***
Harold S. Vogel, Jr. (FBN 432784)
Email: hvogel@dickinson-wright.com
Dickinson Wright PLLC
350 E. Las Olas Blvd., Ste 1750
Fort Lauderdale, Florida 33301
Telephone: (954) 991-5420
Email: hvogel@dickinson-wright.com

*Attorneys for Defendant Changpeng Zhao*

---

[14] Moreover, as the Court is aware, the Osterer Arbitration in Hong Kong has been stayed pending resolution of Defendants’ instant Motion. [*Osterer*, ECF No. 96 at 1-2.] Indeed, if the Court compels Plaintiffs to arbitration as well, it may impact “the parties’ arbitration strategies,” which may be altered to “promot[e] efficiencies and preserv[e] resources.” [*Id.* at 2.]

# EXHIBIT 13

2026 WL 739476
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.

Phillip MARTIN, et al., individually and on behalf of all others similarly situated, Plaintiffs,
v.
BINANCE HOLDINGS LTD. d/b/a Binance, et al., Defendants.
Charles Baratta, et al., individually and on behalf of all others similarly situated, Plaintiffs,
v.
Binance Holdings Ltd., d/b/a Binance, et al., Defendants

CASE NO. 25-CV-22100-RAR,
CASE NO. 25-CV-22202-RAR
|
Signed 03/16/2026

**Attorneys and Law Firms**

David Chad Silver, Jason Stuart Miller, Silver Miller, Coral Springs, FL, Chris N. Ryder, Derek W. Loeser, Lynn Lincoln Sarko, Keller Rohrback LLP, Seattle, WA, Eric Ian Niehaus, Pro Hac Vice, Evan J. Kaufman, Pro Hac Vice, Jonathan A. Ohlmann, Pro Hac Vice, Samuel H. Rudman, Pro Hac Vice, Robbins Geller Rudman and Dowd LLP, Melville, NY, John C. Herman, Pro Hac Vice, Herman Jones LLP, Atlanta, GA, for Plaintiffs in 25-CV-22100.

David Chad Silver, Silver Miller, Coral Springs, FL, Chris N. Ryder, Derek W. Loeser, Lynn Lincoln Sarko, Keller Rohrback LLP, Seattle, WA, for Consol Plaintiffs in 25-CV-22100.

Aaron Stenzler Weiss, Carlton Fields, P.A., Miami, FL, Christopher N. Lavigne, Pro Hac Vice, Tyler Goss, Pro Hac Vice, Withers Bergman LLP, New York, NY, Kimberly A. Pallen, Pro Hac Vice, Withers Bergman LLP, San Francisco, CA, Sean David Jackson, Ballard Spahr LLP, Seattle, WA, Vahe Mesropyan, Pro Hac Vice, Withers Bergman LLP, Los Angeles, CA, for Defendant Binance Holdings Ltd in 25-CV-22100.

Daniel Tramel Stabile, Gabriela Ana Plasencia, Winston & Strawn/Chicago, Miami, FL, Athanasia Charmani, Pro Hac Vice, Winston & Strawn/Chicago, New York, NY, Blake Eddward Marks-Dias, Todd T. Williams, Corr Cronin LLP, Seattle, WA, for Defendant BAM Trading Services Inc. in 25-CV-22100

Harold S. Vogel Jr., Dickinson Wright PLLC, Fort Lauderdale, FL, Alicia Cobb, Quinn Emanuel Urquhart & Sullivan LLP, Seattle, WA, Avi Perry, Pro Hac Vice, Quinn Emanuel Urquhart & Sullivan LLP, Washington, DC, Brenna Ledvora, Pro Hac Vice, Quinn Emanuel Urquhart & Sullivan LLP, Chicago, IL, Jacob S. Frenkel, Pro Hac Vice, Dickinson Wright PLLC, Washington, DC, Michael Linneman, Pro Hac Vice, Peter H. Fountain, Pro Hac Vice, Quinn Emanuel Urquhart & Sullivan LLP, New York, NY, Shalia Marie Sakona, Quinn Emanuel Urquhart & Sullivan LLP, Miami, FL, for Defendant Changpeng Zhao in 25-CV-22100

Chris N. Ryder, Derek W. Loeser, Lynn Lincoln Sarko, Keller Rohrback LLP, Seattle, WA, for Plaintiffs in 25-CV-22202.

Daniel Tramel Stabile, Winston & Strawn/Chicago, Miami, FL, Matthew Solomon, Cleary Gottlieb Steen & Hamilton LLP, Washington, DC, Rishi N. Zutshi, Cleary Gottlieb Steen & Hamilton LLP, New York, NY, Timothy B. Fitzgerald, McNaul Ebel Nawrot & Helgren PLLC, Seattle, WA, for Defendant BAM Trading Services Inc. in 25-CV-22202.

**ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION**

RODOLFO A. RUIZ II, UNITED STATES DISTRICT JUDGE

***1 THIS CAUSE** comes before the Court upon Defendants Binance Holdings, Ltd. ("Binance"), BAM Trading Services Inc. ("BAM"), and Changpeng Zhao's Motion to Compel Arbitration ("Motion"), [ECF No. 137]. On July 31, 2024, the Court entered an Order Granting Defendants' Motion to Compel Arbitration in *Osterer v. BAM Trading Services Inc., et al*. Now before the Court is another Motion to Compel Arbitration in two consolidated cases arising from similar factual allegations. Plaintiffs argue that the inclusion of more Plaintiffs, a new Defendant, and additional statutory causes of action commands the Court to reach a different result than in *Osterer*—but that is not so.

Having carefully considered the Motion, Plaintiffs' Response in Opposition, [ECF No. 138], Defendants' Corrected Reply in Support, [ECF No. 143], the record, and being otherwise fully advised, it is hereby

**ORDERED AND ADJUDGED** that Defendants' Motion, [ECF No. 137], is **GRANTED** for the reasons set forth herein.

## BACKGROUND

### I. *Osterer*

On July 31, 2024, the Court entered an Order Granting Defendants' Motion to Compel Arbitration ("*Osterer* Order") in a related case—*Osterer v. BAM Trading Services Inc., et al.*, No. 23-22083, ECF No. 71. *Osterer* involved a Class Action Complaint against Binance and BAM that asserted claims for conversion, aiding and abetting conversion, and unjust enrichment. *See Osterer*, ECF No. 1. The plaintiff, Michael Osterer, alleged that his and other class members' digital assets were stolen and laundered through Binance accounts due to Defendants' failure to comply with Know Your Customer ("KYC") and Anti-Money Laundering ("AML") protocols. *Id.* at ¶ 1. He further alleged that Defendants "unjustly enriched themselves by collecting significant fees on transactions involving Plaintiff's stolen cryptocurrency." *Id.*

Osterer had maintained an account with U.S.-based cryptocurrency exchange Coinbase, but he did not have an account with Binance or BAM—which are different exchanges. *Osterer*, ECF No. 1 at ¶ 76. He alleged that an unauthorized hacker infiltrated his Coinbase account and stole approximately 8 BTC and 449 ETH from him, which the hacker subsequently routed into several Binance accounts. *Id.* at ¶¶ 77–82. Then, the hacker allegedly withdrew the stolen funds from the Binance accounts and absconded with the money. *Id.*

Defendants Binance and BAM moved to compel arbitration on a theory of equitable estoppel, pointing to the Arbitration Provision[1] in Binance's Terms of Use. *See* Terms, *Osterer*, ECF No. 49-1 at § X.2. The Arbitration Provision required arbitration of any claims "arising in connection with or relating in any way to these Terms or to your relationship with Binance." *Id.* The Terms of Use also included a Delegation Provision,[2] providing that threshold questions as to the jurisdiction, applicability, or scope of the Arbitration Provision are also subject to mandatory arbitration. *Id.*

***2** Osterer countered by arguing that the Terms of Service, and thus the Arbitration and Delegation Provisions included therein, did not apply to him as he was not a party to the underlying agreement. *Osterer*, ECF No. 52. Because a user agrees to the Binance Terms of Use by checking a box while creating their account, Osterer—who never had a Binance account and thus never agreed to the Terms of Use —maintained that he could not be bound by them. *Id.* Osterer further argued that his claims were rooted in the regulatory scheme under which Defendants operated (such as failing to maintain adequate KYC and AML protocols) and thus did not arise from or relate to the Terms of Use. *Id.* at 12–13.

The Court ultimately sided with Defendants and compelled arbitration. *See Osterer*, ECF No. 71. After finding that it had jurisdiction to determine the threshold issues regarding the validity of the Arbitration and Delegation Provisions, the Court held that there was a valid agreement to arbitrate under the doctrine of equitable estoppel. *Id.* The Court pointed out that "a party may compel arbitration against a non-signatory to a contract if the 'plaintiff is relying on a contract to assert its claims and [ ] the scope of the arbitration clause in that contract covers the dispute.' " *Id.* at 6 (quoting *Leidel v. Coinbase, Inc.*, 729 F. App'x 883, 887 (11th Cir. 2018)).

Notably, the Court was unpersuaded by Osterer's attempt to ground his claims in Defendants' failure to comply with KYC and AML rules. *Id.* at 8. Rather, the Court found that Osterer's claims derived from the Terms of Service, which broadly required arbitration of any claims "arising in connection with or relating in any way to these Terms." *Osterer*, ECF No. 71 at 10. Osterer's allegations involved Binance's failure to freeze the deposited funds, which would have "halted the further movement of his stolen property." *Id.* (cleaned up). Thus, his claims had a significant relationship to the Terms of Use because "determining whether Defendants had the ability and obligation to freeze funds will require referencing § II(D)(1) of the Terms." *Id.* The Court also pointed out that Osterer's claims were *not* rooted in Defendants' failure to properly identify customers or trace the origin of deposited funds, as required by KYC and AML protocols. *Id.*

On May 24, 2024, Osterer moved for leave to amend his Complaint. *Osterer*, ECF No. 62. He sought to add Binance founder and CEO Changpeng Zhao as a Defendant. *Id.* at 1. He also sought to add three plaintiffs—Phillip Martin, T.F. (Natalie) Tang, and Yatin Khanna—"who all have been injured by the same wrongful practices of Defendants as

Plaintiff Osterer was." *Id*. Finally, he sought to add a claim for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c)-(d). *Id*. But the Court compelled arbitration on July 31, 2024, and in doing so, denied Osterer's request for leave to amend his Complaint as moot. *Osterer*, ECF No. 71.

**II. *Martin* and *Baratta***

Shortly after the Court entered its Order compelling arbitration in *Osterer*, two cases were filed in the Western District of Washington. The first was filed on August 16, 2024—about two weeks after entry of the *Osterer* Order—and included the new defendant, new plaintiffs, and RICO claim that Osterer had unsuccessfully sought leave to add. Indeed, Plaintiffs Philip Martin, T.F. (Natalie) Tang, and Yatin Khanna ("*Martin* Plaintiffs") filed a Class Action Complaint against Binance, BAM, and Zhao. *Martin*, [ECF No. 1].

Like in *Osterer*, the *Martin* Plaintiffs alleged that their cryptocurrency was stolen from other exchanges and sent to Binance accounts. *Id*. at ¶¶ 19–21. As such, they allege that "Binance.com failed to apply KYC and AML procedures as required by statutory law to detect the lawful ownership of the cryptocurrency properly belonging to Plaintiffs or members of the Class." *Id*. at ¶ 22. The *Martin* Complaint asserts three counts against Defendants: conversion and aiding and abetting conversion (which were also brought in *Osterer*), as well as a RICO claim. *See generally Martin*, [ECF No. 1].

***3** Then, on April 9, 2025, Plaintiffs Charles Baratta, Jason Rappaport, Donald Douty, Thomas Viola, and Hyacinth Ahuruonye ("*Baratta* Plaintiffs") filed a Class Action Complaint against the same three Defendants—Binance, BAM, and Zhao. *Baratta*, [ECF No. 1]. The *Baratta* Plaintiffs similarly allege that their cryptocurrency was stolen and sent to Binance accounts, and they also point to Binance's violations of KYC and AML protocols among other statutory obligations. *See generally id*. The *Baratta* Complaint asserts the same three counts as *Martin*— conversion, aiding and abetting conversion, and RICO—as well as two additional counts for violations of the California Unfair Competition Law ("UCL") and the Massachusetts Consumer Protection Act ("MCPA"). *Id*.

Due to their similarities to *Osterer*, both *Martin* and *Baratta* were transferred to this District from the Western District of Washington. *See Martin*, [ECF Nos. 75, 79]; *Baratta*, [ECF Nos. 14, 18]. In her Order Granting Defendants' Motion to Transfer or Compel Arbitration in *Martin*, Judge Barbara Rothstein held that the parties and issues in *Martin* were "substantially similar" to those in the first-filed *Osterer*. *Martin*, [ECF No. 75] at 4–7. Then, in *Baratta*, the parties filed a Stipulated Motion to Transfer, which Judge Rothstein also granted. *Baratta*, [ECF Nos. 12, 14]. While the cases were originally assigned to other judges in this District, both were promptly transferred to this Court. *Martin*, [ECF No. 79]; *Baratta*, [ECF No. 18]. The Court consolidated the cases on May 22, 2025 for purposes of Defendants' forthcoming Motion to Compel Arbitration. *Martin*, [ECF No. 108]; *Baratta*, [ECF No. 20].

**III. Defendants' Motion to Compel Arbitration**

Defendants filed their Motion to Compel Arbitration on July 25, 2025. *Martin*, [ECF No. 137]. Defendants argue that because *Martin* and *Baratta* are predicated on the same facts and concern the same issues as *Osterer*, Plaintiffs should likewise be compelled to arbitrate their claims. *Id*. at 14. Defendants further argue that Plaintiffs should be judicially estopped from asserting that their claims are different from those in *Osterer*, and that collateral estoppel principles preclude Plaintiffs from relitigating the issue of arbitrability because it was already decided in *Osterer*. *Id*. at 17, 19.

Plaintiffs raise several arguments in their Response. *Martin*, [ECF No. 138]. First, Plaintiffs assert that no valid arbitration agreement exists between Plaintiffs and Defendants—an argument that the Court rejected in *Osterer*. *Id*. at 13–15. Next, in an attempt to distinguish their cases from *Osterer*, Plaintiffs argue that equitable estoppel does not apply because Plaintiffs' claims derive from Defendants' statutory obligations. *Id*. at 15. Finally, Plaintiffs attack the arbitration agreement as unconscionable, illegal, and unenforceable. *See id*. at 17–26.

Defendants' Motion ultimately turns on whether the inclusion of new plaintiffs, a new defendant, and additional claims in *Martin* and *Baratta* necessitate a different result than the one reached in *Osterer* on the question of arbitrability. But it does not, and the *Martin* and *Baratta* Plaintiffs must likewise arbitrate their claims.

## LEGAL STANDARD

The Arbitration Provision is governed by the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA"). Under the FAA, a district court must grant a motion to compel arbitration if it is

satisfied that there is an "issue referable to arbitration under an agreement in writing for such arbitration[.]" *See* 9 U.S.C. § 3; *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) ("[T]he [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration...."). "[A]ny doubts" concerning the arbitrability of a dispute "should be resolved in favor of arbitration[.]" *Moses H Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *see also Attix v. Carrington Mortg. Servs., LLC*, 35 F.4th 1284, 1294 (11th Cir. 2022). Under the FAA, a district court must compel arbitration if (1) a valid written agreement to arbitrate exists, (2) an arbitrable issue exists, and (3) the right to arbitrate has not been waived. *Integrated Sec. Servs. v. Skidata, Inc.*, 609 F. Supp. 2d 1323, 1324 (S.D. Fla. 2009).

## ANALYSIS

### I. As in *Osterer*, Plaintiffs are compelled to arbitrate their claims against Defendants pursuant to Binance's Terms.

***4** Defendants, pointing to this Court's analysis in *Osterer*, assert that a valid arbitration agreement exists and that Defendants did not waive their right to arbitrate, satisfying the first and third elements requiring arbitration. Mot. at 15 (citing *Osterer* Order at 6–7). Defendants also argue that the second element—whether an arbitrable issue exists—is also met because Plaintiffs' claims, which derive from Binance's Terms, are subject to the Terms' Arbitration Provision under principles of equitable estoppel. Despite Plaintiffs' arguments to the contrary, Defendants are correct.

First, Plaintiffs argue that no valid arbitration agreement exists between Plaintiffs and Defendants because "Plaintiffs never created or owned Binance accounts, and therefore never agreed to the Terms."[3] Resp. at 13–14. However, the Court squarely rejected this argument in *Osterer*. *See Osterer* Order at 7–8. Indeed, under the doctrine of equitable estoppel, a party may compel arbitration against a non-signatory to a contract if the "plaintiff is relying on a contract to assert its claims and [ ] the scope of the arbitration clause in that contract covers the dispute." *Leidel*, 729 F. App'x at 887. Here, as in *Osterer*, Plaintiffs did not have Binance accounts and thus never agreed to the Terms. *See Martin*, [ECF No. 1] at ¶¶ 19–21; *Baratta*, [ECF No. 1] at ¶¶ 20–53. But Defendants can nevertheless compel arbitration against the non-signatory Plaintiffs if their claims rely on Binance's Terms and the Terms' arbitration clause covers the dispute. *Leidel*, 729 F. App'x at 887.

Plaintiffs argue that their claims derive from Defendants' statutory obligations, rather than Binance's Terms. Resp. at 15. This same argument, however, was rebuffed in *Osterer*, where the Court concluded that "Defendants' failure to freeze the deposited funds has no connection to Defendant's failure (or statutory obligation) to properly identify customers or trace the origin of deposited funds." *Osterer* Order at 10. Thus, "determining whether Defendants had the ability and obligation to freeze funds will require referencing § II(D)(1) of the Terms." *Id.*

Here, the Court's inquiry centers on whether the *Martin* and *Baratta* Plaintiffs' inclusion of additional statutory claims alters this analysis. It does not. Despite Plaintiffs' addition of claims under RICO, the UCL, and the MCPA, *Martin* and *Baratta* are ultimately predicated on the same factual allegations as *Osterer*. Thus, Plaintiffs' claims likewise arise in connection with or relate to Binance's Terms.

***5** In evaluating whether a plaintiff's claims fall within the scope of an arbitration clause, courts look to the facts alleged in the complaint. *U.S. Nutraceuticals, LLC v. Cyanotech Corp.*, 769 F.3d 1308, 1311 (11th Cir. 2014) (citing *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1208 (11th Cir. 2011)). This analysis involves evaluating the "true thrust" of the complaint, regardless of how the plaintiff "couches its allegations in various terms and theories of action." *Id.* at 1312 (cleaned up). Here, Binance's Terms include a broad Arbitration Provision that covers "any dispute, claim, or controversy between you and Binance (and/or Binance Operators) arising in connection with or relating in any way to these Terms...whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory." *See* Terms at § X.2.[4] Thus, Plaintiffs' claims are subject to arbitration if the factual allegations underlying them arise in connection with or relate to the Terms, regardless of how their legal theory is framed.

The *Martin* Plaintiffs' claims clearly arise in connection with or relate to the Terms in the same way as Osterer's claims. Indeed, the *Martin* Complaint is nearly identical to the Complaint in *Osterer*, as illustrated by the redline Defendants attach to their Motion. *See* [ECF No. 137-1] at 5. To be clear, the *Martin* Plaintiffs attempt to distinguish their case from *Osterer* by removing the unjust enrichment claim and adding allegations that "Plaintiffs are not relying on any contracts or agreements entered into between Binance or BAM Trading (including Binance.US) and any users of

Binance" because "Plaintiffs' claims are based on Binance and CZ, aided and abetted by BAM Trading, violating federal statutory obligations and engaging in the conversion of, and aiding and abetting the conversion of, cryptocurrency properly belonging to Plaintiffs and the members of the Class." *Martin*, [ECF No. 1] ¶ 11.

But these modifications do not change the "true thrust" of the *Martin* Complaint—which remains the same as the *Osterer* Complaint. *U.S. Nutraceuticals, LLC*, 769 F.3d at 1312. Like Osterer, the *Martin* Plaintiffs allege that they were not Binance users who had their cryptocurrency stolen and laundered through Binance—which allowed Defendants to collect fees from transactions involving their stolen cryptocurrency. *Martin*, [ECF No. 1] ¶¶ 19–22, 41. And although the *Martin* Plaintiffs allege a RICO violation in place of unjust enrichment, the present inquiry turns on the underlying factual allegations—*not* the theories of action under which Plaintiffs couch their allegations. *U.S. Nutraceuticals, LLC*, 769 F.3d at 1312. The fact that Osterer sought leave to amend to add the new Plaintiffs, Defendants, and RICO claim to his own Complaint illustrates the lack of daylight between the two cases. *See Osterer*, ECF No. 62. Thus, the Court must likewise compel arbitration in *Martin* for the same reasons as in *Osterer*.

*Baratta* is no different, as it includes similarly situated Plaintiffs suing the same Defendants for the same conduct. *See* [ECF No. 137-1] at 89 (providing a redline comparing the *Baratta* and *Osterer* Complaints). *Baratta* similarly focuses on Defendants' collection of fees from transactions involving non-Binance-user Plaintiffs' stolen cryptocurrency, alleging that "Binance has a strong monetary incentive to encourage, facilitate, and allow as many transactions on its exchange as possible, even transactions involving stolen cryptocurrency." *Baratta*, [ECF No. 1] ¶ 67. Despite its emphasis on KYC and AML procedures, and its three counts for statutory causes of action, the true thrust of the *Baratta* Complaint is nevertheless the same as *Osterer* and *Martin*. As such, the Court must also compel arbitration in *Baratta*.

**II. Plaintiff's additional challenges are without merit because the Terms' Delegation Provision vests the arbitrator with the power to decide threshold issues of arbitrability.**

***6** Plaintiffs also raise three contract-based arguments challenging the arbitration agreement itself. *First*, Plaintiffs argue that the arbitration agreement is both procedurally and substantively unconscionable. Resp. at 17–22. *Second*, Plaintiffs argue that Defendants are seeking to enforce an illegal contract, citing Binance's Plea Agreement with the Department of Justice over separate conduct. *Id*. at 22. *Third*, Plaintiffs argue that the doctrine of effective vindication applies, as the arbitration agreement prohibits Plaintiffs from pursuing their statutory claims under RICO, the UCL, and the MCPA. *Id*. at 22–26. But these arguments are for the arbitrator to resolve, as Binance's Terms—which Plaintiffs are subject to—include a Delegation Provision that vests the arbitrator with the power to decide these threshold issues of arbitrability.

"When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019). "In those circumstances, a court possesses no power to decide the arbitrability issue." *Id*. at 68. Under Eleventh Circuit precedent, courts employ a two-step approach to determine whether an arbitrator should decide threshold issues of arbitrability. First, courts must "consider whether the parties clearly and unmistakably agreed to delegate questions of arbitrability to an arbitrator." *Attix*, 35 F.4th at 1296. Then, courts look at whether the party opposing arbitration specifically challenged the enforceability of the parties' delegation agreement. *Id*. If the parties agreed to delegate questions of arbitrability to an arbitrator *and* the party opposing arbitration has not specifically challenged the enforceability of the delegation agreement, the court must "enforce the parties' delegation agreement as written and compel arbitration." *Id*.

Here, the Terms' Delegation Provision serves as a clear and unmistakable agreement to delegate questions of arbitrability to an arbitrator. The Court has already held that Plaintiffs are subject to Binance's Terms. *See supra* at 8. And the Terms include a Delegation Provision that provides "the arbitrator shall have the exclusive power to rule on his or her own jurisdiction, including without limitation any objections with respect to the existence, scope or validity of the Agreement to Arbitrate, or to the arbitrability of any claim or counterclaim." Terms at § X.2. Indeed, the Delegation Provision here is even more specific than the one in *Attix*, which the Eleventh Circuit deemed to be sufficiently clear and unmistakable. *Attix*, 35 F.4th at 1296–97 ("The arbitrator shall also decide what is subject to arbitration unless prohibited by law. The arbitration will be administered by American Arbitration Association ("AAA") under its Consumer Arbitration Rules,[5] which are available at https://www.adr.org/active-rules.").

Moreover, Plaintiffs' arguments do not specifically challenge the enforceability of the Delegation Provision. Rather, they attack the Arbitration Provision or Binance's Terms at large. A party may resist an arbitration agreement by asserting one of two types of challenges under § 2 of the FAA. The first type "challenges specifically the validity of the agreement to arbitrate," while the second "challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.*, the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." *Rent-A-Ctr, W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010) (citing *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006)). Only the first type of challenge may defeat a delegation provision. *Id.* Thus, "a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate." *Id.* That said, when the challenge to one part of the contract "applies 'equally' to the whole contract and to an arbitration or delegation provision, a court must address that challenge." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 151 (2024).

***7** In *Osterer*, the Court held that it had jurisdiction to determine the validity of the Arbitration and Delegation Provisions. *Osterer* Order at 4. Specifically, the Court noted that by "disputing the very existence" of a valid agreement to arbitrate, plaintiff's challenge applied equally to the Arbitration and Delegation Provisions. *Id.* at 6 (citing *Coinbase, Inc.*, 602 U.S. at 151). A similar challenge to the validity or enforceability of a delegation provision occurred in *Parm v. Nat'l Bank of California, N.A.*, 835 F.3d 1331 (11th Cir. 2016). There, the plaintiff contested the arbitration clause's provision that "any Dispute...will be resolved by Arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules." *Id.* at 1333. The plaintiff argued that "the delegation clause is unenforceable because the arbitration agreement provides no available forum for an arbitrator to decide threshold issues of arbitrability," noting that the Cheyenne River Sioux Tribal Nation does not arbitrate disputes or have arbitration procedures. *Id.* at 1135. Because the plaintiff argued that the designated forum was illusory, she specifically contested the primary agreement to arbitrate *and* the delegation provision. *Id.* at 1337. In other words, plaintiff's challenges in both *Osterer* and *Parm* went directly to whether an arbitration could occur at all, thereby calling into question the entirety of the parties' agreement to arbitrate—and by extension, the parties' delegation agreement as well.

Conversely, general challenges to arbitration provisions that do not specifically implicate delegation provisions are for the arbitrator to resolve. This was the case in *Rent-a-Center*, where the plaintiff contested an arbitration agreement as unconscionable. *Rent-A-Ctr*, 561 U.S. at 73. Particularly, the plaintiff argued that the arbitration provision was one-sided in that it only covered claims that an employee would likely bring against Rent-a-Center, and that it required unconscionable fee-splitting arrangements and limitations on discovery. *Id*. The Supreme Court held that the plaintiff did not specifically contest the delegation provision, which he did not even mention, but instead assailed other provisions of the contract for imposing unconscionable arbitration procedures. *Id.* at 73–74. The Eleventh Circuit reached a similar conclusion *Attix*, where plaintiff's challenge involved whether the arbitration clause covered claims brought pursuant to the Dodd-Frank Act. 35 F.4th at 1307. The Eleventh Circuit held that "[b]y arguing that § 1639c(e)(3) [of the Dodd-Frank Act] gives him the right to prosecute his claims against Carrington in federal court, Attix is disputing the enforceability of the parties' *primary arbitration* agreement." *Id*. (emphasis added). The plaintiff's Dodd-Frank challenge did not concern the *delegation* agreement, which provided that an arbitrator shall determine his or her own jurisdiction to decide what is subject to arbitration. *Id*.

Thus, cases like *Rent-a-Center* and *Attix* concern challenges to the procedures and scope of the arbitration—threshold determinations that were reserved for an arbitrator pursuant to a delegation clause. Neither case addressed the validity or enforceability of the delegation clause at issue. And failure to do so requires a court to treat such a delegation agreement as valid under § 2 of the FAA and enforce it pursuant to §§ 3 and 4. *Attix*, 35 F.4th at 1304.

Here, Plaintiffs' unconscionability, illegality, and effective vindication arguments address the parameters of the arbitration—rather than the foundational question of whether the arbitration can actually take place. For instance, Plaintiffs allege that the arbitration agreement is substantively unconscionable because it exists solely to insulate Defendants from liability, and that it includes other substantively unconscionable mechanisms like the cost-splitting model. Resp. at 19–22. These challenges are analogous to the *Rent-a-Center* plaintiff's unconscionability arguments—which were not specific to the delegation provision and thus for the arbitrator to resolve. *See Rent-A-Ctr*, 561 U.S. at 73–74. And Plaintiffs' effective vindication arguments assert that

the arbitration provision prevents Plaintiffs from pursuing statutory remedies under RICO, the UCL, and the MCPA. Resp. at 22–26. But, as with the Dodd-Frank challenge in *Attix*, this is a clear threshold dispute about what claims can be subject to arbitration. *See Attix*, 35 F.4th 1307. Pursuant to the Terms' Delegation Clause, these are all objections for Plaintiffs to raise before an arbitrator.

***8** Plaintiffs also challenge Binance's Terms on procedural unconscionability and illegality grounds. On procedural unconscionability, Plaintiffs essentially repackage their arguments that they cannot be bound by the Terms because they never agreed to them and lacked notice of the Arbitration Clause included therein. Resp. at 17–19. And on illegality, Plaintiffs argue that Binance's Terms are an unenforceable, illegal contract because of Binance's Plea Agreement with the Department of Justice for "conspiring to conduct, and conducting, an unlicensed [money transmitting business] in violation of federal law." *Id.* at 22.

In general, "[a]rbitration provisions will be upheld as valid unless defeated by fraud, duress, unconscionability, or another 'generally applicable contract defense.' " *Parnell v. CashCall, Inc.*, 804 F.3d 1142, 1146 (11th Cir. 2015) (quoting *Rent-A-Ctr*, 561 U.S. at 67–68). But "[w]hen an arbitration agreement contains a delegation provision and the plaintiff raises a challenge to the contract *as a whole*," review is committed to the arbitrator—unless the plaintiff has " 'challenge[d] the delegation provision *specifically*.' " *Id.* (quoting *Rent-A-Ctr*, 561 U.S. at 72). Here, Plaintiffs raise generally applicable contract defenses against the Terms as a whole, which do not specifically challenge the Delegation Provision. And the challenges Plaintiffs assert here do not "apply equally" to the arbitration agreement *and* the Delegation Provision. *Coinbase, Inc.*, 602 U.S. at 151.

By contrast, the challenge to the Terms in *Osterer* "applied equally" to the Arbitration and Delegation Provisions. *Osterer* Order at 5. There, Osterer maintained that he was not a party to the Terms *at all*, which directly implicated whether he fell under the ambit of the Arbitration *and* Delegation Provisions. *See id.* at 6. Accordingly, Osterer's attack on the Terms as a whole constituted a specific attack on the delegation provision in substance. *See Mod. Perfection, LLC v. Bank of Am., N.A.*, 126 F.4th 235, 243 (4th Cir. 2025) (explaining that while *Coinbase* "does not require that a party challenge *only* the...delegation provision," a party's challenge to the contract as a whole must still *specifically* implicate said provision (quoting *Coinbase, Inc.*, 602 U.S. at 151)).

Here, the Court lacks jurisdiction to hear Plaintiffs' procedural unconscionability and illegality arguments because, while they challenge the Terms as a whole, they do not mention or implicate the Delegation Provision at all. *See Lackie Drug Store, Inc. v. OptumRx, Inc.*, 143 F.4th 985, 998 (8th Cir. 2025) ("[U]nlike the plaintiff in *Coinbase*, Lackie has never challenged the delegation clause."); *Brown v. Santander Consumer USA Inc.*, No. 3:24-CV-00665-NJR, 2025 WL 2280559, at *9 (S.D. Ill. Aug. 8, 2025) (enforcing the delegation clause where plaintiff did not challenge the substance of the arbitration or delegation clauses but rather argued that the underlying contract was void in its entirety). Unlike in *Osterer* and *Parm*, these challenges only address the enforceability of the Terms in a general fashion; they do not challenge the delegation provision directly. Thus, it is within the province of an arbitrator to consider the Terms' overall enforceability—a quintessential threshold inquiry.

## CONCLUSION

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1. The Motion, [ECF No. 137], is **GRANTED**.

2. The *Martin* and *Baratta* Plaintiffs are **COMPELLED** to arbitrate their claims against Defendants pursuant to the Terms.

3. This case is **STAYED** pending the conclusion of arbitration proceedings.

4. The parties shall provide the Court with joint status reports every **sixty (60) days** regarding the status of arbitration proceedings.

***9** 5. The Clerk shall **CLOSE** this case for administrative purposes only. **DONE AND ORDERED** in Miami, Florida, this 16th day of March, 2026.

**All Citations**

Slip Copy, 2026 WL 739476

Footnotes

1 The Arbitration Provision states: "You and Binance Operators agree that, subject to paragraph 1 above, any dispute, claim, or controversy between you and Binance (and/or Binance Operators) arising in connection with or relating in any way to these Terms or to your relationship with Binance (and/or Binance Operators) as a user of Binance Services (whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory, and whether the claims arise during or after the termination of these Terms) will be determined by mandatory final and binding individual (not class) arbitration, except as set forth below under Exceptions to Agreement to Arbitrate."

2 The Delegation Provision states: "You and Binance Operators further agree that the arbitrator shall have the exclusive power to rule on his or her own jurisdiction, including without limitation any objections with respect to the existence, scope or validity of the Agreement to Arbitrate, or to the arbitrability of any claim or counterclaim...."

3 Plaintiffs also maintain that Defendants have not shown a valid arbitration agreement exists between the parties on two evidentiary grounds. First, Plaintiffs assert that "Defendants have not even presented the full arbitration agreement for any date, as they failed to produce the 'Exceptions to Agreement to Arbitrate' section referenced in the arbitration clauses of the Terms." Resp. at 5 n.5. While the Terms make such a reference, it does not appear that the provision was omitted by Defendants. Moreover, the Court considered the Terms as produced in *Osterer* without any concern about their completeness.

Next, Plaintiffs claim that "even though Defendants have produced several agreements from April 20, 2020 to June 24, 2022, they have not established that any of those agreements were in effect with respect to any of the Plaintiffs...who had crypto laundered at Binance during 2023 or 2024." *Id*. at 6–7. But, as Defendants point out in their Reply, they produced a version of the Terms that were in effect in 2023 and 2024 in support of their Motion to Transfer, [ECF No. 68-10], which include the same Arbitration and Delegation Provisions. *See* Reply at 4.

4 Defendants attach various iterations of Binance's Terms to their Motion to Compel Arbitration. *See* [ECF No. 137-1] at 194, 219, 242, 265, 288, 312, 335, 368, 394. Defendants also produced a more recent version of the Terms with their Motion to Transfer. *See* [ECF No. 68-10].

5 The *Attix* court noted that the AAA's Consumer Arbitration Rules state that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." *Attix*, 35 F.4th at 1297–98.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 14

2025 WL 1383369
Only the Westlaw citation is currently available.
United States District Court, W.D. Washington,
at Seattle.

Charles BARATTA, Jason Rappaport, Donald Douty, Thomas Viola, and Hyacinth Ahuruonye, Individually and on Behalf of All Others Similarly Situated, Plaintiffs,
v.
BINANCE HOLDINGS, LTD. d/b/a Binance, BAM Trading Services Inc. d/b/a Binance.US, a Delaware Corporation, and Changpeng Zhao, Defendants.

Case No. 2:25-cv-639-BJR
|
Signed May 13, 2025

**Attorneys and Law Firms**

Lynn Lincoln Sarko, Chris N. Ryder, Derek W. Loeser, Keller Rohrback LLP, Seattle, WA, for Plaintiffs.

Matthew Solomon, Pro Hac Vice, Cleary Gottlieb Steen & Hamilton, Washington, DC, Rishi Zutshi, Pro Hac Vice, Samuel Levander, Pro Hac Vice, Cleary Gottlieb Steen & Hamilton, New York, NY, Timothy B. Fitzgerald, Mcnaul Ebel Nawrot & Helgren PLLC, Seattle, WA, for Defendant BAM Trading Services Inc.

**ORDER GRANTING STIPULATED MOTION TO TRANSFER ACTION TO THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA**

Barbara Jacobs Rothstein, United States District Court Judge

## I. INTRODUCTION

***1** This matter is before the Court on a Stipulated Motion to Transfer This Action to the United States District Court for the Southern District of Florida ("Stipulated Motion to Transfer"), Dkt. No. 12, by Plaintiffs Charles Baratta, Jason Rappaport, Donald Douty, Thomas Viola, and Hyacinth Ahuruonye, and Defendant BAM Trading Services Inc. d/b/a Binance.US (collectively, "Movants").[1] Having fully considered the materials and the relevant legal authorities, the Court grants the Stipulated Motion to Transfer. The reasoning for the Court's decision follows.

## II. BACKGROUND

This case is part of a series of putative class actions. *See* Compl., Dkt. No. 1; *Martin v. Binance Holdings, Ltd.*, No. 2:24-cv-1264 (W.D. Wash. 2024) [hereinafter *Martin*]; *Osterer v. BAM Trading Servs. Inc.*, No. 23-cv-22083 (S.D. Fla. 2023) [hereinafter *Osterer*]; *Kattula v. Coinbase Glob., Inc.*, No. 22-cv-3250 (N.D. Ga. 2022). Plaintiffs in each of these related actions allege claims arising from third-party hackers' theft of cryptocurrency from Coinbase, a cryptocurrency exchange and storage platform, and subsequent use of Binance.com, another cryptocurrency exchange and storage platform, to untraceably exchange the stolen assets.

In the *Martin* action, this Court granted a motion by defendants Binance Holdings, LTD; BAM Trading Services Inc.; and Changpeng Zhao to transfer the action to the Southern District of Florida pursuant to the first-to-file rule.[2] *Martin* Transfer Order, Dkt. No. 75. In light of the *Martin* Transfer Order, Movants assert that the instant action should also be transferred to the Southern District of Florida. Stip. Mot. to Transfer ¶¶ 4-5.

## III. DISCUSSION

A motion to transfer under 28 U.S.C. § 1404(a) requires the movants to show that (1) the action "might have been brought" in the transferee district; and (2) the transfer would be "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a); *Authentify Pat. Co., LLC v. StrikeForce Techs., Inc.*, 39 F. Supp. 3d 1135, 1148 (W.D. Wash. 2014). The purpose of § 1404 is to prevent wasted time, energy, and money and to protect litigants, witnesses, and the public from unnecessary inconvenience and expense. *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964).

As to the first requirement, filings in the related cases are sufficient to establish that this action "might have been brought" in the Southern District of Florida. *See Osterer*

Compl. ¶¶ 14-52, Dkt. No 1; *Osterer* Mot. for Leave to Amend at 1, Dkt. No. 62; 28 U.S.C. § 1404(a); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (providing that courts "may take judicial notice of court filings and other matters of public record"). Therefore, the first § 1404(a) requirement is satisfied.

***2** Regarding the second requirement, Movants acknowledge that transfer of this action to the Southern District of Florida "is appropriate and would serve the interests of judicial economy and efficiency." Stip. Mot. to Transfer ¶ 5. Additionally, this Court's reasoning in *Martin* that transfer of that action was necessary to promote efficiency and avoid duplicative litigation is equally applicable here. *See Martin* Transfer Order at 8-9. Thus, transfer of this action to the Southern District of Florida is in the interest of justice. Accordingly, the second § 1404(a) requirement is also satisfied.

## IV. CONCLUSION

For the foregoing reasons:

1. Movants' Stipulated Motion to Transfer This Action to the United States District Court for the Southern District of Florida (Dkt. No. 12) is GRANTED.

2. This case is hereby TRANSFERRED to the United States District Court for the Southern District of Florida.

## All Citations

Not Reported in Fed. Supp., 2025 WL 1383369

### Footnotes

1 Defendants Binance Holdings, LTD and Changpeng Zhao have not appeared in this action and are not parties to the Stipulated Motion to Transfer.

2 The first-to-file rule is a generally recognized doctrine of federal comity that allows a district court to transfer, stay, or dismiss proceedings if a case with substantially similar issues and parties was previously filed in another district court. *Pacesetter Sys., Inc. v. Medtronic, Inc.*, 678 F.2d 93, 94-95 (9th Cir. 1982); *Alltrade, Inc. v. Uniweld Prods., Inc.*, 946 F.2d 622, 623 (9th Cir. 1991).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.